GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
Kevin J. Nash
125 Park Ave, 12th Floor
New York, NY 10017
Email: Knash@gwfglaw.com

*Proposed Counsel for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

In re:                                                        Chapter 11

Surf 9 LLC,                                             Case No. 25-40078-JMM

                                        Debtor.
-----------------------------------------------------------------x

**DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 FOR
INTERIM AND FINAL APPROVAL OF POST-PETITION FINANCING
AND APPROVAL OF RELATED SUPPLY FINANCING FROM LEEWARDS
AND TO GRANT SUPERPRIORITY LIENS PURSUANT TO 11 U.S.C. § 364(c) AND (d);
AND (II) APPROVAL TO UTILIZE CASH COLLATERAL
AND GRANT ADEQUATE PROTECTION**

        Surf 9 LLC (the "Debtor") the above-captioned debtor and debtor-in-possession, by and

through its undersigned proposed counsel, respectfully submits this motion (the "Motion**"**),

pursuant sections 105(a), 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11

U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-5 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Eastern

District of New York (the "Local Rules") for the entry of an interim order (the "Interim Order")

in the form attached hereto as Exhibit C and ultimately a final order, *inter alia*, (i) authorizing

the Debtor to enter into a senior secured superpriority debtor-in-possession revolving credit

facility and borrow up to $3,180,000, on an interim basis through February 22, 2025, pursuant to

the Budgets attached hereto as Exhibit B, pending a final hearing requested on February 19, 2025

-1-

(as amended, modified and otherwise in effect from time to time, the "DIP Facility") substantially on the terms set forth in the Senior Secured Superpriority Debtor in Possession Loan and Security Agreement between the Debtor and Olden Group LLC ("Lender"), annexed hereto as Exhibit A[1] (as amended, supplemented, or otherwise modified and in effect from time to time, the "DIP Loan and Security Agreement" and, together with any and all schedules thereto and other related documents, notes and agreements entered into in connection with or related to the DIP Facility, including, without limitation, the Budgets attached as Exhibit B, the "DIP Loan Documents"), and approving related supply financing arrangements with Leewards Health and Sports Co., Ltd ("Leewards") on the terms specified below; (ii) authorizing the Debtor to utilize cash collateral and granting adequate protection, and (iii) scheduling a final hearing pursuant to Rules 4001(b) and (c) of the Bankruptcy Rules. In support of this Motion, the Debtor respectively represents as follows:

## Jurisdiction and Venue

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. The statutory predicates for the relief sought herein are sections 105(a), 362, 364 and 507 of Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules.

---

[1]Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Loan and Security Agreement. All obligations under the DIP Loan and Security Agreement, as further described therein, are hereinafter referred to as the "DIP Obligations."

## Background

**A.  Procedural Background**

3.  On January 8, 2025 (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 the Bankruptcy Code.

4.  The Debtor has continued in possession of its properties and is operating and managing its businesses as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.  No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not been appointed in this case.

6.  The Court and interested parties are respectfully referred to the *Declaration of John M. Chenciner Pursuant to Local Bankruptcy Rule 1007-4 and in Support of Debtor's Motion for Use of Cash Collateral and to Obtain Certain Postpetition Financing,* dated January 24, 2025 [Docket Entry No. 15] (the "Rule 1007 Declaration") for a detailed discussion regarding the Debtor, its operations, and the events leading to the filing of the Chapter 11 Case.

**B.  Debtor's Operations**

7.  The Rule 1007 Declaration references and explains the urgent need for the requested DIP Facility.  The Rule 1007 Declaration expressly referenced the operating budgets developed by the Debtor for the month of January 2025, as well as a 10-week budget beginning on February 1, 2025.

8.  As noted, the overriding goal of the DIP financing is to provide liquidity to enable the Debtor to operate in the regular course and complete pending purchase orders issued by the Debtor's prime customer, Costco Wholesale Corporation ("Costco").  A summary of the pending purchase orders are also attached to the Rule 1007 Declaration as

Exhibit C. The Debtor is again attaching the Budgets[2] and summary of purchase orders annexed hereto as Exhibit B for the Court's ready reference.

9.     The Debtor is a well-regarded distributor and wholesaler of watersports products, primarily selling Body Glove IP Holdings, LP ("Body Glove") branded paddleboards pursuant to a written license agreement (the "License").

10.     The Chapter 11 case was filed on an emergency basis to prevent forfeiture or termination of the License in the face of various payment defaults. One of the central goals of the Chapter 11 case will be to cure and reinstate the License and restabilize the Debtor's relationship with Body Glove.

11.     In the interim, the Debtor intends to continue regular operations and is committed to completing purchase orders received largely from Costco. As in the past, the Debtor requires financing to purchase the goods and merchandise necessary to complete the purchase orders, which will be funded by the existing senior Lender, Olden Group LLC, pursuant to the proposed DIP Facility.

12.     To lessen the Debtor's immediate borrowing requirements, one of its major factories, Leewards, has agreed to defer immediate payment pending delivery of the goods and payments from Costco, upon the terms set forth in detail below relating to special supply arrangements. Upon Court approval of such terms, the Debtor's immediate need for postpetition borrowing will be reduced as reflected in the Budgets included in Exhibit B.

---

[2] The Debtor has projected that Costco will withhold approximately $900,000 to account for promotional sales and customer returns of goods purchased. In recent days, Costco has indicated that it may require additional holdbacks, which will impact the projections if same occurs. The matter is still under discussion, and the Debtor will file a supplement to the Budgets, as may be warranted, if the holdbacks increase. Offsetting the holdbacks, the Debtor has negotiated for a release of $600,000 under the Leewards Terms below.

## C. Prepetition Secured Indebtedness

13. As further set forth in the Rule 1007 Declaration, prior to the Petition Date, the Lender entered into, *inter alia*, (i) that certain Loan Purchase Agreement, dated as of December 30, 2024, by and among Garantia, LLC ("Garantia") and Lender (the "Purchase Agreement"), pursuant to which Lender purchased the indebtedness, liens, and rights of Garantia, under that certain Master Purchase Order Financing Agreement, dated August 22, 2014 (as amended, restated or modified, including pursuant to that certain Amended and Restated Loan and Security Agreement, dated as of December 30, 2024, by and between the Debtor and the Lender, the "PO Financing Agreement"), by and between the Debtor and Garantia, as successor in interest to its affiliate Express Trade, Inc. ("Express Trade"); (ii) that certain Assignment and Intercreditor Agreement, dated as of December 30, 2024 (the "Intercreditor Agreement"), among Express Trade, the Debtor, Garantia and the Lender; and (iii) that certain Assignment of Intercreditor Agreement, dated as of December 30, 2024, by and between Garantia and Lender (the "License Intercreditor Assignment" and, together with the Purchase Agreement, PO Financing Agreement, Intercreditor Agreement, and all documents ancillary to or executed or delivered in connection therewith, as amended and restated from time to time, the "Prepetition Financing Agreements").

14. As of the Petition Date, the Debtor owed Lender, in its capacity as prepetition lender under the Prepetition Financing Agreements ("Prepetition Lender"), not less than $27,462,048.47, plus post-purchase/pre-petition advances of $2,980,350 for a total of $30,442,398.47, plus interest accrued from December 27, 2024 through the Petition Date (the "Prepetition Indebtedness"). Pursuant to the Prepetition Financing Agreements, the Prepetition Indebtedness is secured by a blanket perfected lien on all of the Debtor's assets,

including but not limited to all of the Debtor's prepetition inventory, accounts receivable, and all proceeds of the foregoing.

15.     Since 2014, the Debtor's receivables were collected in the ordinary course of its business by Express Trade pursuant to that certain Factoring Agreement, dated August 22, 2014 (the "Factoring Agreement"), by and between the Debtor and Express Trade.  Upon entry into the Loan Purchase Agreement, the Factoring Agreement was amended and restated pursuant to that certain Amended and Restated Factoring Agreement, dated as of December 30, 2024 (as further amended, restated or modified from time to time, the "Collection Factoring Agreement") such that Express Trade continues to provide administrative receivables collection services.

16.     Pursuant to the Collection Factoring Agreement and Prepetition Financing Agreements, although Express Trade continues to perform the administrative service of collecting the Debtor's receivables, it has no recourse to such receivables, which it remits to the Prepetition Lender on account of its first priority liens and security interests in the Debtor's assets, to be applied to reduce the Prepetition Indebtedness.

17.     As of the date hereof, Prepetition Lender has not received any payments towards the Prepetition Indebtedness, but rather has made new loans each time requested by the Debtor as necessary to meet the Debtor's immediate cash needs and avoid irreparable harm, as further detailed below, all of which remain outstanding.

**D.      The Post-Petition Protective Advances and Released Leewards Deposit**

18.     As set forth in the Rule 1007 Declaration, the filing of the Debtor's petition prior to the complete negotiation and documentation of the DIP Facility and related filings was necessary in order to prevent potential termination of the Debtor's primary licensing agreement. However, in the days between the Petition Date and the filing of this Motion, the

Debtor required the immediate influx of funds to preserve the Debtor's supply chain and going concern value.

19.     Therefore, since purchasing the Prepetition Indebtedness, in order to allow the Debtor to pay the factories necessary to fulfill pending orders for Costco, pay payroll, and meet other necessary expenses, the Lender (as Prepetition Lender) advanced new funds in the aggregate principal amount of $5,131,347.33, with $2,980,350 funded prior to the Petition Date, and $2,150,997.33 funded after the Petition Date as a protective advance.  The Debtor is seeking retroactive approval by the Court of these protective advances, in the amount of $2,150,997.33 (the "Protective Advances"), as DIP Obligations under the DIP Facility secured by the liens and claims proposed to be granted pursuant to the Interim Order and Final Order.  Such Protective Advances do not reduce the $10,000,000 maximum amount of the DIP Facility.  The terms of the DIP Facility are much more favorable than the pre-petition borrowings, with reduced interest and accruals.

20.     Separate from the Protective Advances, after the Petition Date but pending entry of the Interim Order, Leewords has agreed to provide the Debtor with additional liquidity. In accordance with the parties' normal course of dealings and pre-petition agreements, Leewards maintains a security deposit from the Debtor in an amount calculated as a percentage of the cost of future goods anticipated to be supplied to the Debtor by Leewards. As reflected on the Debtor's schedules and statement of financial affairs, as of the Petition Date, Leewards held such a deposit in the amount of approximately $1,200,000 (the "Deposit"). However, Leewards is agreeing to release $600,000 to the Debtor to pay budgeted expenses and help cash flow.  This release of funds is an added bonus to the supply of cash.

## E.   Proposed DIP Facility

21.   The DIP Facility will provide the Debtor with up to $10,000,000 in liquidity to fund operations and the administration of the Chapter 11 Case over a 10-week period. The principal terms of the DIP Facility are as follows:[3]

| Borrower: | The Debtor |
|---|---|
| DIP Lender: | Olden Group LLC |
| DIP Facility Amount: | Revolving DIP Loans up to a maximum principal amount of $10,000,000 (exclusive of the Protective Advances), plus interest and Lender's fees and expenses, to be approved on an interim basis pursuant to the Interim Order and on a final basis pursuant to the Final Order. The Debtor may repay all or part of the outstanding DIP Loans, with such repaid amounts eligible to be redrawn under the terms of the Agreement |
| Term: | The Term shall expire on the earliest to occur of (i) the effective date of a plan of reorganization, (ii) consummation of a sale of the Debtor's assets; (iii) the Debtor's seeking, or consenting to, conversion of the Chapter 11 Case to a Chapter 7 case, (iv) conversion to a Chapter 7 case, (v) dismissal of the Chapter 11 Case, (vi) the Debtor's seeking, or consenting to, the dismissal of the Chapter 11 Case, (vii) twelve (12) months from the date of entry of the Interim Order, or (viii) any date on which the DIP Loans are accelerated during the continuance of a Default. Upon expiration of the Term, unless otherwise extended by Lender, all DIP Obligations shall immediately become due and payable. |
| Funding Dates: | Advances may be made when requested by Debtor during the Term absent Default in order to meet the Debtor's cash needs as set forth in the Budgets, subject to the Permitted Weekly Variance. Advance requests are required to be made in writing (which may be by email, copying counsel to the Lender) upon three (3) Business Days' notice of the date upon which the advance is required, in an amount of at least $100,000. Advances of DIP Loans may, in the discretion of Lender, be made for the payment of interest on the DIP Obligations on the date when due |
| Use of Proceeds: | Section 1.01   The Debtor will use the proceeds of the DIP Facility solely to finance expenditures in accordance with the Budgets, |

---

[3] This summary is qualified in its entirety by the actual terms of the DIP Loan Documents.

| | |
|---|---|
| | subject to the Permitted Weekly Variance. |
| **Reimbursement of Lender's Professionals:** | The Debtor will pay all reasonable costs and expenses of Lender in connection with the DIP Obligations, the DIP Loan Documents, the enforcement or preservation of rights and remedies under the DIP Loan Documents, and the prosecution or defense of any investigation, litigation or proceeding arising out of, related to, or in connection with the DIP Obligations, the DIP Loan Documents, and any Interim DIP Order or Final DIP Order. |
| **Interest Rate:** | The non-default interest rate is 5% per annum, and the interest rate applicable upon the occurrence of a Default is 8% per annum. **This rate is much better than the pre-petition interest rate and cannot be replicated anywhere else.** |
| **Collateral:** | The "Collateral" securing the DIP Facility shall include all assets of the Debtor, including (i) all Accounts; (ii) all Inventory; (iii) all Equipment; (iv) all Contract Rights; (v) all Chattel Paper, (vi) Instruments and Documents; (vii) all Intellectual Property; (viii) all General Intangibles; (ix) all Deposit Accounts; (x) all Goods; (xi) all Investment Property; (xii) all Letter of Credit Rights; (xiii) all Commercial Tort Claims; (xiv) to the extent not otherwise included, all rights, proceeds and payments under insurance with respect to any of the Collateral or otherwise of which a Debtor is the beneficiary; (xv) all other goods and real or personal property whether tangible or intangible, including without limitation, all other rights to payment not specified above, and whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, the Debtor and wherever located; (xvi) all books and records relating to any of the foregoing; and (xvii) to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing. |
| **Security and Priorities:** | The DIP Obligations (including Protective Advances) shall be secured by a Lien against the Collateral pursuant to sections 364(d)(2), 364(d)(3) and 364(d)(1) of the Bankruptcy Code, senior to all other Liens, other than the Carve Out.<br><br>Upon entry by the Bankruptcy Court of the Interim DIP Order, Lender's Lien on the Collateral shall be deemed to be a legal, valid and perfected Lien, senior to all other prior Liens other than the Carve Out. |
| **Superpriority Claims:** | The DIP Obligations (including the Protective Advances) shall have the status in the Chapter 11 Case of superpriority administrative expenses under section 364(c)(1) of the Bankruptcy Code. Subject |

| | |
|---|---|
| | only to the Carve Out, such administrative claim shall have priority over all other claims, costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of the Debtor, its estate, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code. |
| **Carve Out:** | The following amounts shall be payable from the DIP Facility and chargeable against the Collateral prior to the liens, security interests and Superpriority Claims that are granted to the Lender (and prior to the adequate protection liens, security interests and superpriority claims granted to the Prepetition Lender in respect of the Prepetition Indebtedness):  (i) the unpaid fees due and payable to the Clerk of the Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, and (ii) the allowed professional fees and expenses of Debtor's counsel, as set forth in the Budget. |
| **Affirmative and Negative Covenants:** | The DIP Loan Documents contain usual and customary affirmative and negative covenants for facilities of this type and nature, including, without limitation:<br><br>(I) <u>affirmative covenants</u> of the Debtor to:<br><br>(a) Satisfy all post-Petition Date obligations as required pursuant to the Bankruptcy Code or by order of the Court;<br><br>(b) Furnish to Lender ten week rolling budget, as updated and extended from time to time during the Term, that covers the projected expenses, disbursements, receipts and revenues each week, and otherwise in form, detail and substance acceptable to Lender (the "<u>Budget</u>").  No payments shall be made by the Debtor that exceed one hundred and fifteen percent (115%) of any line-item amount set forth in the Budget;<br><br>(c) Maintain insurance;<br><br>(d) Keep proper books of record and account;<br><br>(e) Deposit and maintain all proceeds of the DIP Loan in only such accounts permitted by the Financing Orders and other orders of the Court consistent with the Debtor's use after the Petition Date of its existing bank accounts and cash management system, or as otherwise approved in writing by Lender;<br><br>(f) Promptly permit representatives of Lender, upon prior written |

notice to the Debtor, during normal business hours, to visit and inspect records;

(g) Use the proceeds of the DIP Loans solely in accordance with the Budgets subject to the Permitted Variance and upon the terms and conditions set forth in the DIP Loan Documents;

(h) Comply with Laws;.

(i) Furnish to Lender written notice of any Default within five (5) business days after becoming aware of same;

(j) Pay the proceeds of sales of Collateral, issuance of equity securities by the Debtor, or incurrence of debt other than in the ordinary course of business to Lender to be applied to reduce the DIP Obligations;

(k) Execute any and all further documents, financing statements, agreements and instruments, and take all further action that may be required under applicable law, or that the Lender may reasonably request, in order to effectuate the transactions contemplated by the DIP Loan Documents;

(l) Use best efforts to obtain entry of the Financing Orders;

(m) Keep the Lender reasonably informed at all times on all matters related to any sale or auction process of its assets under section 363 of the Bankruptcy Code and the drafting and negotiation of any plan of reorganization;

(n) Pay all taxes, assessments and governmental charges or levies imposed upon the Debtor's property;

(o) Maintain corporate existence;

(p) Maintain and preserve all properties necessary in the conduct of the Debtor's business; and

(q) Conduct any transactions otherwise permitted under the DIP Loan Documents with an affiliate on terms that are fair and reasonable and no less favorable to the Debtor than would be obtained in a comparable arm's length transaction;

(ii) negative covenants of the Debtors not to:

(a) Incur debt except existing debt, the DIP Loans, and pursuant to the Budget;

| | |
|---|---|
| | sell Collateral without the prior written consent of the Lender; |
| | (b) Incur liens except Permitted Liens and the Carve Out; |
| | (c) use proceeds of DIP Loans for any purpose other than as set forth in the Budget, subject ot the Permitted Weekly Variance; |
| | (d) Incur debt pursuant to section 364(c) or (d) or adequate protection obligations except as contemplated by the Financing Orders or agreed to by Lender; |
| | (e) Limit or modify Lender's rights with respect to the DIP Obligations or seek to do so; |
| | (f) sell or transfer Collateral without the prior written consent of Lender except in the ordinary course of business subject to the Budget; |
| | (g) issue or cancel equity securities or membership structure or cause an ownership change without prior written consent of Lender; |
| | (h) Except as permitted under the Final DIP Order, apply for authority to incur any claim, Lien or encumbrance to be *pari passu* with or senior to the liens and claims of Lender or permit any superpriority claim except with respect to the Financing Orders; and |
| | (i) Modify any property or transfer any right, title or interest in any Collateral without Lender's prior written consent. |
| **Conditions Precedent:** | With respect to Lender's obligation to fund the initial advance of DIP Loans, the Bankruptcy Court shall have entered the Interim DIP Order on or before February 19, 2025, and to fund additional advances, the Bankruptcy Court shall have entered the Final DIP Order on or before March 10, 2025. With respect to any advance, no Default shall have occurred, and the Financing Orders shall be in full force and effect. |
| **Adequate Protection:** | As adequate protection for the Debtor's use of assets constituting collateral under the Prepetition Financing Agreements and grant of priming liens, to the extent of any diminution in the value of the Prepetition Lender's claims, the Debtor shall grant pursuant to the Financing Orders superpriority claims and replacement liens on all assets of the Debtor including post-petition inventory and receivables and the proceeds thereof, junior only to the liens of the Lender in respect of the DIP Obligations and subject to the Carve Out, which shall be automatically perfected upon entry of the Financing Orders, as applicable. The Prepetition Lender's rights to credit bid the Prepetition Indebtedness pursuant to Section 363(k) of |

| | |
|---|---|
| | the Bankruptcy Code are preserved. |
| **Section 506(c), 552:** | Except for the Carve Out, no costs or expenses of administration shall be imposed against Lender or any of the Collateral under sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and, subject to entry of the Final DIP Order, the Debtor hereby waives, for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the Lender |
| **Modification of the Automatic Stay:** | Upon an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code and without any application, motion, notice to or order from, the Bankruptcy Court, the Lender shall have, in addition to all other rights of the Lender, the rights and remedies of a secured party under the DIP Loan Documents, the UCC and other applicable laws. |
| **Events of Default:** | Each of the following events shall be an "Event of Default" under the DIP Loan and Security Agreement: |
| | (a) The Debtor shall fail to pay any principal or interest of the DIP Loans or any other DIP Obligation (including any fees or reimbursable amounts) when any such amount becomes due in accordance with the terms hereof, which failure continues for a period of five (5) Business Days after notice thereof from Lender; |
| | (b) The Debtor shall default in the observance or performance of any covenant, agreement, obligation or restriction set forth in this Agreement or any other DIP Loan Document, and such Default shall continue for a period of ten (10) Business Days after notice thereof from Lender; |
| | (c) The Court shall enter an order with respect to the Debtor dismissing the Chapter 11 Case or converting it to a case under chapter 7 of the Bankruptcy Code, or, without the prior written consent of Lender (i) appointing a trustee in the Chapter 11 Case or (ii) appointing a responsible officer or an examiner with enlarged powers relating to the operation of the Debtor's business (beyond those set forth in Section 1106(a)(3) or (4)) under Bankruptcy Code Section 1106(b); |
| | (d) Any of the Financing Orders is reversed, modified, rescinded, amended or vacated or otherwise fails to be in full force and effect; |
| | (e) Any material License for the use of Intellectual Property shall have been deemed terminated or rejected or otherwise fails to be in |

full force and effect, or the Debtor's rights thereunder shall have been materially negatively affected;

(f) A Chapter 11 Plan shall have been filed in the Bankruptcy Case that does not provide for payment in full of the DIP Obligations in accordance with the terms hereof or that is not consented to in writing by the Lender;

(g) The Debtor shall fail to comply with the terms of any of the Financing Orders;

(h) The Bankruptcy Court shall not have entered the Final DIP Order on or before March 10, 2025;

(i) The Debtor shall use the proceeds of the DIP Loans in a manner not provided for herein;

(j) Any challenge in the Bankruptcy Court or other legal proceeding to the validity or enforceability of this Agreement, any Financing Order, the PO Financing Agreement, the Prepetition Indebtedness, any liens or security interests securing the Prepetition Indebtedness or the DIP Obligations or granted as adequate protection in respect of the Prepetition Indebtedness, or the right of the Lender to credit bid its claims in respect of the DIP Obligations or the Prepetition Indebtedness pursuant to Section 363(k) of the Bankruptcy Code;

(k) There occurs any Material Adverse Change, including without limitation, any impairment to the value of Collateral which Lender, in good faith, deems will threaten timely payment in full of the DIP Obligations;

(l) The Court grants any superpriority administrative expense claim or Lien or enters any order granting relief from the automatic stay (if not in favor of Lender) on any assets of the Debtor which have an aggregate value in excess of $50,000, except with the express written consent of Lender;

(m) The Debtor shall assume or reject any material unexpired lease or executory contract without the prior written consent of the Lender.

## F. Compliance with Rule 4001-5 of the Local Rules

22. Rule 4001-5 of the Local Rules requires that certain provisions of the DIP Facility be highlighted and that the Debtor provide justification for the inclusion of such

highlighted provisions. The following provisions of the DIP Facility implicate Local Rule 4001-5 and are justified and necessary in the circumstances of this Chapter 11 Case as set forth below:

- Local Rule 4001-5(a)(i): The Debtor is seeking up to $10 million in revolving loans, to be made available at the discretion of the Lender subject to the Budgets. See §§ 2.1, 2.3.[4] Projected cash needs of the Debtor are set forth in the Budgets. The Debtor is seeking to use cash collateral consisting of inventory and related receivables and the proceeds thereof constituting cash collateral of Lender in respect of the Prepetition Indebtedness.

- Local Rule 4001-5(a)(ii): This Motion describes all material conditions to closing and borrowing, including the Budget provisions.

- Local Rule 4001-5(a)(iii): The DIP Loans accrue interest at a rate of 5% per annum and a Default rate of 8% per annum. See § 3.2. DIP Obligations include reasonable costs and expenses incurred by Lender in connection with the DIP Facility, including legal fees. See § 2.8. There are no other fees.

- Local Rule 4001-5(a)(iv): The DIP Obligations are to be secured on a senior secured basis and Superpriority Claims are to be granted to the Lender. See § 4.1. As set forth in this Motion, the Debtor seeks adequate protection to be granted in respect of the Prepetition Indebtedness in the form of replacement liens on all assets of the Debtor with priority over all liens and claims other than the liens and claims granted in respect of the DIP Obligations (and subject to the Carve Out).

- Local Rule 4001-5(a)(v): A Carve Out (defined herein) is provided for under Section 4.1 of the DIP Loan and Security Agreement.

- Local Rule 4001-5(a)(vi): As set forth in the Motion, the Debtor is seeking adequate protection in respect of the Prepetition Indebtedness in the form of superpriority claims and replacement liens on all assets, including post-petition assets, junior only to the liens and superpriority claims granted to the Lender in respect of the DIP Obligations (subject to the Carve Out).

- Local Rule 4001-5(a)(vii): The DIP Loan Documents to not contemplate any roll-up provision which applies the proceeds of postpetition financing to pay prepetition debt or which otherwise has the effect of converting prepetition debt to postpetition debt.

- Local Rule 4001-5(a)(viii): None.

---

[4] Section references herein refer to sections of the DIP Loan and Security Agreement.

- Local Rule 4001-5(a)(ix): The proceeds of the DIP Loans shall be used by the Debtor only for the sole purpose of financing expenditures in accordance with the Budget, subject to the Permitted Weekly Variance. See § 2.4.

- Local Rule 4001-5(a)(x): Defaults include, without limitation, any challenge to the validity or enforceability of the Prepetition Indebtedness and related liens or security interests or credit bidding rights, and the grant of relief from stay on assets with an aggregate value in excess of $50,000 without Lender consent. See § 9.1. Expiration of the Term occurs upon, *inter alia*, the Debtor seeking, or consenting to, conversion or dismissal of the Chapter 11 Case. See "Term" definition.

- Local Rule 4001-5(a)(xi): Debtor shall not cause an ownership change without Lender consent. See § 6.7.

- Local Rule 4001-5(a)(xii) – (a)(xvi): None.

## G.  Leewards Supply Financing Arrangements

23.    In addition to the DIP Facility, the Debtor requires Leewards' support to provide specific goods to fulfill existing and future orders. To that end, subject to approval by the Court as part of the DIP Facility, the Debtor has negotiated the following terms with Leewards to provide greater liquidity on more favorable terms, which have also been agreed to by the Lender (the "Leewards Terms"):

| Payment Terms | Leewards shall continue to supply product to Debtor upon Debtor's request consistent with past practice, with payment therefor due within one (1) week after payment by Costco for its purchase of such goods |
| --- | --- |
| Deposit | $600,000 immediately released to Debtor for use as working capital Remainder of Deposit retained by Leeward as security |
| Interest | 8% per annum on the purchase price of goods supplied commencing on the date such purchase price is due and remains unpaid |
| Liens and Superpriority Claim | Leewards shall have an automatically perfected senior priority lien and security interest, senior to the liens of the Lender, solely on all goods delivered upon request of the Debtor, together with all proceeds and documentation thereof (the "Leewards Collateral") up to the cost value of such goods (the "Leewards Liens"). Leewards shall have a superpriority claim against the Debtor, senior to the Superpriority Claim of the Lender, up to the value of the Leewards Collateral, for any amounts due and payable that remain unpaid. |

| | |
|---|---|
| Reporting | Debtor shall provide Leewards with periodic reporting of shipment and receipt of payment for the sale of products supplied by Leewards |
| Default and Remedies | Upon Debtor's failure to cause any amounts to be paid to Leewards as and when required, Leewards may, upon notice to Debtor and Lender, draw down upon the Deposit retained by Leewards in such amount, without further order of the Court.<br><br>In the event the Deposit is insufficient to satisfy the amount due, Leewards may: (1) without further order of the Court, immediately stop shipments (except of any products for which Leewards has already received payment or for which the Debor has already placed orders and the payment due date therefor has not yet occurred); and/or (2) after notice to Debtor and Lender, seek relief from the Court to take all actions necessary to foreclose upon the Leewards Liens |
| Plan of Reorganization | Any plan of reorganization filed by Debtor shall propose that at least 65% of the pre-petition amounts due Leewards shall be paid on or before December 31, 2025 and that the remaining 35% of the pre-petition amounts due Leewards shall be paid on or before June 30, 2026 |
| Right of First Refusal | Leewards shall have the right of first refusal to produce or accept purchase orders offered to similarly situated suppliers for the 2026 season |
| Successor Case | The Court's order approving these Leewards Terms shall direct that these terms shall be binding upon any subsequently appointed bankruptcy trustee in the Chapter 11 Case or any successor case. |

24. The Lender has agreed, and the DIP Loan Documents provide, that the liens and claims set forth above may be granted and that the proceeds of Leewards Collateral be paid to Leewards without default under the DIP Loan Documents, subject to approval by the Court in the Financing Orders. As set forth in the Budget, the extended payment terms provided by Leewards, together with the funds under the DIP Facility, are necessary to ensure the Debtor has the liquidity required to sustainably finance its operations. The Debtor therefore seeks approval of the Leewards Terms in conjunction with the DIP Facility in the Interim Order and Final Order.

## Requested Relief and Basis Therefor

25.     The Motion requests, pursuant to sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code and Rules 4001 and 9014 of the Bankruptcy Rules, entry of the proposed Interim Order, attached as Exhibit C hereto, authorizing on an interim basis, pending entry of a final order to be filed with the Court, (i) borrowing, with priority over administrative expenses (other than the Carve Out) and secured by first priority liens and security interests on all property of the Debtor's estate, in an aggregate principal amount of up to $3,180,000 through February 22, 2025, upon the terms of the DIP Loan and Security Agreement attached as Exhibit A and subject to the Budgets attached as Exhibit B; (ii) the use of the Prepetition Lender's cash collateral in respect of the Prepetition Indebtedness and the granting of adequate protection as set forth herein; (iii) approval of the Leewards Terms; (iv) modifying the automatic stay as set forth herein; and (v) scheduling and giving notice of the final hearing on the motion, which the Debtor has requested be held on February 19, 2025 (the "Final Hearing").

## A.     The DIP Facility and Leewards Terms Should be Approved

26.     The credit provided under the DIP Facility and the additional liquidity afforded the Debtor pursuant to the Leewards Terms will enable the Debtor to continue to operate its businesses in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of its estate for the benefit of all parties in interest. The availability of credit under the DIP Facility will provide confidence to the Debtor's suppliers, creditors, distributors, purchasers and other counterparties that will enable and encourage them to continue their relationships with the Debtor.

27.     Bankruptcy Code section 364(c) provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy

Code section 503(b)(1), the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in Bankruptcy Code section 503(b) or 507(b); (ii) secured by a lien on property of the estate that is not otherwise subject to a lien; or (iii) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

28.     The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). See also In re Crouse Group Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987). Courts have applied the following three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code:

> (i)      the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;
>
> (ii)     the credit transaction is necessary to preserve the assets of the estate; and
>
> (iii)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

Crouse Group, 71 B.R. at 549. As discussed below, each of these elements is satisfied.

a.      **The Debtor is Unable to Obtain Unsecured Credit**

29.     A debtor need only demonstrate that, notwithstanding its good faith efforts, credit was unavailable without the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code. See Bray v. Shenandoah Fed. Savs. & Loan Assoc. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re 495 Central Park Ave. Corp., 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (noting that, although "the debtor must

make an effort to obtain credit" it does not need "to seek alternate financing from every possible lender.").

30. The Debtor has the product and business model to successfully reorganize and emerge from bankruptcy a profitable enterprise but requires the liquidity to make purchases of inventory to fulfill existing and future purchase orders and fund the administration of the Chapter 11 Case. The Debtor's factoring facility terminated in August 2024, prompting the Debtor to seek out alternative sources of interim financing. While the Debtor was able to obtain limited unsecured advances from third parties, ultimately the Lender, as the Debtor's prepetition secured creditor, was the only party positioned to support the Debtor's long term financing needs by providing the immediate Protective Advances and the level of availability under the DIP Facility that the Debtor's business and customer orders require. Given the $10 million availability and favorable 5% interest with no fee terms, together with the liquidity provided by the Leewards Terms which the Lender has agreed to subordinate its position on the Leewards Collateral to accommodate, the Debtor cannot hope to match this financing in the marketplace. The Lender would be unwilling to provide the DIP Facility to the Debtor in the absence of the liens and claims proposed to be granted herein.

31. Accordingly, the Debtor has determined that the DIP Facility offered by the Lender, including the supplemental liquidity afforded by Leewards, is the best and only option for post-petition financing.

    **b.**    **The Transactions Under the DIP Loan Documents and Leewards Terms are Necessary to Preserve the Estate**

32. Without access to post-petition financing, the Debtor would be without the liquidity necessary to purchase inventory and fulfill existing and future orders, fund payroll, and pay other necessary operating expenses. The Debtor's inability to operate as a going

concern would significantly impair the value of the Debtor's assets to the detriment of all creditors of the Debtor's estate.

33.     In order to reduce the Debtor's funding needs to a serviceable level during the Debtor's liquidity crunch, the Debtor also requires the payment concessions offered by Leeward.  The Debtor therefore believes that the request to grant liens on inventory supplied by Leewards and the proceeds thereof and to make payments to Leewards therefrom as such receivables are collected is necessary and appropriate and in the best interests of all parties in interest, and the DIP Lender has consented to the use of its collateral for this purpose.

34.     By obtaining the DIP Facility, the Debtor will be in a position to generate net receivables projected to aggregate approximately $26 million, as set forth in the six-month projections of sales annexed to the Rule 1007 Declaration as Exhibit A.  It is vital to the success of the Debtor's reorganization that the Debtor obtain approval to immediately access the DIP Facility, on an interim and final basis, as contemplated by the DIP Loan and Security Agreement.

c.     **The Terms of the DIP Facility and the Leewards Terms are Fair and Reasonable**

35.     The Debtor believes in the exercise of its business judgment that the DIP Facility and Leewards Terms are fair and reasonable and that approval thereof is in the best interests of the Debtor and its estate.  Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.  _See, e.g.,_ Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994), rev'd on other grounds by 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables facility and asset-based facility based upon prudent business

judgment of the debtor); <u>In re Barbara K Enters., Inc.</u>, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); <u>see</u> <u>also</u> <u>Funding Sys. Asset Mgmt. Corp. v. Key Capital Corp. (In re Funding Sys. Asset Mgmt. Corp.)</u>, 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); <u>In re Curlew Valley Assocs.</u>, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

36.     The terms and conditions of the DIP Loan and Security Agreement and the Leewards Terms were negotiated among the parties and their counsel in good faith and at arms' length.  The terms of the DIP Facility, including 5% interest and no fees, are fair and reasonable under the circumstances, particularly given the current economic and lending environment.  As discussed above, the Debtor made efforts to obtain credit on the most favorable terms available. The Debtor obtained more favorable terms in the DIP Facility than under its prepetition secured financing arrangements. Likewise, the Leewards Terms allow the Debtor significant breathing room for payment of necessary quality products unavailable in the current market. Upon approval of the relief set forth herein, pursuant to the Budget, the Debtor anticipates a positive cash flow after surviving the immediate liquidity crunch in May or June.

37.     For all of the reasons set forth herein, the Debtor respectfully asserts that it has satisfied the requirements of sections 364(c) and (d) of the Bankruptcy Code and requests that the Court enter the Interim Order and Final Order, as applicable, approving the DIP Facility and Leewards Terms.

**B.      The Debtor Should Be Authorized to Use Cash Collateral, and The Proposed Adequate Protection Should be Granted**

38.     A chapter 11 debtor may not use cash collateral unless "(A) each entity that has an interest in such collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Courts repeatedly have recognized that use of cash collateral is appropriate where necessary to preserve a debtor's ability to reorganize and thus maximize the value of an estate for all interested parties. See In re Realty Southwest Assoc., 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); H.R. Rep. No. 595, 95th Cong., 1st Sess. 344 (1977); 3 Collier on Bankruptcy 363.03 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006); see also In re Dynaco, 162 B.R. 389, 396; In re Stein, 19 B.R. 458 (Bania. E.D. Pa. 1982). Bankruptcy Rule 4001(b) governs authorization for utilizing cash collateral and provides that the court may permit the debtor-in-possession to use cash collateral prior to a final hearing to the extent necessary to avoid immediate and irreparable harm. After a final hearing held on at least fourteen days' notice, the court may grant the authority to use cash collateral on a permanent basis and other permanent relief requested herein. Fed. Bankr. R. 4001(b).

39.     The Debtor requires the use of cash collateral for working capital, to pay the Debtor's vendors and suppliers in the ordinary course of its business, and to fund the Chapter 11 Case. In the absence of the continued authorization to use cash collateral, the Debtor's

ability to continue operating would cease, causing immediate and irreparable harm to the Debtor's estate, creditors, employees, and all other stakeholders by virtue of the loss of significant going-concern value.

40.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as periodic cash payments, additional liens, replacement liens, or administrative claims, what constitutes adequate protection is decided on a case-by-case basis. See, e.g., In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact specific inquiry . . . left to the vagaries of each case"); In re Realty Sw. Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted). The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession. See 495 Cent. Park, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization."); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); In re Hubbard Power & Light, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

41.     The adequate protection to be provided to the Lender in respect of the Prepetition Indebtedness appropriately safeguards the Lender against the diminution in the value of its claims from the Debtor's use of property constituting the Lender's cash collateral, as well as from the priming of the Lender's liens by the DIP Facility and the liens and assignment of proceeds to be paid to Leewards.  The Lender is providing new money through the DIP Facility solely for operational expenses, not requiring the use of any such proceeds to repay any portion of the Prepetition Indebtedness. On the basis of the adequate protection and other relief proposed herein, the Lender has consented to the Debtor's use of cash collateral and the claims and liens provided for herein in respect of the DIP Facility. Accordingly, the Debtor submits that the adequate protection is fair and reasonable and satisfies the requirements of the Bankruptcy Code.

**C.      The Lender Should Be Deemed a Good Faith Lenders under Section 364(e)**

42.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

43.     As explained in detail herein and in the 1007 Declaration, the DIP Facility is a result of the Debtor's reasonable and informed determination that the Lender offered the

most favorable terms under the circumstances. All negotiations of the DIP Facility were conducted in good faith and at arms' length. The terms and conditions of the DIP Facility are fair and reasonable, including no fees and below market interest rates. The DIP Lender has extended credit in good faith in support of the Debtor's business needs, without requiring repayment of any such amounts or any Prepetition Indebtedness, in reliance upon the ultimate approval of the reasonable protections requested herein. The proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, and in accordance with the Financing Orders and DIP Documents. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all the protections afforded by that section.

D.          **The Automatic Stay Should Be Modified on a Limited Basis**

44.          The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to grant the security interests, liens, and Superpriority Claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens. The Debtor further requests that the automatic stay be vacated and modified, to the extent necessary, to permit the Lender to exercise, at its election upon the occurrence of an Event of Default, all rights and remedies under the DIP Loan Documents or the Interim Order or Final Order, as applicable, as well as to give effect to the Leewards Terms.

45.          Stay modifications of this kind have become standard features of post-petition debtor financing facilities and, in the Debtor's business judgment, are reasonable and fair under the present circumstances. See, e.g., In re The Great Atl. & Pac. Tea Co., Inc., Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) [Docket No. 88]; In re Chassix Holdings, Inc., Case No. 15-10578 (MW) (Bankr. S.D.N.Y. Mar. 13, 2015) [Docket No. 67];

In re The Reader's Digest Assoc., Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) [Docket No. 26]; In re Lear Corp., Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 7, 2009) [Docket No. 59].

**E.      Interim Approval Should Be Granted**

46.      Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief, courts generally apply the same business judgment standard applicable to other business decisions. *See In re Ames Dep't Stores*, 115 B.R. at 36

47.      Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtor requests that the Court conduct an expedited preliminary hearing on this Motion and authorize the borrowing under the DIP Facility and entry into the Leewards Terms on an interim basis pursuant to the Budget, and schedule a Final Hearing for approval of the DIP Facility on a final basis.

48.      As stated in the 1007 Declaration, the Debtor has an urgent and immediate need for cash to continue to operate. The Debtor relies upon purchase order financing in order to obtain the inventory necessary to fulfill its customers' purchase orders. Prepetition and after the Petition Date, the Debtor has relied upon advances from the Lender for the funds necessary to operate its business on an ongoing basis. The Lender has already extended over $5 million, including post-petition Protective Advances of over $2 million, for the purchase of inventory necessary to fulfill pending orders and to pay payroll and other necessary expenses to prevent the shutdown of the supply lines and customer support

necessary for the Debtor's operations. Leewards has extended an additional $600,000 not otherwise available prepetition.

49. Absent authorization from the Court to use cash collateral and obtain secured credit, as well as to remit proceeds to Leewards for extended payment terms, as requested herein, on an interim basis pending the Final Hearing, the Debtor will be unable to meet its ongoing obligations and will be immediately and irreparably harmed. Conversely, with the liquidity provided by the DIP Facility and the concessions of Leeward, the Debtor's projections show positive receivables in excess of $25 million and positive net profits in the next few months.

50. The availability of interim loans under the DIP Loan and Security Agreement and the other relief requested herein will provide necessary assurance of the Debtor's ability to meet its near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtor's business, to the detriment of all parties in interest. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtor and facilitating its reorganization efforts.

## Notice

51. The Debtor shall serve notice of this Motion on the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee for the Eastern District of New York; (ii) counsel to the Lender; (iii) counsel to Express Trade; (iv) counsel to Leewards; (v) the holders of the 20 largest unsecured claims; (vi) the Office of the United States Attorney for the Eastern District of New York; (vii) the Internal Revenue Service; and (viii) all known holders of liens, encumbrances, or security interests in the Collateral; and (ix) all other parties required to receive service under Bankruptcy Rule 2002.

The Debtor submits that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

**No Prior Request**

52.     No prior request for the relief sought in this Motion has been made to this or any other court.

**Conclusion**

**WHEREFORE**, the Debtor respectfully requests entry of the Interim Order and, following the Final Hearing, entry of a Final Order to be filed with the Court, together with such other and further relief as the Court deems appropriate.

Dated:   January 30, 2025
      New York, NY

GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP

By: _/s/ DRAFT_
Kevin Nash
Goldberg Weprin Finkel Goldstein LLP
125 Park Ave
New York, NY 10017
Email: Knash@gwfglaw.com

**Exhibit A**

**(DIP Loan and Security Agreement)**

**Exhibit B**

**(Budget)**

**Exhibit C**

**(Proposed Interim Order)**