# SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT

THIS SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT (this "Agreement"), dated January 31, 2025, is entered into between Surf 9 LLC, a Florida limited liability company, as debtor and debtor-in-possession (the "Debtor"), and Olden Group LLC, a New York limited liability company ("Lender").

W I T N E S S E T H :

WHEREAS, on January 8, 2025 (the "Petition Date") the Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"); and

WHEREAS, pursuant to that certain Loan Purchase Agreement, dated as of December 30, 2024 (the "Purchase Agreement"), by and among Garantia, LLC, a New York limited liability company ("Garantia"), and Lender, Lender purchased any and all of Garantia's right, title and interest in and to that certain Master Purchase Order Financing Agreement, dated August 22, 2014, by and between the Debtor and Garantia, as successor in interest to Express (as amended, restated or modified, the "PO Financing Agreement") and all indebtedness thereunder in an amount of not less than $27,462,048.47, plus advances made by Lender in its capacity as prepetition lender thereunder prior to the Petition Date in an amount of not less than $2,980,350.00, plus interest accrued from December 27, 2024 through the Petition Date (the "Prepetition Indebtedness") and all related agreements and all liens and security interests granted pursuant thereto, as further set forth in the Purchase Agreement;

WHEREAS, the Prepetition Indebtedness is secured by a blanket lien on substantially all of the Debtor's assets pursuant to the terms of the Purchase Agreement and PO Financing Agreement;

WHEREAS, after the Petition Date, at the Debtor's request, Lender advanced an aggregate amount of not less than $2,150,997.33 (the "Protective Advances") to Debtor to fund the cost of inventory, payroll and other essential expenses necessary to allow the Debtor to fulfill customer purchase orders, continue operations and avoid immediate and irreparable harm. The Prepetition Indebtedness and Protective Advances have not been repaid by the Debtor and remain outstanding;

WHEREAS, the Debtor has requested, and Lender has agreed, upon the terms and subject to the conditions set forth herein, including approval by the Bankruptcy Court, that the Lender provide a senior secured superpriority revolving loan facility in an aggregate principal amount not to exceed Ten Million Dollars ($10,000,000), exclusive of the Protective Advances (the "Maximum Amount");

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

# SECTION 1.   DEFINITIONS.

1.1   <u>Defined Terms</u>.   Certain terms are defined in the text of this Agreement. In addition, as used in this Agreement, the following terms shall have the following meanings:

"Accounts" means any "account," as such term is defined in the applicable section of the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all accounts receivable, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments) now owned or hereafter received or acquired by or belonging or owing to the Debtor (including, without limitation, under any trade name, style or division thereof) whether arising out of goods sold or services rendered by a Debtor or from any other transaction, whether or not the same involves the sale of goods or services by a Debtor (including, without limitation, any such obligation which may be characterized as an account or contract right under the UCC) and all of the Debtor's rights in, to and under all purchase orders or receipts now owned or hereafter acquired by it for goods or services, and all of the Debtor's rights to any goods represented by any of the foregoing (including, without limitation, unpaid seller's rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), and all moneys due or to become due to a Debtor under all purchase orders and contracts for the sale of goods or the performance of services or both by the Debtor (whether or not yet earned by performance on the part of such Debtor or in connection with any other transaction), now in existence or hereafter occurring, including, without limitation, the right to receive the proceeds of said purchase orders and contracts, and all collateral security and guarantees of any kind given by any person with respect to any of the foregoing.

"Agreement" means this Senior Secured Superpriority Debtor in Possession Loan and Security Agreement, as it may hereafter be amended, modified, extended, restated or supplemented from time to time.

"Bankruptcy Code" shall have the meaning assigned to such term in the recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as may be amended from time to time.

"Bankruptcy Court" shall have the meaning assigned to such term in the recitals.

"Budget" means the budget annexed hereto as Exhibit A, and any subsequent budget for use of the proceeds of the DIP Loans that may be agreed upon by the Debtor and the Lender, in writing.

"Business Day" means any day on which banks are required to be open in New York City.

"Carve Out" has the meaning given to it in the Interim DIP Order or the Final DIP Order, as applicable.

"Chapter 11 Case" means the voluntary bankruptcy case of the Debtor.

"Collateral" shall have the meaning assigned to such term in <u>Section 3.3</u> hereof.

"Chattel Paper, Instruments and Documents" shall mean any and all chattel paper, instruments, securities, bills of lading, warehouse receipts and other documents of title (all as defined in the applicable UCC sections, if any) and documents of any kind now existing or hereafter acquired or arising, whether arising from or related to the disposition of Inventory, Equipment, or otherwise, and all rights now or hereafter existing in and to all security agreements, leases, securities, letters of credit and other contracts, documents and instruments securing or otherwise relating to any such accounts, rights or instruments (all as defined in the applicable UCC sections, if any).

"Commercial Tort Claims" shall have the meaning given to it in the applicable section of the UCC.

"Contract Rights" means any and all of the Debtor's right, title, estate and interest in and to all contracts, contract rights, undertakings, or other agreements, whether written or oral (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which a Debtor may now or hereafter have any right, title or interest, including, without limitation, with respect to an Account, any agreement relating to the terms of payment or the terms of performance thereof.

"Debtor Representative" shall mean John Chenciner, Marshall Crosby, or any agent of the Debtor designated by any of the foregoing to act as an "Authorized Representative" hereunder.

"Default" means any event specified in <u>Section 6</u> hereof, whether or not any requirement in connection with such event for the giving of notice, lapse of time, or happening of any further condition has been satisfied.

"Default Rate" has the meaning given such term in Section 3.2(b) hereof.

"Deposit Accounts" shall mean any and all "deposit accounts," as such term is defined in the applicable section of the UCC, now owned or hereafter acquired by the Debtor. On the Petition Date, the Debtor will close all deposit accounts in existence on the date hereof and transfer all amounts held in such deposit accounts and all Loan proceeds hereunder to a debtor-in-possession deposit account.

"DIP Loans" has the meaning given such term in <u>Section 2.1</u> hereof.

"DIP Loan Documents" means, collectively, this Agreement, any Interim DIP Order, the Final DIP Order, any Budget, all documents ancillary to or executed in connection with the foregoing, and each other order of the Court and each other instrument, document or agreement required to be delivered pursuant to this Agreement or any order of the Court or delivered in connection with this Agreement, including without limitation any documents or instruments executed or delivered by any Entity from time to time as security for the DIP Obligations, in each case as amended, modified, waived, substituted, replaced or extended from time to time.

"DIP Obligations" means all present and future obligations, indebtedness and liabilities, and all renewals and extensions of all or any part thereof, of the Debtor to Lender arising from, by virtue of, or pursuant to this Agreement, any DIP Loan Documents, and any and all renewals and extensions thereof or any part thereof, or future amendments thereto, plus the Protective Advances, all interest accruing on all or any part of the foregoing, and the reasonable attorneys' fees incurred by Lender for the negotiation and preparation of this Agreement and consummation of the same, execution of waivers, amendments and consents, and in connection with the enforcement or the collection of all or any part of the foregoing, and reasonable attorneys' fees incurred by Lender in connection with the enforcement or the collection of all or any part of the foregoing during the continuance of a Default, in each case whether such obligations, indebtedness and liabilities are direct, indirect, fixed, contingent, joint, several or joint and several.

"Entity" means an individual, partnership, limited liability company, joint venture, corporation, trust, Governmental Unit, unincorporated organization, and government, or any department, agency, or political subdivision thereof.

"Equipment" means any "equipment," as such term is defined in the applicable section of the UCC, now owned or hereafter acquired by a Debtor and used by a Debtor at any location.

"Final DIP Order" means the order entered by the Court upon sufficient notice as required by Bankruptcy Rule 4001, granting the protections set forth in Section 2.10, and otherwise in form and substance satisfactory to Lender, in its sole discretion, approving the DIP Loans and the DIP Loan Documents.

"GAAP" means generally accepted accounting principles applied on a consistent basis.

"General Intangibles" shall have the meaning given to it in the applicable section of the UCC.

"Goods" shall have the meaning given to it in the applicable section of the UCC.

"Governmental Unit" means any state, commonwealth, federal, foreign, territorial, or other court or government body, subdivision, agency, department, commission, board, bureau, or instrumentality of a governmental body.

"Highest Lawful Rate" means, at the particular time in question, the maximum rate of interest which, under applicable law, Lender is then permitted to charge on the DIP Obligations. If the maximum rate of interest which, under applicable law, Lender is permitted to charge on the DIP Obligations shall change after the date hereof, the Highest Lawful Rate shall be increased or decreased automatically, as the case may be, from time to time as of the effective time of each change in the Highest Lawful Rate without notice to the Debtor.

"Instruments" means any "instrument," as such term is defined in the applicable section of the UCC now owned or hereafter acquired by a Debtor, including, without limitation, all notes, certificated securities, and other evidences of indebtedness.

"Intellectual Property" means any and all of the Debtor's right, title, estate and interest, whether now existing or hereafter acquired, in and to: all corporate and other business records in any form, including in form for use by computers or data processing machines; royalties, patents, inventions, copyrights, trademarks, trade secrets and other confidential information relating to the business of the Debtor, including, without limitation, each and every kind of know-how practiced by the Debtor and their employees; licenses, customer lists, advertising, marks, designs, logos, slogans, indicia, corporate names, company names, business names, fictitious business names, trade names, trade styles and registrations issued with respect to any of the foregoing used or useful in the Debtor's business or in which the Debtor otherwise has an interest; and all other information of any kind or character, whether or not reduced in writing, with respect to the conduct by the Debtor of its businesses not generally known by the public; and the goodwill associated with the foregoing.

"Interim DIP Order" means any order entered by the Court with respect to the DIP Loans prior to the Final DIP Order, containing the provisions set forth in Section 2.10 hereof and otherwise in form and substance satisfactory to Lender, in its sole discretion, approving the DIP Loans and the DIP Loan Documents.

"Inventory" means any "inventory," as such term is defined in the applicable section of the UCC, wherever located, now or hereafter owned or acquired by, a Debtor and, in any event, shall include, without limitation, all inventory, merchandise, goods and other personal property which are held by or on behalf of a Debtor for sale or lease or are furnished or are to be furnished under a contract of service or which constitute raw materials, work in process or materials used or consumed or to be used or consumed in the Debtor's businesses, or the processing, packaging, promotion, delivery or shipping of the same, and all finished goods, whether or not such inventory is listed on any schedules, assignments or reports furnished to the Lender from time to time and whether or not the same is in transit or in the constructive, actual or exclusive occupancy or possession of a Debtor or is held by a Debtor or by others for a Debtor's account, including, without limitation, all goods covered by purchase orders and contracts with suppliers and all goods billed and held by suppliers and all inventory which may be located on premises of a Debtor or of any carriers, forwarding agents, truckers, warehousemen, vendors, selling agents or other persons.

"Investment Property" shall have the meaning given to it in the applicable section of the UCC.

"Law" means any constitution, statute, law, ordinance, regulation, rule, order, writ, injunction, or decree of any Governmental Unit.

"Lender" shall have the meaning assigned to such term in the preamble.

"Letter of Credit Rights" shall have the meaning given to it in the applicable section of the UCC.

"License" means any license, permit, consent, certificate of need, authorization, certification, accreditation, franchise, approval, or grant of rights by, or any filing or registration with, any Governmental Unit or other Entity necessary for or useful in the ownership or

operation of the Debtor's businesses or Property, including Licenses for the use of Intellectual Property.

"Lien" means any properly filed and perfected mortgage, pledge, security interest, encumbrance, lien, or charge of any kind, including without limitation any agreement to give or not to give any of the foregoing, any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement or other similar form of public notice under the Laws of any jurisdiction (except for the filing of a financing statement or notice in connection with an operating lease).

"Litigation" means any proceeding, claim, lawsuit, arbitration, and/or investigation conducted by or before any Governmental Unit or arbitrator, including without limitation proceedings, claims, lawsuits, and/or investigations under or pursuant to any environmental, occupational, safety and health, antitrust, unfair competition, securities, Tax, or other Law, or under or pursuant to any contract, agreement, or other instrument.

"Material Adverse Change" means any circumstance or event that, by itself or aggregated together with all other events or circumstances, is or would reasonably be expected to materially and adversely affect the validity or enforceability of or any rights of Lender under the DIP Loan Documents, the Interim DIP Order, or the Final DIP Order.

"Maximum Amount" shall have the meaning assigned to such term in the recitals.

"Permitted Liens" means:

(a)     any Lien in favor of Lender pursuant to the DIP Loan Documents, the Interim DIP Order, or the Final DIP Order to secure the DIP Obligations hereunder;

(b)     Liens existing on the Petition Date or any replacement liens and any adequate protection Liens granted pursuant to a Financing Order, provided, however, that, pursuant to Section 364(d)(1), the Final DIP Order shall provide that all such Liens shall be rendered junior and second to the liens and security interests granted Lender herein;

(c)     Liens for Taxes, assessments, governmental charges, levies or claims but only so long as no foreclosure, restraint, sale or similar proceedings have been commenced with respect thereto;

(d)     Liens of carriers, warehousemen, mechanics, laborers and materialmen and other similar Liens incurred in the ordinary course of business for sums not yet due or being contested in good faith, if such reserve or appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(e)     Liens on Inventory and the proceeds thereof granted to a consignor or supplier of such Inventory pursuant to a consignment agreement or supply agreement acceptable to the Lender in its sole discretion and approved by the Bankruptcy Court; and

(f)     Liens incurred in the ordinary course of business after the Petition Date in connection with worker's compensation, unemployment insurance or similar legislation.

"Permitted Weekly Variance" shall mean a weekly variance of up to fifteen percent (15%) with respect to any one category of the Budget, provided that the overall weekly disbursements do not exceed one hundred fifteen percent (115%) of the budgeted expenses of the Debtor for such period, as reflected in the Budget.

"Petition Date" shall have the meaning assigned to such term in the recitals.

"Proceeds" means "proceeds," as such term is defined in the applicable section of the UCC and, in any event, shall include, without limitation, (i) any and all accounts, chattel paper, deposit accounts, instruments, cash and other proceeds, payable to a Debtor from time to time in respect of the Collateral, (ii) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to a Debtor from time to time with respect to any of the Collateral, (iii) any and all payments (in any form whatsoever) made or due and payable to a Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority), (iv) any claim of a Debtor against third parties (a) for past, present or future infringement of any patent or patent license or (b) for past, present or future infringement or dilution of any trademark or trademark license or for injury to the goodwill associated with any trademark, trademark registration or trademark licensed under any trademark license, (v) any recoveries by a Debtor against third parties with respect to any litigation or dispute concerning any of the Collateral including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, Collateral, and (vi) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral. In addition, the term "Proceeds" shall include, without limitation, all accounts, chattel paper, deposit accounts, instruments, equipment, inventory, consumer goods, farm products, documents, general intangibles and other proceeds which arise from the sale, lease, transfer or other use or disposition of any kind of Collateral or proceeds and all proceeds of any type described above acquired with cash proceeds.

"Property" means all types of real, personal, tangible, intangible, or mixed property, whether owned or hereafter acquired in fee simple or leased or licensed by the Debtor.

"Protective Advances" has the meaning assigned to such term in the recitals.

"Superpriority Claims" means any debt or other claim arising out of credit obtained or debt incurred by the Debtor having priority in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code.

"Term" shall mean the period commencing on the date hereof and ending on the earliest to occur of (i) the effective date of a plan of reorganization of the Debtor confirmed by the Bankruptcy Court, (ii) consummation of a sale or other disposition of a material portion of the Debtor's assets pursuant to 11 U.S.C. 363 or otherwise, (iii) the Debtor's seeking, or consenting to, conversion of the Chapter 11 Case to a proceeding under Chapter 7 of the Bankruptcy Code, (iv) conversion of the Chapter 11 Case to a proceeding under Chapter 7 of the Bankruptcy Code, (v) dismissal of the Chapter 11 Case, (vi) the Debtor's seeking, or consenting to, the dismissal of the Chapter 11 Case, (vii) the date that is twelve (12) months from the date of entry of the

Interim Order, or (viii) any date on which the DIP Loans are accelerated during the continuance of a Default.

"Tax" or "Taxes" means all taxes, assessments, imposts, fees, or other charges at any time imposed by any Laws or Governmental Unit.

"UCC" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; provided, however, in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of the Lender's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions related to such provisions.

    1.2    Other Definitional Provisions.

    (a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in any other DIP Loan Document or any certificate or other document made or delivered pursuant hereto.

    (b)    As used herein, in any other DIP Loan Document and in any certificate or other document made or delivered pursuant hereto, accounting terms relating to the Debtor not defined herein, and accounting terms partly defined herein to the extent not defined, shall have the respective meanings given to them under GAAP.

    (c)    The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.

    (d)    The meanings given to terms defined herein shall be equally applicable to the singular and plural forms of such terms.

SECTION 2.  DIP LOAN.

    2.1    DIP Loans.  Subject to and in accordance with the terms and conditions of this Agreement, including, without limitation, the entry of the Interim DIP Order or Final DIP Order, as applicable, Lender may in its sole and absolute discretion make advances to the Debtor in an aggregate principal amount at any time outstanding of up to the Maximum Amount (the "DIP Loans"). The Debtor may, from time to time, repay all or part of the outstanding DIP Loans, with such repaid amounts eligible to be redrawn under the terms of the Agreement.

    2.2    Term.  Upon expiration of the Term, unless otherwise extended by Lender, in its sole discretion, all DIP Obligations shall immediately become due and payable in full to Lender.

    2.3    Advance Procedures.  Provided that no Event of Default shall have occurred and no circumstances exist that, with the giving of notice and/or the passage of time, would constitute an Event of Default, advances of DIP Loans may be made if and when requested in

writing on behalf of the Debtor by a Debtor Representative from time to time during the Term in order to meet the Debtor's cash needs as set forth in the Budget, subject to the Permitted Weekly Variance. The Debtor Representative will be required to make any requests for advances from the Lender in writing (which may be by email, copying counsel to the Lender), upon three (3) business days' notice of the date upon which the advance is required. Unless otherwise permitted by Lender, each advance requested shall be in an amount of at least $100,000. Advances of DIP Loans may, in the discretion of Lender, be made for the payment of interest on the DIP Obligations on the date when due.

2.4    Use of Proceeds.  The proceeds of the DIP Loans shall be used by the Debtor only for the sole purpose of financing expenditures in accordance with the Budget, subject to the Permitted Weekly Variance

2.5    Collateral.  As provided in the Final DIP Order, all indebtedness, including DIP Obligations under this Agreement and the DIP Loan Documents shall be secured by automatically perfected security interests and Liens granted pursuant to Section 364(c) and 364(d)(1) of the Bankruptcy Code, with first priority on all Collateral.

2.6    Application of Payments.  Payment on the DIP Obligations shall be applied first to accrued interest, if any, second, to fees and expenses of the Lender, and third, to the outstanding DIP Obligations.

2.7    Monthly Interest Payments.  The Debtor shall pay monthly interest payments to the Lender in accordance with the terms of this Agreement, as computed in accordance with Section 3.2 of this Agreement.

2.8    Fees and Expenses.  The Debtor shall pay for all reasonable costs and expenses incurred by Lender in connection with the DIP Obligations, the DIP Loan Documents, the enforcement or preservation of rights and remedies under the DIP Loan Documents, and the prosecution or defense of any investigation, litigation or proceeding arising out of, related to, or in connection with the DIP Obligations, this Agreement, the other DIP Loan Documents, and any Interim DIP Order or Final DIP Order.

2.9    Prepayment.  The unpaid principal amount of the DIP Loan, together with any and all accrued interest thereon through the date of prepayment, may be voluntarily paid or prepaid, in whole or in part, without premium or penalty.

2.10    Interim and Final DIP Orders.  For the avoidance of doubt and without waiving any discretion or other rights reserved to the Lender in this Agreement, unless otherwise consented to by the Lender through written authorization, the Interim DIP Order and Final DIP Order will not be acceptable to the Lender and no DIP Loans shall be funded by the Lender, unless the same grants, inter alia, (a) first priority, valid, perfected, priming liens on all of the Collateral to secure repayment of the DIP Obligations, as contemplated in Section 3.3 hereof, and (b) a Superpriority Claim against the Debtor in an amount no less than the DIP Obligations; and (c) adequate protection pursuant to Sections 361 and 364 of the Bankruptcy Code of the claims and Liens in respect of the Prepetition Indebtedness, including Superpriority Claims and replacement Liens on all post-petition assets of the Debtor, subject only to the claims and Liens

of the DIP Lender in respect of the DIP Obligations granted under the DIP Loan Documents and subject to the Carve Out.

SECTION 3.   GENERAL PROVISIONS APPLICABLE TO DIP LOAN.

3.1   No Note.  This Agreement, the DIP Loan Documents, any Interim DIP Orders and the Final DIP Order fully evidence and memorialize the DIP Obligations, and no other instrument is required to evidence such DIP Obligations.

3.2   Interest Rates.

(a)   Interest Rate.  Subject to Section 3.2.(b) hereof, the DIP Obligations shall bear interest at a rate of five (5%) percent per annum.

(b)   Default Rate.  Upon the occurrence and during the continuance of a Default, the DIP Obligations shall bear interest at a rate equal to eight (8%) percent per annum (the "Default Rate").

(c)   Computation of Interest.  Interest on the Advances shall be computed on the basis of a year of 365 days and the actual days elapsed (including the first day but excluding the last day) occurring in the period for which such interest is payable, unless such calculation would exceed the Highest Lawful Rate, in which case interest shall be calculated on the per annum.

3.3   Collateral.

(a)   Grant of Security Interest.  As security for the prompt and complete payment and performance when due of all the Secured Obligations, the Debtor each hereby assign, convey, mortgage, pledge, hypothecate and transfer to the Lender, and hereby grant to Lender a security interest in and continuing lien on, all of the Debtor's right, title and interest in, to and under all real, personal, tangible, intangible, or mixed property, whether now owned or hereafter acquired in fee simple or leased by a Debtor, including, without limitation all bank accounts, deposits and cash, wherever located, and all proceeds (including the proceeds of any asset sales to third parties), products, rents, revenues and profits of any of the foregoing, all causes of action (except causes of action of Debtor's estate under Chapter 5 of the Bankruptcy Code), and including, but not limited to the following, in each case now owned or at any time hereafter acquired by the a Debtor or in which a Debtor now has or at any time in the future may acquire any right, title or interest (collectively, the "Collateral"), which assignment, conveyance, mortgage, pledge, hypothecation, transfer and security interest shall be subject to the priorities set forth herein and in the Interim DIP Order and, when applicable, the Final DIP Order:

(b)   all Accounts;

(c)   all Inventory;

(d)   all Equipment;

(e)   all Contract Rights;

(f)     all Chattel Paper, Instruments and Documents;

(g)     all Intellectual Property;

(h)     all General Intangibles;

(i)     all Deposit Accounts;

(j)     all Goods;

(k)     all Investment Property;

(l)     all Letter of Credit Rights;

(m)     all Commercial Tort Claims;

(n)     to the extent not otherwise included, all rights, proceeds and payments under insurance with respect to any of the Collateral or otherwise of which a Debtor is the beneficiary;

(o)     all other goods and real or personal property whether tangible or intangible, including without limitation, all other rights to payment not specified above, and whether now or hereafter owned or existing, leased or licensed, consigned by or to, or acquired by, the Debtor and wherever located;

(p)     all books and records relating to any of the foregoing; and

(q)     to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing.

(r)     <u>Perfection; Duty of Care</u>.   Until all the DIP Obligations have been paid and performed in full, the Debtor shall take all actions reasonably requested by Lender or otherwise required to perfect, maintain and protect Lender's security interest in the Collateral, including delivering to Lender all Collateral in which Lender's security interest may be perfected by possession together with such endorsements as Lender may request.  The Debtor shall pay when due all Tax assessments and other charges imposed upon or with respect to the Collateral or any part thereof, first arising after the Petition Date, unless such assessments and charges are subject to a good faith contest adequately reserved for by the Debtor.  If the Debtor shall fail to pay such amounts, upon prior written notice to the Debtor, Lender may do so and add the amount of such payment to the principal owed under the DIP Loan.  Upon prior written notice to the Debtor, Lender may discharge any Lien that is not a Permitted Lien, pay for any insurance, or take any other action the Debtor are required to take pursuant to this Agreement but have not taken, and add the amount of such payment to the principal owed under the DIP Loan.

SECTION 4.   CERTAIN BANKRUPTCY MATTERS; SUPERPRIORITY OF OBLIGATIONS.

4.1     Except to the extent otherwise provided in any Interim DIP Order or the Final DIP Order and agreed to by Lender, the Debtor hereby agrees as follows:

(a)     The DIP Obligations shall be secured by a Lien against the Collateral pursuant to sections 364(d)(2), 364(d)(3) and 364(d)(1) of the Bankruptcy Code, senior to all other Liens, other than the Carve Out.

(b)     The DIP Obligations shall have the status in the Chapter 11 Case of superpriority administrative expenses under section 364(c)(1) of the Bankruptcy Code.  Subject to the Carve Out, such administrative claim shall have priority over all other claims, costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of the Debtor, its estate, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code.

(c)     The Lender's Lien on the Collateral under sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, for the benefit of the Lender, and the superpriority administrative claim under section 364(c)(1) of the Bankruptcy Code afforded the DIP Obligations shall be subject only to the Carve Out.

(d)     Subject to the provisions of this Section 4.1(d), the Debtor shall be permitted to pay in accordance with the Budget as the same may become due and payable (i) administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code incurred in the ordinary course of the Debtor's businesses and (ii) compensation and reimbursement of expenses to professionals allowed or otherwise permitted to be paid by the Bankruptcy Court and payable under sections 330 and 331 of the Bankruptcy Code.  Except for the Carve Out, no costs or expenses of administration shall be imposed against Lender or any of the Collateral under sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and, subject to entry of the Final DIP Order, the Debtor hereby waives, for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the Lender.

(e)     On behalf of itself and its estate, and for so long as any DIP Obligation shall be outstanding, the Debtor hereby irrevocably waives any right, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Lien securing the DIP Obligations or to approve a claim of equal or greater priority than the DIP Obligations (other than the Carve Out).

(f)     Upon the maturity (whether by acceleration or otherwise) of any of the DIP Obligations under this Agreement, the Lender shall be entitled to immediate payment of such DIP Obligations without further application to, or order of, the Bankruptcy Court.

(g)     Upon entry by the Bankruptcy Court of the Interim DIP Order, Lender's Lien on the Collateral shall be deemed to be a legal, valid and perfected Lien, senior to all other prior Liens other than the Carve Out.  Upon the entry by the Bankruptcy Court of the Interim DIP Order, no additional filings or recordings shall be necessary to perfect the security interests

created in the Collateral under this Agreement and Lender shall not be required to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Lien on the Collateral granted pursuant to this Agreement or any other DIP Loan Document.

(h)     The Debtor agrees that unless the DIP Obligations are paid and otherwise satisfied in full on or before confirmation of the Debtor's plan under chapter 11 of the Bankruptcy Code ("Chapter 11 Plan") (i) the DIP Obligations hereunder shall not be discharged by the entry of an order confirming a Chapter 11 Plan in the Chapter 11 Case (and the Debtor, pursuant to section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to Lender pursuant to the Interim DIP Order and Final DIP Order shall not be affected in any manner by the entry of an order confirming a Chapter 11 Plan in the Chapter 11 Case.

SECTION 5.     AFFIRMATIVE COVENANTS.

The Debtor hereby agrees that, so long as any portion of the DIP Loans or other DIP Obligations remain outstanding and unpaid or any other amount is owing to Lender hereunder, the Debtor shall:

5.1     Payment of Post-Petition Obligations.    Pay, discharge or otherwise satisfy all post-Petition Date obligations and liabilities as required pursuant to the Bankruptcy Code or by order of the Court.

5.2     Budget.  On the date hereof, the Debtor shall provide the Lender with a ten (10) week rolling budget, as updated and extended from time to time during the Term, that covers the projected expenses, disbursements, receipts and revenues each week, and otherwise in form, detail and substance acceptable to the Lender (and as supplemented, the "Budget"). The Debtor covenants and agrees that, subject to prior written consent of the Lender, no payments shall be made by the Debtor that exceed one hundred and fifteen percent (115%) of any line-item amount set forth in the Budget.  The initial Budget is attached hereto as Exhibit A.  The Budget shall be rolled, supplemented and provided to Lender for its approval weekly hereafter.

5.3     Insurance.

(a)     Maintain with financially sound and reputable insurance companies, insurance on all Collateral in at least such amounts and with only such deductibles as are usually maintained, and against at least such risks as are usually insured against in the same general area, by companies engaged in the same or a similar business; and furnish to Lender, at its request, full information as to the insurance carried.

(b)     Lender shall be named as an additional insured and as its interests may appear on all insurance maintained by the Debtor.

5.4     Books and Records.  Keep proper books of record and account in which complete and correct entries are made of all dealings and transactions in relation to the Debtor's business and activities and which permit financial statements to be prepared in conformity with GAAP and all applicable Laws.

5.5     Cash Accounts.   Deposit and maintain all proceeds of the DIP Loans and Protective Advances in only such accounts permitted by the Financing Orders and other orders of the Court consistent with the Debtor's use after the Petition Date of its existing bank accounts and cash management system, or as otherwise approved in writing by Lender.

5.6     Visits and Inspections.   Promptly permit representatives of Lender, upon prior written notice to the Debtor, from time to time during normal business hours to (a) visit and inspect any Property of the Debtor as often as Lender shall reasonably deem advisable, (b) make such inspections of, abstracts from and copies of the Debtor's books and records as Lender shall deem advisable, and (c) discuss with the Debtor's members, officers and the auditors of the Debtor, the Debtor's business, operations, assets, liabilities, financial positions, results of operations and business prospects as often as Lender shall deem advisable.

5.7     Use of Proceeds.   Use the proceeds of the DIP Loans solely in accordance with the Budget (as applicable) subject to the Permitted Weekly Variance and upon the terms and conditions set forth in this Agreement.

5.8     Compliance with Law.   Comply in all material respects with all requirements of Law applicable to the Debtor's Property (including but not limited to requirements relating to the environment or hazardous or toxic substances) and the Bankruptcy Code.

5.9     Notice of Default.  Furnish to Lender written notice of any Default within five (5) business days after Debtor becomes aware of the occurrence of such Default.

5.10     Payment of Proceeds.  Pay the proceeds of (i) the sale or other disposition of Collateral (other than a sale of Collateral in the ordinary course of business), (ii) any issuance of equity securities by the Debtor, or (iii) any incurrence of indebtedness (other than in the ordinary course of business), to the Lender to be applied to reduce the DIP Obligations.

5.11     Future Cooperation.  Execute any and all further documents, financing statements, agreements and instruments, and take all further action that may be required under applicable law, or that the Lender may reasonably request, in order to effectuate the transactions contemplated by the DIP Loan Documents.

5.12     Approval of DIP Loan Documents.   Use best efforts to obtain an order of the Court authorizing the Debtor to enter into the DIP Loan Documents and the sale related motions.

5.13     Plan or 363 Sale.  Keep the Lender reasonably informed at all times on all matters related to any sale or auction process of its assets under section 363 of the Bankruptcy Code and the drafting and negotiation of any plan of reorganization.

5.14     Taxes, etc. Pay all taxes, assessments and governmental charges or levies imposed upon the Debtor's Property.

5.15     Corporate Existence.   Except with the prior written consent of the Lender, preserve and maintain, its existence, legal structure, legal name, rights (charter and statutory), permits, licenses, approvals, privileges and franchises.

5.16    Affiliate Transactions. Conduct all transactions otherwise permitted under the DIP Loan Documents with an affiliate on terms that are fair and reasonable and no less favorable to the Debtor than they would obtain in a comparable arm's length transaction.

SECTION 6.    NEGATIVE COVENANTS.

The Debtor hereby agree that each shall not, directly or indirectly so long as the DIP Loans or any of the DIP Obligations remain outstanding and unpaid, or any other amount is owing to Lender hereunder (it being understood that each of the permitted exceptions to each of the covenants in this Section 6 is in addition to, and not overlapping with, any other of such permitted exceptions except to the extent expressly provided):

6.1    Debt.  Create, incur, assume or suffer to exist any debt, except:

(a)    Debt in existence on the date of this Agreement;

(b)    the DIP Loans and this Agreement; and

(c)    Debt incurred by the Debtor within the Budget, subject to the Permitted Weekly Variance, in the ordinary course of business in the form of accounts payable and accrued expenses.

6.2    Limitation on Liens.  Create, incur, assume or suffer to exist any Lien upon any of the Debtor's Property, assets, income or profits, whether now owned or hereafter acquired, except Permitted Liens and the Carve Out.

6.3    Use of Proceeds.  Use the proceeds of the DIP Loans for any purpose not set forth in each respective Budget or in Section 2.3 hereof, subject to the Permitted Weekly Variance.

6.4    DIP Financing.  Incur, or apply to the Court for authority to incur, or suffer to exist, any (i) indebtedness having the priority afforded by Section 364(c) or (d) of the Bankruptcy Code (including any Superpriority Claims) other than the financing provided for under this Agreement and the other DIP Loan Documents or (ii) obligation to make adequate protection payments, or otherwise provide adequate protection, other than as contemplated hereunder by the Interim Order or the Final DIP Order or in the Budget, or as may be required by order of the Court in connection with the provision of adequate protection to holders of Permitted Liens whose collateral is sold or otherwise disposed of or as to which Lender consents.

6.5    Alteration of Rights of Lender.  Limit, affect or modify, or apply to the Court to limit, affect or modify, any of Lender's rights with respect to the DIP Obligations, including rights with respect to the Collateral and the priority thereof, except with the prior written consent of Lender.

6.6    Sales.  The Debtor will not sell, assign, transfer, hypothecate or encumber all or any portion of the Collateral without the prior written consent of the Lender.  For the avoidance of doubt, while no Default exists, Collateral consisting of cash accounts receivable and inventory created in the ordinary course of business may be used by the Debtor in the ordinary course of businesses, subject to the terms hereof and the Budget.

6.7    Existing Ownership.  The Debtor shall not, without the prior express written consent of the Lender, (a) issue any equity securities, (b) cancel any authorized equity securities or (c) alter existing membership structure, or take any other action, so as to further or cause an ownership change within the meaning of Section 382 of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code").  Upon acquiring information or knowledge that any person or entity may take action to become a "5% shareholder" within the meaning of Section 382 of the Internal Revenue Code, the Debtor shall immediately advise the Lender of such circumstance, shall consult in good faith with the Lender as to any commercially reasonable actions that the Debtor may take to prevent such person or entity becoming a "5% shareholder," and shall take any and all such commercially reasonable actions mutually agreed upon with the Lender.

6.8    Chapter 11 Claims.  Except as permitted under the Final DIP Order, apply to the Court for the authority to incur, create, assume, suffer or permit any claim, Lien or encumbrance (other than Permitted Liens and the Carve Out) against the Debtor, or any of its assets in the Chapter 11 Case to be *pari passu* with, or senior to, the Liens and claims of Lender granted and arising under the DIP Loan Documents.

6.9    Superpriority Administrative Expense.  Create or permit to exist any Superpriority Claims (other than with respect to this Agreement or the Financing Orders and other than the Carve Out).

6.10    Alterations.  Undertake any alterations or modifications to the Debtor's Property without Lender's prior written consent.

6.11    Transfers.  Transfer, directly or indirectly, any of their right, title or interest in, to or under any of the Collateral without the Lender's prior written consent.

SECTION 7.  **REPRESENTATIONS AND WARRANTIES OF DEBTOR**.  The Debtor hereby represents and warrants to the best of its knowledge and belief to the Lender that:

7.1    Organization and Good Standing.  The Debtor is a limited liability company duly organized, validly existing and in good standing under the laws of the states of Florida and in each state in which it does business and has all requisite power and authority to carry on its business as now conducted.

7.2    Authorization.  The execution, delivery and performance by the Debtor of this Agreement is within the Debtor's power; has been duly authorized by all necessary and proper action and, on the date of initial funding of the DIP Loans hereunder and on each subsequent funding date, will be authorized by a Financing Order from the Bankruptcy Court which remains in full force and effect and has not been amended, stayed or vacated; will not violate any applicable law; does not require the consent or approval of any governmental authority or any other person (other than entry of the applicable Financing Order) and except such consents as have been obtained.

7.3    Non-contravention of Other Instruments.  The Debtor is not in violation or default (i) of any provision of its operating agreement, certificate of formation or other organizational documents or (ii) of any post-petition instrument, judgment, order, writ, decree or contract to

which it is a party or by which it is bound. The execution and delivery of the DIP Loan Documents, the performance of the Debtor's obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby will not result in any violation or be in conflict with or constitute, with or without the passage of time and giving of notice, a default under any such operating agreement, certificate of formation or other organizational documents, post-petition instrument, judgment, order, writ, decree or contract or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Debtor or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization, or approval applicable to the Debtor, their businesses or operation or any of its assets or Property.

7.4    Title to Collateral.  Except as expressly provided otherwise in this Agreement, all assets and Property of the Debtor are included in the Collateral.  The Debtor owns and holds good and marketable title to its assets and Property, including, without limitation, intangible property and contract rights, constituting the Collateral. There are no Liens, claims or encumbrances on the Collateral other than the Permitted Liens and there are no licenses, assignments or other transfers of rights or interests, covenants not to sue, or adverse claims, with respect to such property and any maintenance fees with respect to such property are current.

7.5    Budget.  The Budget represents the anticipated expenses, disbursements, receipts and revenues of the Debtor.

SECTION 8.    CONDITIONS PRECEDENT.  The Lender's obligation to make the initial and each successive advance of DIP Loans hereunder is subject to the satisfaction of the following conditions precedent:

8.1    Interim and Final Orders.  (a) With respect to Lender's obligation to fund the initial advance of DIP Loans, the Bankruptcy Court shall have entered the Interim DIP Order in the form of Exhibit B attached hereto, with such modifications as are acceptable to Lender in its sole and absolute discretion, on or before February 19, 2025; (b) with respect to Lender's obligation to fund additional advances hereunder, the Bankruptcy Court shall have entered the Final DIP Order, with such modifications as are acceptable to Lender in its sole and absolute discretion, on or before March 10, 2025; and (c) the Bankruptcy Court shall have entered such other financing orders requested by the Lender authorizing the Debtor to enter into this Agreement and to perform all of its obligations set forth therein, all in form and substance satisfactory to Lender (collectively, the "Financing Orders").  Such Financing Orders shall be in full force and effect and shall not have been amended, stayed or vacated.

8.2    DIP Loan Documents.  The Debtor shall have executed and delivered to the Lender the DIP Loan Documents, all in form and substance satisfactory to the Lender.

8.3    No Defaults.  No Default shall have occurred and be continuing or would result from the proposed borrowing.

8.4    Representations and Warranties.  All representations and warranties contained herein shall be true and correct in all material respects on and as of the date of each request for

an advance in accordance with <u>Section 2.3</u> hereof (or if such representation or warranty expressly relates to an earlier date, then as of such earlier date).

SECTION 9.   DEFAULT.

9.1    <u>Default</u>.  The occurrence of any of the following shall constitute a Default:

(a)    The Debtor shall fail to pay any principal or interest of the DIP Loans or any other DIP Obligation (including any fees or reimbursable amounts) when any such amount becomes due in accordance with the terms hereof, which failure continues for a period of five (5) Business Days after notice thereof from Lender; or

(b)    The Debtor shall default in the observance or performance of any covenant, agreement, obligation or restriction set forth in this Agreement or any other DIP Loan Document, and such Default shall continue for a period of ten (10) Business Days after notice thereof from Lender; or

(c)    The Court shall enter an order with respect to the Debtor dismissing the Chapter 11 Case or converting it to a case under chapter 7 of the Bankruptcy Code, or, without the prior written consent of Lender (i) appointing a trustee in the Chapter 11 Case or (ii) appointing a responsible officer or an examiner with enlarged powers relating to the operation of the Debtor's business (beyond those set forth in Section 1106(a)(3) or (4)) under Bankruptcy Code Section 1106(b); or

(d)    Any of the Financing Orders is reversed, modified, rescinded, amended or vacated or otherwise fails to be in full force and effect; or

(e)    Any material License for the use of Intellectual Property shall have been deemed terminated or rejected or otherwise fails to be in full force and effect, or the Debtor's rights thereunder shall have been materially negatively affected;

(f)    A Chapter 11 Plan shall have been filed in the Chapter 11 Case that does not provide for payment in full of the DIP Obligations in accordance with the terms hereof or that is not consented to in writing by the Lender; or

(g)    The Debtor shall fail to comply with the terms of any of the Financing Orders; or

(h)    The Bankruptcy Court shall not have entered the Final DIP Order within forty-five (45) days after the filing of the Debtor's motion for approval of this Agreement; or

(i)    The Debtor shall use the proceeds of the DIP Loans in a manner not provided for herein; or

(j)    Except as expressly permitted in the Financing Orders with respect to a challenge by an official committee of unsecured creditors appointed in the Chapter 11 Case for a period of up to sixty (60) days after such appointment), Any challenge in the Bankruptcy Court or other legal proceeding to the validity or enforceability of this Agreement, any Financing Order, the Prepetition Financing Agreements or Prepetition Indebtedness or liens or security interests

securing the Prepetition Indebtedness the liens or security interests securing the DIP Obligations or granted as adequate protection in respect of the Prepetition Indebtedness, or the right of the Lender to credit bid its claims in respect of the DIP Obligations or the Prepetition Indebtedness pursuant to Section 363(k) of the Bankruptcy Code; or

(k)     There occurs any Material Adverse Change, including without limitation, any impairment to the value of Collateral which Lender, in good faith, deems will threaten timely payment in full of the DIP Obligations; or

(l)     The Court grants any superpriority administrative expense claim or Lien or enters any order granting relief from the automatic stay (if not in favor of Lender) on any assets of the Debtor which have an aggregate value in excess of $50,000, except with the express written consent of Lender; or

(m)     The Debtor shall assume or reject any material unexpired lease or executory contract without the prior written consent of the Lender.

9.2     <u>Remedies</u>.  Upon the occurrence of a Default and expiration of any cure period applicable thereto (an "<u>Event of Default</u>"), the DIP Obligations shall, at the option of the Lender, be immediately due and payable to the Lender, and Lender may exercise any and all rights and remedies under this Agreement, and applicable law.  Upon an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code and without any application, motion, notice to or order from, the Bankruptcy Court:  (i) the Lender shall have, in addition to all other rights of the Lender, the rights and remedies of a secured party under the DIP Loan Documents, the UCC and other applicable laws; (ii) the Lender may, at any time, take possession of the Collateral and keep it on the Debtor's premises, at no cost to the Lender, or remove any part of it to such other place or places as the Lender may desire, or the Debtor shall, upon the demand of the Lender, at the Debtor's cost, assemble the Collateral and make it available to the Lender at a place reasonably convenient to the Lender; and (iii) the Lender may sell and deliver any Collateral at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the Lender deems advisable, in its sole discretion, and may, if the Lender deems it reasonable, postpone or adjourn any sale of the Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale without giving a new notice of sale. Without in any way requiring notice to be given in the following manner, the Debtor agrees that any notice by the Lender of sale, disposition or other intended action hereunder or in connection herewith, whether required by the UCC or otherwise, shall constitute reasonable notice to the Debtor if such notice is transmitted to the Debtor or its counsel identified herein either by electronic mail, registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt, at least ten (10) days prior to such action to the Debtor's notice address provided herein.  If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the DIP Obligations until the Lender receives payment, and if the buyer defaults in payment, the Lender may resell the Collateral without further notice to the Debtor.  In the event the Lender seeks to take possession of all or any portion of the Collateral by judicial process, the Debtor irrevocably waive:  (A) the posting of any bond, surety or security with respect thereto which might otherwise be required; (B) any demand for possession prior to the commencement of any suit or action to recover the Collateral; and (C) any requirement that the Lender retain possession and not dispose of any Collateral until

after trial or final judgment. The Debtor agrees that the Lender has no obligation to preserve rights to the Collateral or marshal any Collateral for the benefit of any person or entity. The Lender is hereby granted a license or other right to use, without charge, the Debtor's labels, patents, copyrights, name, trade secrets, trade names, trademarks, and advertising matter, or any similar property, in completing production of, advertising or selling any Collateral, and the Debtor's rights under all contracts, licenses and agreements shall inure to the Lender's benefit for such purpose.

9.3 <u>Waiver</u>. The Debtor hereby waives presentment, demand, protest or any notice not specifically required herein (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

9.4 <u>No Waiver of Rights by Lender</u>. No course of dealing or failure or delay on the part of the Lender in exercising any right, power or privilege hereunder or with respect to the DIP Loan Documents shall operate as a waiver hereof or thereof, nor shall a single or partial exercise thereof preclude any other or further exercise or the exercise of any other right, power or privilege. The rights of the Lender with respect to the DIP Loan Documents and the rights of the Lender under this Agreement are cumulative and not exclusive of any rights or remedies which the Lender would otherwise have.

SECTION 10. MISCELLANEOUS.

10.1 <u>Grantor Liable</u>.

(a) It is expressly agreed by the Debtor that, anything herein to the contrary notwithstanding, the Debtor shall remain liable under each of their agreements included in the Collateral to observe and perform all the conditions and obligations to be observed and performed by it thereunder, and the Debtor shall comply and perform with or pursuant to the terms and provisions of each such agreement. The Lender shall not have any obligation or liability under any agreement included in the Collateral by reason of or arising out of this Agreement or the granting to the Lender of a security interest therein or the receipt by the Lender of any payment relating to any agreement included in the Collateral pursuant hereto, nor shall the Lender be required or obligated in any manner to perform or fulfill any of the obligations of the Debtor under or pursuant to any agreement included in the Collateral, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any agreement included in the Collateral, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times. Upon entry of the Interim DIP Order, the Debtor waives any rights under section 506(c) of the Bankruptcy Code respecting the Collateral.

(b) The Debtor agrees that, from time to time at its own expense, the Debtor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or that Lender may reasonably request, in order to perfect, preserve and protect any security interest granted or purported to be granted hereby in Collateral. With respect to the foregoing and the grant of the security interest hereunder, the Debtor hereby authorizes Lender to file one or more financing or continuation statements (including the

description of the Collateral as "all assets" or "all personal property" of the Debtor), and amendments thereto, relative to all or any part of the Collateral without the signature of (or by signing on behalf of) the Debtor. A carbon, photographic or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

10.2    Modification of Agreement. No modification or waiver of any provision of this Agreement, and no consent to any departure by the Debtor therefrom, shall be effective unless the same shall be in writing and signed by the Lender. Any such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Debtor in any case shall entitle the Debtor to any other or further notice or demand in the same, similar or other circumstances.

10.3    Notices. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or three Business Days after being deposited in the mail, postage prepaid, or one Business Day after being entrusted to a reputable commercial overnight delivery service, or, in the case of electronic mail notice, when sent, addressed as follows in the case of the Debtor and Lender or to such other address as may be hereafter notified by such respective parties hereto:

The Debtor:

> Surf 9 LLC

With a copy to

> Goldberg Weprin Finkel Goldstein LLP
> 125 Park Avenue
> New York, NY 10017
> Attn: Kevin Nash, Esq.
> Telephone: (212) 221-5700
> Email: knash@gwfglaw.com


Lender:

> Olden Group LLC
> 4203 13th Avenue
> Suite 102
> Brooklyn, NY 11219

With a copy to

> Klestadt Winters Jureller Southard & Stevens, LLP
> 200 West 41 Street, 17th Floor
> New York, NY  10036

Attn:  Ian R. Winters, Esq.
Attn: Stephanie Sweeney, Esq.
Telephone: (212) 972-3000
Email: iwinters@klestadt.com
        ssweeney@klestadt.com


10.4  GOVERNING LAW.  THIS AGREEMENT SHALL BE CONSTRUED, INTERPRETED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHT OF THE PARTIES SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE.

10.5  WAIVER OF JURY TRIAL.  THE DEBTOR AND THE LENDER HEREBY WAIVE TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT OR THE VALIDITY, PROTECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF, OR ANY OTHER CLAIM OR DISPUTE HOWSOEVER ARISING, BETWEEN THE DEBTOR AND THE LENDER.

10.6  Survival of Agreement.  All covenants, agreements, representations and warranties made in this Agreement shall survive the delivery by the Debtor of this Agreement and shall continue in full force and effect so long as any DIP Obligations remain outstanding or any amount required to be reimbursed or paid by the Debtor hereunder shall remain unpaid. Whenever in this Agreement Lender is referred to, such reference shall be deemed to include the successors and assigns of the Lender, and all covenants, promises and agreements by or on behalf of the Debtor which are contained in this Agreement shall inure to the benefit of the successors and assigns of the Lender.  The rights and duties of the Debtor, however, may not be assigned or transferred without the prior written consent of the Lender and any attempted assignment or transfer in violation hereof is void and of no force or effect.

10.7  Severability.  The provisions of this Agreement shall be deemed severable.  If any part of this Agreement shall be held unenforceable, by any court of competent jurisdiction, the remainder shall remain in full force and effect, and such unenforceable provision shall be reformed by such court so as to give maximum legal effect to the intention of the parties as expressed therein.

10.8  Headings.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

10.9  Counterparts.  This Agreement may be executed in two or more counterparts and by facsimile or other electronic means, each of which shall be deemed an original and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

10.10  Additional Grant of Lien.  All DIP Obligations, contingent or absolute (including, without limitation, the principal thereof, interest thereon, and any costs and expenses owing in

connection therewith) which may now or from time to time hereafter be owing by the Debtor to Lender under any of the DIP Loan Documents shall be secured as set forth in the Final DIP Order.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

[The remainder of this page is intentionally left blank.]

**DEBTOR**

SURF 9 LLC

By:_____
Title:_____



**LENDER**

OLDEN GROUP LLC

By:_____
Title:_____

# EXHIBIT A

## BUDGET