Samuel D. Levy
Martin S. Krezalek
Ira L. Herman
Evan J. Zucker
**BLANK ROME LLP**
1271 Avenue of the Americas
New York, New York 10020

Samuel.Levy@BlankRome.com
Martin.Krezalek@BlankRome.com
Ira.Herman@BlankRome.com
Evan.Zucker@BlankRome.com
(212) 885-5000

*Attorneys for Body Glove IP Holdings, LP*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>          Surf 9 LLC,<br><br>                          Debtor. | Chapter 11<br>Case No. 25-40078-JMM |

### PRELIMINARY OBJECTIONS OF CREDITOR BODY GLOVE IP HOLDINGS, LP TO DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 FOR INTERIM AND FINAL APPROVAL OF POST-PETITION FINANCING AND APPROVAL OF RELATED SUPPLY FINANCING FROM LEEWARDS AND TO GRANT SUPERPRIORITY LIENS PURSUANT TO 11 U.S.C. § 364(C) AND (D); AND APPROVAL TO UTILIZE CASH COLLATERAL AND GRANT ADEQUATE PROTECTION

Body Glove IP Holdings, LP ("**Licensor**"), by and through its undersigned counsel, submits this opposition to Surf 9 LLC's ("**Debtor**") January 31, 2025 motion (the "**Motion**"), pursuant to Sections 105(a), 361, 362, 363, and 364 for Interim and Final Approval of Post-Petition Financing and Approval of Related Supply Financing from Leewards and to Grant Superpriority Liens Pursuant to 11 U.S.C. § 364(c) and (d) and Approval to Utilize Cash Collateral and Grant Adequate Protection, (Doc. 17), and respectfully states as follows:

# INTRODUCTION

1. Approval of the relief sought in the Motion should be denied for multiple reasons:

    a. such relief would affect an impermissible taking of Licensor's intellectual property rights by authorizing the continued use of Licensor's intellectual property to generate income for the Debtor's business, without providing adequate assurance that Debtor will comply with its monetary and non-monetary obligations under the License Agreement (as herein defined).

    b. various provisions of the proposed Interim DIP Order and the DIP Loan Documents,[1] would have the effect of improperly modifying the License Agreement and Licensor Intercreditor Agreement (as herein defined) and vitiating the bargained for provisions included in these agreements to protect Licensor's interests in its intellectual property.

    c. the proposed Interim DIP Order and the DIP Loan Documents provide for priming liens that would prime Licensor's security interests and liens in the Debtor's property, without providing Licensor with adequate protection, as required by the Bankruptcy Code.

    d. the proposed Interim DIP Order and the DIP Loan Documents would wrongly authorize the use of cash collateral in which Licensor has an interest, without adequately protecting Licensor's interests in such cash collateral, as required by the Bankruptcy Code.

    e. while the Debtor argues that it cannot obtain financing on more favorable terms, and that the DIP Facility is on reduced rates and "much better than the pre-petition interest rate and cannot be replicated anywhere," (Motion at ¶ 21) such statement is illusory, because the terms of the Proposed Interim Order and the DIP Loan Documents provide Olden Group with effective control over the Debtor. Such transfer of Debtor's rights is expressly prohibited by the License Agreement and the Licensor Intercreditor Agreement. *See, e.g.*, Licensor Intercreditor

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed in the Motion.

Agreement ¶ 4 (providing lender only a limited right for a 90-day period to the use of the License to liquidate inventory).

2.      The proposed DIP Facility is not the product of arm's length negotiations.  Here, the proposed DIP lender, Olden Group, has all the indicia of a "non-statutory insider", with a contrived loan-to-own strategy, with control and influence over the Debtor and the entire bankruptcy process. Indeed, venue in this District was manufactured for the Debtor's case by using Olden Group's business address as the Debtor's address – as the Debtor has no other connection to this District.  Due to the relationship of the parties, the Court should strictly scrutinize the entire fairness of the proposed transaction.

3.      The extent of Olden Group's involvement with the Debtor or close relationship to the Debtor is further evidenced by actions taken by Olden Group prior to the filing of the Debtor's case. For example, by Olden Group's own admission, prior to finalizing its alleged purchase of Express Trade's interest in the Prepetition Loan Documents, Olden Group made certain advances to the Debtor – both pre-petition and post-petition in subversion of the Bankruptcy Code and this Court.  Additionally, prior to the bankruptcy filing, Olden Group acted as the Debtor's "mouthpiece" in the District Court. It was Olden Group, not the Debtor, that inexplicability filed an action to enjoin any termination of the License Agreement. It was also Olden Group that argued to the District Court, that its decision will "force **us** into bankruptcy" (emphasis added).  Thus, it is absolutely clear that Olden Group had no problem telling the District Court that it and the Debtor are one and the same.

4.      The Debtor and Olden Group inappropriately seek, on an interim basis, approval for post-petition advances that were made prior to this Court's approval. The Debtor and Olden Group do not provide a single justification for waiting nearly a month and then seeking post-

petition financing and use of cash collateral on an emergency basis, all while making unauthorized post-petition advances to the Debtor.

5.      Finally, the DIP Facility is not entirely fair for among, other reasons:

a.      The definition of "Collateral" in the DIP Loan documents includes the Debtor's interests in the Licensor's intellectual property, however, the subject License Agreement is exclusive to the Debtor and is not transferable absent the Licensor's consent; and the Licensor does not consent.

b.      The License is a non-assignable, exclusive trademark agreement that cannot be assumed, yet an event of default in the proposed DIP loan agreement includes the License being "deemed terminated or rejected or otherwise fails to be in full force and effect, or the Debtor's rights thereunder shall have been materially negatively affected," allowing Olden Group and Leewards to foreclose and take possession of the Debtor's interest in the intellectual property in violation of bankruptcy and non-bankruptcy law. Essentially, the Debtor, Olden Group, and Leewards seek—on an emergency basis and without robust briefing—to force the Licensor to accept Olden Group and Leewards as new licensees, a position the Licensor rejects.

c.      Events of Default are overbroad and unfairly allow Olden Group and Leewards to foreclose on the License, without the Licensor's consent.

d.      Olden Group will receive waivers of numerous key protections for unsecured creditors, including 506(c) surcharge rights, marshaling, and the equities of the case doctrine.

e.      Olden Group is not entitled to a good faith finding, pursuant to section 364(e) for the reasons set forth herein.

## BACKGROUND

6.      Licensor is the owner of the intellectual property connected to the well-known Body Glove outdoor active brand, including the "BODY GLOVE" and "HAND DESIGN" trademarks, used in connection with a variety of products and services including wetsuits, swimwear, and surf equipment.  Licensor is managed by Marquee Brands Intermediate Holdings II LLC.

7.      In 2009, Body Glove International LLC, Licensor's predecessor in interest, entered into a License Agreement with Debtor Surf 9, a Florida-based sporting goods manufacturer, to use the "BODY GLOVE" and "HAND DESIGN" trademarks in association with certain products (the "**License Agreement**"). The License Agreement requires the Debtor to pay periodic royalties and regularly report the calculations of such royalty payments. If the Debtor fails to make the required payments, it has three days to cure the default following notice by Licensor.

8.      Pursuant to an August 22, 2014, Factoring Agreement and equally dated Master Purchase Order Finance Agreement between the Debtor and Express Trade (collectively, the "**Credit Agreement**"), Express Trade extended credit to the Debtor secured in part by Surf 9's interests under the License Agreement.

9.      On November 30, 2023, Licensor, the Debtor, and Express Trade entered into an Intercreditor, Subordination and Collateral Nondisturbance Agreement (the "**Licensor Intercreditor Agreement**") to, among other things, confirm the relative priority of Express Trade and the Licensor's liens on the Debtor's assets and properties. Under the Licensor Intercreditor Agreement:

    a.      Section 2 provides that "the Lender may not, in its capacity as the holder of any such Lien, transfer any or all of the Borrower's right, title and interest under the License Agreement to itself (except as provided herein) or any other person without obtaining the Licensor's prior written consent. Lender hereby acknowledges the grant by the Borrower to the Licensor of a Lien in, the Collateral."

    b.      Section 9 grants Express Trade the right (but not the obligation) to cure a Surf 9 License Agreement default, with the cure period running from Express Trade's receipt of a notice of default.

10.      Prior to December 22, 2023, the Debtor defaulted in its obligations under the License Agreement by, among other things, among other defaults, failing to timely (i) provide accurate royalty reporting; (ii) accurately remit quarterly royalties; and (ii) render payments

identified in an audit of the January 1, 2019 - December 31, 2021 period. In an effort to resolve these and other defaults, Licensor and the Debtor entered into a Sixth Amendment to License Agreement and Forbearance Agreement on December 22, 2023 (the "**Sixth Amendment**"), which provided that Licensor would forebear its rights to enforce the License Agreement default provisions, including termination, provided that the Debtor cure its existing defaults pursuant to an agreed payment schedule. Additionally, the Debtor granted Licensor a security interest in all of its assets as collateral for the prompt payment and performance of its obligations under the License Agreement.

11. The Debtor defaulted under the Sixth Amendment, and on September 26, 2024, the Licensor served a default notice upon the Debtor and Express Trade, along with a statement that Body Glove IP "expressly reserve[s] all of its rights, powers, privileges and remedies under the License Agreement, any related documents, applicable law or otherwise with respect to any Event of Default now existing or hereafter arising under the License Agreement, including without limitation (i) the right to declare the License Agreement to be terminated." The Debtor and Express Trade did not cure the Debtor's default or attempt to do so.

12. Olden Group, Express Trade, the Debtor, and Garantia, LLC, an affiliate of Express Trade allegedly executed that certain First Amended and Restated Letter of Intent as of December 9, 2024 (the "**LOI**"). In the LOI, Olden Group states its intention to buy certain indebtedness due to Express Trade. The parties agreed to draft definitive documents by a date which the parties refused to disclose to Licensor—ostensibly because, at the time of disclosure, the documents were not yet drafted. The LOI indicates that as of November 30, 2024, the Debtor's debt under the Credit Agreement totaled $27,447,033.35. Importantly, nowhere in the LOI is there a reference to the License Agreement, including as part of any condition to closing.

13.     The next day, on December 10, 2024, Olden Group filed, without notice to Licensor, a Summons with Notice, captioned *Olden Group LLC v. Body Glove International Inc. and Body Glove IP Holdings*, *LP*, Index No. 533445/2024 (the "**Summons**") in the New York Supreme Court, County of Kings ("**Kings County Court**"). According to the Summons, Olden Group sought a declaratory judgment that Licensor may not terminate the License Agreement and must accept a payoff from Olden Group. The Summons also sought a permanent injunction barring termination of the License Agreement without allowing Olden Group to exercise "its right to cure." Concurrently with its filing of the Summons, Olden Group moved for an *ex parte* order enjoining Defendants from terminating the License Agreement and requiring the Defendants to allow Olden Group to cure any default.

14.     That same day, the Kings County Court granted the no-notice, *ex parte* TRO requested by Olden Group, enjoining Licensor from terminating the License Agreement pending a hearing to be held by the Kings County Court on December 18, 2024. Only after it received the *ex parte* TRO did Olden Group notify Licensor of the Summons and TRO.

15.     Licensor removed the action initiated by the Summons to the United States District Court for the Eastern District of New York on December 17, 2024, and on December 27, 2024, moved to dissolve the *ex parte* TRO imposed by the Kings County Court and to oppose Olden Group's request for a preliminary injunction, on among other grounds, that Olden Group did not have standing to seek the requested relief.

16.     On December 29, 2024, Olden Group opposed Licensor's motion and separately moved to extend the TRO, attaching for the first time and disclosing to the Licensor for the first time, a heavily redacted version of the LOI.

17.     On January 7, 2025, the District Court conducted a hearing on the parties' requested relief and found, among other things, that Olden Group's counsel conceded that Olden Group

> might not be bound by the LOI to enter into the contemplated agreement ("LOI Agreement") if Defendant terminated the License Agreement with Surf9, **and then informed the Court mid-argument that Plaintiff had just finalized the LOI Agreement today. Plaintiff has not yet produced the LOI Agreement nor provided a reason for the Court to conclude that it will impact this Court's decision. The fact that Plaintiff reportedly executed this agreement, knowing that the parties were in the midst of a dispute over a TRO that Plaintiff claims would significantly affect its rights under the LOI Agreement, underscores that any alleged harm to Plaintiff could have been avoided.** See Convergen Energy WI, LLC v. L'Anse Warden Elec. Co., LLC, No. 20-CV-5240 (LJL), 2020 WL 5894079, at *5 (S.D.N.Y. Oct. 5, 2020) (noting that "a movant cannot manufacture its own exigency" and then claim that a self-inflicted harm is irreparable, and that "irreparable harm does not exist where alternatives are available to the movant" (citations omitted)).

District Court Order dated January 7, 2025. As a result, the District Court entered an order at around 11:35 p.m. on January 7, 2025 finding that Olden Group "failed to demonstrate that it is entitled to a TRO or preliminary injunction that would prevent Defendant from terminating the License Agreement," and vacating the TRO entered by the Kings County Court.

18.     Hours later, as threatened by Olden Group at the January 7, 2025, hearing, on January 8, 2025, at 9:01 a.m., the Debtor commenced the above-captioned Chapter 11 case by filing a skeletal petition. See Jan 7, 2025 Hr'g Tr. at *61* ("MR. MONTCLARE: By the way Surf9 and ETC fully endorse getting this restrained on termination of the license. What they're doing, your Honor, is they're going to force us into bankruptcy. THE COURT: Force who into bankruptcy? MR. MONTCLARE: Force Surf9 in this bankruptcy. You know what [Licensor will] get at the end, nothing. And the business will be destroyed").

19. To date, Olden Group has still not provided the definitive document that it contends was finalized on January 7, 2025 to Licensor.[2] Curiously, however, the Debtor in the Motion indicates that the agreement was finalized on December 30, 2024, and that Olden Group made protective advances of over $2.9 million in the 7 days prior to the Debtor filing for bankruptcy. That is, Olden Group represented to the District Court that the definitive documents were executed on January 7, 2025, but in this Court, the Debtor and Olden Group maintain that $2.9 million was advanced before the definitive documents were executed, which occurred even before the District Court's hearing to extend or vacate the state court TRO. One of those court statements is a deliberate and self-serving misrepresentation.

20. On January 10, 2025, the District Court ordered the parties to submit letters concerning the application of the bankruptcy automatic stay to the District Court action. Licensor submitted a letter in response to the District Court on January 23, 2025, and Olden Group submitted its letter on January 24, 2025. On January 23, 2025, Olden Group submitted a pre-motion letter to the District Court requesting leave to file a motion to remand the District Court action to the Kings County Court. Licensor responded to Olden Group's pre-motion letter on January 30, 2025, and in that response, Licensor confirmed its position that the automatic stay should apply to the District Court action.

21. On January 24, 2024, the Debtor filed the Declaration of John Chenciner, pursuant to Local Bankruptcy Rule 1007-4 (the "**Chenciner Declaration**"). The Chenciner Declaration provides, among other things, that:

---

[2] THE COURT: Then what happens? You're saying with the letter of intent, is your client again still bound to go through with it if I don't, I don't impose a preliminary injunction, I can lift the TRO, and Body Glove goes ahead and terminates the license agreement. MR. MONTCLARE: That's an open question, they're negotiating that. And basically, it has to do with whether the parties were proceeding in good faith. Jan 7, 2025 Hr'g Tr. at 27 (a copy is attached hereto as Ex. A).

a.  The Debtor believes the total outstanding royalties owed to Body Glove are approximately $1.1 million, including $480,0000 attached to the audit.

b.  Body Glove branded products account for about 90% of the Debtor's overall sales. In 2024, the Debtor had total completed sales of approximately $49 million. If fully restructured, the Debtor has the potential of growing its business to higher levels of at least $64 million by 2027.

22.  On January 31, 2025, the Debtor filed this Motion, wherein the Debtor stated its intention to enter into a senior secured superpriority debtor-in-possession revolving credit facility and borrow up to $3,180,000, on an interim basis through February 22, 2025, from Olden Group without a single payment, according to the budget, being made to the Licensor.

23.  At no time in the District Court action did Olden Group represent that it had entered into a Loan Purchase Agreement dated as of December 30, 2024 to purchase the indebtedness of the Master Purchase Order Financing Agreement dated August 22, 2014 (Motion at ¶ 13) which by Debtor's own admission terminated in August 2024 (Motion at ¶ 30) and which was allegedly amended after said termination on the eve of commencement of this bankruptcy case (Motion at ¶ 13) in the Amended and Restated Loan and Security Agreement, dated as of December 30, 2024. The Chenciner Declaration states that the AR Facility under the Factoring Agreement was converted into a collection factoring facility pursuant to that certain First Amended and Restated Factoring Agreement, dated as of December 30, 2024 by and between Express Trade and the Debtor. (Chenciner Declaration at ¶ 14.) The Debtors' Motion does not even mention this First Amended and Restated Factoring Agreement or seek any Court approval with respect to it. The maneuverings of Olden Group, the Debtor and Express Trade must be investigated and scrutinized by this Court, by any official committee of creditors to be appointed, or in the absence of any official committee of creditors, by the U.S. Trustee's office.

24. Similarly, the Debtor's obfuscation and deficient disclosures in the Motion and the Chenciner Declaration relate not just to Olden Group's maneuvering. For example:

a. nowhere in the Motion or the Chenciner Declaration does the Debtor reference the existence of Licensor's liens or the Licensor Intercreditor Agreement. Yet, the Debtor acknowledges in its schedules that Licensor is a secured creditor;

b. the Debtor purports to include a budget of necessary expenses of over $3 million during the interim period, but has failed to file any of the customary first day motions for the payment of necessary expenses including utilities and insurance; and

c. the Debtor provides no explanation of why it waited almost a month to file the Motion, accepted advances from a third-party, and made unauthorized postpetition payments during this period, or the particulars of such payments.

## ARGUMENT

25. The DIP Facility should not be approved because it is an insider transaction designed solely to benefit Olden Group and is not in the best interests of the Debtor's estate.

26. A court should approve a proposed debtor in possession financing only if such financing "is in the best interest of the general creditor body." *In re Roblin Industries, Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (citing *In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983)); *see also In re Tenney Village Co., Inc.*, 104 B.R. 562, 569 (Bankr. D. N.H. 1989) ("The debtor's prevailing obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries"). Moreover, the proposed financing must be "fair, reasonable, and adequate." *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987).

27. Importantly, post-petition financing should not be authorized if its primary purpose is to benefit or improve the position of an entity other than the debtor. *See, e.g., In re Aqua Assocs.*,

123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."). Indeed, the law has long acknowledged the unequal bargaining power inherent in negotiations leading to proposed post-petition financing, as well as the very significant harm that can befall creditors if the proposed financier is enabled to exploit its leverage position.

28.     Here, as set forth below, the Debtor has failed to establish its high evidentiary burden. Indeed, to date, the Debtor has failed to disclose, much less submit, the evidence needed to authorize the relief sought in the motion.

I.     **THE PROPOSED DIP FACILITY SHOULD NOT BE APPROVED BECAUSE IT CONSTITUTES AN UNFAIR INSIDER TRANSACTION SUBJECT TO GREATER SCRUTINY BY THE COURT**

29.     The proposed DIP Facility constitutes an unfair insider transaction, to a non-statutory insider, designed to leverage the bankruptcy process for the advantage of non-debtor parties to the detriment of the creditor body. "An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." S. REP. No. 95-989, 2d Sess., at 25 (1978), reprinted in COLLIER ON BANKRUPTCY, Appendix D. Part 4(e)(91) at 4-1957 (Lawrence P. King et al. eds., 15th ed. Rev. 2001) (emphasis added). *See also* H.R. REP. No. 95-595, 1st Sess., at 312 (1977), 1977 U.S.C.C.A.N. 5787, 5963; s*ee also Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) (To qualify as a non-statutory insider, actual control is not necessary; "rather, the question 'is whether there is a close relationship . . . and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length.'"). Factors to

consider include: (i) access to the debtor's insider information; (ii) the degree of control or influence over the debtor; and (iii) whether the parties share a common space. *In re The Village at Lakeridge, LLC*, 814 F.3d 993 (9th Cir. 2016).

30.     When confronted with insider transactions such as this DIP Facility, the Court should apply the much higher "entire fairness" standard of review, and not the Debtors' business judgment, which is inevitably compromised.  *See Pepper v. Litton*, 308 U.S. 295, 306 (1939) (finding that insider transactions in the bankruptcy context are "subjected to rigorous scrutiny"); *see WHBA Real Estate Ltd. P'ship v. Lafayette Hotel P'ship (In re Lafayette Hotel P'ship)*, 227 B.R. 445, 454 (S.D.N.Y. 1998) ("[S]ince there is an incentive and opportunity to take advantage, dominant shareholders' and others insiders' loans in a bankruptcy must be subject to rigorous scrutiny."), *aff'd*, 198 F.3d 234 (2d Cir. 1999); *In re St. Mary Hospital*, 86 B.R. 393 (Bankr. E.D. Pa. 1988) (applying a heighten standard of review to insider financing agreement with parent company).

31.     "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration."  *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

32.     There can be no dispute that a "transaction between a debtor in possession and an insider are subject to greater scrutiny than 'arms-length' transactions."  *In re Charles Crook Wholesale Produce*, 7 F.3d 222 (4th Cir. 1993), (quoting *Sinclair v. Barr (In re Mid-Town Produce Terminal, Inc.)*, 599 F.2d 389, 392 (10th Cir. 1979)) ("'Because there is incentive and opportunity to take advantage, dominant shareholders and other insiders' loans in a bankruptcy situation are subject to special scrutiny."); *Stancill v. Harford Sands Inc. (In re Harford Sands Inc.)*, 372 F. 3d

637, 641 (4th Cir. 2004) ("An insider's dealings with a bankrupt corporation are ordinarily subject to 'rigorous' or 'strict' scrutiny.")

33.     Here Olden Group is a non-statutory insider of the Debtor with a sufficiently close relationship with the Debtor. For example, the Debtor's address on the petition is listed as c/o Olden Group – there is otherwise no nexus to New York or the Eastern District of New York. Furthermore, Olden Group has informed Body Glove IP that the Debtor's CEO (the declarant in support of the Motion) and COO have already been offered employment agreements with Olden Group to operate Surf 9 upon Olden Group taking control of the Debtor.

34.     Moreover, the overreaching purpose of the DIP Financing is for Olden Group to take control of the Debtor to avoid Licensor's consent requirement on transfer of the License Agreement and who has the right to use and exploit Body Glove IP's License, and to unfairly gain an advantage in litigation pending outside of the bankruptcy case. Indeed, here, the whole purpose of the DIP Facility is to lock in a debt-to-equity conversion, given that Licensor does not consent to Olden Group assuming Express Trade's rights with respect to the License. Given that the License Agreement may not be assumed and assigned by the Debtor to Olden Group in a Section 363 asset sale, and could not have been assigned absent consent in a foreclosure action, Olden Group has manufactured this bankruptcy case to improperly take the equity.[3]

35.     The Debtor seeks to obtain financing under 11 U.S.C. §364 to be allowed as a super-priority administrative expense clam.  Incurrence of administrative debt by a debtor is allowed only if the debtor can demonstrate "it is an actual, necessary cost or expense of preserving the estate." *In re Villalobos*, 2011 WL4485793, at \*7 (B.A.P. 9th Cir. 2011) (citing *In re Club Dev. & Mgmt. Corp.*, 27 B.R. at 611–12. "An order granted pursuant to § 364(b) must be supported by

---

[3] Licensor reserves all rights to argue that the License Agreement may not be assumed by the Debtor.

such a finding."). If Olden Group believes that the continued operations and expenses of the Debtor are justified, it should provide the proposed funding as an unsecured loan in as much as it is apparent that it is either implicitly or explicitly controlling the Debtor. Indeed, prepetition, and prior to finalizing the LOI (which was not finalized until, according to Olden Group, January 7, 2025), Olden Group provided the Debtor with funds. Given that its purchase of Express Trade's secured claim was not finalized prior to Olden Group extending such funds, Licensor reserves all of its rights with respect to whether such advances were in fact made under the Prepetition Financing Agreement.

## II. THE PROPOSED DIP LOAN DOCUMENTS AMOUNT TO A SUB ROSA PLAN AND IS AN ATTEMPT TO TRANSFER A NONTRANSFERABLE LICENSE

36. Debtor-in-possession financing should not have the effect of turning over control of all assets to DIP lenders, but that is exactly what the DIP Loan Documents seek to accomplish. A debtor is not permitted to enter into a transaction that "would amount to a sub rosa plan of reorganization" or an attempt to circumvent the Chapter 11 requirements for confirmation of a plan of reorganization. *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007). While this issue most often arises in asset sales, it is applicable to other transactions as well. As the court in *In re Latam Airlines Group S.A.*, 620 B.R. 722, 813-14 (Bankr. S.D.N.Y. 2020), explained:

> "Concerns about sub rosa plans are not limited to transactions involving section 363 asset sales. They are germane to any transaction by a debtor that adversely impacts on interested parties' rights to participate in the restructuring process. "The reason sub rosa plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, 'short circuit the requirements of Chapter 11 for confirmation of a reorganization plan.'" Iridium, 478 F.3d at 466 (quoting In re Braniff Airways, Inc., 700 F.2d at 940).
>
> ***

"The touchstone consideration in conducting that analysis is "whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest[.]"

37.     The DIP Loan Documents clearly violate these principles. Upon an event of default, Olden Group would be able to take possession of the Debtor's interest in the License, without Licensor's consent.

38.     Similarly, the Loan Documents provide that only Olden Group's consent is needed to transfer the Debtor's interest in the License Agreement, not Licensor's consent. Indeed, Olden Group has purportedly acquired Express Trade's interests, in violation of the Licensor Intercreditor Agreement, as the Licensor Intercreditor Agreement required Licensor's consent before Express Trade could transfer its interests without the consent of Licensor (and Licensor does not consent). *See* Licensor Intercreditor Agreement, ¶ 2 ("…the Lender may not, in its capacity as the holder of any such Lien, transfer any or all of the Borrower's right, title and interest under the License Agreement to itself (except as provided herein) or any other person without obtaining the Licensor's prior written consent. Lender hereby acknowledges the grant by the Borrower to the Licensor of a Lien in, the Collateral.").

39.     Further, through the DIP Loan Documents, Olden Group and the Debtor seeks to provide Olden Group with remedies it would not otherwise have under the Licensor Intercreditor Agreement, under the License Agreement or at law or in equity. These remedies would amount to Olden Group and Leewards taking possession and control of the License, without the Licensor's consent.

40.     It is readily apparent that the Debtor and Olden Group are seeking through the DIP Loan Documents and the forthcoming Chapter 11 plan to transfer a non-assignable exclusive

license agreement to a third-party without the Licensor's consent. Under the terms of the DIP Loan Documents, if the License is not assumed (which it cannot be), then an Event of Default would occur and Olden Group would be entitled to foreclose on the License, thus avoiding the Bankruptcy Code and non-bankruptcy law that prevents the transfer of the License absent the Licensor's consent. *Tap Publications, Inc. v. Chinese Yellow Pages (New York) Inc.*, 925 F. Supp 212, 218 (S.D.N.Y. 1996) ("The general rule is that unless the license states otherwise, the licensee's right to use the licensed mark is personal and cannot be assigned to another."); *In re Trump Ent. Resorts, Inc.*, 526 B.R. 116, 125 (Bankr. D. Del. 2015) (federal trademark law prohibits assignment of trademark licenses under circumstances where it is clear that the identity of the licensee is crucial to the agreement. Thus, the requirement of Section 365(c)(1)(A) is satisfied."); *In re Ajranc Ins. Agency, Inc.*, 2021 WL 2774937, at *2 (Bankr. M.D. Fla. July 2, 2021) (prohibiting assumption or assignment of franchise agreement that granted right to use of trademarks); *In re Pinnacle Foods of California LLC*, 2024 WL 5190414, at *7 (Bankr. E.D. Cal. Dec. 19, 2024) (same); *In re Luce Indus., Inc.,* 14 B.R. 529 (S.D.N.Y. 1981).

III. **THE LICENSOR IS NOT BEING ADEQUATELY PROTECTED FOR THE USE OF ITS LICENSE AND DOES NOT CONSENT TO ANY PRIMING**

41.     The ability to prime an existing lender is extraordinary. Indeed, § 364(d)(1) of the Bankruptcy Code authorizes non-consensual priming only when the debtor cannot obtain credit otherwise and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1)(B).

42.     "[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained pre-bankruptcy," and the "determination of whether there is adequate protection is made on a case by case basis." *In re Swedeland Dev. Group,*

*Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (citations omitted). "Whether protection is adequate depends directly on how effectively it compensates the secured creditor for the loss of value caused by the superpriority given to the pre-petition loan." *Id*.

43.     The Debtor bears the burden of satisfying these elements. *See* 11 U.S.C. § 364(d)(2) ("In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection"); *In re Swedeland Dev. Group, Inc.*, 16 F.3d at 564 ("A debtor has the burden to establish that the holder of the lien to be subordinated has adequate protection").

44.     The Debtor has made no showing of the how Licensor's collateral is being protected, and does not provide Licensor with any adequate protection for priming its secured claim. Instead, the Debtor plans to use and exploit Licensor's property, without payment, and proposing only $219,384 of approximately $1.4 million owed Licensor (less than 20% of the amount due) months later in April 2025.[4]

45.     Essentially, the Debtor is asking the Licensor to bear the risk of this case, based on a speculative belief that by 2027 net sales will increase by $15 million to over $64 million, while other creditors continue to be paid. When evaluating the sufficiency of adequate protection, courts have held time and time again that "[a] creditor is not protected by projections . . . particularly if those projections are themselves risky or contain speculation about successful future operations." *In re Futures Equity L.L.C.*, Nos. 00-33682-BJH-11, 00-34825-BJH-11, 00-34826-BJH-11, 2001 Bankr. LEXIS 2229, at \*16 (Bankr. N.D. Tex. 2001) (citing *Swedelend*, 16 F.3d at 565-66; *In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996) ("A finding of adequate protection should be premised on facts, or on projections grounded on a firm evidentiary basis.")); *see also In re*

---

[4] As of April 2025, however, Licensor expects the amount the Debtor will owe the Licensor will be higher than $1.4 million and reserves all of its rights with respect to the total claim amount.

*Laffite's Harbor Dev. I, LP*, No. 17-36191-H5-11, 2018 Bankr. LEXIS 2, at *7 (Bankr. S.D. Tex. 2018) (finding lack of adequate protection because reorganization prospects were "highly speculative" and noting that Debtors "were marketing the property before the petition was filed and found no takers"); *In re Strug-Division LLC*, 380 B.R. 505, (Bankr. N.D. Ill. 2008) (finding lack of adequate protection because "potential success of the proposed renovation project [was] too speculative" and secured creditor "should not be required to bear the risk of whether the renovations will generate income necessary"); *In re Stoney Creek Techs.*, LLC, 364 B.R. 882 (Bankr. E.D. Pa. 2007) (denying DIP transaction because debtor's "speculative projections" failed to show how debtor could generate sufficient profits); *In re Tempe Land Co., LLC*, No. 2:08-bk17587-JMM, 2009 Bankr. LEXIS 1137, at *5 (Bankr. D. Ariz. 2009) (denying DIP transaction because "predictions of success are equally outweighed by predictions of failure"); *In re St. Petersburg Hotel Associates, Ltd.*, 44 B.R. 944 (Bankr. M.D. Fla. 1984) (holding that the assumptions which formed the basis for adequate protection were "highly speculative and unrealistic," thus DIP transaction should be denied).

46.     Accordingly, at a minimum, Licensor must receive weekly adequate protection payments, adequate protection replacement liens, and Licensor's rights to its intellectual property must be preserved (*i.e.*, that it cannot be transferred, assumed, or assigned absent Licensor's consent).

## IV.   THE DEBTOR MAY NOT USE THE LICENSOR'S CASH COLLATERAL WITHOUT LICENSOR'S CONSENT UNLESS THEY SATISFY THEIR BURDEN OF SHOWING THAT LICENSOR IS ADEQUATELY PROTECTED

47.     A debtor may not use cash collateral absent consent of each entity that has an interest in cash collateral unless "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2)(B). When a secured

creditor does not consent, the court may only grant permission to use cash collateral pursuant to Section 363 if each entity that has an interest in such cash collateral is "adequately protected." 11 U.S.C. § 363(e). The Bankruptcy Code does not define "adequate protection" but includes examples in section 361, such as periodic cash payments, additional or replacement liens or granting such other relief as will result in the realization of the indubitable equivalent of such entity's interest in such property, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense. 11 U.S.C. § 361.

48.     The Debtor bears the burden of showing that it can adequately protect Licensor's interest in the cash collateral. 11 U.S.C. § 363(p); *see also In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (Debtor bears burden of establishing that adequate protection is being provided for use of lender's cash collateral); *In re Energy Partners, Ltd.*, 409 B.R. 211, 235-37 (Bankr. S.D. Tex. 2009) (denying use of cash collateral based on debtor's failure to demonstrate the secured creditor was adequately protected). The Debtor has failed to produce any credible evidence of the value of the cash collateral. Nor has the Debtor shown that the Licensor is adequately protected. *In re Stoney Creek Tech., LLC*, 364 B.R. 882, 891 (Bankr. E.D. Pa. 2007) (regarding adequate protection concerning priming financing, "an equity cushion may provide adequate protection but that an equity cushion alone will not be determinative."); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865-66 (Bankr. W.D. Pa. 2003) ("Where an equity cushion is insufficient in size or likely to erode, it cannot, standing alone, constitute adequate protection.").

49.     Licensor does not consent to the Debtor's use of cash collateral absent a minimum commitment by the Debtor to make meaningful adequate protection payments to Licensor, provide replacement liens under the DIP Orders, provide that the Debtor promptly and timely fulfils its

disclosure obligations under the License Agreement, and provides an agreement that the Debtor will not transfer or assume the License Agreement without Licensor's consent.

## V. THE DIP LENDERS ARE NOT ENTITLED TO PROTECTION UNDER SECTION 364(E) BECAUSE THE DIP FACILITY WAS NOT PROPOSED IN GOOD FAITH.

50.     The Debtor has failed to provide sufficient evidence that the proposed financing is an arm's length transaction entered into in good faith with an insider and the DIP Lender should not receive the protections of § 364(e). Credit is not being extended in good faith "where it is evident from the loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code" or where the lender extends credit with an "ulterior purpose." *In re EDC Holding Co.*, 676 F.2d 945, 948–49 (7th Cir. 1982). The party seeking to establish good faith bears the burden of proof. *See, e.g., Colad Grp.* 324 B.R. 208, 225 (Bankr. W.D.N.Y. 2005) (finding that the debtor failed to carry affirmative burden to establish good faith of the proposed financing transaction; the presence of offensive terms and conditions in the financing agreement created uncertainty as to lender's intent and rendered inappropriate a finding of good faith); *see also New York Life Ins. Co. v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 901 F.2d 1359, 1366 (6th Cir. 1990) (holding that good faith under section 364(e) should not be presumed).[5]

51.     The Debtors and the DIP Lenders cannot carry this burden and should not be entitled, on an *ex parte* basis, and without a proper investigation to any good faith protection under § 364(e), particularly, whereas here, the DIP Lenders have refused to turnover essential

---

[5] This bankruptcy case and the DIP Loan Documents essentially amount to a two-party dispute between Olden Group and the Licensor and is a blatant attempt to force the Licensor to accept Olden Group, or its designee, without its consent. *In re Outta Control Sportfishing*, 642 B.R. 180, 185, 2022 Bankr. LEXIS 1818 (Bankr. S. Fl. June 29, 2022) ("[C]ourts do not condone the use of Chapter 11 to resolve two-party disputes in the bankruptcy court when such litigation is still pending in a non-bankruptcy forum prior to the commencement of the case.").

information to the Licensor including copies of the documents evidencing Olden Group's purchase

of Express Trade's interests in the Prepetition Loan Documents.

## VI.    OTHER OBJECTIONABLE PROVISIONS IN THE DIP LOAN

52.    The DIP Loan Documents and the Interim Order contain numerous other provisions

that are troubling and inappropriate.  For example:

a.    The definition of "Collateral" in the Section 3.3 of the DIP Loan documents includes the Debtor's interests in the Licensor's intellectual property, however, the License Agreement requires the Licensor's consent to transfer, and the Licensor does not consent to transfer of the License Agreement or the rights under the License Agreement. No security interest can be given to Olden Group in the License Agreement and the Debtor cannot "assign, convey . . . pledge hypothecate and transfer to [Olden Group] . . . the Debtor's right, title and interest in [the License].  Licensor does not consent to such conveyance or transfer, and the License Agreement by its terms and under prevailing law cannot be transferred to Olden Group absent Licensor's consent.

b.    Events of Default are overbroad and unfairly allow the DIP Lenders to foreclose on the License, without Licensor's consent, and to take actions that violate the Licensor Intercreditor Agreement.

c.    The Debtor seeks to inappropriately waive numerous key protections for the estate, including § 506(c) surcharge rights, marshaling, and the equities of the case doctrine. *See e.g., Hartford Fire Ins. Co. v. Nw. Bank Minn. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (8th Cir. B.A.P. 1998) (holding that provision in financing order purporting to immunize the post-petition lender from Section 506(c) surcharges was unenforceable); *In re Colad Group, Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve post-petition financing agreement to the extent that the agreement purported to modify statutory rights and obligations created by the Bankruptcy Code by prohibiting any surcharge of collateral under § 506(c)).

d.    The Debtor should not indemnify the Lender for challenges and investigations of its loans, documents and liens and the mere challenge thereof should not result in an Event of Default before a Committee or other creditors have a customary investigation period.

e.    The Lender must not be automatically entitled to relief from the automatic stay upon giving notice of an Event of Default, but instead be required to affirmatively seek relief from the automatic stay.

f.    The Debtor under Section 6.6 of the DIP Loan Agreement is prevented from

selling, assigning or transferring any Collateral without Olden Group's consent; but such Lender consent is not required for transfer of the License Agreement if authorized by the Licensor.

g.     The assets and Property of the Debtor under Section 7.4 of the DIP Loan Agreement are included in the Collateral, but the License Agreement is not the Collateral or property of the Debtor and not subject to transfer, control, or assignment absent Licensor's written consent.

h.     Under DIP Loan Agreement Section 9.2, upon the occurrent of a Default, the Lender (Olden Group) is entitled to take control of the License Agreement, an impermissible term given the License Agreement is not transferable at the discretion of the Debtor or pursuant to a contractual arrangement the Debtor has with Olden Group.

i.     The request for $10 million of revolving loans is misleading because the Debtor also received the ultra vires "Protective Advances".

j.     The Budget does not include required post-petition payments to Licensor and does not include any amounts for a Creditors' Committee.

k.     The Budget is not credible because the Debtor has not filed any first-day motions and does not have authority to pay for any of the listed expenses, including payment of prepetition taxes, utilities, and insurance. Without such first day motions the Court and parties are unaware of the necessity and details of such expenses.

53.     Finally, prior to any funding, and as a condition to continuing to fund, the DIP Loan Agreement should include that the Debtor must timely comply with its obligations under the License Agreement including its disclosure obligations. The Debtor for months has continued to delay in providing the Licensor with critical information necessary to preserve and protect its License and to provide access for an audit, all of which is required under the License Agreement.

## RESERVATION OF RIGHTS

54.     As of the filing of this Objection, Licensor and its advisors are just beginning to perform diligence relevant to the Motion. Licensor has had a limited opportunity to obtain discovery and reserves all rights related thereto. Accordingly, this Objection is submitted without prejudice to, and with a full reservation of, the Licensor's rights, claims, defenses, and remedies,

including the right to amend, modify, or supplement this Objection in connection with any further interim hearing or final hearing on the motion, to introduce evidence at any hearing relating to the Motion or any other request for relief, and without in any way limiting any other rights of the Licensor to further object to the approval of the Motion or the transactions contemplated thereby as may be appropriate.

## CONCLUSION

For the foregoing reasons, the Licensor respectfully requests that the Court (i) deny the relief requested in the Motion or condition approval of the Motion on the requirement that the modifications requested herein be made; and (ii) grant the Licensor such other relief as the Court deems just, proper and equitable.

Dated: February 5, 2025
      New York, New York

Respectfully submitted,

**BLANK ROME LLP**

*/s/ Evan J. Zucker*
Samuel D. Levy
Martin S. Krezalek
Ira L. Herman
Evan J. Zucker
1271 Avenue of the Americas
New York, New York 10020
Samuel.Levy@BlankRome.com
Martin.Krezalek@BlankRome.com
Ira.Herman@BlankRome.com
Evan.Zucker@BlankRome.com
(212) 885-5000

*Attorneys for Body Glove IP Holdings, LP*