# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
OLDEN GROUP, LLC,                  : 24-CV-8613(PKC)
                                   :
        Plaintiff,                 :
                                   :
                                   :
                                   : United States Courthouse
     -against-                     : Brooklyn, New York
                                   :
                                   :
                                   :
                                   : Tuesday, January 7, 2025
Body Glove INTERNATIONAL           : 4:00 p.m.
INC. and Body Glove IP             :
HOLDINGS, LP,                      :
                                   :
        Defendants.                :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE PAMELA K. CHEN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Plaintiff:      MITCHELL, SILBERBERG & KNUPP, LLP
                        Attorneys for the Plaintiff -
                        Olden Group, LLC
                            437 Madison Avenue
                            25th Floor
                            New York, New York 10022
                        BY: PAUL D. MONTCLARE, ESQ.
                            SAMANTHA W. FRANKEL, ESQ.



                        BARCLAY DAMON, LLP
                        Attorneys for the Plaintiff -
                        Olden Group, LLC
                            1270 Avenue of the Americas
                            Suite 501
                            New York, New York 10020
                        BY: LAUREN J. WACHTLER, ESQ.

A P P E A R A N C E S: (Continued.)


 For the Defendant:        BLANK ROME LLP
                           Attorneys for the Defendant -
                           Body Glove International, Inc., and
                           Body Glove IP Holdings, LP,
                           1271 Avenue of the Americas
                                New York, New York 10020
                           BY: SAMUEL D. LEVY, ESQ.
                               MARTIN SIMON KREZELAK, ESQ.
                               EVAN JASON ZUCKER, ESQ.


Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                 Official Court Reporter
                 Telephone: (718) 613-2487
                 Facsimile: (718) 613-2694
                 E-mail: Anthony_Frisolone@nyed.uscourts.gov


Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

1          (In open court.)

2          COURTROOM DEPUTY:  Civil cause for status

3     conference, Docket No. 24-CV-8613, Olden Group, LLC versus

4     Body Glove International, Inc., et al.

5          Persons granted remote access to proceedings are

6     reminded of the general prohibition against photographing,

7     recording, and rebroadcasting of court proceedings.

8     Violation of these prohibitions may result in sanctions,

9     including removal of court issued media credentials,

10    restricted entry to future hearings, denial of entry to

11    future hearings, or any other sanctions deemed necessary by

12    the court.

13          Counsel, please state your appearance beginning

14    with the plaintiff.

15          MR. MONTCLARE:  Yes.  My name is Paul Montclare,

16    your Honor, and I am from the Law Firm of Mitchell,

17    Silberberg & Knupp and I represent the plaintiff Olden

18    Equities.

19          Good afternoon.

20          THE COURT:  Good afternoon.  I want to make sure

21    you're coming in clearly.  I'm not sure if it's my computer

22    or yours.

23          MS. FRANKEL:  Good afternoon.

24          Samantha Frankel also from Mitchell, Silberberg on

25    behalf of plaintiff.

1        MS. WACHLER:  Good afternoon, your Honor.  Lauren

2   Wachtler, also on behalf of the plaintiff, from the Law Firm

3   of Barclay Damon, LLP.

4        THE COURT:  Good afternoon to all of you.

5        For the defense?

6        MR. LEVY:  Good afternoon, your Honor.

7        I'm Sam Levy of Blank Rome here on behalf of the

8   defendant Body Glove IP Holdings, LP.  We informed the Court

9   that Body Glove International, Inc., is a nonexisting entity

10  so I cannot appear on behalf of that entity.

11        THE COURT:  All right.  And Mr. Krezalek.

12        MR. KREZALEK:  Good afternoon, your Honor.  Martin

13  Krezalek also on behalf of Body Glove IP Holdings, LP.

14        While I recognize that the docket reflects that I

15  also represent Body Glove International, Inc., that was

16  inadvertent and I will be submitting an application to

17  withdraw as counsel for that entity with an explanation as

18  to how the mistake was made.  So I am here only behalf of

19  Body Glove IP Holdings, LP.

20        THE COURT:  Okay.

21        MR. ZUCKER:  Good afternoon, your Honor.  Evan

22  Zucker, Blank Rome, also on behalf of

23  Body Glove IP Holdings.  I understand I have not filed any

24  notice of appearance yet and I will do so promptly after

25  this hearing.

1        THE COURT:  All right.  Thank you for that.  Good

2   afternoon to everyone.

3        So we're here for what is now going to be oral

4   argument on the defendant's motion to vacate a Temporary

5   Restraining Order that was put into place by the state court

6   judge before the case was removed here.

7        I think just to set the table, I guess, I want

8   reframe this slightly because even though this is styled as,

9   and was initiated by defendant, as a motion to vacate or

10  lift the TRO, I view it really as a motion or what would be

11  a motion by plaintiff to impose a preliminary injunction or

12  a Temporary Restraining Order in the federal case.  Because

13  the Temporary Restraining Order in the state case for all

14  practical purposes expired.  And so, we can talk about

15  reviving to or continuing to, but what we're really talking

16  about here because the relevant standards are under federal

17  law now is whether or not I would, if there were an

18  application by plaintiff, impose a preliminary injunction.

19       Because what I'm trying to do is be efficient

20  here.  I don't want to resolve this motion and then have

21  another motion filed by plaintiff to impose a preliminary

22  injunction because this is the time to make that decision.

23  So I'm going to make it because the standards are the same

24  so everyone should view it as such, okay?  We're not going

25  to do two rounds of this:  To lift the other one or to

1  vacate it or to impose one.

2          So this is plaintiff's opportunity to argue for

3  with I should impose a preliminary injunction that prevents

4  defendant from terminating the licensing agreement with

5  Surf9 and any agreements it has with ETC, which is

6  Express Trade Capital.

7          And I assume for -- actually, for Mr. Frisolone,

8  for your benefit is S-u-r-f-9, LLC.

9          So why don't we start since it's really the

10  plaintiff's burden to establish why there should be a

11  preliminary injunction with Mr. Montclare or Ms. Frankel or

12  Ms. Wachtler.

13          MR. MONTCLARE:  Your Honor, I'll be speaking for

14  the plaintiff and I appreciate by filing --

15          THE COURT:  No, wait.  You're definitely breaking

16  up.  I don't know what's wrong with your speaker.

17          MR. MONTCLARE:  Can you hear me now?

18          THE COURT:  You want to maybe try logging in?

19          MS. FRANKEL:  I believe if NYC Room, the

20  conference room, if you mute, his will come in clearer.

21          THE COURT:  Let's try that.

22          Still breaking up.  Try a few more sentences.

23          MR. MONTCLARE:  Okay.  I will try now.  I will

24  speak slowly.  Can you hear me?

25          THE COURT:  I think it has to do with your

1    connection.  Maybe you want to try logging back in again?

2          MR. MONTCLARE:  Yes, I can do that.  Let me try

3    that again.

4          THE COURT:  We'll give you a second while you do

5    that.

6          MR. MONTCLARE:  Thank you.

7          (A brief pause in the proceedings was held.)

8          THE COURT:  Go ahead.

9          MR. MONTCLARE:  So, your Honor, we're here because

10   we're seeking a TRO to stop the defendant from terminating a

11   license agreement with a non-party, ETC.  And the reason

12   we're doing that is because we don't believe they have any

13   right to terminate the agreement.  And if they don't

14   restrain doing that, and refrain from doing that, the

15   plaintiff will incur substantial damages.

16         This case is kind of an interesting case in terms

17   of why we think we should win this case.  Our client is an

18   individual who has bought the debt of a non-party, ETC.

19         THE COURT:  Had not yet bought the debt, it's a

20   letter of intent.

21         MR. MONTCLARE:  It's a binding letter of intent.

22   And the parties are ready to go to a definitive document

23   once we get this litigation underway and make sure that

24   we're not going to have deal with a terminated agreement.

25         What happened in this case is that there were

1 negotiations between ETC and the defendant and another party

2 to try to resuscitate Surf9. Surf9 is a company that

3 sells -- is very well regarded by manufacturers of sporting

4 goods products especially ones involving surfing, water

5 sports. Surfing, yes. And they have a license to

6 manufacture and sell these goods. When they were doing very

7 well they were selling maybe $30, $40 million a year worth

8 of goods. They ran into a problem with a defect and one of

9 their very big buyers, Costco, required that they do a

10 recall. And a recall was required because of a

11 manufacturing defect.

12        As a result of that, they started to have real

13 difficulties financially. They were bleeding money and it

14 got to a point where they were heavily in debt. ETC is a

15 factor and takes purchase orders essentially -- and a

16 lender. And it takes purchase orders as collateral. So

17 when the deal started to fall apart, it wound up that ETC,

18 the non-party, was holding a secured debt of around

19 $27 million. That secured debt was -- is superior to any

20 other obligations and assets, pretty much all of them except

21 a couple, that are owned by Surf9.

22        So what happened here was Surf9; the factor, ETC,

23 and the licensor, who is the defendant, decided to keep the

24 company going. So they entered into an intercreditor

25 agreements.

1      These intercreditor agreements are fairly well

2  established as a vehicle to keep companies that have

3  potential money but still protecting the secured debtor.  So

4  how that's done is that they entered into an intercreditor

5  agreement that has specific terms that permit the

6  continuation of the business.

7      One of the particular assets that were involved

8  here was the license to sell this Body Glove franchise, the

9  copyrights, and also the fact that they were selling the

10  actual products.  And, as a result, they entered into an

11  intercreditor agreement which absolutely stated

12  unequivocally that on --

13      THE COURT:  ETC has the right to cure, is that

14  what you're going to say?

15      MR. MONTCLARE:  ETC has the right to cure, that's

16  part of it.  But ETC has a superior lien and that there are

17  specific provisions in the intercreditor agreement which

18  states that the licensor under this agreement is not

19  entitled to terminate the agreement if that's going to

20  impair the security.

21      The reason why I want to proceed on, I'm not

22  really ready to proceed on a full-blown argument as to why

23  we should get preliminary injunction, is because I think

24  something like this is going to require a hearing where the

25  parties can come in and explain to the Court all the issues

1   involving the case.  I can go through these agreements but

2   it will take hours to go through them to actually set up why

3   it is that the defendant does not have any basis for

4   terminating this agreement.

5              THE COURT:  Hang on, Mr. Montclare.

6              Let's assume that I'm going to assume that for the

7   moment that there's some merit to that argument.  But I

8   think more fundamentally what I have a problem with is

9   standing.  If, in fact, you're right the agreement should

10  not be terminated, ETC or Surf9 should be the ones that

11  should come in and say that to the defendant Body Glove.  So

12  that's one issue.

13             And then there's the issue of irreparable harm.  I

14  understand that you've characterized this letter of intent

15  and the contemplated deal to buy the debt obligations for

16  ETC or Surf9 as unique and I think something else you said.

17  But it's a business deal and one that was made by your

18  client knowing what the situation was.  That, in fact, Surf9

19  was already in an arrears.  I think the period to cure,

20  presumably, had passed because I think I looked at the

21  licensing agreement.  It's a short period of time when it

22  comes to payments like this.  I think it's maybe only three

23  days or something like that.  But that at the point that

24  your client entered into the deal, they knew that there was

25  this issue, a problem.  One that ETC and/or Surf9 could

1  have, should have, resolved before agreeing to sell the

2  rights that they have because termination was looming.  So I

3  don't really understand.

4          MR. MONTCLARE:  I disagree with that.

5          THE COURT:  I don't understand that how that

6  equates to irreparable harm.  There's this notion of

7  self-inflicted harm I think that the defendant rightfully

8  raised.  But there is also a notion of compensable remedies

9  or an adequate remedy-at-law that these compensable

10  potential harms.

11          Also, the deal not going through, I'm not sure

12  that's just the client maybe loses money because it wasn't a

13  good deal, period.  But it's not one that I think

14  constitutes irreparable harm when the contracting party

15  undertakes it knowing what the risk is.  So I have trouble

16  getting past both likelihood of success or serious questions

17  on the merits and irreparable harm because of standing,

18  because of the nature of the claim being made being one that

19  I think is not irreparable.  I know you say Surf9 will go

20  out of business.  Yes, to Surf9 that could be irreparable

21  harm, but they're not the ones who are fighting about this.

22  It's your client who wants to buy the debt that's claiming

23  that somehow they're going to be irreparably harmed.  They

24  could not be harmed at all because they just simply don't go

25  through with this deal.  Or if, for some reason, they think

1   that there's a wrongful termination and somehow they're

2   harmed in terms of the amount of money they could have

3   recouped from this deal, then I guess in theory they could

4   sue Surf9, ETC, and may be also Body Glove and try to get

5   the money back for this.

6          But it seems to me intervening in there is, and I

7   don't think it's the case, some misrepresentation by Surf9

8   or ETC about the value of or the bargain that's being

9   struck.  And I don't think that that's accurate because it

10  sounds like your clients fully understand what the situation

11  is because, in fact, this LOI, this letter of intent, was

12  signed the day before you all filed suit.  So these happened

13  in very close proximity.

14         So let me go ahead and let you speak,

15  Mr. Montclare.

16         MR. MONTCLARE:  Let's think about it this way.

17         We have a company, ETC, which has a debt.  There

18  is nothing preventing, in any of the agreements, there's

19  nothing preventing from ETC selling its debt.  It's a common

20  thing to do; there's no agreement that disallows them from

21  doing that.  And what they have decided to do was to sell

22  the debt.  That costs my client money.

23         In addition, my client will be now providing

24  funding on a going-forward basis to maintain the business so

25  that more money will be there to satisfy the debt.  It's not

1   a matter of what our compensable damages are.  To be sure,

2   if they go ahead and terminate this agreement and we don't

3   get a TRO, and then someone comes in and they try to sell

4   this debt to somebody else, I mean, they try to sell this

5   license to someone else, there's going to be a monumental --

6   because there's going to be a monumental litigation.

7              THE COURT:  Who is the they?

8              MR. MONTCLARE:  They --

9              THE COURT:  Body Glove?

10             MR. MONTCLARE:  Body Glove, yes, the licensor.

11             What we're asking the licensor not to do is to

12   terminate the license agreement that now exists between

13   Surf9 and themselves.

14             THE COURT:  But why aren't they entitled to if

15   everyone --

16             MR. MONTCLARE:  They're not entitled to it.

17             THE COURT:  Because?

18             MR. MONTCLARE:  Because they first have to first

19   give them notice of termination and an opportunity to cure.

20             THE COURT:  Okay.  Then why doesn't ETC fight that

21   battle?  Because the problem I'm having is you don't really

22   have a right to enforce.  It's ETC's right to enforce at

23   best or maybe Surf9's because there is this intercreditor

24   agreement but that's between Body Glove, Surf9, and ETC.

25             MR. MONTCLARE:  Correct.

1      THE COURT:  And that includes this right to cure

2   that I mentioned.  But your client is not a part party to

3   that.  So doesn't make any sense to me that ETC is bringing

4   a lawsuit for wrongful termination or breach of contract.

5      MR. MONTCLARE:  No one is bringing any cause of

6   action for any of that.  All they want to do is collect

7   their money, as they're entitled to do, as a secured

8   creditor.  They have $27 million of debt that they want to

9   collect, that they're entitled to collect.  The agreement --

10  the intercreditor --

11     THE COURT:  The they again is Body Glove?

12     MR. MONTCLARE:  Body Glove, yes.

13     THE COURT:  Body Glove wants to collect from ETC

14  or Surf9?

15     MR. MONTCLARE:  Body Glove wants to collect the

16  debts owed to it by Surf9.

17     THE COURT:  Okay.

18     MR. MONTCLARE:  Part of the assets that are the

19  subject of the lien, and it says it right in the agreements,

20  is the license.  The license is part of the collateral that

21  has value that is owned in a superior lien format by ETC.

22  So now, ETC has a $27 million security debt that it's trying

23  to collect.  The debt came from the Surf9 people not paying

24  them for the loans that were made, okay?

25     So what they can do is they can simply go is and

1    declare bankruptcy and liquidate the company and go away.

2              THE COURT:  They being ETC?

3              MR. MONTCLARE:  ETC.

4              THE COURT:  Make Surf9 go away?

5              MR. MONTCLARE:  Yes, Surf9 can go away.

6              THE COURT:  Right.

7              MR. MONTCLARE:  Or they can do what they are

8    intending to do which is in the documentation.  And what

9    they're intending to do is say, look, we think this company

10   will have value in the future, meaning, Surf9.  We want to

11   keep it running.  We have a license agreement, if it's not

12   terminated, will be in effect to at least three more years.

13             THE COURT:  Why don't they go to Body Glove and

14   say all that?  Like, don't -- you can't terminate this, we

15   need to have this open.

16             My issue is who is bringing the lawsuit?  It's

17   your client versus -- there is a party here that has a right

18   that they can enforce.

19             MR. MONTCLARE:  So let me ask it.

20             This could all be settled real quickly, resolved

21   real quickly, if we get a commitment from the other side

22   that they are not going to terminate this license.  If

23   they're going to go and terminate this license now and I

24   have an agreement, and my client has an agreement with the

25   factor, which is the, you know, to ETC to collect this money

1   and we paid a lot of money for that right.

2            THE COURT:  But that's a bad deal.

3            MR. MONTCLARE:  It's not a bad deal because they

4   have no right to terminate it.

5            THE COURT:  But that's something that should have

6   been sorted out before they struck this deal.  You're not

7   the right person to try to -- this right, your client

8   should.

9            ETC, if they wanted to sell you something, or, I

10  mean, let's put it this way.  They either have to live with

11  the consequences of striking a deal where there is this

12  uncertainty or ETC should have cleaned this up and gotten

13  the guarantees or done whatever they needed to do to ensure

14  there wasn't going to be a termination.  Because if they're

15  in default, ETC knows that Surf9, I mean, if Surf9 is

16  default, ETC knows that what it has is it at risk of being

17  terminated, whatever rights, they have the license they

18  have, it all could be terminated.

19           So I don't understand why, though, your client can

20  come in and say, okay, ETC has these rights and we don't

21  want them terminated because we want to buy them.

22           I understand that but you knew going into, not

23  you, but your client knew going into it that there was this

24  risk because of the condition that Surf9 was in where they'd

25  already defaulted and ETC already had debts that they were

1  going to have to deal with.  So I just don't

2  understand -- this is a problem or this is, you know, this

3  is a solution almost in search of a problem and I don't know

4  if that's right way of saying it but the right people are

5  not here is the issue I'm having.

6             Why isn't ETC here?

7             MR. MONTCLARE:  This is what the contract says.

8  This is what the intercreditor contract is.  The

9  intercreditor agreement is signed by ETC, it's signed by the

10 defendant who is the licensor, and it's signed by Surf9 who

11 is the manufacturer and the company who sells the product.

12 It says, "The licensor," meaning, the defendant.

13            THE COURT:  Body Glove, yes.

14            MR. MONTCLARE:  "Hereby consents to the grant by

15 the borrower to the lender of a lien in and to upon the

16 licensing agreement."  They can't terminate it, we have a

17 lien on it.  We have a superior interest with regard to

18 control of what happens with that document.

19            And if you go on, it says later on in the same

20 kind of thing.  If you go to Paragraph 4, it says,

21 "Notwithstanding anything else in the agreement, upon the

22 occurrence of a continuing senior default," which is the

23 debt that we own which is now in default that, "which shall

24 include without limitation a termination of the license

25 agreement, that the lender gives licensor written notice,"

1   that they're going to take possession of that collateral

2   including the license and they're going to be able to

3   liquidate it in either in a proceeding or another

4   proceeding.

5           So the bottom line is, if they don't have a right

6   to terminate it are you saying we don't have standing to say

7   they don't have the right to terminate, is that the issue?

8   Not that they don't have the right to terminate it.

9           THE COURT:  I'm not going to get to whether they

10  have the right or not for the moment.  Yes, I'm saying your

11  client doesn't have the standing to make that argument.  ETC

12  does in theory.  They could say you cannot terminate this

13  and then they can contract with your client to sell it.

14          But if your client goes into this knowing that

15  there's this potential for termination because Surf9 is,

16  everyone knows, in arrears, and at risk of losing the right

17  to lose the licensor have the license, I don't understand

18  how your client can then complain when, in fact, this is

19  starting to happen.  ETC never sought to ensure that they

20  could actually transfer the license or everything that was

21  collateral in this intercreditor agreement.  And so, that's

22  one issue and not going to whether or not Body Glove even

23  has the right to terminate.

24          Again, and I know I sound like a broken record, it

25  is just that your client isn't the one that has the right to

1    enforce the contract, the intercreditor contract, or even

2    the license agreement.

3         Even though your client wants to get a secured

4    interest in it, one they haven't yet, that's one issue.  But

5    if you say it's a binding letter of intent, so for all

6    practical purposes it is a contract, they still don't have

7    these particular rights.  That is for ETC at this point to

8    enforce.  Because, as I understand it, the agreement that

9    you're going to strike under the letter of agreement gives

10   you the right under the licensing agreement but not under

11   this intercreditor agreement.  And tell me that's wrong but

12   I looked at it.

13        MR. MONTCLARE:  But being a party to a contract is

14   not the only way you have standing, your Honor.

15        The Second Circuit is very clear, they're very

16   clear about this.  They say that the test is whether there

17   is injury-in-fact and a sufficient causal connection between

18   the injury and the conduct complained of and the likelihood

19   that the injury will be redressed by a favorable decision.

20        If we're talking about actual standing, if that's

21   what we're talking about, then the Second Circuit is very

22   liberal.  It's a very, very low threshold.  So the question

23   is, will we be hurt?  If you say, oh, we made a bad deal

24   then we would be hurt.  If we're going to be hurt, we have

25   standing; that's the bottom line.  So you may say we have no

1    right to terminate but it's not a standing question.

2            THE COURT:  You may have failure to state a claim

3    then.  In other words, you can't say we have a contract that

4    we can enforce.

5            MR. MONTCLARE:  That's another issue and I don't

6    think that is correct either.  Because if you take a look at

7    this first amended and restated letter of intent, it says

8    right at the beginning what the transaction is.  And this is

9    a transaction that is going to be the one that is covered in

10   a definitive agreement pursuant to the letter of intent.  It

11   says, "The seller shall assign and transfer to the buyer,

12   which is my client, all of seller's rights, title, and

13   interest in and to the indebtedness.  The indebtedness is

14   what they owe us and also the contract rights under the

15   agreement.

16           I mean, that's what the transaction is.  To say

17   that we to we have no interest because we made a bad deal

18   doesn't amount to standing in the pure sense.  And it

19   certainly doesn't mean that we can't contract with someone

20   else to collect a debt of the I don't know why that is.  You

21   may say if I were doing this from the beginning, this case

22   was removed, I wasn't back in state court, I would add these

23   parties.  And whether they're permissive joinder or

24   necessary joinder is an issue of fact.  I mean, is an issue

25   we'll have to address.  We're intending to pursue that.  For

1  the purposes of stopping these people to destroy that entire

2  issue by going ahead and terminating an agreement which

3  they're not entitled to terminate, and then sell it to

4  someone else, because that's what they threatened to do,

5  then we are being injured.

6          And the Court, if you apply the tests of -- the

7  four tests that you have to apply in order to get a

8  preliminary injunction or a TRO for that matter, we meet

9  every one of them.  We set that out in our brief and the

10 case law is very clear on this.  I'm not saying this is the

11 end of the case.  All I'm saying is don't destroy a valuable

12 right that you're entitled to have under a contract by

13 allowing them to go ahead without any basis to terminate an

14 agreement.

15          THE COURT:  I'll let the defendants obviously

16 speak in a moment.  But what is the irreparable harm then?

17 You have a number here, a dollar number here, for this

18 letter of intent.  And presumably, I think you said your

19 client intends to sell it, turn around and sell this

20 indebtedness.  So isn't there some adequate remedy of law?

21 Let's suppose I find you have standing and you can pursue

22 this claim that there was a breach of contract or the

23 termination of the license agreement was wrong and somehow

24 undermine the value, I guess, of what you purchased isn't

25 this compensable?

1      MR. MONTCLARE:  It may be compensable but it's not

2  the only injury, your Honor.  There are equitable injuries.

3  We're not seeking contract damages in this case.  Rest

4  assured, if this happens, there will be an a massive lawsuit

5  if they terminate and try to sell.

6      But what the law is very clear.  The Second

7  Circuit is clear on this.  This jurisdiction wants to

8  enforce unique contracts, contracts for unique services or a

9  unique contract.  This is a unique deal.  It is irreparable

10  harm if you don't get the contract that you bargained for

11  and it will destroy the business.

12      THE COURT:  Destroy Surf9's business?

13      MR. MONTCLARE:  Yes.

14      THE COURT:  That was destroyed by the fact that

15  they failed to pay under the contract.

16      MR. MONTCLARE:  They failed to pay but parties

17  don't have to -- when someone fails to pay, you don't have

18  to take damages for them, you can enter into an

19  intercreditor agreement.  This says, look, we're going to

20  allow you to stay in business but you go to do what we say

21  under this agreement.  And if you don't, we are going to

22  have to either foreclose on you.  Or better yet, what we

23  really want to do was to do a kind of, you know, a

24  debtor-in-possession Article IX case where we say, I mean, a

25  UCC-9 case where we can put in a manager, we operate the

1  case, we make money, we pay the defendants off a hundred

2  percent, we tendered that it them.  A hundred percent of

3  their debt we tendered to pay them.  We tendered to pay --

4  to put up collateral for another year at least for what and

5  we gave them financial information.  And we say, okay, let

6  us get this business back up and going.  They are ticked off

7  that they didn't get their person to take over this

8  business.

9          THE COURT:  That may be their prerogative if

10  they're still operating under the terms of the agreement.

11  They can do it for whatever reason they want.  Let me ask

12  you another question on it.

13          Under the letter of intent, is your client bound

14  as you say to go through this deal if Body Glove does

15  terminate the license, and you may say wrongfully, and there

16  is then no licensing rights to transfer.  Is your client

17  still bound to purchase, to make this purchase, with no

18  collateral that will go with it, I guess.

19          MR. MONTCLARE:  They're not bound to make a

20  purchase.  They're not getting purchase, they're buying

21  debt.

22          THE COURT:  Right.

23          MR. MONTCLARE:  They're not buying the company.

24          THE COURT:  So will they still go through with

25  this deal then?

1          MR. MONTCLARE:  Yes, but what debt is there to

2     buy?  Unless they can control the business, how do they buy

3     the debt?  Under the intercreditor agreement, the creditor

4     controls the debt.  If he wants to -- he has put up monies,

5     real money.  To answer your question, he has a liquidated

6     damage clause just by getting the letter of credit he had to

7     put up a large amount of money.

8          THE COURT:  So explain this, break it down for me.

9          So your client is purchasing for the indebtedness

10    of about $27 million, right?

11         MR. MONTCLARE:  Yes.

12         THE COURT:  And that indebtedness is ETC's based

13    on the factoring agreement between ETC and Surf9?

14         MR. MONTCLARE:  Yes, correct.

15         THE COURT:  Okay.  And so, what then does your

16    client intend to do with its indebtedness, to sell it?

17         MR. MONTCLARE:  With the somewhat, I'm sorry.

18         THE COURT:  The indebtedness.  So they

19    basically --

20         MR. MONTCLARE:  They will buy to and now they will

21    go ahead and they use that indebtedness as to -- it's a debt

22    acquisition agreement.  What happens is that they buy the

23    debt and in return they get a percentage of the return --

24         THE COURT:  I'm sorry, I really don't understand.

25         MR. MONTCLARE:  -- of the collections.

1          It's a fancy debt collection.

2          THE COURT:  Okay.  So Surf9 has a bunch of

3   customers who haven't paid them.  So they have a certain

4   amount of debt that they're trying to collect, right?

5          MR. MONTCLARE:  Right.

6          THE COURT:  Your client wants to buy that and then

7   collect on those debts and your client is willing to pay I,

8   I guess, $27 million?

9          MR. MONTCLARE:  No, they pay less, that's why it's

10  a good deal.  So the creditor just wants to get out of it.

11  I don't want to -- I don't care, you pay me a certain amount

12  of money plus I'll get a certain amount of what you get

13  going forward.  You'll also take care of running your

14  business and capitalizing it going forward because that's in

15  the agreement, too.

16         THE COURT:  Pause for a second.

17         Why does it matter, then, if Body Glove cancels

18  the license agreement if all your client is buying debt at a

19  lower value and then, obviously, collecting hopefully more

20  than they pay, how does the determination of a license

21  agreement determine that affect.

22         MR. MONTCLARE:  Because he has a right to go

23  forward and capitalize the business on a going-forward

24  basis.  Under UCC-9 type of Secured Transaction Law or he

25  can do a straight bankruptcy but that would be silly and

1    just liquidate everything.  He's getting all the rights of

2    the creditor including the right to keep the business going

3    because he thinks he'll get more of his money back.

4    Obviously, it stops up to 27 million.  But he bought it for

5    less than 27 million, it's his risk.

6                    Part of that is --

7                    THE COURT:  Your argument is he is essentially

8    stepping into the shoes of ETC.

9                    MR. MONTCLARE:  Yes.

10                   THE COURT:  And getting all the indebtedness plus

11   also which he can collect on and also being able to exercise

12   all of the rights that ETC has under the licensing

13   agreement?

14                   MR. MONTCLARE:  Yes, correct.

15                   THE COURT:  Okay.  Are you also arguing that --

16   because I don't think that's in the letter of intent, but is

17   he also then -- or is it your argument that he also has the

18   rights that exist under the intercreditor agreement between

19   ETC, Surf9, and Body Glove?

20                   MR. MONTCLARE:  Yes, but only acting on behalf of

21   the creditor which is ETC.

22                   THE COURT:  All right.

23                   MR. MONTCLARE:  So he's acting like an agent

24   almost for them under the debt acquisition program.

25                   THE COURT:  Then what happens?  You're saying with

1   the letter of intent, is your client again still bound to go

2   through with it if I don't I don't impose a preliminary

3   injunction, I can lift the TRO, and Body Glove goes ahead

4   and terminates the license agreement.

5        MR. MONTCLARE:  That's an open question, they're

6   negotiating that.  And basically, it has to do with whether

7   the parties were proceeding in good faith.

8        THE COURT:  So what's the irreparable harm then?

9   Or what's your standing because to seems to me part of the

10  defendant's argument is that this is speculative right now.

11  The right that your client claims standing in the shoes of

12  ETC hasn't been finalized because you only have this letter

13  of intent.

14       Now, you're saying it's an open question.  If

15  the Circumstances change, then it seems to me your client

16  isn't necessarily bound by the letter anymore.  He can back

17  out and say I bought it under the assumption that I would be

18  able to get all the rights that ETC has which includes

19  these -- the interests, Surf9's interests, under the license

20  agreement.  Now that that circumstance has changed, all bets

21  are off, I don't have to go through with this deal.  So both

22  the standing and the question and the irreparable harm

23  issue.

24       MR. MONTCLARE:  With all respect, really, it's

25  backwards.  If they have no right to terminate, why should

1   we not be able to proceed with a profitable agreement that

2   we have with ETC?

3               THE COURT:  Because ETC is --

4               MR. MONTCLARE:  Now with ETC.

5               THE COURT:  But you're not -- we're going to go

6   back to this -- you're not the party to enforce it.  ETC

7   should have done that if they wanted to sell this whatever

8   it is.  For its part of the bargain, it should have said, We

9   can give you -- it's almost like title to a house -- free

10  and clear, we're telling you we have this license that's

11  intact with Body Glove.

12              But, clearly, everyone knew it was at risk because

13  Surf9 -- this is the circumstance under which you're all

14  operating -- Surf9 was already in arrears.  And there was, I

15  gather, and it, in turn, needed to collect.  So we're

16  talking about two different debts, I guess.  But it in turn

17  needed to collect from its creditors, I guess.  And so, all

18  I'm saying is I don't -- I'm not saying -- I can't speak to

19  the merits of whether they have the right to terminate the

20  license or not is or have the right to.  But what I'm

21  speaking to is the speculative nature of your client's

22  interest and rights and therefore his standing, which is one

23  of the issues here.  And also, the irreparable harm you

24  claim will befall your client.  Whereas, it seems like he

25  could simply back out of the deal by saying we only had a

1    letter of intent under these assumed conditions, biggest one

2    or one of the big ones is I would have the ability to

3    exercise the rights under the license agreement for purposes

4    of running Surf9.  And if that's not the case, ETC, then

5    this deal is off.  And so, then we go back to -- your client

6    goes on his merry way and he's not harmed and I just

7    don't -- and this is what I think defendant says makes your

8    assertion of an interest speculative because it's

9    conditioned on something that ETC can guarantee and didn't

10   seek to in some way validate or confirm or concretize, if

11   you will.

12          So that's any concern.  You say were you the

13   lawyer, you would have brought them in.  Yes, I guess so,

14   that's right.  That's the problem.  I think your client is

15   in a position that makes the standing questionable.

16          MR. MONTCLARE:  I don't want to beat this to death

17   because I know the other side needs to speak but you're

18   doing a very good job.

19          You're stating --

20          THE COURT:  I'm carrying their water for them at

21   the moment.  I'm sure they'll do a much better job when I

22   let them speak.

23          MR. MONTCLARE:  I'm absolutely they'll do a good

24   job, too.

25          Here's the thing.  All we're really asking for, in

1  terms of preliminary injunctive relief while we just sort

2  out whether they have a right to terminate or not, is

3  whether they will be permitted to terminate.

4         And, again, on standing, there's no question that

5  we're affected by it.  If we're affected by it, we have

6  standing.  What you're saying is, though, what is the

7  irreparable harm?  If you take a look at those standing

8  cases that we cited, they're pretty straightforward and the

9  bar is so low, and even sitting here talking about it today,

10  if we lose ten -- if we lose anything we have standing.

11         If they're permitted to terminate, and we lose the

12  opportunity to run this business and make money, that's

13  standing.  The question is whether or not there's an

14  irreparable harm and that I think is also covered here

15  because the irreparable harm is not being able to obtain the

16  benefit of a potentially profitable agreement where money

17  damages are not the only thing.  You want to keep a business

18  intact; you want to grow the business.  And for what?  So

19  they can terminate, if we're right, terminate it in

20  violation of the agreement.

21         You know what they did when we started this case?

22  We got a TRO, not we, prior counsel got a TRO in state

23  court.  That is still in effect, by the way.  It's still in

24  effect.  We extended it.  It can be extended by 14 days.  It

25  lasts 14 days and then it can be extended another 14 days

1   under the rules which is in one of the briefs we explained

2   to her that's how that works.  But that's whey we had to get

3   the Court involved on, I guess, it was Christmas Eve.

4            THE COURT:  After Christmas.

5            MR. MONTCLARE:  Yes, on Christmas Eve.  And now,

6   we were talking about how we're going to move forward this.

7            So the full amount of adjournments have not been

8   used up under the TRO rules and the preliminary injunction

9   rules in New York.  I mean, in the Federal Rules.

10           But this is what happened.  On the 9th, ETC said,

11  you know the deal we're trying to do with a third-party that

12  you liked?  Well, guess what, we got a better deal from

13  Olden.  And, you know, we want to do the deal with them.  We

14  have a right to do that because we don't want to be involved

15  in this anymore.  We're going to get rid of all our debt and

16  we're going to give this debt collection idea to Olden and

17  allow them to fund everything.

18           What happened then there was a meeting where

19  Mr. Sprei of my firm went ahead and offered to pay them the

20  entire debt load that would take them out.  It would be owed

21  nothing, the licensor.  The entire debt would be taken out

22  and they refused.  He also -- they said they wanted more.

23  They wanted some security that he'll be able to pay in the

24  future.  He said, I'll give you an -- or an accountant who's

25  going to give you financial statements.  Then he said, okay,

1   I'll even put up a letter of credit with my own money or

2   some kind of a secured document, secured funding source.

3   So, you know, to pay for the next year to make sure that

4   whatever you're entitled to get as license fees, you'll get

5   because my intention is make this a great company so that

6   down the road, the company can be sold and prosper and

7   whatever it's going to be.

8            And they said we don't want to do business with

9   you, that's what they said.  Okay.  And then we got the

10  injunction because they threatened to terminate the

11  agreement.

12           So what do they do?  The TRO was issued on the

13  10th.  On, I think, it's the 16th, they sent two default

14  letter to Surf9.  They sent it notwithstanding, the

15  injunction, and then they said, okay, you owe us

16  one-million-something plus all this other money and you're

17  in default and, you know, we're going to terminate the --

18  terminate your license.  This is exactly at the time that

19  they were not allowed to do that and they wrote these --

20           THE COURT:  Hang on.  They're allowed to give

21  notice as you said they're required to.  But what they

22  weren't allowed to do was to actually through.  They had to

23  give notice about the arrears and say we intend to

24  terminate.

25           MR. MONTCLARE:  Yes, but the notices, I can go

1  through them with you.  These notices are absolutely a

2  scandal.  In these notices, they claim that they don't tell

3  you what the cure period is.

4          THE COURT:  But it's in the agreement.

5          MR. MONTCLARE:  Yes.  And they say it's in the

6  agreement but the agreement has two levels of notice.  One

7  can be up to a reasonable amount of time to cure up to

8  30 days.  The other is if it's a certain -- if it relates to

9  a certain paragraph of an agreement that was entered into

10 25 years ago with respect to specific debts, there's a

11 five-day notice period.  That five-day period doesn't even

12 apply anymore.  It only applied to specific debts that

13 existed back 25 jurors ago, not all the things that they put

14 in their letter.

15          Then they send another letter and said, look, some

16 of the things you were supposed to do like fund certain

17 things you didn't do and that's not curable.  Or certain,

18 you know, changes to the intercreditor agreement were not

19 supposed to be made and therefore you're in default.  Those

20 are so defective, those letters, if they're going to use

21 those as a basis for terminating, I mean, that shows you

22 what these people -- they don't care about the law.  They

23 don't care about the what their obligations are under the

24 intercreditor agreement.  They're just going to try to screw

25 everybody by -- bad word, sorry -- they're just going to try

1    to get everybody destroyed because they don't want to do a

2    deal that the $27 million secured creditor wants to do that

3    he's entitled to do and they should be stopped from doing

4    that.  I mean, that's what we're dealing with.

5         If you told me, that they were going to -- that

6    they had a problem with something specific or that they had

7    a right -- if they said they had a right to terminate and

8    they sat down and told you what their rights to terminate

9    were and that they're correct.  I said, okay, we lose.

10        But to have them say that they don't have to have

11   any rights at all.  They can make up these letters

12   notwithstanding the existence of an injunction.  They can

13   say that you have -- they don't have to tell you what the

14   cure period is.  If you don't pay it within a certain amount

15   of time, we're going to we're going to cancel the contract,

16   I mean, that is just insidious and I don't think Law of

17   Equity would apply here.  I don't think they have a right to

18   do it.  I don't think that means they're going to have a

19   likelihood of success on the merits that they're entitled to

20   do it and suffer the damages.

21        And I do think it's irreparable harm because it

22   affects our right to have business move forward in a manner

23   that we're entitled to have it move forward.  They don't own

24   Surf9.  They are the licensor, and yet, they're trying to

25   destroy it.  I really, I mean, I'm sorry to get so emotional

1   but I rarely get emotional over things.  But this is really

2   too much.  I think that if we have a short -- unless they're

3   going to say now they're not going to sell it.  I they say

4   now they're going to terminate it, they're not going to

5   terminate it or they're not going to reassign it to

6   somebody, then we don't need an injunction.  We'll just go

7   right to whether they have a right to terminate.

8           But if they're not willing to do that, you're

9   putting a commercial enterprise in jeopardy of being

10  destroyed without having a stay pending your right to argue

11  that they're not entitled to do any of the things they're

12  intending to do.  And that's my --

13          THE COURT:  Can I ask you a question, though, and

14  then I truly want to hear from the defendant.

15          The chronology is that your client entered into

16  the letter of intent on December 5th.

17          MR. MONTCLARE:  10th.  9th.

18          THE COURT:  What was it?

19          MR. MONTCLARE:  9th.

20          THE COURT:  9th, right.

21          Then December 10th, you, not you, but your

22  predecessors filed a lawsuit on behalf of your client

23  seeking to have, well, actually, seeking to prevent

24  defendant from terminating the license agreement.

25          MR. MONTCLARE:  For a declaration.  The actual

1   action was brought for a declaration saying that that they

2   had not right to.

3          THE COURT:  Okay.  And so, why is that the

4   chronology?  Why is it that your client signs a letter of

5   intent and then sues?

6          MR. MONTCLARE:  Because he was told they were

7   going to sell the property.

8          THE COURT:  So when were they told that?

9          MR. MONTCLARE:  I think next day or that morning

10  the lawyers were talking.  They threatened to cancel the

11  agreement and actually tried to do it on the 16th so we know

12  that it wasn't.

13         THE COURT:  Okay.  Obviously, your client entered

14  into this letter of intent but then files a lawsuit the next

15  day so I'm wondering about that.

16         MR. MONTCLARE:  Because they threatened to

17  terminate the agreement.

18         THE COURT:  So before December 10th that happened?

19         MR. MONTCLARE:  It happened between the time they

20  made the deal with ETC on the 9th and the 10th when we

21  started the proceeding.

22         THE COURT:  So within that 24-hour period roughly?

23         MR. MONTCLARE:  Yes.

24         THE COURT:  Okay.

25         MR. MONTCLARE:  That's why it's all in the

1    affidavits that we submitted below that are now before this

2    court.  I mean, not below, in the state court that's now

3    before this court.  There's no doubt about that.  I mean,

4    they didn't do it because they say, oh, they did it because

5    they don't want any restraints.  They said we don't want to

6    be restrained and we don't want to do business with your guy

7    for whatever reason which I don't even want to speculate

8    what the reason is I.  That's why I think we need a hearing

9    to get all these facts out.

10            I think what they're doing is actually trying --

11   they're trying to play the legal system to do something

12   they're not entitled to do so that they can get their way.

13   And it flies in the face of contract rights.  It flies in

14   the face of the rights under the creditor laws and equity

15   and any real policy that could ever be tolerated by the

16   judicial system.

17            They're literally trying to get this company to do

18   what it wants.  They are a junior creditor with a license

19   agreement that's owned by the senior creditor who agreed to,

20   look, we'll give you a little bit of money.  We, meaning,

21   ETC, will give you money so that business can stay in

22   operation and eventually we'll give some of the money to you

23   if we keep doing the business going forward.

24            THE COURT:  Let me ask you one question.

25            Is there any dispute that Surf9 is in debt or in

1  arrears with respect to what it owes Body Glove under the

2  license agreement?

3         MR. MONTCLARE:  No.  No, but that doesn't matter

4  because they're just a general creditor and there's

5  $27 million of debt ahead of them.  They'll never get that

6  money.

7         THE COURT:  Who is the they?

8         MR. MONTCLARE:  Body Glove.

9         THE COURT:  Body Glove.

10         MR. MONTCLARE:  Body Glove will never get that

11  money.  They have to wait until there's $27 million

12  available to get that money.  After the debt is paid,

13  they'll get some money.  Under the intercreditor agreement,

14  they do get some money going forward.  That's the beauty of

15  keeping business running.

16         THE COURT:  Right.  I understand why you believe

17  it would be better that it works out the way your client

18  wants, but I guess I'm trying to understand that you keep

19  saying that Body Glove has no right to terminate the

20  agreement.

21         But starting from the undisputed fact that Surf9

22  owes money to Body Glove, is the only issue you're taking

23  with them terminating is they haven't complied with the

24  notice to cure issue with respect to ETC or Body Glove?

25         MR. MONTCLARE:  To do that, to terminate would

1    violate the intercreditor agreement they signed.

2              THE COURT:  Because.

3              MR. MONTCLARE:  Because they can't terminate the

4    license because it's liened up.  They're a general creditor.

5    They're owed 139 or 159,000 or a million dollar, whatever it

6    is.  They are a general creditor.  Think about a normal

7    situation.  If you have a debt.  If someone is running a

8    grocery store and they owe $15 to the company that delivers

9    them apples every day.  Okay, that apple guy, it's their

10   $15.  They now borrowed money to run the business for years

11   so now they owe the bank $10,000.

12             THE COURT:  Who is the they again?  The grocery

13   store?

14             MR. MONTCLARE:  The grocery store.  They owe the

15   bank $10,000.

16             THE COURT:  Right.

17             MR. MONTCLARE:  So they also owed the delivery guy

18   $15.  The bank has a lien on every asset that they have and

19   it's a superior lien because the debt preceded the debt that

20   was owed to the business.

21             THE COURT:  Here, you're saying the license

22   agreement is an asset of Surf9.

23             MR. MONTCLARE:  Yes.  It says it right in the

24   agreements.

25             THE COURT:  So therefore your argument is that

1   Body Glove cannot terminate it even if it, and you're saying

2   even if it's clear that Surf9 has violated or breached the

3   agreement or ETC, and hasn't cured and notice has been

4   provided.  You're saying Body Glove could not terminate it

5   because the license is subject to a lien by a superior

6   creditor.

7          MR. MONTCLARE:  Absent, absent an intercreditor

8   agreement that permitted it.  So the only time it would be

9   permitted is if they gave proper notice to cure, they had a

10  proper termination agreement.  That's all the stuff we want

11  to discuss.  And in the end, the senior debt wipes out the

12  company, they get nothing.  They get nothing under the

13  agreement.  And under the UCC law.

14         THE COURT:  So let me hear from the defendant and

15  I appreciate your patience on this.

16         I don't know which of the three lawyers is going

17  to speak but go ahead.

18         MR. LEVY:  This is Sam Levy, your Honor, I'll

19  speak.  And thank you.

20         Your Honor asked a lot of important questions.  I

21  won't be so arrogant to say "good questions on our behalf."

22  But a lot of important questions that I was going to ask

23  your Honor to actually ask counsel.

24         We were accused, among other things.  We, meaning

25  Body Glove, of playing the legal system, okay?  So let's

1    then talk about the legal system.  What is omitted in the

2    plaintiff's papers, and we object to the late submission of

3    the memorandum of law just yesterday evening.  But assuming

4    your Honor takes into account its contents.  What has been

5    omitted from the other two motions pending before Court is

6    an analysis of Rule 65(b)(2) that the state court TRO has to

7    meet every element in order for it not to be dissolved of

8    §65(b)(2) which includes, with regards to TROs issued

9    without notice, they have to state the date, the hour it was

10   issued, describe the injury, and state why there's

11   irreparable harm.  None of that is included in this state

12   court TRO and that's not in dispute.

13        In addition, under Rule 65(b)(1)(a) there's no

14   affidavit or verified complaint which even shows irreparable

15   harm in the underlying state court context.  We cite to the

16   Court several cases <u>Granny Goose</u>, <u>Gardner</u>-<u>Alfred</u>, <u>Rabbi</u>

17   <u>Jacob</u>, <u>Lapa</u>, and <u>Vicky Vij</u>.

18        We ask the Court look at those cases, they're all

19   state --

20        THE COURT:  Mr. Levy, I'm sorry, let me cut you

21   off.  I don't want to actually talk about whether I am

22   preserving, continuing, or not vacating the state court TRO

23   in the absence of any reasoning behind it.  Because there

24   was supposed to be a hearing, that obviously got interrupted

25   because you removed the case.  So rather than discuss that,

1  why don't we just talk about -- as I said at the

2  beginning -- the factors that would allow me to impose a

3  preliminary injunction under Rule 65 if assuming plaintiff

4  wants and that's obviously what they want.  You can call it

5  "continuing the state court TRO" but I'm not going call it

6  that.  I'm talking about impose a preliminary injunction

7  which is what the state court was going to address on

8  December 18th had the hearing happened.  So let's just talk

9  about it in that context.

10         MR. LEVY:  Sure, your Honor.  I'll pivot to that.

11  So let's pivot then to standing, okay, as your Honor raised

12  that.

13         I don't think there's any dispute that Olden Group

14  an interloper stranger to Body Glove prior to the LOI and

15  prior to the lawsuit has no standing in this case because,

16  number one, it's not a party to the license agreement.  It's

17  got an incidental beneficiary of the license agreement.

18  It's not an intended beneficiary of the license agreement.

19  And even if it was an incidental beneficiary with a

20  financial stake, it has no standing.  We have cited cases at

21  page 15 of our memorandum of law.

22         Even if the license and the intercreditor

23  agreement were somehow credited to be assigned by your

24  Honor, there's been no foreclosure on any of the assets.

25         There have been UCC filings.  Mr. Montclare

1  referred to Body Glove as juts a general creditor, no, it's

2  a secured creditor.  It has made UCC filings in this case.

3  And I would encourage Mr. Montclare during the break while

4  I'm presenting to the Court to specifically find in the

5  intercreditor agreement where Body Glove is prevented from

6  terminating the license agreement.  There is no place and we

7  know that not just because of the omission of such language

8  in the intercreditor agreement, but because under Section 9

9  of the intercreditor agreement, and if your Honor is going

10  to move to that.

11               THE COURT:  I'm looking at it.

12               MR. LEVY:  Under section.

13               THE COURT:  The right to cure provision?

14               MR. LEVY:  Correct.  The lender has a right but

15  not the obligation to cure.

16               So if there was no bases far the licensor,

17  Body Glove, to terminate then why would there be a passage

18  allowing ETC, the factor, to cure a default?  We also know

19  that and we can just revert to the agreements that we have

20  in the LOI.  The letter of intent omits the word "license."

21  It omits the license agreement, there's no reference to it,

22  it doesn't even use the word "license" in it and there's a

23  reason for that.  There's no rep and warranty that it

24  exists, that the license exists.  A seasoned and experienced

25  factor like Olden Group, would have if it understood that

1   transfer of the license was part of this underlying LOI

2   would have included that passage.  We also know that the LOI

3   does not convey transfer of the license for a few reasons.

4            Referring back to the intercreditor agreement

5   under Section 2 this is just assuming that the intercreditor

6   agreement there's a standing in the shoes which we object

7   to.  But under Section 2 of the intercreditor agreement, it

8   specifically provides that the license agreement cannot be

9   transferred to the lender, who is ETC, or to a third-party.

10  And why is that clause included?  Because in the license

11  itself, there can be no transfer of the license.  It's a

12  nonassignable and nontransferable license under

13  Section 2(a)(I) of the license in Section 13.

14           The only thing the license conveys by its terms is

15  IP rights, that's it.  Which is not different than every

16  other kind of license that your Honor has probably been

17  presented with in your years of experience on the court.

18  And speaking of which, the extent to which Mr. Montclare

19  threatens this massive lawsuit, whatever it might be, that

20  massive lawsuit would be for damages derived from what the

21  plaintiff claims is an improper perhaps termination.

22  They're arguing that the notices didn't comply with the

23  license agreement.  We have no information about how the

24  notices, the default notices, the three of them, which are

25  in our papers.  We have no information about how they didn't

1  comply with the license agreement, only an allegation that

2  they're improper for some reason.

3          We also have no allegation as to on what basis the

4  default notices should be discarded.  Instead the default

5  notices were issued and your Honor asked about timing.  So

6  the default notices were issued after the LOI.  Your Honor

7  cogently observed that the LOI is dated December 9th and

8  they sued the next day, December 10th.  Mr. Montclare would

9  have you have believe that the parties were speaking and

10 there was a threatened termination of the license agreement,

11 but that could not have been occurred because no notices,

12 those two notices on December 16th, had not yet gone out

13 yet.  And an experienced licensee like Surf9, and an

14 experienced Olden Group, an experienced factor like ETC

15 would have known that absent notices, there could not be a

16 termination.  And moreover, ETC had the right to cure and

17 there were two forms of notices, default notices.  One was a

18 payment, they could have just paid the amount of money is

19 roughly $1.3 million.  ETC could have just paid.

20          Olden Group, if it is to be believed that this

21 deal is just to sell debt in a credit bid -- later on UCC

22 credit bidding, then it could have been instructed Surf9 to

23 satisfy the cures to cure the defaults.  It could have done

24 all of those things but it didn't which is consistent with

25 your Honor observing that there really is not irreparable

1   harm.  How do we know that?  Well, I was going to go through

2   all the case that's we cite about there being a lack of

3   irreparable harm and there's nothing cited below on behalf

4   of the plaintiff to do it.

5           In the brief we just got yesterday, there are

6   three cited about irreparable harm, they all deal with

7   licenses and they all deal with witnesses that have had been

8   in place some family relationships for many, many years and

9   the termination of those licenses would have destroyed a

10  business that had been existing for a lot of years.  Those

11  three cases deal with those situations which is unlike here.

12          We can just go back to talk about with regard to

13  irreparable harm what Mr. Montclare himself has advocated

14  and I'm pretty sure I wrote this down.  But he started off

15  in his fourth sentence, when given a chance to present to

16  your Honor that his client will incur substantial damages

17  absent a noncontinuation of the TRO.  He later went on to

18  say that his the company would be devalued.  There would be

19  a lawsuit for millions.  And the entire purpose of the LOI

20  was that it be for a profitable arrangement.

21          We just don't have to take Mr. Montclare's word

22  for it, we can take his client's word for it, too.  At

23  Document 12 of this case at Paragraph 11, Mr. Sprei

24  testifies that irreparable harm will result only because of

25  the devaluation of plaintiff's collateral.  We can assess

1   what devaluation that is, we can bring in experts assuming

2   that it exists.  And that harm is reparable harm, not

3   irreparable harm by definition and by law.

4           We also know that it's true because, in this case,

5   Mr. Montclare, who is -- a very good question by your Honor

6   as to whether there was an obligation of Olden Group to

7   continue the LOI if there was a termination.  And

8   Mr. Montclare vacillated a little bit about whether they had

9   to do it, whether they didn't have to do it; they would

10  think about it, there would be some negotiation.  That in

11  and of itself, in my view, the plaintiff talked itself out

12  of a TRO in this case.  Because if it does not have to

13  continue the LOI, which we now have that to be the case on

14  the record, there can be no irreparable harm.

15          And even if we discredit those remarks by

16  Mr. Montclare, we can look at the LOI itself.  Because, by

17  its very language, it is subject to later definitive

18  agreements.  It's prospective in terms of what the parties

19  are obligated to do.  If there are definitive agreements,

20  there's a return of an amount of money that was paid, the

21  deposit, if there is no definitive agreement.  And it also

22  has clauses in here that contemplate the further transfer of

23  assets to third-parties.  So this is not an entire purchase

24  agreement as has been portrayed.

25          In addition, to make the standing argument a

1   little bit more complex is that this agreement is between a

2   company called Garantia, LLC, okay, another interloper to

3   Body Glove.  If you look, the buyer is defined -- I'm sorry

4   the seller is defined as Garantia.  Garantia, LLC, is a

5   company who is selling the debt.

6           Now, presumably, Garantia is related to Surf9..

7   Surf9 is also a party to this.  But there's been no

8   representation in here about what Garantia is or how it

9   affects standing in this case.

10          I think your Honor had a question and I didn't

11  want to...

12          THE COURT:  No, you're good.  Go ahead.

13          MR. LEVY:  The other issues of a Rule 65

14  injunction deal with the balance of equities and the balance

15  of hardship.  Really none advocated in the parties' papers,

16  in the plaintiff's papers.

17          And then, we often turn in these kinds of

18  situations to the likelihood of success on the merits.  In

19  this case, the only thing we have is a summons with notice,

20  we don't have a complaint.  The summons with notice merely

21  says that they're entitled to a declaration that you can't

22  terminate the license.  So we can't really address the

23  merits of the claims other than what we're generally

24  speaking about now and that is whether or not there is an

25  entitlement to a TRO.

1       So, your Honor, I could take the time and go

2   through all these other cases but I think that your Honor

3   questions with regard to the letter of intent and the impact

4   upon this and the standing and the issues we raised about

5   irreparable harm of which there is none.

6       And on that point, I just refer to one final

7   point.  We're dealing with Mr. Sprei's affirmation that he

8   submitted in support the TRO in the state court.  So there

9   are two affirmations by Mr. Sprei.

10      One in the federal court action is in service of

11  the motion to continue the TRO.  The original affidavit

12  talks in the state court, again, this TRO was given on a

13  two-page affirmation with no memorandum of law on no notice

14  and ex parte, okay?  But Mr. Sprei, in an unsigned

15  affirmation, the basis of which apparently was used by the

16  court to issue the TRO, commented that the irreparable harm

17  arose out of a product that is unique and exclusive.

18      Now, theres no cases cited how it's unique or

19  exclusive and under what basis it would be irreparable that

20  probably because it's the product itself.  Body Glove makes

21  surfboards and wet suits and things like that.  There is no

22  authority to support that a license that allows for that

23  kind of product is unique in and of itself to warrant a TRO

24  based upon irreparable harm.

25      And with that, your Honor, I'm open to any of your

1  questions.

2        THE COURT:  One question I have with respect to

3  the notices that have been filed about the breach or the

4  default, how long a cure period is provided?  In other

5  words, when would be the first date that your client could

6  actually terminate the license?

7        MR. LEVY:  We can terminate now.

8        THE COURT:  Okay.

9        MR. LEVY:  Under the initial license agreement, it

10  was five days.  The sixth amendment to the license agreement

11  truncated that to three days.

12        THE COURT:  Right.  You were referring to

13  Paragraph 16 of the original license agreement which I went

14  to look at.  It actually has two provisions, this is what I

15  think Mr. Montclare referred to, 30 days for some parts but,

16  really, when it comes to breach of payments due under

17  Paragraph 6, I realize there are a lot of amendments

18  thereafter.  But I presume this is one of the bedrock

19  provisions, it says five days.  And you're saying in the

20  sixth amendment, which, admittedly, I didn't go through all

21  the amendments, that got decreased to three days where there

22  is nonpayment.

23        MR. LEVY:  Under Section 11 of the sixth amendment

24  which really is the penultimate amendment for the Court's

25  purpose.

1          THE COURT:  Right.

2          MR. LEVY:  It was reduced to three business days.

3          THE COURT:  Okay.

4          MR. LEVY:  And given that, we sent these default

5    notices considerably more than three business days ago.  Our

6    client should not be judicially impaired from exercising its

7    right to terminate the agreement.  And as I volunteer that,

8    perhaps Mr. Montclare can find a passage in the

9    intercreditor agreement or any other agreement which

10   prevents termination of a license which would be, frankly,

11   the first in the history of licensor/licensee relationships

12   in this kind of context.  Then we're open to discuss the

13   interpretation of such a passage.

14          But under Section 2 of the intercreditor

15   agreement, the only place anyone could possibly look to for

16   a basis to continue the license in the absence of breach,

17   there is no provision preventing termination of the license

18   agreement.  To the contrary, the provision provides that the

19   license agreement cannot be transferred to a third-party.

20   And we also know that to be true because in Mr. Sprei's

21   affirmation, he talks about in Paragraph 9 he talks about

22   requesting Body Glove's consent to assign the license

23   agreement in several passages in their papers that they've

24   submitted.

25          There is an inclusion that it is Olden Group who

1  wants the consent of the licensor, Body Glove, for an

2  assignment.  If there wasn't a basis to terminate the

3  agreement, and it could be automatically assigned by

4  Olden Group, the plaintiff standing in the shoes of ETC

5  vis-à-vis the creditor agreement, then they wouldn't have

6  been seeking that voluntary assignment in this case.

7  Instead, they would be exercising it.

8          We submit in closing, your Honor, that all of the

9  claims of harm that the plaintiff Olden Group has submitted

10 that it's going to suffer losses, it's going to devalue its

11 -- the indebtedness and its ability to conduct a credit sale

12 and those kinds of things are all compensable by money

13 damages.  And they're not only is no irreparable harm in

14 this context but there cannot be irreparable harm in this

15 context.  Using the words of counsel and Mr. Sprei himself.

16         THE COURT:  So let's go back to you for a second,

17 Mr. Montclare, and let's start off by having you answer the

18 question posed by Mr. Levy.

19         Is there anything in the intercreditor agreement

20 that says that that ETC could have the rights to the license

21 itself.  It seems to me Paragraph 2 says the opposite.  In

22 other words, I think one of your arguments was that the

23 license, the rights of the license under the license

24 agreement is part of the collateral or part of the asset,

25 rather, that was being transferred in the deal between ETC

1  and your client.

2           You're on mute.

3           You're still on mute.

4           MR. MONTCLARE:  So Article 5A of the intercreditor

5  agreement says, "Priority of liens."  Then it goes on to

6  say, "For so long as lender," which is my client, which is

7  ETC, "has a lien on the collateral," that includes the

8  license, "securing the senior debt," that's the license,

9  "any lien licensor with the defendant may now have or

10  hereafter acquire upon the collateral securing the

11  subordinated debt.  Shall be subject and subordinated in all

12  respects to any lien upon the collateral securing the senior

13  debt."

14           So what that says is that the right to do

15  something to monetize the junior debt collateral with the

16  collateral that is subject to a senior lien, it's junior.

17  So if there's going to be some economic exploitation of the

18  license for value, that value has to go to ETC.  Has to.

19  That's what it means.

20           THE COURT:  Paragraph 2, though, says and it seems

21  to be a carve-out for that.  It says the "Lender," meaning,

22  ETC, "may not in its capacity of holder of any such lien."

23  So this is when defendant licensor consents to the grant by

24  the borrower to the lender of a lien.

25           MR. MONTCLARE:  You have to read the rest.

1      THE COURT:  "Cannot transfer any or all of the

2  borrower's right, title, and interest under the license

3  agreement."

4      MR. MONTCLARE:  "Except as provided herein."

5      THE COURT:  And you're suggesting that

6  paragraph --

7      MR. MONTCLARE:  Five.  And if you read

8  Paragraph 4, it's a lead-in to five.  Notwithstanding

9  anything else in the agreement, we are the senior lienor and

10 we have a right to exploit the collateral that supports that

11 lien.

12      And then it guess on to say that, "And so long as

13 the lien is still existent that the lien licensor is

14 subordinate."  And then if you go down even a little bit

15 farther B explains how these actual foreclosures work.  It's

16 little complicated, but the bottomline it says at the end of

17 this, that because senior lienor's rights as a senior

18 lienor, if it wants to foreclose on that lien it can.

19      So the idea that, oh, we gave that up.  I was also

20 advised by my client, I have to bring it up.  He said that

21 they closed today on the MOI.  I don't have it, I wasn't

22 there, I don't do their corporate work.  I was expecting

23 today to be a different kind of -- it was originally set up

24 as a conference.  I wanted to get a brief to the Court

25 because we were only given two days notice initially so

1  that's why I briefed it to the Court.  The idea that

2  Mr. Levy said it should be rejected, the Court should look

3  at the briefs that were submitted when he gave two days

4  notice is a little bit rich.

5           But putting that aside.

6           So that -- the interest, he is affected by this

7  because he has an agreement so there is standing.  And he's

8  bound and he's already but up four and a half million

9  dollars.

10          THE COURT:  Which he can get back.

11          MR. MONTCLARE:  No, the deal is done.

12          THE COURT:  No, but if you prevail, or if he

13  prevails, now we're going to go to irreparable harm for a

14  moment.

15          It is possible to quantify the injury that your

16  client ultimately, or the loss, or the damages I should say

17  that your client would ultimately claim.  The only

18  irreparable harm you point to is the loss of Surf9's

19  business.

20          And, again, the fact that I think the best

21  connection you have is this notion that your client could

22  then also try to run Surf9's business under the license

23  agreement and that ability would be lost if the license

24  agreement is terminated.  That's sort of the only agreement

25  your client can make about irreparable harm.  But, again,

1    that's an income stream.  That's sort of is a quantifiable

2    number as well.

3         MR. MONTCLARE:  What would be irreparable is if

4    they terminate the license, it would impair the security.

5    That's what he said in his initial submission.  That's a

6    certain.  If they kill something that's part of this

7    collateral, the other side does --

8         THE COURT:  Doesn't he then get compensated

9    whatever he paid for it?

10        MR. MONTCLARE:  Yes, but he's -- they're not

11   entitled to do it.

12        THE COURT:  No.  Again, you're putting the cart

13   before the horse.  You may prevail, in which case then

14   everything -- that if you prevail, then your client wins

15   some money.  The question is, can his injury, whatever he's

16   claiming, the damages or whatever he claims he will lose as

17   a result of it, is it some harm that be compensated and it

18   seems that it can.

19        MR. MONTCLARE:  Can we also -- we're not seeking

20   damages.  It was effectively seeking specific performance of

21   the intercreditor agreement.  This is not -- and we're at a

22   point in the case right now where if we're right, we don't

23   want to have lose the business that we wanted to run.  That

24   we're going no run this business, we're going to all make a

25   lot of money out of it, but it's also an opportunity for the

1   business.

2           THE COURT:  Here's the problem I'm having.

3           We started off the whole conversation, the motions

4   themselves, when your client only had a letter of intent.  I

5   asked you the question about whether he would have to go

6   through with it if, in fact, the circumstances changed upon

7   which the letter was negotiated.  You waffled, I think as

8   Mr. Levy pointed out, and now your client, knowing that this

9   is an issue and a genuine risk that I might rule against him

10  with respect to this TRO, goes ahead and solidifies the

11  deal.

12          Quite honestly, if this was to force my hand which

13  is really note -- this is the height of almost

14  self-inflicted injury.  I understand that maybe he felt like

15  it was Scylla and Charybdis, like, damned if you do; damned

16  if you don't.  Either you're bound to have no standing

17  because you haven't actually signed a deal, or you signed a

18  deal and I find that you just created some injury

19  potential -- you tried to manufacture injury by signing into

20  this situation know that there was some risk involved.

21          You can't claim it's irreparable, I think when

22  someone takes it on knowingly.  Obviously, I think I'm

23  mixing terms a bit.  But, to me, this smacks a little of

24  gamesmanship, quite honestly.  I'm not saying you did

25  anything wrong Mr. Montclare.  I'm saying your client was

1   aware of this motion.  Your client with an aware that there

2   was a distinct possibility I was not going to continue the

3   TRO, or moreover, I was not going to grant a new TRO.  And

4   yet, he decided to go ahead with this deal where there is

5   this real risk that the agreement can be terminated.  And

6   then, ultimately, come in and say I'm injured.  I think this

7   is -- and it's irreparable.  It was reparable, it could have

8   been avoided.

9           MR. MONTCLARE:  Your Honor, if I could just

10  interrupt for a second?  I'm sorry, I don't know, I don't

11  like interrupt especially judges but I want to make a point.

12          This NOI was a binding of NOI.  It was subject to

13  them negotiating the terms of a definitive agreement.  He

14  did that, it took a while.  And yes, this litigation has

15  been part of an issue that we have to deal with because,

16  essentially, we are concerned that they're going to

17  terminate without notice.

18          THE COURT:  You gave notice.

19          MR. MONTCLARE:  Without having the ability to do

20  it.

21          So the parties said, and it was a, I understand

22  now, that this definitive agreement was entered into.  And

23  it's not like it changed the terms of the agreement.  This

24  first intended amended restated letter of intent was signed

25  on December 9th.  I mean, to suggest that in every case a

1  licensor can jump ahead of the rights of a senior secured

2  creditor, as was suggested to you, that's -- let him prove

3  that.  Let's have some real witnesses here.  We have lawyers

4  yakking.  I think that anyone who looks at that who is

5  familiar with this business will be able to tell you that

6  this kind of intercreditor agreement is not that unusual.

7  What it basically says is let's keep the business running,

8  we'll give you a little bit of your piece until you pay it

9  off.  We'll allow you to make a little bit on new business

10 and we are going to try to make the business go forward so

11 that it will be successful going forward which would be good

12 for the debtor, Surf9.  It will be good for the employees.

13 It will be good for keeping the business going and having an

14 opportunity to flourish.  And it will be good for me because

15 we'll make some money, we think we'll make more money this

16 way.  Because as part of these intercreditor agreements, you

17 get some percentage of going-forward income because there's

18 a financing aspect to it.

19         So the idea that somehow what we're doing is

20 underhanded of self-inflicted wounds is really not the case.

21 The only thing that's happened here is we have a junior

22 creditor who is trying to jump through the hierarchy of

23 lienholders and get what he wants which is to do business

24 with somebody else with a license that is held and operated

25 by us as a superior lien creditor.

1          And just one thing.  When Garantia, if you read

2   that part about Garantia, I don't know why he brought that

3   up it says that the buyer, which would be my client, will

4   purchase from Garantia certain assets.  That doesn't -- what

5   does that mean?

6          It goes on to say that Express Trade Capital,

7   Express, obviously is the debtor, excuse me, is the

8   creditor.  So I don't know what the Garantia fluff was all

9   about.  It has nothing to do with this case.

10         THE COURT:  Why do you say it has nothing with the

11  case?  It's letter of intent that you're saying gives you

12  the superior -- your client the superior lien.

13         MR. MONTCLARE:  Counsel argued that Garantia is a

14  non-party stranger to this.  And what are they doing in

15  this -- involved in this deal?  All that Garantia, which is

16  mentioned in the first amended restated letter of intent,

17  the one that we say is a binding letter of intent.  All it

18  says about Garantia is they're going to sell some assets.

19         THE COURT:  Mr. Frisolone, it's G-a-r-a-n-t-i-a.

20         But what is Garantia.

21         MR. MONTCLARE:  Garantia is affiliated with

22  Express Trade Capital.  It's an investment --

23         THE COURT:  It's related to ETC.

24         MR. MONTCLARE:  Yes.  It's not related to Surf9.

25         THE COURT:  All right.

1          MR. MONTCLARE:  By the way Surf9 and ETC fully

2    endorse getting this restrained on termination of the

3    license.  What they're doing, your Honor, is they're going

4    to force us into bankruptcy.

5          THE COURT:  Force who into bankruptcy?

6          MR. MONTCLARE:  Force Surf9 in this bankruptcy.

7    You know what they'll get at the end, nothing.  And the

8    business will be destroyed.

9          THE COURT:  Maybe they're making a bad business

10   decision, I don't know.  But they maybe entitled to make it.

11   And the question really is we still have to go back to the

12   rights and the procedure involved here.

13          I just want to ask you one other thing about this

14   first amended and restated letter of intent.

15          I think as you told someone in my chambers you did

16   submit a redacted copy.  And I'll note what's redacted is a

17   paragraph that says excluded assets.  Now, I think you

18   represented to someone maybe my law clerk, that the

19   redactions don't affect the decision here.  But I would like

20   to actually receive an unredacted copy.  I'm not quite sure

21   why it was redacted.  But when the paragraph is entitled,

22   "Excluded Assets," I mean.

23          MR. MONTCLARE:  I have no problem with that, your

24   Honorer.  Just order us to do it and we'll send you one

25   without redactions.

1          THE COURT:  Okay.  Why don't you.

2          MR. MONTCLARE:  The reason that was is because

3    there was a confidentiality provision in the agreement that

4    if you order us to send it to you, we can send it to you.

5    But we have no problem sending it to you.  I can tell you

6    what it is, but basically, it's other assets that are

7    involved with other notes having nothing to do with this.

8          THE COURT:  All right.

9          MR. MONTCLARE:  I'll send it to you.

10         THE COURT:  Here's what I would like you to do.  I

11   would like you to e-mail it to my chambers.  I'm assuming

12   the defendant has a copy of this already.

13         MR. LEVY:  No.  No, Your Honor we've requested.

14   We requested from the beginning of the LOI.  We finally ale

15   got a redacted version.  We were asked to enter into an NDA

16   which provided that we couldn't use it in court.  So,

17   obviously, we objected to signing an NDA precluding us from

18   using the non-redacted LOI in court.

19         MR. MONTCLARE:  That's not exactly right but you

20   can say that.  What happened, actually, is I asked for an

21   NDA, we needed an NDA so that it could be disclosed

22   publicly.  And I never said we couldn't use it in court.

23   And the NDA was never drafted, it was discussed.

24         We were having discussions, I thought this case

25   would be resolved but apparently they want it their way and

1   they want -- they won't agree to anything.  They send

2   letters saying they'll agree to a settlement on these things

3   where they keep on adding more and more and more and more

4   and more money to what they want to resolve it without

5   telling us they're going to withdraw their termination.

6   That they're not going to terminate.  I don't know what

7   their problem is.

8           THE COURT:  Can I ask you a related question.

9           I don't think you ever provided a copy of the

10  factoring agreement.  I don't know if it's particularly

11  relevant between Surf9 and ETC.

12          MR. MONTCLARE:  If we have it we can do that, your

13  Honor.

14          THE COURT:  I don't know if the defendant has seen

15  that.  But I'm just trying to keep track of all these

16  different agreement and it seems worth...

17          MR. MONTCLARE:  Those are relatively short

18  agreements, your Honor, basically.  That's called a purchase

19  order factoring agreement, that's what POF means.  We can

20  send those to you.

21          THE COURT:  What I want to do here is since this

22  is the last day of the extension of the state TRO is I would

23  like to reach a decision today.  I can't do it right now in

24  court, if you will.  I want to consider the arguments that

25  are made and look at these documents again and I hope to

1   issue something on the docket or in a short memorandum and

2   order later today or tonight.

3          I just want to make sure that before I let you all

4   go that I understand exactly, Mr. Montclare, your argument

5   about I guess we'll call it standing, really, which is that

6   your client now it turns out as we've been talking entered

7   into, you represent, an actual agreement.  And if you have

8   it, obviously, I think you should also forward that to

9   everyone via e-mail.  That presumably looks a lot like the

10  letter of intent and, therefore, your client stands

11  basically in the shoes of ETC and has all the rights and

12  obligations that ETC has under the intercreditor agreement

13  between Body Glove, Surf9, and ETC.  And, therefore, your

14  client has a superior lien as to all of Surf9's assets

15  including any right Surf9 that is under the license

16  agreement and there we have a dispute about what Paragraph 2

17  means versus what paragraph was it.

18          MR. MONTCLARE:  Seven.

19          THE COURT:  Seven means.

20          And, therefore, you would argue your client

21  certainly has a right to prevent -- well, to argue that the

22  termination is improper.  And, therefore, I think that's

23  sort of the extent of it, I guess, that gives you standing

24  at least to make this argument.

25          Also, you would argue that somehow your client is

1   going to be injured and with the standard for standing is

2   requires very little.  I'm not sure I agree with you when it

3   comes to these breach of contract issues because I think

4   there is some notion of an intended beneficiary that comes

5   into play here.  It's not just anyone who might be injured

6   by the breach of contract I think who gets standing.  I

7   don't think the standard is that loose.  If you think about

8   it, consumers might be injured because it can no longer get,

9   you know, Body Glove products from Surf9 one could argue.

10  But I'm being somewhat facetious on that.

11        But that's what I understand your argument to be

12  about standing.  And then irreparable harm is basically that

13  Surf9's business will be destroyed thereby depriving your

14  client who just purchased the indebtedness and also the

15  right to exploit Surf9's assets including its license

16  agreement or license rights, rather, to perpetuate and grow

17  or make prosper Surf9 if they want to.  That's essentially

18  the nature the irreparable harm.

19        And you're saying it can't be compensated by money

20  because Surf9 will be destroyed.

21        MR. MONTCLARE:  The law favors the enforcement of

22  contracts that have a unique quality to them.  I mean, we

23  cited cases in our brief.

24        THE COURT:  Why is it a unique product?  I guess,

25  going back to something that Mr. Levy said.  I mean,

1  Body Glove is the one who makes the products that are being

2  licensed, I guess, if I'm correct.  And Body Glove isn't

3  saying their products are so unique.

4          Am I correct, that that's what you're getting at

5  Mr. Levy?

6          MR. MONTCLARE:  It's a unique opportunity to --

7          THE COURT:  It's a unique opportunity for your

8  client.

9          MR. MONTCLARE:  For my client, yes, it is.

10  Because he's going to be able to now to hopefully build the

11  company that is not prosperous now and is in debt into a

12  company used to be which had $50 million worth of assets, he

13  can continue to have employees.  There's a public interest

14  to be served by not having companies go out of business and

15  I think --

16          THE COURT:  Not necessarily if they're in default

17  of their obligations.  I think that's the law of the

18  fittest.  That's what, you know, capitalism is.

19          MR. MONTCLARE:  Yes, but not really.  In a case

20  like this, there was a secured debt and the creditor and the

21  creditor who is secure says, you know what, I would

22  rather -- and this happens all the time.  I would rather

23  restructure the company and fund it, put some money into it,

24  so that it can continue to exist rather than just take my

25  marbles and go home.  From a business perspective, it

1   probably is a good thing because I don't know if what the

2   liquidation value is of Surf9 but...

3          THE COURT:  What you're essentially saying is the

4   lost business opportunity to your client is the irreparable

5   harm.

6          MR. MONTCLARE:  Yes, exactly.

7          THE COURT:  All right.  I understand your

8   arguments.  I just want to make sure I didn't, you know,

9   that I come away from this understanding what your arguments

10  are and the key issues of both standing and irreparable

11  harm.  And standing, to me, goes to likelihood of success.

12  Obviously, if you have no standing, you have little

13  likelihood of success or a serious question on the merits.

14         So I this that's part of it.  That's a big part of

15  it for me.  Because, as I've said from the beginning, I'm

16  not necessarily convinced otherwise still that your client

17  is simply just the wrong party to be bringing this action

18  about a breach of contract or wrongful termination of a

19  contract.  That's any problem.  It's not as if you didn't

20  have the opportunity to bring those parties in.  I mean you

21  filed your state case back in December 10th, I think.  This

22  case was removed December 17th.  We're now at January 7th.

23  And, yes, I acknowledge that there's been a lot of paper and

24  burden going on with the TRO issue, but, obviously, one

25  other thing that could have been done I think to make this

1  less controversial is to have those two parties also brought

2  in in some capacity to make the arguments that you represent

3  they would make which is, yes, we believe our interests

4  would be irreparably harmed or we feel like we would be

5  irreparably harmed and we have a likelihood of success

6  because we are actually the parties to the contract.

7        I just don't understand how you can argue so

8  vociferously when those steps weren't taken.  And then your

9  client goes ahead with the deal while we're discussing the

10  fraught nature of this whole endeavor and how he could lose

11  what you say he will be irreparably harmed by, namely,

12  termination of the license agreement with Surf9.

13        So I just feel like this is all constructed in a

14  way, and I can't get away from feeling that it is

15  self-inflicted.  I'll stay away from assigning an impure or

16  strategic motive but it's ill-advised.  Maybe you cannot

17  create the injury and all of a sudden then cry foul that all

18  of a sudden this is irreparable to us.

19        Like I said before, if feels like it was avoidable

20  up to this moment in time.  That he could have said, listen,

21  if they terminate, we're not doing this deal.  And so he

22  loses a business opportunity but it's a lost occasion by a

23  fight between ETC potentially and Surf9 and Body Glove.  But

24  it's not one your client had to buy in or buy, purchase,

25  quite frankly.  He bought himself a fraught situation.

1        And then to claim that I have to give him a TRO to
2   keep things in place when there was a way to avoid this, I
3   think is not the way this should have -- this should go.
4   That' not the proper use, I don't think, of the judicial
5   system.  But let me think about this further and you'll have
6   a definitive answer by the end of the day.

7        MR. LEVY:  Your Honor, may I just add a couple
8   points?  I know we're late.

9        Mr. Montclare talked about it's rich that we moved
10  on Rule 65(b)(4) on two days' notice.  It's about the tenth
11  time we've heard this since this matter stated.  That's what
12  the rule provides, that's how we moved.

13       What I think is more rich is what your Honor
14  observed and that is they allegedly closed this LOI during
15  the pendency of a TRO with knowledge of the defaults of
16  Surf9.  And Surf9, you know, this $27 million in debt and
17  how they're going to be harmed if the license is terminated.
18  Well, that also cannot be true, not just it isn't true it
19  cannot be true because Surf9 has more brands than just
20  Body Glove.  It has Nautica, it has Eddie Bauer, it has
21  Spyder, it has Air Walk and many other brands.

22       My guess is some of these excluded assets pertains
23  to these other brands.  My guess is in this LOI, there are
24  carve-outs for some of these other brands.  Perhaps when we
25  see the definitive agreements, we'll know more.

1          And on a housekeeping note, your Honor, if the

2    LOI, the nonredacted LOI is going to be sent to your Honor,

3    can it also be sent to us in nonredacted form?

4          THE COURT:  I don't know the merits of this NDA

5    issue.  If there is a confidentiality agreement, I don't

6    want the plaintiff to run afoul of it.  But I think that if

7    you folks can at least agree that you will not disclose it

8    to any other party and only -- and if you're going to

9    reference it, reference it under seal in this proceeding.  I

10   think it's only fair that you get a copy of it.

11         MR. LEVY:  We can make that representation but we

12   also want to be able to share it with our client.  And our

13   client will keep it with the parameters of client use as

14   well, too, which I have more than once represented to

15   Mr. Montclare in our discussions.

16         So we would want to use it in court to the extent

17   necessary and now I'm understanding that we could and we

18   also want to be able to show it to our client.  Because,

19   otherwise, he's submitting it to the Court or giving it to

20   us to us AEO and we haven't bargained for that and we would

21   perhaps need an opportunity to contest an AEO designation.

22         THE COURT:  Mr. Montclare, to the extent you're

23   really relying on this, I don't think you can hide portions

24   of it from the defense.

25         Now, if you want to submit it to me at least in

1  camera so I can review it first, we can have a further

2  discussion.  Because at the end of the day, you're not going

3  to have a chance to use it, Mr. Levy, in the context of

4  fighting about this TRO or preliminary injunction.  So we

5  may save that disagreement for a later date.  I would like

6  to see it now just so I have a full understanding of this

7  letter of intent which has somehow been, I think,

8  concretized into a actual agreement.

9          But you can raise this issue again or we can

10  address it again depending on where the case goes from here.

11  I just don't want to get hung up on it so that you don't get

12  to -- or I don't get to see it before we resolve this

13  because I would like to see it and then I'll be able to rule

14  more intelligently once I actually see the redacted portions

15  of it on any request to unseal it or have you receive it

16  under some restriction, okay?

17          MR. MONTCLARE:  We tried to get this to you

18  earlier in the day.  There was some problem with getting it

19  filed.  You said to e-mail it to your chambers, we will do

20  at that.  I would also like to send you, hopefully, before

21  you rule actually the definitive agreement entered into last

22  week.

23          THE COURT:  So that you should share with the

24  defense.

25          MR. MONTCLARE:  We would like -- yes, I think it

1  would be useful for you to have as well because it goes to

2  your standing point as well as the, I believe, as well as

3  the irreparable harm point.

4  THE COURT:  Well, if it ends up being sent to the

5  defense with redactions, we'll have the same discussion

6  about that later.  If it mirrors this letter of intent, I

7  imagine it might.  But just keep in mind that we haven't

8  resolved this redaction issue but at least get a copy to the

9  defense of the final agreement and then send me the

10  unredacted version of that.

11  MR. MONTCLARE:  I was just now referring to the

12  definitive agreement under the letter of intent.

13  THE COURT:  I don't know if it has sensitive

14  confidential information in it.

15  MR. LEVY:  Your Honor, we're, on behalf of the

16  defendant, we're comfortable proceeding that way with one

17  possible caveat.  I mean, your Honor is about to receive two

18  agreements that may or may not impact your Honor's decision

19  and we will not have had an opportunity to review and/or

20  provide comments to.  But we trust, given the nature of this

21  argument, that your Honor will look at it in the context of

22  which it is delivered.

23  THE COURT:  That's fine.  I mean, the alternative

24  given the hour and given the way this case has unfolded

25  including its assignment and then reassignment to me only a

1  few days ago, I could extend the TRO, in effect, 'till

2  tomorrow so that everyone can have a chance to take a look

3  at the actual agreement.  And then if you want to, submit

4  anything very quickly by noon tomorrow.

5          MR. LEVY:  We're comfortable on your Honor not

6  doing that.  We're comfortable with you taking in the

7  agreement and issuing the ruling tonight.

8          THE COURT:  Okay.

9          MR. MONTCLARE:  That's what I would suggest that

10  we do.

11          THE COURT:  Okay.

12          MR. MONTCLARE:  They're important documents, they

13  made a big deal of them.  They effectively say they suspect

14  it has to do with other of their licensed products.  I have

15  no idea what they're talking about.  So I would like to be

16  able to put -- just have a full record.  This is an

17  important motion, we spent a lot of time on it.  And the

18  delay, quite frankly, is because it had nothing to do with

19  us.  We didn't delay anything.  We tried to get a hearing as

20  quickly as possible.  We actually had to make an Order to

21  Show Cause and made a request for a rapid hearing which we

22  did early on.

23          THE COURT:  Well, listen, I think what's driving

24  it is the deadline.  The expiration of the TRO, obviously,

25  is driving a lot of this.

1    Let me just say this, and first of all, apologies

2  to you Mr. Frisolone, the court reporter, whom we're keeping

3  late.

4    I do want to ask you one thing, Mr. Montclare.  Is

5  it correct, though, because you have made the irreparable

6  harm argument as it relates to the destruction of Surf9's

7  business.  Is it correct that Surf9 does sell other products

8  including the ones that Mr. Levy mentioned besides the

9  Body Glove?

10   MR. MONTCLARE:  Yes.

11   THE COURT:  Okay.  So on what basis to you say it

12  would destroy their business?

13   MR. MONTCLARE:  Because it's probably the largest

14  customer we have is Costco and it's a very large portion of

15  the business of Surf9.

16   THE COURT:  All right.  Thank you all very much.

17  I appreciate your argument and a decision will be

18  forthcoming, okay?

19   Thank you.

20   MR. MONTCLARE:  Thank you.

21   MR. LEVY:  Thank you.

22   (WHEREUPON, this matter was concluded.)

23

24                    *   *   *

25

# CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

_____
Anthony D. Frisolone, FAPR, RDR, CRR, CRI
Official Court Reporter

## $

**$10,000** [2] - 39:11, 39:15
**$15** [3] - 39:8, 39:10, 39:18
**$27** [9] - 8:19, 14:8, 14:22, 24:10, 25:8, 34:2, 38:5, 38:11, 69:16
**$30** [1] - 8:7
**$40** [1] - 8:7
**$50** [1] - 66:12

## '

**'till** [1] - 73:1

## 1

**1.3** [1] - 45:19
**10020** [2] - 1:22, 2:6
**10022** [1] - 1:17
**10th** [7] - 32:13, 35:17, 35:21, 36:18, 36:20, 45:8, 67:21
**11** [2] - 46:23, 50:23
**12** [1] - 46:23
**1270** [1] - 1:21
**1271** [1] - 2:5
**13** [1] - 44:13
**139** [1] - 39:5
**14** [3] - 30:24, 30:25
**15** [1] - 42:21
**159,000** [1] - 39:5
**16** [1] - 50:13
**16th** [3] - 32:13, 36:11, 45:12
**17th** [1] - 67:22
**18th** [1] - 42:8

## 2

**2** [3] - 52:21, 53:20, 64:16
**2(a)(I** [1] - 44:13
**2025** [1] - 1:7
**24-CV-8613** [1] - 3:3
**24-CV-8613(PKC** [1] - 1:3
**24-hour** [1] - 36:22
**25** [2] - 33:10, 33:13
**25th** [1] - 1:16
**27** [2] - 26:4, 26:5

## 3

**30** [2] - 33:8, 50:15

## 4

**4** [2] - 17:20, 54:8
**437** [1] - 1:16
**4:00** [1] - 1:8

## 5

**501** [1] - 1:22
**5A** [1] - 53:4

**5th** [1] - 35:16

## 6

**6** [1] - 50:17
**65** [2] - 42:3, 48:13
**65(b)(1)(a** [1] - 41:13
**65(b)(2** [1] - 41:6
**65(b)(4** [1] - 69:10

## 7

**7** [1] - 1:7
**7th** [1] - 67:22

## 9

**9** [2] - 43:8, 51:21
**9th** [5] - 31:10, 35:17, 35:19, 35:20, 36:20

## A

**ability** [4] - 29:2, 52:11, 55:23, 58:19
**able** [12] - 18:2, 26:11, 27:18, 28:1, 30:15, 31:23, 59:5, 66:10, 70:12, 70:18, 71:13, 73:16
**above-entitled** [1] - 75:3
**absence** [2] - 41:23, 51:16
**absent** [4] - 40:7, 45:15, 46:17
**absolutely** [3] - 9:11, 29:23, 33:1
**access** [1] - 3:5
**account** [1] - 41:4
**accountant** [1] - 31:24
**accurate** [1] - 12:9
**accused** [1] - 40:24
**acknowledge** [1] - 67:23
**acquire** [1] - 53:10
**acquisition** [2] - 24:22, 26:24
**acting** [2] - 26:20, 26:23
**action** [4] - 14:6, 36:1, 49:10, 67:17
**actual** [7] - 9:10, 19:20, 35:25, 54:15, 64:7, 71:8, 73:3
**add** [2] - 20:22, 69:7
**adding** [1] - 63:3
**addition** [4] - 12:23, 41:13, 47:25
**address** [4] - 20:25, 42:7, 48:22, 71:10
**adequate** [2] - 11:9, 21:20
**adjournments** [1] - 31:7
**admittedly** [1] - 50:20
**advised** [2] - 54:20, 68:16
**advocated** [2] - 46:13, 48:15
**AEO** [2] - 70:20, 70:21
**affect** [2] - 25:21, 61:19
**affected** [3] - 30:5, 55:6
**affects** [2] - 34:22, 48:9
**affidavit** [2] - 41:14, 49:11
**affidavits** [1] - 37:1
**affiliated** [1] - 60:21
**affirmation** [4] - 49:7, 49:13, 49:15, 51:21
**affirmations** [1] - 49:9
**afoul** [1] - 70:6

**afternoon** [9] - 3:19, 3:20, 3:23, 4:1, 4:4, 4:6, 4:12, 4:21, 5:2
**agent** [1] - 26:23
**ago** - 33:10, 33:13, 51:5, 73:1
**agree** [4] - 63:1, 63:2, 65:2, 70:7
**agreed** [1] - 37:19
**agreeing** [1] - 11:1
**agreement** [134] - 6:4, 7:11, 7:13, 7:24, 9:5, 9:11, 9:17, 9:18, 9:19, 10:4, 10:9, 10:21, 12:20, 13:2, 13:12, 13:24, 14:9, 15:11, 15:24, 17:9, 17:16, 17:21, 17:25, 18:21, 19:2, 19:8, 19:9, 19:10, 19:11, 20:10, 20:15, 21:2, 21:14, 21:23, 22:19, 22:21, 23:10, 24:3, 24:13, 24:22, 25:15, 25:18, 25:21, 26:13, 26:18, 27:4, 27:20, 28:1, 29:3, 30:16, 30:20, 32:11, 33:4, 33:6, 33:9, 33:18, 33:24, 35:24, 36:11, 36:17, 37:19, 38:2, 38:13, 38:20, 39:1, 39:22, 40:3, 40:8, 40:10, 40:13, 42:16, 42:17, 42:18, 42:23, 43:5, 43:6, 43:8, 43:9, 43:21, 44:4, 44:6, 44:7, 44:8, 44:23, 45:1, 45:10, 47:21, 47:24, 48:1, 50:9, 50:10, 50:13, 51:7, 51:9, 51:15, 51:18, 51:19, 51:23, 52:3, 52:5, 52:19, 52:24, 53:5, 54:3, 54:9, 55:7, 55:23, 55:24, 56:21, 58:5, 58:13, 58:22, 58:23, 59:6, 62:3, 63:10, 63:16, 63:19, 64:7, 64:12, 64:16, 65:16, 68:12, 70:5, 71:8, 71:21, 72:9, 72:12, 73:3, 73:7
**agreements** [14] - 6:5, 8:25, 9:1, 10:1, 12:18, 14:19, 39:24, 43:19, 47:18, 47:19, 59:16, 63:18, 69:25, 72:18
**ahead** [15] - 7:8, 12:14, 13:2, 21:2, 21:13, 24:21, 27:3, 31:19, 38:5, 40:17, 48:12, 57:10, 58:4, 59:1, 68:9
**aided** [1] - 2:12
**Air** [1] - 69:21
**al** [1] - 3:4
**ale** [1] - 62:14
**Alfred** [1] - 41:16
**allegation** [2] - 45:1, 45:3
**allegedly** [1] - 69:14
**allow** [4] - 22:20, 31:17, 42:2, 59:9
**allowed** [3] - 32:19, 32:20, 32:22
**allowing** [2] - 21:13, 43:18
**allows** [1] - 49:22
**almost** [4] - 17:3, 26:24, 28:9, 57:13
**alternative** [1] - 72:23
**amended** [4] - 20:7, 58:24, 60:16, 61:14
**amendment** [1] - 50:24
**amendments** [2] - 50:17, 50:21
**Americas** [2] - 1:21, 2:5
**amount** [11] - 12:2, 20:18, 24:7, 25:4, 25:11, 25:12, 31:7, 33:7, 34:14, 45:18, 47:20
**analysis** [1] - 41:6
**answer** [3] - 24:5, 52:17, 69:6
**apart** [1] - 8:17
**apologies** [1] - 74:1
**appear** [1] - 4:10
**appearance** [2] - 3:13, 4:24
**apple** [1] - 39:9
**apples** [1] - 39:9
**application** [2] - 4:16, 5:18
**applied** [1] - 33:12
**apply** [4] - 21:6, 21:7, 33:12, 34:17

**appreciate** [3] - 6:14, 40:15, 74:17
**argue** [7] - 6:2, 35:10, 64:20, 64:21, 64:25, 65:9, 68:7
**argued** [1] - 60:13
**arguing** [2] - 26:15, 44:22
**argument** [15] - 5:4, 9:22, 10:7, 18:11, 26:7, 26:17, 27:10, 39:25, 47:25, 64:4, 64:24, 65:11, 72:21, 74:6, 74:17
**ARGUMENT** [1] - 1:11
**arguments** [5] - 52:22, 63:24, 67:8, 67:9, 68:2
**arose** [1] - 49:17
**arrangement** [1] - 46:20
**arrears** [5] - 10:19, 18:16, 28:14, 32:23, 38:1
**arrogant** [1] - 40:21
**Article** [2] - 22:24, 53:4
**aside** [1] - 55:5
**aspect** [1] - 59:18
**assertion** [1] - 29:8
**assess** [1] - 46:25
**asset** [3] - 39:18, 39:22, 52:24
**Assets** [1] - 61:22
**assets** [13] - 8:20, 9:7, 14:18, 42:24, 47:23, 60:4, 60:18, 61:17, 62:6, 64:14, 65:15, 66:12, 69:22
**assign** [2] - 20:11, 51:22
**assigned** [2] - 42:23, 52:3
**assigning** [1] - 68:15
**assignment** [3] - 52:2, 52:6, 72:25
**assume** [2] - 6:7, 10:6
**assumed** [1] - 29:1
**assuming** [5] - 41:3, 42:3, 44:5, 47:1, 62:11
**assumption** [1] - 27:17
**assured** [1] - 22:4
**Attorneys** [2] - 1:15, 2:4
**attorneys** [1] - 1:20
**authority** [1] - 49:22
**automatically** [1] - 52:3
**available** [1] - 38:12
**Avenue** [3] - 1:16, 1:21, 2:5
**avoid** [1] - 69:2
**avoidable** [1] - 68:19
**avoided** [1] - 58:8
**aware** [1] - 58:1

**B**

**backwards** [1] - 27:25
**bad** [6] - 16:2, 16:3, 19:23, 20:17, 33:25, 61:9
**balance** [2] - 48:14
**bank** [3] - 39:11, 39:15, 39:18
**bankruptcy** [5] - 15:1, 25:25, 61:4, 61:5, 61:6
**bar** [1] - 30:9
**BARCLAY** [1] - 1:20
**Barclay** [1] - 4:3
**bargain** [2] - 12:8, 28:8
**bargained** [2] - 22:10, 70:20
**based** [2] - 24:12, 49:24
**bases** [1] - 43:16
**basis** [10] - 10:3, 12:24, 21:13, 25:24, 33:21, 45:3, 49:15, 49:19, 51:16, 52:2,

74:11
**battle** [1] - 13:21
**Bauer** [1] - 69:20
**beat** [1] - 29:16
**beauty** [1] - 38:14
**bedrock** [1] - 50:18
**befall** [1] - 28:24
**beginning** [6] - 3:13, 20:8, 20:21, 42:2, 62:14, 67:15
**behalf** [12] - 3:25, 4:2, 4:7, 4:10, 4:13, 4:18, 4:22, 26:20, 35:22, 40:21, 46:3, 72:15
**behind** [1] - 41:23
**below** [3] - 37:1, 37:2, 46:3
**beneficiary** [4] - 42:17, 42:18, 42:19, 65:4
**benefit** [2] - 6:8, 30:16
**best** [2] - 13:23, 55:20
**bets** [1] - 27:20
**better** [4] - 22:22, 29:21, 31:12, 38:17
**between** [8] - 8:1, 13:12, 13:24, 19:17, 24:13, 26:18, 36:19, 48:1, 52:25, 63:11, 64:13, 68:23
**bid** [1] - 45:21
**bidding** [1] - 45:22
**big** [4] - 8:9, 29:2, 67:14, 73:13
**biggest** [1] - 29:1
**binding** [4] - 7:21, 19:5, 58:12, 60:17
**bit** [8] - 37:20, 47:8, 48:1, 54:14, 55:4, 57:23, 59:8, 59:9
**Blank** [2] - 4:7, 4:22
**BLANK** [1] - 2:3
**bleeding** [1] - 8:13
**blown** [1] - 9:22
**Body** [54] - 1:8, 1:8, 2:4, 2:5, 3:4, 4:8, 4:9, 4:13, 4:15, 4:19, 4:23, 9:8, 10:11, 12:4, 13:9, 13:10, 13:24, 14:11, 14:12, 14:13, 14:15, 15:13, 17:13, 18:22, 23:14, 25:17, 26:19, 27:3, 28:11, 38:1, 38:8, 38:9, 38:10, 38:19, 38:22, 38:24, 40:1, 40:4, 40:25, 42:14, 43:1, 43:5, 43:17, 48:3, 49:20, 51:22, 52:1, 64:13, 65:9, 66:1, 66:2, 68:23, 69:20, 74:9
**borrowed** [1] - 39:10
**borrower** [2] - 17:15, 53:24
**borrower's** [1] - 54:2
**bottom** [2] - 18:5, 19:25
**bottomline** [1] - 54:16
**bought** [5] - 7:18, 7:19, 26:4, 27:17, 68:25
**bound** [7] - 23:13, 23:17, 23:19, 27:1, 27:16, 55:8, 57:16
**brands** [4] - 69:19, 69:21, 69:23, 69:24
**breach** [8] - 14:4, 21:22, 50:3, 50:16, 51:16, 65:3, 65:6, 67:18
**breached** [1] - 40:2
**break** [2] - 24:8, 43:3
**breaking** [2] - 6:15, 6:22
**brief** [5] - 7:7, 21:9, 46:5, 54:24, 65:23
**briefed** [1] - 55:1
**briefs** [2] - 31:1, 55:3
**bring** [3] - 47:1, 54:20, 67:20
**bringing** [4] - 14:3, 14:5, 15:16, 67:17
**broken** [1] - 18:24
**Brooklyn** [1] - 1:5
**brought** [4] - 29:13, 36:1, 60:2, 68:1

**build** [1] - 66:10
**bunch** [1] - 25:2
**burden** [2] - 6:10, 67:24
**business** [48] - 9:6, 10:17, 11:20, 12:24, 22:11, 22:12, 22:20, 23:6, 23:8, 24:2, 25:14, 25:23, 26:2, 30:12, 30:17, 30:18, 32:8, 34:22, 37:6, 37:21, 37:23, 38:15, 39:10, 39:20, 46:10, 51:2, 51:5, 55:19, 55:22, 56:23, 56:24, 57:1, 59:5, 59:7, 59:9, 59:10, 59:13, 59:23, 61:8, 61:9, 65:13, 66:14, 66:25, 67:4, 68:22, 74:7, 74:12, 74:15
**but..** [1] - 67:2
**buy** [10] - 10:15, 11:22, 16:21, 24:2, 24:20, 24:22, 25:6, 68:24
**buyer** [3] - 20:11, 48:3, 60:3
**buyers** [1] - 8:9
**buying** [3] - 23:20, 23:23, 25:18

**C**

**camera** [1] - 71:1
**cancel** [2] - 34:15, 36:10
**cancels** [1] - 25:17
**cannot** [10] - 4:10, 18:12, 40:1, 44:8, 51:19, 52:14, 54:1, 68:16, 69:18, 69:19
**capacity** [2] - 53:22, 68:2
**Capital** [3] - 6:6, 60:6, 60:22
**capitalism** [1] - 66:18
**capitalize** [1] - 25:23
**capitalizing** [1] - 25:14
**care** [4] - 25:11, 25:13, 33:22, 33:23
**carrying** [1] - 29:20
**cart** [1] - 56:12
**carve** [2] - 53:21, 69:24
**carve-out** [1] - 53:21
**carve-outs** [1] - 69:24
**case** [41] - 5:6, 5:12, 5:13, 7:16, 7:17, 7:25, 10:1, 12:7, 20:21, 21:10, 21:11, 22:3, 22:24, 22:25, 23:1, 29:4, 30:21, 41:25, 42:15, 43:2, 46:2, 46:23, 47:4, 47:12, 47:13, 48:9, 48:19, 52:6, 56:13, 56:22, 58:25, 59:20, 60:9, 60:11, 62:24, 66:19, 67:21, 67:22, 71:10, 72:24
**cases** [8] - 30:8, 41:16, 41:18, 42:20, 46:11, 49:2, 49:18, 65:23
**causal** [1] - 19:17
**caveat** [1] - 72:17
**certain** [10] - 25:3, 25:11, 25:12, 33:8, 33:9, 33:16, 33:17, 34:14, 56:6, 60:4
**certainly** [2] - 20:19, 64:21
**CERTIFICATE** [1] - 75:1
**certify** [1] - 75:2
**chambers** [3] - 61:15, 62:11, 71:19
**chance** [3] - 46:15, 71:3, 73:2
**change** [1] - 27:15
**changed** [3] - 27:20, 57:6, 58:23
**changes** [1] - 33:18
**characterized** [1] - 10:14
**Charybdis** [1] - 57:15
**CHEN** [1] - 1:12
**Christmas** [3] - 31:3, 31:4, 31:5
**chronology** [2] - 35:15, 36:4
**circumstance** [2] - 27:20, 28:13
**circumstances** [2] - 27:15, 57:6

**cite** [2] - 41:15, 46:2
**cited** [6] - 30:8, 42:20, 46:3, 46:6, 49:18, 65:23
**civil** [1] - 3:2
**claim** [8] - 11:18, 20:2, 21:22, 28:24, 33:2, 55:17, 57:21, 69:1
**claiming** [2] - 11:22, 56:16
**claims** [5] - 27:11, 44:21, 48:23, 52:9, 56:16
**clause** [2] - 24:6, 44:10
**clauses** [1] - 47:22
**cleaned** [1] - 16:12
**clear** [7] - 19:15, 19:16, 21:10, 22:6, 22:7, 28:10, 40:2
**clearer** [1] - 6:20
**clearly** [2] - 3:21, 28:12
**clerk** [1] - 61:18
**client** [72] - 7:17, 10:18, 10:24, 11:12, 11:22, 12:22, 12:23, 14:2, 15:17, 15:24, 16:7, 16:19, 16:23, 18:11, 18:13, 18:14, 18:18, 18:25, 19:3, 20:12, 21:19, 23:13, 23:16, 24:9, 24:16, 25:6, 25:7, 25:18, 27:1, 27:11, 27:15, 28:24, 29:5, 29:14, 35:15, 35:22, 36:4, 36:13, 38:17, 46:16, 50:5, 51:6, 53:1, 53:6, 54:20, 55:16, 55:17, 55:21, 55:25, 56:14, 57:4, 57:8, 57:25, 58:1, 60:3, 60:12, 64:6, 64:10, 64:14, 64:20, 64:25, 65:14, 66:8, 66:9, 67:4, 67:16, 68:9, 68:24, 70:12, 70:13, 70:18
**client's** [2] - 28:21, 46:22
**clients** [1] - 12:10
**close** [1] - 12:13
**closed** [2] - 54:21, 69:14
**closing** [1] - 52:8
**cogently** [1] - 45:7
**collateral** [15] - 8:16, 14:20, 18:1, 18:21, 23:4, 23:18, 46:25, 52:24, 53:7, 53:10, 53:12, 53:15, 53:16, 54:10, 56:7
**collect** [13] - 14:6, 14:9, 14:13, 14:15, 14:23, 15:25, 20:20, 25:4, 25:7, 26:11, 28:15, 28:17
**collecting** [1] - 25:19
**collection** [2] - 25:1, 31:16
**collections** [1] - 24:25
**comfortable** [3] - 72:16, 73:5, 73:6
**coming** [1] - 3:21
**commented** [1] - 49:16
**comments** [1] - 72:20
**commercial** [1] - 35:9
**commitment** [1] - 15:21
**common** [1] - 12:19
**companies** [2] - 9:2, 66:14
**company** [18] - 8:2, 8:24, 12:17, 15:1, 15:9, 17:11, 23:23, 32:5, 32:6, 37:17, 39:8, 40:12, 46:18, 48:2, 48:5, 66:11, 66:12, 66:23
**compensable** [6] - 11:8, 11:9, 13:1, 21:25, 22:1, 52:12
**compensated** [3] - 56:8, 56:17, 65:19
**complain** [1] - 18:18
**complained** [1] - 19:18
**complaint** [2] - 41:14, 48:20
**complex** [1] - 48:1
**complicated** [1] - 54:16
**complied** [1] - 38:23

**comply** [2] - 44:22, 45:1
**computer** [1] - 3:21
**Computer** [1] - 2:12
**Computer-aided** [1] - 2:12
**computerized** [1] - 2:12
**concern** [1] - 29:12
**concerned** [1] - 58:16
**concluded** [1] - 74:22
**concretize** [1] - 29:10
**concretized** [1] - 71:8
**condition** [1] - 16:24
**conditioned** [1] - 29:9
**conditions** [1] - 29:1
**conduct** [2] - 19:18, 52:11
**conference** [3] - 3:3, 6:20, 54:24
**confidential** [1] - 72:14
**confidentiality** [2] - 62:3, 70:5
**confirm** [1] - 29:10
**connection** [3] - 7:1, 19:17, 55:21
**consent** [3] - 51:22, 52:1
**consents** [2] - 17:14, 53:23
**consequences** [1] - 16:11
**consider** [1] - 63:24
**considerably** [1] - 51:5
**consistent** [1] - 45:24
**constitutes** [1] - 11:14
**constructed** [1] - 68:13
**consumers** [1] - 65:8
**contemplate** [1] - 47:22
**contemplated** [1] - 10:15
**contents** [1] - 41:4
**contest** [1] - 70:21
**context** [7] - 41:15, 42:9, 51:12, 52:14, 52:15, 71:3, 72:21
**continuation** [1] - 9:6
**continue** [10] - 47:7, 47:13, 49:11, 51:16, 58:2, 66:13, 66:24
**Continued** [1] - 2:1
**continuing** [4] - 5:15, 17:22, 41:22, 42:5
**contract** [24] - 14:4, 17:7, 17:8, 18:13, 19:1, 19:6, 19:13, 20:3, 20:14, 20:19, 21:12, 21:22, 22:3, 22:9, 22:10, 22:15, 34:15, 37:13, 65:3, 65:6, 67:18, 67:19, 68:6
**contracting** [1] - 11:14
**contracts** [3] - 22:8, 65:22
**contrary** [1] - 51:18
**control** [2] - 17:18, 24:2
**controls** [1] - 24:4
**controversial** [1] - 68:1
**conversation** [1] - 57:3
**convey** [1] - 44:3
**conveys** [1] - 44:14
**convinced** [1] - 67:16
**copy** [6] - 61:16, 61:20, 62:12, 63:9, 70:10, 72:8
**copyrights** [1] - 9:9
**corporate** [1] - 54:22
**correct** [11] - 13:25, 20:6, 24:14, 26:14, 34:9, 43:14, 66:2, 66:4, 74:5, 74:7, 75:2
**Costco** [2] - 8:9, 74:14
**costs** [1] - 12:22
**counsel** [6] - 3:13, 4:17, 30:22, 40:23, 52:15, 60:13
**couple** [2] - 8:21, 69:7

**Court** [15] - 2:9, 2:9, 4:8, 9:25, 21:6, 31:3, 41:5, 41:16, 41:18, 43:4, 54:24, 55:1, 55:2, 70:19, 75:9
**court** [27] - 3:1, 3:7, 3:9, 3:12, 5:5, 20:22, 30:23, 37:2, 37:3, 41:6, 41:12, 41:15, 41:22, 42:5, 42:7, 44:17, 49:8, 49:10, 49:12, 49:16, 62:16, 62:18, 62:22, 63:24, 70:16, 74:2
**Court's** [1] - 50:24
**Courthouse** [1] - 1:5
**covered** [2] - 20:9, 30:14
**create** [1] - 68:17
**created** [1] - 57:18
**credentials** [1] - 3:9
**credit** [5] - 24:6, 32:1, 45:21, 45:22, 52:11
**credited** [1] - 42:23
**creditor** [22] - 14:8, 24:3, 25:10, 26:2, 26:21, 34:2, 37:14, 37:18, 37:19, 38:4, 39:4, 39:6, 40:6, 43:1, 43:2, 52:5, 59:2, 59:22, 59:25, 60:8, 66:20, 66:21
**creditors** [1] - 28:17
**cry** [1] - 68:17
**curable** [1] - 33:17
**cure** [16] - 9:13, 9:15, 10:19, 13:19, 14:1, 33:3, 33:7, 34:14, 38:24, 40:9, 43:13, 43:15, 43:18, 45:16, 45:23, 50:4
**cured** [1] - 40:3
**cures** [1] - 45:23
**customer** [1] - 74:14
**customers** [1] - 25:3
**cut** [1] - 41:20

# D

**damage** [1] - 24:6
**damages** [7] - 7:15, 13:1, 22:3, 22:18, 30:17, 34:20, 44:20, 46:16, 52:13, 55:16, 56:16, 56:20
**damned** [2] - 57:15
**Damon** [1] - 4:3
**DAMON** [1] - 1:20
**date** [3] - 41:9, 50:5, 71:5
**dated** [1] - 45:7
**days** [15] - 10:23, 30:24, 30:25, 33:8, 50:10, 50:11, 50:15, 50:19, 50:21, 51:2, 51:5, 54:25, 55:3, 73:1
**days'** [1] - 69:10
**deadline** [1] - 73:24
**deal** [44] - 7:24, 8:17, 10:15, 10:17, 10:24, 11:11, 11:13, 11:25, 12:3, 16:2, 16:3, 16:6, 16:11, 17:1, 19:23, 20:17, 22:9, 23:14, 23:25, 25:10, 27:21, 28:25, 29:5, 31:11, 31:12, 31:13, 34:2, 36:20, 45:21, 46:6, 46:7, 46:11, 48:14, 52:25, 55:11, 57:11, 57:17, 57:18, 58:4, 58:15, 60:15, 68:9, 68:21, 73:13
**dealing** [2] - 34:4, 49:7
**death** [1] - 29:16
**debt** [48] - 7:18, 7:19, 8:14, 8:18, 8:19, 10:15, 11:22, 12:17, 12:19, 12:22, 12:25, 13:4, 14:8, 14:22, 14:23, 17:23, 20:20, 23:3, 23:21, 24:1, 24:3, 24:4, 24:21, 24:23, 25:1, 25:4, 25:18, 26:24, 31:15, 31:16, 31:20, 31:21, 37:25, 38:5, 38:12,

39:7, 39:19, 40:11, 45:21, 48:5, 53:8, 53:11, 53:13, 53:15, 66:11, 66:20, 69:16

**debtor** [4] - 9:3, 22:24, 59:12, 60:7

**debtor-in-possession** [1] - 22:24

**debts** [6] - 14:16, 16:25, 25:7, 28:16, 33:10, 33:12

**December** [7] - 35:16, 35:21, 36:18, 42:8, 45:8, 45:12, 67:21, 67:22

**December 9th** [2] - 45:7, 58:25

**decided** [3] - 8:23, 12:21, 58:4

**decision** [7] - 5:22, 19:19, 61:10, 61:19, 63:23, 72:18, 74:17

**declaration** [3] - 35:25, 36:1, 48:21

**declare** [1] - 15:1

**decreased** [1] - 50:21

**deemed** [1] - 3:11

**default** [16] - 16:15, 16:16, 17:22, 17:23, 32:13, 32:17, 33:19, 43:18, 44:24, 45:4, 45:6, 45:17, 50:4, 51:4, 66:16

**defaulted** [1] - 16:25

**defaults** [2] - 45:23, 69:15

**defect** [2] - 8:8, 8:11

**defective** [1] - 33:20

**defendant** [5] - 5:9, 6:4, 29:7, 35:24, 53:23

**defendant's** [2] - 5:4, 27:10

**defendants** [3] - 1:10, 21:15, 23:1

**defense** [5] - 4:5, 70:24, 71:24, 72:5, 72:9

**defined** [2] - 48:3, 48:4

**definitely** [1] - 6:15

**definition** [1] - 47:3

**definitive** [7] - 7:22, 20:10, 47:17, 47:19, 47:21, 58:13, 58:22, 69:6, 69:25, 71:21, 72:12

**delay** [2] - 73:18, 73:19

**delivered** [1] - 72:22

**delivers** [1] - 39:8

**delivery** [1] - 39:17

**denial** [1] - 3:10

**deposit** [1] - 47:21

**depriving** [1] - 65:13

**DEPUTY** [1] - 3:2

**derived** [1] - 44:20

**describe** [1] - 41:10

**designation** [1] - 70:21

**destroy** [6] - 21:1, 21:11, 22:11, 22:12, 34:25, 74:12

**destroyed** [7] - 22:14, 34:1, 35:10, 46:9, 61:8, 65:13, 65:20

**destruction** [1] - 74:6

**determination** [1] - 25:20

**determine** [1] - 25:21

**devaluation** [2] - 46:25, 47:1

**devalue** [1] - 52:10

**devalued** [1] - 46:18

**different** [4] - 28:16, 44:15, 54:23, 63:16

**difficulties** [1] - 8:13

**disagree** [1] - 11:4

**disagreement** [1] - 71:5

**disallows** [1] - 12:20

**discarded** [1] - 45:4

**disclose** [1] - 70:7

**disclosed** [1] - 62:21

**discredit** [1] - 47:15

---

**discuss** [3] - 40:11, 41:25, 51:12

**discussed** [1] - 62:23

**discussing** [1] - 68:9

**discussion** [2] - 71:2, 72:5

**discussions** [2] - 62:24, 70:15

**dispute** [4] - 37:25, 41:12, 42:13, 64:16

**dissolved** [1] - 41:7

**distinct** [1] - 58:2

**docket** [2] - 4:14, 64:1

**Docket** [1] - 3:3

**document** [3] - 7:22, 17:18, 32:2

**Document** [1] - 46:23

**documentation** [1] - 15:8

**documents** [2] - 63:25, 73:12

**dollar** [2] - 21:17, 39:5

**dollars** [1] - 55:9

**done** [6] - 9:4, 16:13, 28:7, 45:23, 55:11, 67:25

**doubt** [1] - 37:3

**down** [5] - 24:8, 32:6, 34:8, 46:14, 54:14

**drafted** [1] - 62:23

**driving** [2] - 73:23, 73:25

**due** [1] - 50:16

**during** [2] - 43:3, 69:14

---

## E

**E-mail** [1] - 2:11

**e-mail** [3] - 62:11, 64:9, 71:19

**early** [1] - 73:22

**economic** [1] - 53:17

**Eddie** [1] - 69:20

**effect** [4] - 15:12, 30:23, 30:24, 73:1

**effectively** [2] - 56:20, 73:13

**efficient** [1] - 5:19

**either** [5] - 16:10, 18:3, 20:6, 22:22, 57:16

**element** [1] - 41:7

**emotional** [2] - 34:25, 35:1

**employees** [2] - 59:12, 66:13

**encourage** [1] - 43:3

**end** [6] - 21:11, 40:11, 54:16, 61:7, 69:6, 71:2

**endeavor** [1] - 68:10

**endorse** [1] - 61:2

**ends** [1] - 72:4

**enforce** [8] - 13:22, 15:18, 19:1, 19:8, 20:4, 22:8, 28:6

**enforcement** [1] - 65:21

**ensure** [2] - 16:13, 18:19

**enter** [2] - 22:18, 62:15

**entered** [10] - 8:24, 9:4, 9:10, 10:24, 33:9, 35:15, 36:13, 58:22, 64:6, 71:21

**enterprise** [1] - 35:9

**entire** [5] - 21:1, 31:20, 31:21, 46:19, 47:23

**entitled** [18] - 9:19, 13:14, 13:16, 14:7, 14:9, 21:3, 21:12, 32:4, 34:3, 34:19, 34:23, 35:11, 37:12, 48:21, 56:11, 61:10, 61:21, 75:3

**entitlement** [1] - 48:25

**entity** [3] - 4:9, 4:10, 4:17

**entry** [2] - 3:10

**equates** [1] - 11:6

**equation** [1] - 22:2

---

**Equities** [1] - 3:18

**equities** [1] - 48:14

**equity** [1] - 37:14

**Equity** [1] - 34:17

**especially** [2] - 8:4, 58:11

**ESQ** [4] - 1:17, 1:18, 1:23, 2:2, 2:7, 2:7

**essentially** [5] - 8:15, 26:7, 58:16, 65:17, 67:3

**establish** [1] - 6:10

**established** [1] - 9:2

**et** [1] - 3:4

**ETC** [73] - 6:5, 7:11, 7:18, 8:1, 8:14, 8:17, 8:22, 9:13, 9:15, 9:16, 10:10, 10:16, 10:25, 12:4, 12:8, 12:17, 12:19, 13:20, 13:24, 14:3, 14:13, 14:21, 14:22, 15:2, 15:3, 15:25, 16:9, 16:12, 16:15, 16:16, 16:20, 16:25, 17:6, 17:9, 18:11, 18:19, 19:7, 24:13, 26:8, 26:12, 26:19, 26:21, 27:12, 27:18, 28:2, 28:3, 28:4, 28:6, 29:4, 29:9, 31:10, 36:20, 37:21, 38:24, 40:3, 43:18, 44:9, 45:14, 45:16, 45:19, 52:4, 52:20, 52:25, 53:7, 53:18, 53:22, 60:23, 61:1, 63:11, 64:11, 64:12, 64:13, 68:23

**ETC's** [2] - 13:22, 24:12

**EVAN** [1] - 2:7

**Evan** [1] - 4:21

**Eve** [2] - 31:3, 31:5

**evening** [1] - 41:3

**eventually** [1] - 37:22

**ex** [1] - 49:14

**exactly** [4] - 32:18, 62:19, 64:4, 67:6

**except** [2] - 8:20, 54:4

**excluded** [2] - 61:17, 69:22

**Excluded** [1] - 61:22

**exclusive** [2] - 49:17, 49:19

**excuse** [1] - 60:7

**exercise** [2] - 26:11, 29:3

**exercising** [2] - 51:6, 52:7

**exist** [2] - 26:18, 66:24

**existed** [1] - 33:13

**existence** [1] - 34:12

**existent** [1] - 54:13

**existing** [1] - 46:10

**exists** [4] - 13:12, 43:24, 47:2

**expecting** [1] - 54:22

**experience** [1] - 44:17

**experienced** [4] - 43:24, 45:13, 45:14

**experts** [1] - 47:1

**expiration** [1] - 73:24

**expired** [1] - 5:14

**explain** [2] - 9:25, 24:8

**explained** [1] - 31:1

**explains** [1] - 54:15

**explanation** [1] - 4:17

**exploit** [2] - 54:10, 65:15

**exploitation** [1] - 53:17

**Express** [4] - 6:6, 60:6, 60:7, 60:22

**extend** [1] - 73:1

**extended** [3] - 30:24, 30:25

**extension** [1] - 63:22

**extent** [4] - 44:18, 64:23, 70:16, 70:22

---

## F

**face** [2] - 37:13, 37:14

---

**facetious** [1] - 65:10
**Facsimile** [1] - 2:10
**fact** [1] - 9:9, 10:9, 10:18, 12:11, 18:18, 19:17, 20:24, 22:14, 38:21, 55:20, 57:6
**factor** [6] - 8:15, 8:22, 15:25, 43:18, 43:25, 45:14
**factoring** [3] - 24:13, 63:10, 63:19
**factors** [1] - 42:2
**facts** [1] - 37:9
**failed** [2] - 22:15, 22:16
**fails** [1] - 22:17
**failure** [1] - 20:2
**fair** [1] - 70:10
**fairly** [1] - 9:1
**faith** [1] - 27:7
**fall** [1] - 8:17
**familiar** [1] - 59:5
**family** [1] - 46:8
**fancy** [1] - 25:1
**far** [1] - 43:16
**favorable** [1] - 19:19
**favors** [1] - 65:21
**Federal** [1] - 31:9
**federal** [3] - 5:12, 5:16, 49:10
**fees** [1] - 32:4
**felt** [1] - 57:14
**few** [3] - 6:22, 44:3, 73:1
**fight** [2] - 13:20, 68:23
**fighting** [2] - 11:21, 71:4
**filed** [7] - 4:23, 5:21, 12:12, 35:22, 50:3, 67:21, 71:19
**files** [1] - 36:14
**filing** [1] - 6:14
**filings** [2] - 42:25, 43:2
**final** [2] - 49:6, 72:9
**finalized** [1] - 27:12
**finally** [1] - 62:14
**financial** [3] - 23:5, 31:25, 42:20
**financially** [1] - 8:13
**financing** [1] - 59:18
**fine** [1] - 72:23
**Firm** [2] - 3:16, 4:2
**firm** [1] - 31:19
**first** [10] - 13:18, 20:7, 50:5, 51:11, 58:24, 60:16, 61:14, 71:1, 74:1
**fittest** [1] - 66:18
**five** [6] - 33:11, 50:10, 50:19, 54:7, 54:8
**five-day** [2] - 33:11
**flies** [2] - 37:13
**Floor** [1] - 1:16
**flourish** [1] - 59:14
**fluff** [1] - 60:8
**folks** [1] - 70:7
**force** [4] - 57:12, 61:4, 61:5, 61:6
**foreclose** [2] - 22:22, 54:18
**foreclosure** [1] - 42:24
**foreclosures** [1] - 54:15
**foregoing** [1] - 75:2
**form** [1] - 70:3
**format** [1] - 14:21
**forms** [1] - 45:17
**forthcoming** [1] - 74:18
**forward** [14] - 12:24, 25:13, 25:14, 25:23, 31:6, 34:22, 34:23, 37:23, 38:14, 59:10, 59:11, 59:17, 64:8

**foul** [1] - 68:17
**four** [2] - 21:7, 55:8
**fourth** [1] - 46:15
**franchise** [1] - 9:8
**FRANKEL** [3] - 1:18, 3:23, 6:19
**Frankel** [2] - 3:24, 6:11
**frankly** [1] - 51:10, 68:25, 73:18
**fraught** [2] - 68:10, 68:25
**free** [1] - 28:9
**full** [4] - 9:22, 31:7, 71:6, 73:16
**full-blown** [1] - 9:22
**fully** [2] - 12:10, 61:1
**fund** [3] - 31:17, 33:16, 66:23
**fundamentally** [1] - 10:8
**funding** [2] - 12:24, 32:2
**future** [4] - 3:10, 3:11, 15:10, 31:24

## G

**G-a-r-a-n-t-i-a** [1] - 60:19
**gamesmanship** [1] - 57:24
**Garantia** [14] - 48:2, 48:4, 48:6, 48:8, 60:1, 60:2, 60:4, 60:8, 60:13, 60:15, 60:18, 60:20, 60:21
**Gardner** [1] - 41:16
**Gardner-Alfred** [1] - 41:16
**gather** [1] - 28:15
**general** [5] - 3:6, 38:4, 39:4, 39:6, 43:1
**generally** [1] - 48:23
**genuine** [1] - 57:9
**given** [7] - 46:15, 49:12, 51:4, 54:25, 72:20, 72:24
**Glove** [53] - 1:8, 1:8, 2:4, 2:5, 3:4, 4:8, 4:9, 4:13, 4:15, 4:19, 4:23, 9:8, 10:11, 12:4, 13:9, 13:10, 13:24, 14:11, 14:12, 14:13, 14:15, 15:13, 17:13, 18:22, 23:14, 25:17, 26:19, 27:3, 28:11, 38:1, 38:8, 38:9, 38:10, 38:19, 38:22, 38:24, 40:1, 40:4, 40:25, 42:14, 43:1, 43:5, 43:17, 48:3, 49:20, 52:1, 64:13, 65:9, 66:1, 66:2, 68:23, 69:20, 74:9
**Glove's** [1] - 51:22
**going-forward** [3] - 12:24, 25:23, 59:17
**goods** [3] - 8:4, 8:6, 8:8
**Goose** [1] - 41:16
**Granny** [1] - 41:16
**grant** [3] - 17:14, 53:23, 58:3
**granted** [1] - 3:5
**great** [1] - 32:5
**grocery** [3] - 39:8, 39:12, 39:14
**GROUP** [1] - 1:3
**Group** [1] - 1:15, 1:21, 3:3, 42:13, 43:25, 45:14, 45:20, 47:6, 51:25, 52:4, 52:9
**grow** [2] - 30:18, 65:16
**guarantee** [1] - 29:9
**guarantees** [1] - 16:13
**guess** [18] - 5:7, 12:3, 21:24, 23:18, 25:8, 28:16, 28:17, 29:13, 31:3, 31:12, 38:18, 54:12, 64:5, 64:23, 65:24, 66:2, 69:22, 69:23
**guy** [3] - 37:6, 39:9, 39:17

## H

**half** [1] - 55:8
**hand** [1] - 57:12
**hang** [2] - 10:5, 32:20
**hardship** [1] - 48:15
**harm** [42] - 10:13, 11:6, 11:7, 11:14, 11:17, 11:21, 21:16, 22:10, 27:8, 27:22, 28:23, 30:7, 30:14, 30:15, 34:21, 41:11, 41:15, 46:1, 46:3, 46:6, 46:13, 46:24, 47:2, 47:3, 47:14, 49:5, 49:16, 49:24, 52:9, 52:13, 52:14, 55:13, 55:18, 55:25, 56:17, 65:12, 65:18, 67:5, 67:11, 72:3, 74:6
**harmed** [8] - 11:23, 11:24, 12:2, 29:6, 68:4, 68:5, 68:11, 69:17
**harms** [1] - 11:10
**hear** [4] - 6:17, 6:24, 35:14, 40:14
**heard** [1] - 69:11
**hearing** [4] - 4:25, 9:24, 37:8, 41:24, 42:8, 73:19, 73:21
**hearings** [2] - 3:10, 3:11
**heavily** [1] - 8:14
**height** [1] - 57:13
**held** [2] - 7:7, 59:24
**hereafter** [1] - 53:10
**hereby** [1] - 17:14
**herein** [1] - 54:4
**hide** [1] - 70:23
**hierarchy** [1] - 59:22
**himself** [3] - 46:13, 52:15, 68:25
**history** [1] - 51:11
**holder** [1] - 53:22
**holding** [1] - 8:18
**Holdings** [5] - 2:5, 4:8, 4:13, 4:19, 4:23
**HOLDINGS** [1] - 1:9
**home** [1] - 66:25
**honestly** [2] - 57:12, 57:24
**Honor** [41] - 3:16, 4:1, 4:6, 4:12, 4:21, 6:13, 7:9, 19:14, 22:2, 40:18, 40:20, 40:23, 41:4, 42:10, 42:11, 42:24, 43:9, 44:16, 45:5, 45:6, 45:25, 46:16, 47:5, 48:10, 49:1, 49:2, 49:25, 52:8, 58:9, 61:3, 62:13, 63:13, 63:18, 69:7, 69:13, 70:1, 70:2, 72:15, 72:17, 72:21, 73:5
**Honor's** [1] - 72:18
**HONORABLE** [1] - 1:12
**Honorer** [1] - 61:24
**hope** [1] - 63:25
**hopefully** [3] - 25:19, 66:10, 71:20
**horse** [1] - 56:13
**hour** [2] - 41:9, 72:24
**hours** [1] - 10:2
**house** [1] - 28:9
**housekeeping** [1] - 70:1
**hundred** [2] - 23:1, 23:2
**hung** [1] - 71:11
**hurt** [2] - 19:23, 19:24

## I

**idea** [5] - 31:16, 54:19, 55:1, 59:19, 73:15
**ill** [1] - 68:16

**ill-advised** [1] - 68:16
**imagine** [1] - 72:7
**impact** [2] - 49:3, 72:18
**impair** [2] - 9:20, 56:4
**impaired** [1] - 51:6
**important** [4] - 40:20, 40:22, 73:12, 73:17
**impose** [8] - 5:11, 5:18, 5:21, 6:1, 6:3, 27:2, 42:2, 42:6
**improper** [3] - 44:21, 45:2, 64:22
**impure** [1] - 68:15
**inadvertent** [1] - 4:16
**INC** [1] - 1:8
**Inc** [4] - 2:4, 3:4, 4:9, 4:15
**incidental** [2] - 42:17, 42:19
**include** [1] - 17:24
**included** [3] - 41:11, 44:2, 44:10
**includes** [4] - 14:1, 27:18, 41:8, 53:7
**including** [7] - 3:9, 18:2, 26:2, 64:15, 65:15, 72:25, 74:8
**inclusion** [1] - 51:25
**income** [2] - 56:1, 59:17
**incur** [2] - 7:15, 46:16
**indebtedness** [11] - 20:13, 21:20, 24:9, 24:12, 24:16, 24:18, 24:21, 26:10, 52:11, 65:14
**individual** [1] - 7:18
**inflicted** [4] - 11:7, 57:14, 59:20, 68:15
**information** [4] - 23:5, 44:23, 44:25, 72:14
**informed** [1] - 4:8
**initial** [2] - 50:9, 56:5
**initiated** [1] - 5:9
**injunction** [17] - 5:11, 5:18, 5:22, 6:3, 6:11, 9:23, 21:8, 27:3, 31:8, 32:10, 32:15, 34:12, 35:6, 42:3, 42:6, 48:14, 71:4
**injunctive** [1] - 30:1
**injured** [5] - 21:5, 58:6, 65:1, 65:5, 65:8
**injuries** [1] - 22:2
**injury** [11] - 19:17, 19:18, 19:19, 22:2, 41:10, 55:15, 56:15, 57:14, 57:18, 57:19, 68:17
**injury-in-fact** [1] - 19:17
**insidious** [1] - 34:16
**instead** [2] - 45:4, 52:7
**instructed** [1] - 45:22
**intact** [2] - 28:11, 30:18
**intelligently** [1] - 71:14
**intend** [2] - 24:16, 32:23
**intended** [3] - 42:18, 58:24, 65:4
**intending** [4] - 15:8, 15:9, 20:25, 35:12
**intends** [1] - 21:19
**intention** [1] - 32:5
**intercreditor** [35] - 8:24, 9:1, 9:4, 9:11, 9:17, 13:23, 14:10, 17:8, 17:9, 18:21, 19:1, 19:11, 22:19, 24:3, 26:18, 33:18, 33:24, 38:13, 39:1, 40:7, 42:22, 43:5, 43:8, 43:9, 44:4, 44:5, 44:7, 51:9, 51:14, 52:19, 53:4, 56:21, 59:6, 59:16, 64:12
**interest** [9] - 17:17, 19:4, 20:13, 20:17, 28:22, 29:8, 54:2, 55:6, 66:13
**interesting** [1] - 7:16
**interests** [3] - 27:19, 68:3
**interloper** [2] - 42:14, 48:2
**INTERNATIONAL** [1] - 1:8

**International** [4] - 2:4, 3:4, 4:9, 4:15
**interpretation** [1] - 51:13
**interrupt** [2] - 58:10, 58:11
**interrupted** [1] - 41:24
**intervening** [1] - 12:6
**investment** [1] - 60:22
**involved** [7] - 9:7, 31:3, 31:14, 57:20, 60:15, 61:12, 62:7
**involving** [1] - 8:4, 10:1
**IP** [7] - 1:8, 2:5, 4:8, 4:13, 4:19, 4:23, 44:15
**irreparable** [43] - 10:13, 11:6, 11:14, 11:17, 11:19, 11:20, 21:16, 22:9, 27:8, 27:22, 28:23, 30:7, 30:14, 30:15, 34:21, 41:11, 41:14, 45:25, 46:3, 46:6, 46:13, 46:24, 47:3, 47:14, 49:5, 49:16, 49:19, 49:24, 52:13, 52:14, 55:13, 55:18, 55:25, 56:3, 57:21, 58:7, 65:12, 65:18, 67:4, 67:10, 68:18, 72:3, 74:5
**irreparably** [4] - 11:23, 68:4, 68:5, 68:11
**issue** [23] - 10:12, 10:13, 10:25, 15:16, 17:5, 18:7, 18:22, 19:4, 20:5, 20:24, 21:2, 27:23, 38:22, 38:24, 49:16, 57:9, 58:15, 64:1, 67:24, 70:5, 71:9, 72:8
**issued** [6] - 3:9, 32:12, 41:8, 41:10, 45:5, 45:6
**issues** [6] - 9:25, 28:23, 48:13, 49:4, 65:3, 67:10
**issuing** [1] - 73:7
**itself** [7] - 44:11, 47:11, 47:16, 49:20, 49:23, 52:21
**IX** [1] - 22:24

# J

**Jacob** [1] - 41:17
**January** [2] - 1:7, 67:22
**JASON** [1] - 2:7
**jeopardy** [1] - 35:9
**job** [3] - 29:18, 29:21, 29:24
**joinder** [2] - 20:23, 20:24
**judge** [1] - 5:6
**judges** [1] - 58:11
**judicial** [2] - 37:16, 69:4
**judicially** [1] - 51:6
**jump** [2] - 59:1, 59:22
**junior** [4] - 37:18, 53:15, 53:16, 59:21
**jurisdiction** [1] - 22:7
**jurors** [1] - 33:13
**juts** [1] - 43:1

# K

**keep** [13] - 8:23, 9:2, 15:11, 26:2, 30:17, 37:23, 38:18, 59:7, 63:3, 63:15, 69:2, 70:13, 72:7
**keeping** [3] - 38:15, 59:13, 74:2
**key** [1] - 67:10
**kill** [1] - 56:6
**kind** [9] - 7:16, 17:20, 22:23, 32:2, 44:16, 49:23, 51:12, 54:23, 59:6
**kinds** [2] - 48:17, 52:12
**knowing** [4] - 10:18, 11:15, 18:14, 57:8
**knowingly** [1] - 57:22

**knowledge** [1] - 69:15
**known** [1] - 45:15
**knows** [3] - 16:15, 16:16, 18:16
**Knupp** [1] - 3:17
**KNUPP** [1] - 1:14
**Krezalek** [2] - 4:11, 4:13
**KREZALEK** [1] - 4:12
**KREZELAK** [1] - 2:7

# L

**lack** [1] - 46:2
**language** [2] - 43:7, 47:17
**Lapa** [1] - 41:17
**large** [2] - 24:7, 74:14
**largest** [1] - 74:13
**last** [2] - 63:22, 71:21
**lasts** [1] - 30:25
**late** [3] - 41:2, 69:8, 74:3
**Lauren** [1] - 4:1
**LAUREN** [1] - 1:23
**Law** [4] - 3:16, 4:2, 25:24, 34:16
**law** [14] - 5:17, 11:9, 21:10, 21:20, 22:6, 33:22, 40:13, 41:3, 42:21, 47:3, 49:13, 61:18, 65:21, 66:17
**laws** [1] - 37:14
**lawsuit** [9] - 14:4, 15:16, 22:4, 35:22, 36:14, 42:15, 44:19, 44:20, 46:19
**lawyer** [1] - 29:13
**lawyers** [3] - 36:10, 40:16, 59:3
**lead** [1] - 54:8
**lead-in** [1] - 54:8
**least** [6] - 15:12, 23:4, 64:24, 70:7, 70:25, 72:8
**legal** [3] - 37:11, 40:25, 41:1
**Lender** [1] - 53:21
**lender** [8] - 8:16, 17:15, 17:25, 43:14, 44:9, 53:6, 53:24
**less** [3] - 25:9, 26:5, 68:1
**letter** [28] - 19:9, 24:6, 27:16, 32:1, 32:14, 33:14, 33:15, 57:7
**letter of intent** [28] - 7:20, 7:21, 10:14, 12:11, 19:5, 20:7, 20:10, 21:18, 23:13, 26:16, 27:1, 27:12, 29:1, 35:16, 36:4, 36:14, 43:20, 49:3, 57:4, 58:24, 60:11, 60:16, 60:17, 61:14, 64:10, 71:7, 72:6, 72:12
**letters** [3] - 33:20, 34:11, 63:2
**levels** [1] - 33:6
**LEVY** [18] - 2:6, 4:6, 40:18, 42:10, 43:12, 43:14, 48:13, 50:7, 50:9, 50:23, 51:2, 51:4, 62:13, 69:7, 70:11, 72:15, 73:5, 74:21
**Levy** [4] - 4:7, 40:18, 41:20, 52:18, 55:2, 57:8, 65:25, 66:5, 71:3, 74:8
**liberal** [1] - 19:22
**license** [83] - 7:11, 8:5, 9:8, 13:5, 13:12, 14:20, 15:11, 15:22, 15:23, 16:17, 17:24, 18:2, 18:17, 18:20, 19:2, 21:23, 23:15, 25:18, 25:20, 27:4, 27:19, 28:10, 28:20, 29:3, 32:4, 32:18, 35:24, 37:18, 38:2, 39:4, 39:21, 40:5, 42:16, 42:17, 42:18, 42:22, 43:6, 43:20, 43:21, 43:22, 43:24, 44:1, 44:3, 44:8, 44:10, 44:11, 44:12, 44:13, 44:14, 44:16, 44:23, 45:1, 45:10,

48:22, 49:22, 50:6, 50:9, 50:10, 50:13, 51:10, 51:16, 51:17, 51:19, 51:22, 52:20, 52:23, 53:8, 53:18, 54:2, 55:22, 55:23, 56:4, 59:24, 61:3, 64:15, 65:15, 65:16, 68:12, 69:17

**licensed** [2] - 66:2, 73:14

**licensee** [1] - 45:13

**licenses** [2] - 46:7, 46:9

**licensing** [6] - 6:4, 10:21, 17:16, 19:10, 23:16, 26:12

**licensor** [16] - 8:23, 9:18, 13:10, 13:11, 17:10, 17:12, 17:25, 18:17, 31:21, 34:24, 43:16, 52:1, 53:9, 53:23, 54:13, 59:1

**licensor/licensee** [1] - 51:11

**lien** [21] - 9:16, 14:19, 14:21, 17:15, 17:17, 39:18, 39:19, 40:5, 53:7, 53:9, 53:12, 53:16, 53:22, 53:24, 54:11, 54:13, 54:18, 59:25, 60:12, 64:14

**liened** [1] - 39:4

**lienholders** [1] - 59:23

**lienor** [2] - 54:9, 54:18

**lienor's** [1] - 54:17

**liens** [1] - 53:5

**lift** [3] - 5:10, 5:25, 27:3

**likelihood** [7] - 11:16, 19:18, 34:19, 48:18, 67:11, 67:13, 68:5

**limitation** [1] - 17:24

**line** [2] - 18:5, 19:25

**liquidate** [3] - 15:1, 18:3, 26:1

**liquidated** [1] - 24:5

**liquidation** [1] - 67:2

**listen** [2] - 68:20, 73:23

**literally** [1] - 37:17

**litigation** [3] - 7:23, 13:6, 58:14

**live** [1] - 16:10

**LLC** [7] - 1:3, 1:15, 1:21, 3:3, 6:8, 48:2, 48:4

**LLP** [4] - 1:14, 1:20, 2:3, 4:3

**load** [1] - 31:20

**loans** [1] - 14:24

**logging** [2] - 6:18, 7:1

**LOI** [17] - 12:11, 42:14, 43:20, 44:1, 44:2, 45:6, 45:7, 46:19, 47:7, 47:13, 47:16, 62:14, 62:18, 69:14, 69:23, 70:2

**look** [15] - 15:9, 20:6, 22:19, 30:7, 33:15, 37:20, 41:18, 47:16, 48:3, 50:14, 51:15, 55:2, 63:25, 72:21, 73:2

**looked** [2] - 10:20, 19:12

**looking** [1] - 43:11

**looks** [2] - 59:4, 64:9

**looming** [1] - 11:2

**loose** [1] - 65:7

**lose** [8] - 18:17, 30:10, 30:11, 34:9, 56:16, 56:23, 68:10

**loses** [2] - 11:12, 68:22

**losing** [1] - 18:16

**loss** [2] - 55:16, 55:18

**losses** [1] - 52:10

**lost** [3] - 55:23, 67:4, 68:22

**low** [2] - 19:22, 30:9

**lower** [1] - 25:19

**LP** [5] - 1:9, 2:5, 4:8, 4:13, 4:19

## M

**Madison** [1] - 1:16

**mail** [4] - 2:11, 62:11, 64:9, 71:19

**maintain** [1] - 12:24

**manager** [1] - 22:25

**manner** [1] - 34:22

**manufacture** [2] - 8:6, 57:19

**manufacturer** [1] - 17:11

**manufacturers** [1] - 8:3

**manufacturing** [1] - 8:11

**marbles** [1] - 66:25

**MARTIN** [1] - 2:7

**Martin** [1] - 4:12

**massive** [2] - 44:19, 44:20

**matter** [7] - 13:1, 21:8, 25:17, 38:3, 69:11, 74:22, 75:3

**mean** [22] - 13:4, 16:10, 16:15, 20:16, 20:19, 20:24, 22:24, 31:9, 33:21, 34:4, 34:16, 34:25, 37:2, 37:3, 58:25, 60:5, 61:22, 65:22, 65:25, 67:20, 72:17, 72:23

**meaning** [5] - 15:10, 17:12, 37:20, 40:24, 53:21

**means** [5] - 34:18, 53:19, 63:19, 64:17, 64:19

**media** [1] - 3:9

**meet** [2] - 21:8, 41:7

**meeting** [1] - 31:18

**memorandum** [4] - 41:3, 42:21, 49:13, 64:1

**mentioned** [3] - 14:2, 60:16, 74:8

**merely** [1] - 48:20

**merit** [1] - 10:7

**merits** [7] - 11:17, 28:19, 34:19, 48:18, 48:23, 67:13, 70:4

**merry** [1] - 29:6

**might** [5] - 44:19, 57:9, 65:5, 65:8, 72:7

**million** [17] - 8:7, 8:19, 14:8, 14:22, 24:10, 25:8, 26:4, 26:5, 32:16, 34:2, 38:5, 38:11, 39:5, 45:19, 55:8, 66:12, 69:16

**millions** [1] - 46:19

**mind** [1] - 72:7

**mirrors** [1] - 72:6

**misrepresentation** [1] - 12:7

**mistake** [1] - 4:18

**MITCHELL** [1] - 1:14

**Mitchell** [2] - 3:16, 3:24

**mixing** [1] - 57:23

**MOI** [1] - 54:21

**moment** [6] - 10:7, 18:10, 21:16, 29:21, 55:14, 68:20

**monetize** [1] - 53:15

**money** [39] - 8:13, 9:3, 11:12, 12:2, 12:5, 12:22, 12:25, 14:7, 15:25, 16:1, 23:1, 24:5, 24:7, 25:12, 26:3, 30:12, 30:16, 32:1, 32:16, 37:20, 37:21, 37:22, 38:6, 38:11, 38:12, 38:13, 38:14, 38:22, 39:10, 45:18, 47:20, 52:12, 56:15, 56:25, 59:15, 63:4, 65:19, 66:23

**monies** [1] - 24:4

**Montclare** [21] - 3:15, 6:11, 10:5, 12:15, 42:25, 43:3, 44:18, 45:8, 46:13, 47:5, 47:8, 47:16, 50:15, 51:8, 52:17, 57:25, 64:4, 69:9, 70:15, 70:22, 74:4

**MONTCLARE** [109] - 1:17, 3:15, 6:13,

6:17, 6:23, 7:2, 7:6, 7:9, 7:21, 9:15, 11:4, 12:16, 13:8, 13:10, 13:16, 13:18, 13:25, 14:5, 14:12, 14:15, 14:18, 15:3, 15:5, 15:7, 15:19, 16:3, 17:7, 17:14, 19:13, 20:5, 22:1, 22:13, 22:16, 23:19, 23:23, 24:1, 24:11, 24:14, 24:17, 24:20, 24:25, 25:5, 25:9, 25:22, 26:9, 26:14, 26:20, 26:23, 27:5, 27:24, 28:4, 29:16, 29:23, 31:5, 32:25, 33:5, 35:17, 35:19, 35:25, 36:6, 36:9, 36:16, 36:19, 36:23, 36:25, 38:3, 38:8, 38:10, 38:25, 39:3, 39:14, 39:17, 39:23, 40:7, 53:4, 53:25, 54:4, 54:7, 55:11, 56:3, 56:10, 56:19, 58:9, 58:19, 60:13, 60:21, 60:24, 61:1, 61:6, 61:23, 62:2, 62:9, 62:19, 63:12, 63:17, 64:18, 65:21, 66:6, 66:9, 66:19, 67:6, 71:17, 71:25, 72:11, 73:9, 73:12, 74:10, 74:13, 74:20

**Montclare's** [1] - 46:21

**monumental** [2] - 13:5, 13:6

**moreover** [2] - 45:16, 58:3

**morning** [1] - 36:9

**motion** [9] - 5:4, 5:9, 5:10, 5:11, 5:20, 5:21, 49:11, 58:1, 73:17

**motions** [2] - 41:5, 57:3

**motive** [1] - 68:16

**move** [4] - 31:6, 34:22, 34:23, 43:10

**moved** [2] - 69:9, 69:12

**MS** [3] - 3:23, 4:1, 6:19

**mute** [3] - 6:20, 53:2, 53:3

## N

**name** [1] - 3:15

**namely** [1] - 68:11

**nature** [5] - 11:18, 28:21, 65:18, 68:10, 72:20

**Nautica** [1] - 69:20

**NDA** [6] - 62:15, 62:17, 62:21, 62:23, 70:4

**necessarily** [3] - 27:16, 66:16, 67:16

**necessary** [3] - 3:11, 20:24, 70:17

**need** [4] - 15:15, 35:6, 37:8, 70:21

**needed** [4] - 16:13, 28:15, 28:17, 62:21

**needs** [1] - 29:17

**negotiated** [1] - 57:7

**negotiating** [2] - 27:6, 58:13

**negotiation** [1] - 47:10

**negotiations** [1] - 8:1

**never** [5] - 18:19, 38:5, 38:10, 62:22, 62:23

**new** [2] - 58:3, 59:9

**New** [8] - 1:5, 1:17, 1:22, 2:6, 31:9

**next** [4] - 32:3, 36:9, 36:14, 45:8

**NOI** [2] - 58:12

**non** [5] - 7:11, 7:18, 8:18, 60:14, 62:18

**non-party** [4] - 7:11, 7:18, 8:18, 60:14

**non-redacted** [1] - 62:18

**nonassignable** [1] - 44:12

**noncontinuation** [1] - 46:17

**none** [3] - 41:11, 48:15, 49:5

**nonexisting** [1] - 4:9

**nonpayment** [1] - 50:22

**nonredacted** [2] - 70:2, 70:3

**nontransferable** [1] - 44:12

**noon** [1] - 73:4
**normal** [1] - 39:6
**note** [3] - 57:13, 61:16, 70:1
**notes** [1] - 62:7
**nothing** [11] - 12:18, 12:19, 31:21, 40:12, 46:3, 60:9, 60:10, 61:7, 62:7, 73:18
**notice** [19] - 4:24, 13:19, 17:25, 32:21, 32:23, 33:6, 33:11, 38:24, 40:3, 40:9, 41:9, 48:19, 48:20, 49:13, 54:25, 55:4, 58:17, 58:18, 69:10
**notices** [16] - 32:25, 33:1, 33:2, 44:22, 44:24, 45:4, 45:5, 45:6, 45:11, 45:12, 45:15, 45:17, 50:3, 51:5
**notion** [4] - 11:6, 11:8, 55:21, 65:4
**Notwithstanding** [1] - 17:21
**notwithstanding** [3] - 32:14, 34:12, 54:8
**number** [4] - 21:17, 42:16, 56:2
**NYC** [1] - 6:19

68:22, 70:21, 72:19
**opposite** [1] - 52:21
**oral** [1] - 5:3
**ORAL** [1] - 1:11
**order** [6] - 21:7, 41:7, 61:24, 62:4, 63:19, 64:2
**Order** [4] - 5:5, 5:12, 5:13, 73:20
**orders** [2] - 8:15, 8:16
**original** [2] - 49:11, 50:13
**originally** [1] - 54:23
**otherwise** [2] - 67:16, 70:19
**outs** [1] - 69:24
**owe** [5] - 20:14, 32:15, 39:8, 39:11, 39:14
**owed** [5] - 14:16, 31:20, 39:5, 39:17, 39:20
**owes** [2] - 38:1, 38:22
**own** [3] - 17:23, 32:1, 34:23
**owned** [3] - 8:21, 14:21, 37:19

**penultimate** [1] - 50:24
**people** [4] - 14:23, 17:4, 21:1, 33:22
**percent** [2] - 23:2
**percentage** [2] - 24:23, 59:17
**performance** [1] - 56:20
**perhaps** [4] - 44:21, 51:8, 69:24, 70:21
**period** [9] - 10:19, 10:21, 11:13, 33:3, 33:11, 34:14, 36:22, 50:4
**permissive** [1] - 20:23
**permit** [1] - 9:5
**permitted** [4] - 30:3, 30:11, 40:8, 40:9
**perpetuate** [1] - 65:16
**person** [2] - 16:7, 23:7
**Persons** [1] - 3:5
**perspective** [1] - 66:25
**pertains** [1] - 69:22
**photographing** [1] - 3:6
**piece** [1] - 59:8
**pivot** [2] - 42:10, 42:11
**place** [5] - 5:5, 43:6, 46:8, 51:15, 69:2
**Plaintiff** [4] - 1:4, 1:14, 1:15, 1:20
**plaintiff** [16] - 3:14, 3:17, 3:25, 4:2, 5:11, 5:18, 5:21, 6:14, 7:15, 42:3, 44:21, 46:4, 47:11, 52:4, 52:9, 70:6
**plaintiff's** [5] - 6:2, 6:10, 41:2, 46:25, 48:16

## O

**object** [2] - 41:2, 44:6
**objected** [1] - 62:17
**obligated** [1] - 47:19
**obligation** [2] - 43:15, 47:6
**obligations** [5] - 8:20, 10:15, 33:23, 64:12, 66:17
**observed** [2] - 45:7, 69:14
**observing** [1] - 45:25
**obtain** [1] - 30:15
**obviously** [13] - 21:15, 25:19, 26:4, 36:13, 41:24, 42:4, 57:22, 60:7, 62:17, 64:8, 67:12, 67:24, 73:24
**occasion** [1] - 68:22
**occurred** [1] - 45:11
**occurrence** [1] - 17:22
**offered** [1] - 31:19
**Official** [2] - 2:9, 75:9
**often** [1] - 48:17
**OLDEN** [1] - 1:3
**Olden** [14] - 1:15, 1:21, 3:3, 3:17, 31:13, 31:16, 42:13, 43:25, 45:14, 45:20, 47:6, 51:25, 52:4, 52:9
**omission** [1] - 43:7
**omits** [2] - 43:20, 43:21
**omitted** [2] - 41:1, 41:5
**once** [3] - 7:23, 70:14, 71:14
**one** [40] - 5:25, 6:1, 8:8, 9:7, 10:12, 10:17, 10:25, 11:13, 11:18, 14:5, 18:22, 18:25, 19:4, 20:9, 21:9, 28:22, 29:1, 29:2, 31:1, 32:16, 33:6, 37:24, 42:16, 45:17, 49:6, 49:10, 50:2, 50:18, 52:22, 60:1, 60:17, 61:13, 61:24, 65:9, 66:1, 67:24, 68:24, 72:16, 74:4
**one-million-something** [1] - 32:16
**ones** [5] - 8:4, 10:10, 11:21, 29:2, 74:8
**open** [6] - 3:1, 15:15, 27:5, 27:14, 49:25, 51:12
**operate** [1] - 22:25
**operated** [1] - 59:24
**operating** [2] - 23:10, 28:14
**operation** [1] - 37:22
**opportunity** [12] - 6:2, 13:19, 30:12, 56:25, 59:14, 66:6, 66:7, 67:4, 67:20,

## P

**p.m** [1] - 1:8
**page** [2] - 42:21, 49:13
**paid** [7] - 16:1, 25:3, 38:12, 45:18, 45:19, 47:20, 56:9
**PAMELA** [1] - 1:12
**paper** [1] - 67:23
**papers** [5] - 41:2, 44:25, 48:15, 48:16, 51:23
**paragraph** [5] - 33:9, 54:6, 61:17, 61:21, 64:17
**Paragraph** [9] - 17:20, 46:23, 50:13, 50:17, 51:21, 52:21, 53:20, 54:8, 64:16
**parameters** [1] - 70:13
**part** [16] - 9:16, 14:2, 14:18, 14:20, 26:6, 27:9, 28:8, 44:1, 52:24, 56:6, 58:15, 59:16, 60:2, 67:14
**parte** [1] - 49:14
**particular** [2] - 9:7, 19:7
**particularly** [1] - 63:10
**parties** [7] - 7:22, 9:25, 20:23, 22:16, 27:7, 45:9, 47:18, 47:23, 58:21, 67:20, 68:1, 68:6
**parties'** [1] - 48:15
**parts** [1] - 50:15
**party** [17] - 7:11, 7:18, 8:1, 8:18, 11:14, 14:2, 15:17, 19:13, 28:6, 31:11, 42:16, 44:9, 48:7, 51:19, 60:14, 67:17, 70:8
**passage** [4] - 43:17, 44:2, 51:8, 51:13
**passages** [1] - 51:23
**passed** [1] - 10:20
**past** [1] - 11:16
**patience** [1] - 40:15
**Paul** [1] - 3:15
**PAUL** [1] - 1:17
**pause** [2] - 7:7, 25:16
**pay** [15] - 22:15, 22:16, 22:17, 23:1, 23:3, 25:7, 25:9, 25:11, 25:20, 31:19, 31:23, 32:3, 34:14, 59:8
**paying** [1] - 14:23
**payment** [1] - 45:18
**payments** [2] - 10:22, 50:16
**pendency** [1] - 69:15
**pending** [2] - 35:10, 41:5

**play** [2] - 37:11, 65:5
**playing** [1] - 40:25
**plus** [3] - 25:12, 26:10, 32:16
**POF** [1] - 63:19
**point** [10] - 8:14, 10:23, 19:7, 49:6, 49:7, 55:18, 56:22, 58:11, 72:2, 72:3
**pointed** [1] - 57:8
**points** [1] - 69:8
**policy** [1] - 37:15
**portion** [1] - 44:14
**portions** [2] - 70:23, 71:14
**portrayed** [1] - 47:24
**posed** [1] - 52:18
**position** [1] - 29:15
**possession** [2] - 18:1, 22:24
**possibility** [1] - 58:2
**possible** [3] - 55:15, 72:17, 73:20
**possibly** [1] - 51:15
**potential** [4] - 9:3, 11:10, 18:15, 57:19
**potentially** [2] - 30:16, 68:23
**practical** [2] - 5:14, 19:6
**preceded** [1] - 39:19
**precluding** [1] - 62:17
**predecessors** [1] - 35:22
**preliminary** [13] - 5:11, 5:18, 5:21, 6:3, 6:11, 9:23, 21:8, 27:2, 30:1, 31:8, 42:3, 42:6, 71:4
**prerogative** [1] - 23:9
**present** [1] - 46:15
**presented** [1] - 44:17
**presenting** [1] - 43:4
**preserving** [1] - 41:22
**presumably** [4] - 10:20, 21:18, 48:6, 64:9
**presume** [1] - 50:18
**pretty** [3] - 8:20, 30:8, 46:14
**prevail** [3] - 55:12, 56:13, 56:14
**prevails** [1] - 55:13
**prevent** [2] - 35:23, 64:21

**prevented** [1] - 43:5
**preventing** [3] - 12:18, 12:19, 51:17
**prevents** [2] - 6:3, 51:10
**Priority** [1] - 53:5
**problem** [14] - 8:8, 10:8, 10:25, 13:21, 17:2, 17:3, 29:14, 34:6, 57:2, 61:23, 62:5, 63:7, 67:19, 71:18
**procedure** [1] - 61:12
**proceed** [3] - 9:21, 9:22, 28:1
**proceeding** [6] - 18:3, 18:4, 27:7, 36:21, 70:9, 72:16
**Proceedings** [1] - 2:12
**proceedings** [4] - 3:5, 3:7, 7:7, 75:3
**produced** [1] - 2:12
**product** [5] - 17:11, 49:17, 49:20, 49:23, 65:24
**products** [7] - 8:4, 9:10, 65:9, 66:1, 66:3, 73:14, 74:7
**profitable** [3] - 28:1, 30:16, 46:20
**program** [1] - 26:24
**prohibition** [1] - 3:6
**prohibitions** [1] - 3:8
**promptly** [1] - 4:24
**proper** [3] - 40:9, 40:10, 69:4
**property** [1] - 36:7
**prospective** [1] - 47:18
**prosper** [2] - 32:6, 65:17
**prosperous** [1] - 66:11
**protecting** [1] - 9:3
**prove** [1] - 59:2
**provide** [1] - 72:20
**provided** [5] - 40:4, 50:4, 54:4, 62:16, 63:9
**provides** [3] - 44:8, 51:18, 69:12
**providing** [1] - 12:23
**provision** [4] - 43:13, 51:17, 51:18, 62:3
**provisions** [3] - 9:17, 50:14, 50:19
**proximity** [1] - 12:13
**public** [1] - 66:13
**publicly** [1] - 62:22
**purchase** [8] - 8:15, 8:16, 23:17, 23:20, 47:23, 60:4, 63:18, 68:24
**purchased** [2] - 21:24, 65:14
**purchasing** [1] - 24:9
**pure** [1] - 20:18
**purpose** [2] - 46:19, 50:25
**purposes** [4] - 5:14, 19:6, 21:1, 29:3
**pursuant** [1] - 20:10
**pursue** [2] - 20:25, 21:21
**put** [10] - 5:5, 16:10, 22:25, 23:4, 24:4, 24:7, 32:1, 33:13, 66:23, 73:16
**putting** [3] - 35:9, 55:5, 56:12

## Q

**quality** [1] - 65:22
**quantifiable** [1] - 56:1
**quantify** [1] - 55:15
**questionable** [1] - 29:15
**questions** [6] - 11:16, 40:20, 40:21, 40:22, 49:3, 50:1
**quickly** [4] - 15:20, 15:21, 73:4, 73:20
**quite** [5] - 57:12, 57:24, 61:20, 68:25, 73:18

## R

**Rabbi** [1] - 41:16
**raise** [1] - 71:9
**raised** [3] - 11:8, 42:11, 49:4
**ran** [1] - 8:8
**rapid** [1] - 73:21
**rarely** [1] - 35:1
**rather** [6] - 41:25, 52:25, 65:16, 66:22, 66:24
**reach** [1] - 63:23
**read** [3] - 53:25, 54:7, 60:1
**ready** [2] - 7:22, 9:22
**real** [7] - 8:12, 15:20, 15:21, 24:5, 37:15, 58:5, 59:3
**realize** [1] - 50:17
**really** [23] - 5:10, 5:15, 6:9, 9:22, 11:3, 13:21, 22:23, 24:24, 27:24, 29:25, 34:25, 35:1, 45:25, 48:15, 48:22, 50:16, 50:24, 57:13, 59:20, 61:11, 64:5, 66:19, 70:23
**reason** [9] - 7:11, 9:21, 11:25, 23:11, 37:7, 37:8, 43:23, 45:2, 62:2
**reasonable** [1] - 33:7
**reasoning** [1] - 41:23
**reasons** [1] - 44:3
**reassign** [1] - 35:5
**reassignment** [1] - 72:25
**rebroadcasting** [1] - 3:7
**receive** [3] - 61:20, 71:15, 72:17
**recognize** [1] - 4:14
**record** [4] - 18:24, 47:14, 73:16, 75:3
**recorded** [1] - 2:12
**recording** [1] - 3:7
**recouped** [1] - 12:3
**redacted** [6] - 61:16, 61:21, 62:15, 62:18, 71:14
**redaction** [1] - 72:8
**redactions** [3] - 61:19, 61:25, 72:5
**redressed** [1] - 19:19
**reduced** [1] - 51:2
**refer** [1] - 49:6
**reference** [3] - 43:21, 70:9
**referred** [2] - 43:1, 50:15
**referring** [3] - 44:4, 50:12, 72:11
**reflects** [1] - 4:14
**refrain** [1] - 7:14
**reframe** [1] - 5:8
**refused** [1] - 31:22
**regard** [3] - 17:17, 46:12, 49:3
**regarded** [1] - 8:3
**regards** [1] - 41:8
**rejected** [1] - 55:2
**related** [4] - 48:6, 60:23, 60:24, 63:8
**relates** [2] - 33:8, 74:6
**relationships** [2] - 46:8, 51:11
**relatively** [1] - 63:17
**relevant** [2] - 5:16, 63:11
**relief** [1] - 30:1
**relying** [1] - 70:23
**remarks** [1] - 47:15
**remedies** [1] - 11:8
**remedy** [2] - 11:9, 21:20
**remedy-at-law** [1] - 11:9
**reminded** [1] - 3:6

**remote** [1] - 3:5
**removal** [1] - 3:9
**removed** [4] - 5:6, 20:22, 41:25, 67:22
**rep** [1] - 43:23
**reparable** [2] - 47:2, 58:7
**reporter** [1] - 74:2
**Reporter** [3] - 2:9, 2:9, 75:9
**REPORTER** [1] - 75:1
**represent** [4] - 3:17, 4:15, 64:7, 68:2
**representation** [2] - 48:8, 70:11
**represented** [2] - 61:18, 70:14
**request** [2] - 71:15, 73:21
**requested** [2] - 62:13, 62:14
**requesting** [1] - 51:22
**require** [1] - 9:24
**required** [3] - 8:9, 8:10, 32:21
**requires** [1] - 65:2
**resolve** [3] - 5:20, 63:4, 71:12
**resolved** [4] - 11:1, 15:20, 62:25, 72:8
**respect** [6] - 27:24, 33:10, 38:1, 38:24, 50:2, 57:10
**respects** [1] - 53:12
**rest** [2] - 22:3, 53:25
**restated** [4] - 20:7, 58:24, 60:16, 61:14
**restrain** [1] - 7:14
**restrained** [2] - 61:6, 61:2
**Restraining** [3] - 5:5, 5:12, 5:13
**restraints** [1] - 37:5
**restricted** [1] - 3:10
**restriction** [1] - 71:16
**restructure** [1] - 66:23
**result** [5] - 3:8, 8:12, 9:10, 46:24, 56:17
**resuscitate** [1] - 8:2
**return** [3] - 24:23, 47:20
**revert** [1] - 43:19
**review** [2] - 71:1, 72:19
**reviving** [1] - 5:15
**rich** [3] - 55:4, 69:9, 69:13
**rid** [1] - 31:15
**rightfully** [1] - 11:7
**rights** [25] - 11:2, 16:17, 16:20, 19:7, 20:12, 20:14, 23:16, 26:1, 26:12, 26:18, 27:18, 28:22, 29:3, 34:8, 34:11, 37:13, 37:14, 44:15, 52:20, 52:23, 54:17, 59:1, 61:12, 64:11, 65:16
**risk** [6] - 11:15, 16:16, 16:24, 18:16, 26:5, 28:12, 57:9, 57:20, 58:5
**road** [1] - 32:6
**Rome** [2] - 4:7, 4:22
**ROME** [1] - 2:3
**Room** [1] - 6:19
**room** [1] - 6:20
**roughly** [2] - 36:22, 45:19
**rounds** [1] - 5:25
**Rule** [5] - 41:6, 41:13, 42:3, 48:13, 69:10
**rule** [4] - 57:9, 69:12, 71:13, 71:21
**Rules** [1] - 31:9
**rules** [3] - 31:1, 31:8, 31:9
**ruling** [1] - 73:7
**run** [6] - 30:12, 39:10, 55:22, 56:23, 56:24, 70:6
**running** [6] - 15:11, 25:13, 29:4, 38:15, 39:7, 59:7

# S

**S-u-r-f-9** [1] - 6:8
**sale** [1] - 52:11
**Sam** [2] - 4:7, 40:18
**SAMANTHA** [1] - 1:18
**Samantha** [1] - 3:24
**SAMUEL** [1] - 2:6
**sanctions** [2] - 3:8, 3:11
**sat** [1] - 34:8
**satisfy** [2] - 12:25, 45:23
**save** [1] - 71:5
**scandal** [1] - 33:2
**screw** [1] - 33:24
**Scylla** [1] - 57:15
**seal** [1] - 70:9
**search** [1] - 17:3
**seasoned** [1] - 43:24
**second** [4] - 7:4, 25:16, 52:16, 58:10
**Second Circuit** [3] - 19:15, 19:21, 22:6
**Section** [4] - 43:8, 44:13, 50:23
**section** [1] - 43:12
**Section 2** [3] - 44:5, 44:7, 51:14
**secure** [1] - 66:21
**Secured** [1] - 25:24
**secured** [11] - 8:18, 8:19, 9:3, 14:7, 19:3, 32:2, 34:2, 43:2, 59:1, 66:20
**securing** [3] - 53:8, 53:10, 53:12
**security** [4] - 9:20, 14:22, 31:23, 56:4
**see** [5] - 69:25, 71:6, 71:12, 71:13, 71:14
**seek** [1] - 29:10
**seeking** [7] - 7:10, 22:3, 35:23, 52:6, 56:19, 56:20
**self** [4] - 11:7, 57:14, 59:20, 68:15
**self-inflicted** [4] - 11:7, 57:14, 59:20, 68:15
**sell** [19] - 8:6, 9:8, 11:1, 12:21, 13:3, 13:4, 16:9, 18:13, 21:3, 21:19, 22:5, 24:16, 28:7, 35:3, 36:7, 45:21, 60:18, 74:7
**seller** [2] - 20:11, 48:4
**seller's** [1] - 20:12
**selling** [4] - 8:7, 9:9, 12:19, 48:5
**sells** [2] - 8:3, 17:11
**send** [9] - 33:15, 61:24, 62:4, 62:9, 63:1, 63:20, 71:20, 72:9
**sending** [1] - 62:5
**senior** [10] - 17:22, 37:19, 40:11, 53:8, 53:12, 53:16, 54:9, 54:17, 59:1
**sense** [2] - 14:3, 20:18
**sensitive** [1] - 72:13
**sent** [6] - 32:13, 32:14, 51:4, 70:2, 70:3, 72:4
**sentence** [1] - 46:15
**sentences** [1] - 6:22
**serious** [2] - 11:16, 67:13
**served** [1] - 66:14
**service** [1] - 49:10
**services** [1] - 22:8
**set** [4] - 5:7, 10:2, 21:9, 54:23
**settled** [1] - 15:20
**settlement** [1] - 63:2
**seven** [2] - 64:18, 64:19
**several** [2] - 41:16, 51:23

**shall** [3] - 17:23, 20:11, 53:11
**share** [2] - 70:12, 71:23
**shoes** [5] - 26:8, 27:11, 44:6, 52:4, 64:11
**short** [4] - 10:21, 35:2, 63:17, 64:1
**Show** [1] - 73:21
**show** [1] - 70:18
**shows** [2] - 33:21, 41:14
**side** [3] - 15:21, 29:17, 56:7
**signed** [8] - 12:12, 17:9, 17:10, 39:1, 57:17, 58:24
**signing** [2] - 57:19, 62:17
**signs** [1] - 36:4
**SILBERBERG** [1] - 1:14
**Silberberg** [2] - 3:17, 3:24
**silly** [1] - 25:25
**SIMON** [1] - 2:7
**simply** [4] - 11:24, 14:25, 28:25, 67:17
**sitting** [1] - 30:9
**situation** [5] - 10:18, 12:10, 39:7, 57:20, 68:25
**situations** [2] - 46:11, 48:18
**sixth amendment** [2] - 50:10, 50:20, 50:23
**slightly** [1] - 5:8
**slowly** [1] - 6:24
**smacks** [1] - 57:23
**sold** [1] - 32:6
**solidifies** [1] - 57:10
**solution** [1] - 17:3
**someone** [6] - 13:3, 13:5, 20:19, 21:4, 22:17, 39:7, 57:22, 61:15, 61:18
**somewhat** [2] - 24:17, 65:10
**sorry** [7] - 24:17, 24:24, 33:25, 34:25, 41:20, 48:3, 58:10
**sort** [4] - 30:1, 55:24, 56:1, 64:23
**sorted** [1] - 16:6
**sought** [1] - 18:19
**sound** [1] - 18:24
**sounds** [1] - 12:10
**source** [1] - 32:2
**speaker** [1] - 6:16
**speaking** [5] - 6:13, 28:21, 44:18, 45:9, 48:24
**specific** [6] - 9:5, 9:17, 33:10, 33:12, 34:6, 56:20
**specifically** [2] - 43:4, 44:8
**speculate** [1] - 37:7
**speculative** [3] - 27:10, 28:21, 29:8
**spent** [1] - 73:17
**sporting** [1] - 8:3
**sports** [1] - 8:5
**Sprei** [5] - 31:19, 46:23, 49:9, 49:14, 52:15
**Sprei's** [2] - 49:7, 51:20
**Spyder** [1] - 69:21
**stake** [1] - 42:20
**standard** [2] - 65:1, 65:7
**standards** [2] - 5:16, 5:23
**standing** [39] - 10:9, 11:17, 18:6, 18:11, 19:14, 19:20, 19:25, 20:1, 20:18, 21:21, 27:9, 27:11, 27:22, 28:22, 29:15, 30:4, 30:6, 30:7, 30:10, 30:13, 42:11, 42:15, 42:20, 44:6, 47:25, 48:9, 49:4, 52:4, 55:7, 57:16, 64:5, 64:23, 65:1, 65:6, 65:12,

67:10, 67:11, 67:12, 72:2
**stands** [1] - 64:10
**start** [2] - 6:9, 52:17
**started** [6] - 8:12, 8:17, 30:21, 36:21, 46:14, 57:3
**starting** [2] - 18:19, 38:21
**state** [20] - 3:13, 5:5, 5:13, 20:2, 20:22, 30:22, 37:2, 41:6, 41:9, 41:10, 41:11, 41:15, 41:19, 41:22, 42:5, 42:7, 49:8, 49:12, 63:22, 67:21
**statements** [1] - 31:25
**states** [1] - 9:18
**stating** [1] - 29:19
**status** [1] - 3:2
**stay** [4] - 22:20, 35:10, 37:21, 68:15
**stenography** [1] - 2:12
**stepping** [1] - 26:8
**steps** [1] - 68:8
**still** [13] - 6:22, 9:3, 19:6, 23:10, 23:17, 23:24, 27:1, 30:23, 53:3, 54:13, 61:11, 67:16
**stop** [1] - 7:10
**stopped** [1] - 34:3
**stopping** [1] - 21:1
**stops** [1] - 26:4
**store** [3] - 39:8, 39:13, 39:14
**straight** [1] - 25:25
**straightforward** [1] - 30:8
**stranger** [2] - 42:14, 60:14
**strategic** [1] - 68:16
**stream** [1] - 56:1
**strike** [1] - 19:9
**striking** [1] - 16:11
**struck** [2] - 12:9, 16:6
**stuff** [1] - 40:10
**styled** [1] - 5:8
**subject** [6] - 14:19, 40:5, 47:17, 53:11, 53:16, 58:12
**submission** [2] - 41:2, 56:5
**submit** [4] - 52:8, 61:16, 70:25, 73:3
**submitted** [5] - 37:1, 49:8, 51:24, 52:9, 55:3
**submitting** [2] - 4:16, 70:19
**subordinate** [1] - 54:14
**subordinated** [2] - 53:11
**substantial** [2] - 7:15, 46:16
**success** [6] - 11:16, 34:19, 48:18, 67:11, 67:13, 68:5
**successful** [1] - 59:11
**sudden** [2] - 68:17, 68:18
**sue** [1] - 12:4
**sued** [1] - 45:8
**sues** [1] - 36:5
**suffer** [2] - 34:20, 52:10
**sufficient** [1] - 19:17
**suggest** [2] - 58:25, 73:9
**suggested** [1] - 59:2
**suggesting** [1] - 54:5
**suit** [1] - 12:12
**Suite** [1] - 1:22
**suits** [1] - 49:21
**summons** [2] - 48:19, 48:20
**superior** [8] - 8:19, 9:16, 14:21, 17:17, 39:19, 40:5, 59:25, 60:12, 64:14
**support** [2] - 49:8, 49:22

**supports** [1] - 54:10
**suppose** [1] - 21:21
**supposed** [3] - 33:16, 33:19, 41:24
**Surf9** [60] - 6:5, 8:2, 8:21, 8:22, 10:10, 10:16, 10:18, 10:25, 11:19, 11:20, 12:4, 12:7, 13:13, 13:24, 14:14, 14:16, 14:23, 15:4, 15:5, 15:10, 16:15, 16:24, 17:10, 18:15, 24:13, 25:2, 26:19, 28:13, 28:14, 29:4, 32:14, 34:24, 37:25, 38:21, 39:22, 40:2, 45:13, 45:22, 48:6, 48:7, 59:12, 60:24, 61:1, 61:6, 63:11, 64:13, 64:15, 65:9, 65:17, 65:20, 67:2, 68:12, 68:23, 69:16, 69:19, 74:7, 74:15
**Surf9's** [9] - 13:23, 22:12, 27:19, 55:18, 55:22, 64:14, 65:13, 65:15, 74:6
**surfboards** [1] - 49:21
**surfing** [2] - 8:4, 8:5
**suspect** [1] - 73:13
**system** [5] - 37:11, 37:16, 40:25, 41:1, 69:5

## T

**table** [1] - 5:7
**talks** [3] - 49:12, 51:21
**Telephone** [1] - 2:10
**Temporary** [3] - 5:4, 5:12, 5:13
**ten** [1] - 30:10
**tendered** [3] - 23:2, 23:3
**tenth** [1] - 69:10
**terminate** [51] - 7:13, 9:19, 13:2, 13:12, 15:14, 15:22, 15:23, 16:4, 17:16, 18:6, 18:7, 18:8, 18:12, 18:23, 20:1, 21:3, 21:13, 22:5, 23:15, 27:25, 28:19, 30:2, 30:3, 30:11, 30:19, 32:10, 32:17, 32:18, 32:24, 34:7, 34:8, 35:4, 35:5, 35:7, 36:17, 38:19, 38:25, 39:3, 40:1, 40:4, 43:17, 48:22, 50:6, 50:7, 51:7, 52:2, 56:4, 58:17, 63:6, 68:21
**terminated** [9] - 7:24, 10:10, 15:12, 16:17, 16:18, 16:21, 55:24, 58:5, 69:17
**terminates** [1] - 27:4
**terminating** [8] - 6:4, 7:10, 10:4, 21:2, 33:21, 35:24, 38:23, 43:6
**termination** [21] - 11:2, 12:1, 13:19, 14:4, 16:14, 17:24, 18:15, 21:23, 40:10, 44:21, 45:10, 45:16, 46:9, 47:7, 51:10, 51:17, 61:2, 63:5, 64:22, 67:18, 68:12
**terms** [10] - 7:16, 9:5, 12:2, 23:10, 30:1, 44:14, 47:18, 57:23, 58:13, 58:23
**test** [1] - 19:16
**testifies** [1] - 46:24
**tests** [2] - 21:6, 21:7
**that'** [1] - 69:4
**the defendant** [17] - 2:3, 2:4, 4:7, 7:10, 8:1, 8:23, 10:3, 10:11, 11:7, 17:9, 17:12, 35:14, 40:14, 53:9, 62:12, 63:14, 72:15
**themselves** [2] - 13:13, 57:4
**theory** [2] - 12:3, 18:12
**thereafter** [1] - 50:18
**thereby** [1] - 65:13
**therefore** [7] - 28:22, 33:19, 39:25, 64:10, 64:13, 64:20, 64:22
**they've** [1] - 51:23
**thinks** [1] - 26:3

**third** [4] - 31:11, 44:9, 47:23, 51:19
**third-parties** [1] - 47:23
**third-party** [3] - 31:11, 44:9, 51:19
**threatened** [5] - 21:4, 32:10, 36:10, 36:16, 45:10
**threatens** [1] - 44:19
**three** [10] - 10:22, 15:12, 40:16, 44:24, 46:6, 46:11, 50:11, 50:21, 51:2, 51:5
**threshold** [1] - 19:22
**ticked** [1] - 23:6
**timing** [1] - 45:5
**title** [3] - 20:12, 28:9, 54:2
**to..** [1] - 48:11
**today** [5] - 30:9, 54:21, 54:23, 63:23, 64:2
**tolerated** [1] - 37:15
**tomorrow** [2] - 73:2, 73:4
**tonight** [2] - 64:2, 73:7
**took** [1] - 58:14
**track** [1] - 63:15
**Trade** [3] - 6:6, 60:6, 60:22
**transaction** [3] - 20:8, 20:9, 20:16
**Transaction** [1] - 25:24
**transcript** [1] - 75:2
**Transcript** [1] - 2:12
**TRANSCRIPT** [1] - 1:11
**Transcription** [1] - 2:12
**transfer** [8] - 18:20, 20:11, 23:16, 44:1, 44:3, 44:11, 47:22, 54:1
**transferred** [3] - 44:9, 51:19, 52:25
**tried** [4] - 36:11, 57:19, 71:17, 73:19
**TRO** [31] - 5:10, 7:10, 13:3, 21:8, 27:3, 30:22, 31:8, 32:12, 41:6, 41:12, 41:22, 42:5, 46:17, 47:12, 48:25, 49:8, 49:11, 49:12, 49:16, 49:23, 57:10, 58:3, 63:22, 67:24, 69:1, 69:15, 71:4, 73:1, 73:24
**TROs** [1] - 41:8
**trouble** [1] - 11:15
**true** [5] - 47:4, 51:20, 69:18, 69:19
**truly** [1] - 35:14
**truncated** [1] - 50:11
**trust** [1] - 72:20
**try** [16] - 6:18, 6:21, 6:22, 6:23, 7:1, 7:2, 8:2, 12:4, 13:3, 13:4, 16:7, 22:5, 33:24, 33:25, 55:22, 59:10
**trying** [11] - 5:19, 14:22, 25:4, 31:11, 34:24, 37:10, 37:11, 37:17, 38:18, 59:22, 63:15
**Tuesday** [1] - 1:7
**turn** [4] - 21:19, 28:15, 28:16, 48:17
**turns** [1] - 64:6
**two** [15] - 5:25, 28:16, 32:13, 33:6, 41:5, 45:12, 45:17, 49:9, 49:13, 50:14, 54:25, 55:3, 68:1, 69:10, 72:17
**two-page** [1] - 49:13
**type** [1] - 25:24

## U

**UCC** [4] - 40:13, 42:25, 43:2, 45:21
**UCC-9** [2] - 22:25, 25:24
**ultimately** [3] - 55:16, 55:17, 58:6
**uncertainty** [1] - 16:12
**under** [49] - 5:16, 9:18, 19:9, 19:10, 20:14, 21:12, 22:15, 22:21, 23:10, 23:13,

24:3, 25:24, 26:12, 26:18, 26:24, 27:17, 27:19, 28:13, 29:1, 29:3, 31:1, 31:8, 33:23, 37:14, 38:1, 38:13, 40:12, 40:13, 41:13, 42:3, 43:8, 43:12, 44:5, 44:7, 44:12, 49:19, 50:9, 50:16, 50:23, 51:14, 52:23, 54:2, 55:22, 64:12, 64:15, 70:9, 71:16, 72:12
**underhanded** [1] - 59:20
**underlying** [2] - 41:15, 44:1
**undermine** [1] - 21:24
**understood** [1] - 43:25
**undertakes** [1] - 11:15
**underway** [1] - 7:23
**undisputed** [1] - 38:21
**unequivocally** [1] - 9:12
**unfolded** [1] - 72:24
**unique** [13] - 10:16, 22:8, 22:9, 49:17, 49:18, 49:23, 65:22, 65:24, 66:3, 66:6, 66:7
**United States** [4] - 1:1, 1:5, 1:12
**unless** [2] - 24:2, 35:2
**unlike** [1] - 46:11
**unredacted** [2] - 61:20, 72:10
**unseal** [1] - 71:15
**unsigned** [1] - 49:14
**unusual** [1] - 59:6
**up** [24] - 6:16, 6:22, 8:17, 10:2, 16:12, 23:4, 23:6, 24:4, 24:7, 26:4, 31:8, 32:1, 33:7, 34:11, 39:4, 54:19, 54:20, 54:23, 55:8, 60:3, 68:20, 71:11, 72:4
**useful** [1] - 72:1

## V

**vacate** [3] - 5:4, 5:9, 6:1
**vacating** [1] - 41:22
**vacillated** [1] - 47:8
**validate** [1] - 29:10
**valuable** [1] - 21:11
**value** [8] - 12:8, 14:21, 15:10, 21:24, 25:19, 53:18, 67:2
**vehicle** [1] - 9:2
**verified** [1] - 41:14
**version** [2] - 62:15, 72:10
**versus** [3] - 3:3, 15:17, 64:17
**via** [1] - 64:9
**Vicky** [1] - 41:17
**view** [3] - 5:10, 5:24, 47:11
**Vij** [1] - 41:17
**violate** [1] - 39:1
**violated** [1] - 40:2
**violation** [1] - 30:20
**Violation** [1] - 3:8
**vis-à-vis** [1] - 52:5
**vociferously** [1] - 68:8
**voluntary** [1] - 52:6
**volunteer** [1] - 51:7

## W

**WACHLER** [1] - 4:1
**WACHTLER** [1] - 1:23
**Wachtler** [2] - 4:2, 6:12
**waffled** [1] - 57:7

**wait** [2] - 6:15, 38:11
**Walk** [1] - 69:21
**wants** [15] - 11:22, 14:13, 14:15, 19:3, 22:7, 24:4, 25:6, 25:10, 34:2, 37:18, 38:18, 42:4, 52:1, 54:18, 59:23
**warrant** [1] - 49:23
**warranty** [1] - 43:23
**water** [2] - 8:4, 29:20
**week** [1] - 71:22
**wet** [1] - 49:21
**whereas** [1] - 28:24
**whey** [1] - 31:2
**whole** [2] - 57:3, 68:10
**willing** [2] - 25:7, 35:8
**win** [1] - 7:17
**wins** [1] - 56:14
**wipes** [1] - 40:11
**withdraw** [2] - 4:17, 63:5
**witnesses** [2] - 46:7, 59:3
**wondering** [1] - 36:15
**word** [5] - 33:25, 43:20, 43:22, 46:21, 46:22
**words** [4] - 20:3, 50:5, 52:15, 52:22
**works** [2] - 31:2, 38:17
**worth** [2] - 8:7, 66:12
**worth..** [1] - 63:16
**wound** [1] - 8:17
**wounds** [1] - 59:20
**written** [1] - 17:25
**wrongful** [3] - 12:1, 14:4, 67:18
**wrongfully** [1] - 23:15
**wrote** [2] - 32:19, 46:14

## Y

**yakking** [1] - 59:4
**year** [3] - 8:7, 23:4, 32:3
**years** [6] - 15:12, 33:10, 39:10, 44:17, 46:8, 46:10
**yesterday** [2] - 41:3, 46:5
**York** [8] - 1:5, 1:17, 1:22, 2:6, 31:9

## Z

**Zucker** [1] - 4:22
**ZUCKER** [2] - 2:7, 4:21

## §

**§65(b)(2** [1] - 41:8