UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------x

In re: Chapter 11

Surf 9 LLC, Case No. 25-40078-JMM

Debtor.
-----------------------------------------x

**DECLARATION OF DIP LENDER IN FURTHER SUPPORT OF DEBTOR'S MOTION FOR APPROVAL OF DEBTOR-IN-POSSESSION FINANCING AND IN RESPONSE TO PRELIMINARY OBJECTIONS OF CREDITOR BODY GLOVE IP HOLDINGS, LP**

Yechiel Shimon Sprei declares the following under penalties of perjury pursuant to 28 U.S.C. §1746:

1. I am the managing member of Olden Group, LLC (the "Lender" or "Olden"), proposed post-petition lender to the above-captioned Debtor and debtor-in-possession (the "Debtor" or "Company").

2. I respectfully submit this Declaration in further support of the Debtor's Motion for entry of interim and final orders authorizing the Debtor to use cash collateral and obtain post-petition financing [Dkt. No. 17] the ("DIP Motion") and in response to the Preliminary Objections of Creditor Body Glove IP Holdings, LP ("Body Glove") to the DIP Motion [Dkt. No. 24]. Terms capitalized but not defined herein shall have the meanings ascribed to them in the DIP Motion.

3. Neither I nor Olden is, or at any time has been, an affiliate or insider of the Debtor. Neither I nor Olden holds any equity or membership interest in the Debtor. Prior to the negotiation and documentation of Olden's purchase of the Debtor's prepetition senior indebtedness, neither I nor Olden had any financial dealings with, or any other connections to, the Debtor or its officers, directors or managers. I am not an officer or director of the Debtor and Olden has no designee officers or directors of the Debtor.

4.      The Lender and its counsel negotiated the terms of the DIP Loan Documents with the Debtor and its counsel and, with respect to the terms relating to Leewards, with Leewards and its counsel, at arm's length and in good faith. The DIP Loan Documents provide for a below market rate of 5% interest on a revolving facility with up to $10 million in availability without payment of any line fees, collateral monitoring fees, exit fees or any other similar fees which I understand are often sought in connection with debtor-in-possession financing facilities. The Lender made concessions during such negotiations in favor of the Debtor, including but not limited to reducing default interest, subordinating certain lien and payment rights to Leewards, and deferring repayment of advances any interest payments to the payment of necessary operating expenses to the extent set forth in the Budget.

5.      During such negotiations and prior to the filing of the DIP Motion, the Lender approved requests by the Debtor for funds that were identified by the Debtor as necessary to avoid immediate and irreparable harm to the Debtor's operations. All funds advanced by Olden to the Company were advanced upon the prior written request of the Company for the purpose of paying expenses identified by the Company as necessary to avoid immediate harm and ensure the continuation of the Company's operations.  Without this funding, the Debtor would have been unable to fund payroll, purchase goods needed to fulfill customer orders or pay other essential operating expenses.

6.      The financing subject of the DIP Motion is similarly required by the Debtor in order to fund essential operating expenses, purchase goods needed to fill customer orders, preserve jobs, and maintain the Debtor's business operations while the Debtor seeks to reorganize under the protections of Chapter 11.

7.      As set forth in the DIP Motion, Olden purchased the Company's outstanding senior indebtedness due to Express Trade (via its affiliate Garantia) pursuant to the Purchase

Agreement and related Prepetition Financing Agreements dated as of December 30, 2024. A copy of the Purchase Agreement is attached hereto as Exhibit A.

8. For clarity, prior to execution of the Prepetition Financing Agreements, Olden had entered into a binding First Amended and Restated Letter of Intent, dated as of December 9, 2024, by and among Olden, Express Trade, Garantia and the Company, setting forth the material terms of the loan purchase (the "LOI"). In connection with the LOI, Olden and Express Trade entered into a Participation Agreement, dated as of December 10, 2024, pursuant to which Olden funded approximately $1,742,011.43 in pre-petition advances through Express Trade, at the Debtor's request, which advances were essential to the preservation of the Debtor's business operations.

9. Among the Prepetition Financing Agreements is the License Intercreditor Assignment, a copy of which is attached hereto as Exhibit B, whereby Olden succeeded to Express Trade's rights under that certain Intercreditor, Subordination and Collateral Nondisturbance Agreement, dated as of November 30, 2023 (the "License Intercreditor Agreement"), by and among and Body Glove, the Company and Express Trade, a copy of which is attached hereto as Exhibit C.

10. The assignment was permitted pursuant to the express terms of the License Intercreditor Agreement, which provides that it "shall be binding upon the parties hereto and their respective successors and assigns." See Ex. C, paras. 14, 16 and "Creditors" definition.

11. The License Intercreditor Agreement provides that any lien of Body Glove is "subject and subordinate in all respects" to the liens of Lender. See Ex. C, para. 5(a). Additionally, in the case of an insolvency proceeding, the License Intercreditor Agreement prohibits Body Glove from contesting debtor-in-possession financing or cash collateral use, prevents Body Glove from seeking adequate protection other than certain junior adequate

protection liens, and requires that Lender's liens are senior to the liens of Body Glove in the Debtor's assets, whether securing Lender's debt arising prior to or after the Petition Date. See Ex. C, para 6.

12.     The Lender remains willing to continue good faith negotiations among itself, Body Glove and the Debtor to facilitate continuation of the Debtor's relationship with Body Glove as in the best interest of all parties and the Debtor's estate.

13.     It is my understanding that Debtor's long-time secured lender, Express Trade, is unwilling to further finance the Debtor's operations and that financing from banks and other commercial finance companies is not an option for the Debtor given the Debtor's assets, pre-petition secured debt, financing needs and business operations.  It is my further understanding that the terms of the debtor-in-possession financing Olden has agreed to provide to the Debtor, as reflected in the DIP Motion, is as favorable, if not significantly more favorable, than financing terms provided to debtors in similar Chapter 11 bankruptcy cases.

14.     It is my understanding that without the financing subject of the DIP Motion, the Debtor will be forced to immediately cease business operations, resulting in the immediate layoff of all employees, the suspension of shipments of goods needed to fulfill customer orders, the collapse of the Debtor's supply pipeline, and the cancellation of millions of dollars of go forward purchase orders from customers.

15.     In such a scenario, Olden's rights and interests in its pre-petition collateral would be significantly impaired, and the Debtor's junior secured and unsecured creditors would receive no recovery on their pre-petition claims.

[signature follows]

Dated: New York, New York
February 6, 2025

/s/ *Yechiel Shimon Sprei*___________
Yechiel Shimon Sprei
Managing Member, Olden Group, LLC

# Exhibit A

Docusign Envelope ID: 7F8702A3-51C0-4D26-A3CD-45AC847A8B60

# LOAN PURCHASE AGREEMENT

This Loan Purchase Agreement ("**Agreement**") is dated as of December 30, 2024 (the "**Agreement Date**"), and is entered into by and between Garantia, LLC, a New York limited liability company (together with its predecessors in interest, "**Seller**") and Olden Group LLC, a New York limited liability company ("**Buyer**"), with the consent of Surf 9, LLC, a Florida limited liability company ("**Company**") to govern the purchase and sale of the Transferred Assets described herein.

## 1. Definitions

1.1 General**.** Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto herein. Terms defined in the POF Agreement and not otherwise defined in this Agreement shall have the same meanings assigned to such terms in the POF Agreement.

1.2 In this Agreement:

**"Affiliate"** means, with respect to any Entity, all Entities controlling, controlled by or under common control with, such Entity, whether directly or indirectly through one or more intermediaries, where control includes the power to direct or cause the direction of the management or policies of an Entity, whether through the ownership of voting securities, management authority, contract, equity interest or otherwise.

**"Amended and Restated Factoring Agreement"** means the Amended and Restated Factoring Agreement by and between the Company and Express dated as of the Closing Date (as amended, restated or modified), which shall be an amendment and restatement of the Pre-Closing Factoring Agreement, as contemplated in Section 8 of the LOI.

**"Ancillary Agreements"** means the Intercreditor Agreement, the Amended and Restated Factoring Agreement, the Forbearance Agreement and the Participation Agreement and all documents referenced therein or herein as being executed and delivered in connection with the foregoing or this Agreement.

**"Bankruptcy Code"** means Title 11 of the United States Code, 11 U.S.C. §§101 et seq., as amended.

"**Body Glove Intercreditor Agreement**" means the Intercreditor, Subordination and Collateral Nondisturbance Agreement by and between Express Trade Capital, Inc. and Body Glove IP Holdings dated as of November 23, 2023 (as amended, restated or modified).

**"Closing Date"** means the date on which the closing of the transactions contemplated by this Agreement take place, which shall be no later than the later of (i) ten (10) business days following the execution of the LOI and delivery of initial drafts of this Agreement and the Ancillary Agreements and (ii) December 31, 2024.

**“Collateral”** means any property, whether real or personal, tangible or intangible, of whatever kind and wherever located, whether now owned or hereafter acquired or created, in or over which an Encumbrance on property of the Company has been, or is purported to have been, granted to or for the benefit of the Seller arising under or concerning the POF Agreement.

“**Deferred Purchase Price Note**” means a promissory note delivered by Buyer on the Closing Date to evidence the Deferred Purchase Price Obligations.

**“Deferred Purchase Price Obligations”** means Seven Million Dollars ($7,000,000), which shall be paid by Buyer to Seller in eighteen equal monthly installments of Three Hundred Eighty-Eight Thousand Eight Hundred Eighty-Eight and 88/100 Dollars ($388,888.88) commencing January 2, 2025, and continuing thereafter on the first business day of each subsequent month until paid in full.

**“Deposit”** means the cash deposit in the amount of Three Million Five Hundred Fifty Thousand Dollars ($3,550,000) that was delivered by Buyer to Seller prior to the Closing Date.

**“Effective Date”** means the Closing Date**.**

**“Encumbrance”** means any: (a) mortgage, pledge, lien, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance or other adverse claim against title of any kind; (b) purchase or option agreement or put arrangement; (c) subordination agreement or arrangement other than as specified in the POF Agreement; (d) prior sale, transfer, assignment or participation by Seller of the Transferred Assets or any part thereof; or (e) agreement to create or effect any of the foregoing.

**“Entity”** includes any individual, partnership, corporation, limited liability company, association, estate, trust, business trust, Governmental Authority, fund, investment account or other entity.

**“Excluded Assets”** means all assets not expressly included within the definition of Transferred Assets, including without limitation:

a. The Note and the indebtedness evidenced thereby.

b. The Pre-Closing Factoring Agreement, all liens and security interests granted by the Company therein, the pre-closing receivables assigned and/or sold by the Company to Seller pursuant thereto, and the indebtedness related thereto.

c. Any mortgages, security agreements (other than the POF Agreement) and guarantees relating to the indebtedness and obligations of the Company to Seller or Express.

    d.   All right, title and interest, including all liens and security interests, of Seller, Express, and/or the Company in and to S9 Air Inc., S9 Yachting LLC, and Relentless II LLC, and any assets owned by these entities.

**"Express"** means Express Trade Capital, Inc., a New York Corporation.

**"Factoring Obligations"** means the Company's obligations arising under, relating to, or evidenced by the Pre-Closing Factoring Agreement which is approximately negative Eight Thousand Five Hundred Sixty-Two Dollars and 81/100 Dollars (-$8,562.81) as of the date of this Agreement (which amount is exclusive of chargebacks that may be claimed against open accounts receivable and the Flybar Assigned Funds).

**"Flybar"** means Flybar, Inc., a New Jersey corporation.

**"Flybar Assigned Funds"** means not less than One Million Three Hundred Forty Thousand Eight Hundred Thirteen and 61/100 Dollars ($1,340,813.61) (calculated as of December 27, 2024) that has been collected by Express and has been assigned and is payable to Flybar, payment of which to Flybar will increase the Factoring Obligations by that amount.

**"Flybar Release Funds"** means the sum of One Million Seven Hundred and Fifty Thousand Dollars ($1,750,000).

**"Forbearance Agreement"** means the Forbearance Agreement contemplated in Section 3 of the LOI.

**"Governmental Authority"** means any federal, state, or other governmental department, agency, institution, authority, regulatory body, court or tribunal, foreign or domestic, and includes arbitration bodies, whether governmental, private or otherwise.

**"Intercreditor Agreement"** means the Assignment and Intercreditor Agreement entered into contemporaneously herewith dated as of December 30, 2024 among Express, Buyer, and the Company (as amended restated or modified).

**"LOI"** means that certain First Amended Letter of Intent by and between Buyer, Seller and the Company, dated as of December 9, 2024.

**"Note"** means the Promissory Note, dated August 1, 2023, in the principal amount of Twenty Million Dollars ($20,000,000), issued by the Company in favor of Express.

**"Note Obligations"** means the Company's obligations arising under, relating to or evidenced by the Note.

**"Participation Agreement"** means that certain Participation Agreement dated as of December 10, 2024 between Express and Buyer (as amended, restated or modified).

**“Party”** means Buyer, Seller, Express or the Company, as applicable.

“**POF Agreement**” means that certain Master Purchase Order Financing Agreement, dated August 22, 2014, by and between the Company and Seller, as successor in interest to Express (as amended, restated or modified).

**“POF Agreement Rights”** means all of Seller’s rights, title and interest in and to the POF Agreement, all liens and security interests granted by the Company to Seller or Express therein in connection with the POF Indebtedness, and to the extent they relate to the POF indebtedness, all waivers, amendments, modifications, supplements, forbearances, intercreditor agreements, and subordination agreements, and any and all other agreements, documents or instruments ancillary to or executed or delivered in connection with the foregoing, each as amended, restated or modified from time to time.

“**POF Indebtedness**” means all indebtedness of the Company to Seller arising under the POF Agreement, excluding indebtedness that arose under the POF Agreement that is now evidenced by the Note, and including all loans, advances and financial accommodations made by Express or Seller to or for the benefit of the Company in connection with the POF Agreement.

**“Pre-Closing Factoring Agreement”** means the Factoring Agreement by and between the Company and Express dated August 22, 2014 (as amended, restated or modified).

**“Purchase Price”** is defined in Section 3 hereof.

**“Transaction”** means the purchase and sale of the Transferred Assets pursuant to the terms set forth in this Agreement.

**“Transferred Assets”** means any and all of Seller’s right, title, and interest in and to: (i) the POF Indebtedness; (ii) the POF Agreement Rights, and (iii) the Body Glove Intercreditor Agreement, and excludes the Excluded Assets.

**2. Sale, Assignment and Assumption**

2.1 In consideration of the mutual covenants and agreements in, and subject to the terms and conditions of, this Agreement:

(a) Seller irrevocably sells, transfers, assigns, grants, and conveys, without recourse, the Transferred Assets to Buyer with effect on and after the Effective Date;

(b) Buyer irrevocably acquires the Transferred Assets with effect on and after the Effective Date.

2.2 The Company agrees that Seller and Express shall have no obligations to the Company or otherwise under the POF Agreement after the Effective Date.

2.3 This Agreement is intended to, and upon execution hereof shall effect a true sale and assignment of all the Transferred Assets.

2.4 For the Avoidance of doubt, the Excluded Assets are not being sold, assigned, transferred or otherwise conveyed as part of this Transaction.

2.5 Seller and Express acknowledge and agree that neither they nor their respective Affiliates shall have any recourse to the Transferred Assets or to any now existing or hereafter acquired assets of the Company for any amounts at any time due or owing to Seller, Express or their respective Affiliates by the Company or any of its Affiliates, whether on account of the Factoring Obligations or the Note Obligations, and whether arising under, relating to, or evidenced by the Excluded Assets or otherwise, other than (a) the Company's rights, title and interest in and to S9 Air Inc., S9 Yachting LLC and Relentless II LLC and their respective assets, and (b) the Company's pre-closing accounts receivable, and any proceeds thereof. For the sake of clarity, Express and its Affiliates will have full recourse to the assets of the Company for all obligations of the Company to Express arising after the Closing Date under the Amended and Restated Factoring Agreement, for amounts related to collection factoring services rendered to the Company after the Closing Date, subject to the terms of the Intercreditor Agreement.

2.6 Express will file a UCC-3 amendment within five (5) business days of the Effective Date to add Buyer as an additional secured party to its UCC-1 financing statement filed on August 26, 2014, with file number 201402081896 (the "**UCC-1**"). Express shall retain all other rights to the UCC-1 but shall not amend or modify the UCC-1 without the prior written consent of Buyer, which consent shall not be unreasonably withheld. Seller shall file UCC-3 continuation statements, as required, to continue perfection of the subject security interests of Buyer and Seller and shall provide Buyer with copies of all filed UCC-3 statements filed.

**3. Purchase Price.**

3.1 The total purchase price to be paid by Buyer for the Transferred Assets is the sum of Eleven Million Five Hundred Thousand Dollars ($11,500,000), consisting of (i) the Deposit, (ii) cash in the amount of Nine Hundred Fifty Thousand Dollars ($950,000) to be paid on the Closing Date, and (iii) the Deferred Purchase Price Obligations, evidenced by the Deferred Purchase Price Note to be delivered by Buyer on the Closing Date (collectively, the "**Purchase Price**").

3.2 In addition to the Purchase Price, Buyer shall remit to Seller on the Closing Date the Flybar Release Funds to be held by Seller subject to the provisions of the Intercreditor Agreement.

**4. Virtual Closing**

4.1 The closing of the Transaction shall take place on the Closing Date.

**5. Representations and Warranties**

5.1 The following representations and warranties are true and correct as of the date of this Agreement and shall be true as of the Effective Date and shall survive closing of the Transaction:

a. From the Seller:

i. As of December 30, 2024, the aggregate amount of POF Indebtedness owed by the Company to Seller is not less than Twenty-Seven Million Four Hundred Sixty-Two Thousand Forty-Eight and 47/100 Dollars ($27,462,048.47) (calculated as of December 27, 2024), which consists of principal, interest, commissions, fees, costs, expenses and other charges relating thereto.

ii. The POF Indebtedness arose under the POF Agreement.

iii. The Company has not made any claim to Seller for an offset, defense, counterclaim, subordination or recharacterization of any kind, nature or description whatsoever with respect to the POF indebtedness.

iv. To Seller's knowledge: (i) the POF Agreement has been duly executed and delivered by the Company and Express and is in full force and effect as of the date hereof; and (ii) the Company has no valid defense to the enforcement of such obligations as of the date hereof.

v. Events of Default have occurred and are continuing under the POF Agreement.

vi. At the time of transfer, assignment of the POF Agreement, the POF Indebtedness, the POF Agreement Rights and all security interests granted in respect thereof have been assigned to Seller, and the Transferred Assets are owned by Seller and shall be conveyed by Seller free and clear of all liens, security interests, setoffs, and encumbrances other than liens in favor of Buyer.

vii. Seller has full authority to enter into this Agreement and the Ancillary Agreements to which it is a party.

viii. The execution, delivery and performance by Seller of this Agreement does not and will not conflict with any provision or result in any breach

or violation of, and contract or agreement to which Seller is a party or by which any of the Transferred Assets are otherwise bound.

b. From the Buyer:

i. Buyer has full authority to enter into this Agreement and the Ancillary Agreements.

ii. The execution, delivery and performance by Buyer of this Agreement does not and will not conflict with any provision or result in any breach or violation of, and contract or agreement to which Buyer is a party.

iii. Buyer has the financial ability to pay the Purchase Price on the dates and in the amounts indicated above.

5.2 Except as expressly stated in this Agreement, the Seller has not previously made, nor does it make by this Agreement, any representation or warranty, and the Seller assumes no liabilities or responsibilities, with respect to the due execution by the Company, the legality, validity, sufficiency, enforceability of or collectability under the POF Agreement or any document related thereto or of the POF Indebtedness, the financial condition of the Company, or the financial information provided to the Buyer regarding the Company.

**6. Costs and Expenses**

6.1 Each Party hereto shall be responsible for its legal and other costs and expenses for preparing, negotiating, executing and implementing this Agreement or any related documents and consummating the Transaction.

**7. Notices**

7.1 All communications between the Parties in respect of, or notices or other information sent under, this Agreement shall be in writing, hand delivered or sent by overnight courier, electronic transmission or telecopier, addressed to the relevant Party at its address, electronic mail or facsimile number specified below or at such other address, electronic mail or facsimile number as such Party may subsequently request in writing. All such communications and notices shall be effective upon receipt.

<u>Seller's Address for Notices and Delivery</u>
Garantia, LLC
1410 Broadway, Suite 2600
New York, NY 10018
peter@expresstradecapital.com

with a copy to:

Docusign Envelope ID: 7F8702A3-51C0-4D26-A3CD-45AC847A8B60

Ben Ellis
Express Trade Capital, Inc.
1410 Broadway, Suite 2600
New York, NY 10018
Telephone: 212-997-0155 x271
Email: ben@expresstradecapital.com

Buyer's Address for Notices and Delivery

Olden Group LLC
4203 13th Avenue
Suite 102
Brooklyn, NY 11219

with a copy to:

Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Email: IWinters@Klestadt.com
Attn: Ian R. Winters, Esq.

Company's Address for Notices and Delivery
Surf 9, LLC
24850 Old 41 Rd., Ste 10
Bonita Springs, FL 34135

with a copy to:

Maughan, Himschoot & Associates Law Group
Fort Myers Office/Mailing Address:
15750 New Hampshire Court, Suite A
Fort Myers, FL 33908
Telephone: 239-472-2424
Email: jm@mhalawgroup.com
Attn: Jason R. Maughan, Esq.

7.2 After the Effective Date, if Seller receives any notices, correspondence or other documents in respect of the Transferred Assets that, to the best of Seller's knowledge, were not sent to Buyer, Seller shall promptly forward them to Buyer.

**8. Further Transfers**

8.1 Buyer may sell, assign, grant a participation in, or otherwise transfer all or any portion of the Transferred Assets, this Agreement and its rights under this Agreement, or any interest in any of the foregoing without the consent of or notice to Seller; provided, however, that such sale, assignment, participation, or transfer shall not violate any applicable laws, rules or regulations, including, without limitation, any applicable securities laws, rules or regulations; and notwithstanding any such sale, assignment, participation or transfer, unless Seller otherwise consents in writing (which consent Seller shall not unreasonably withhold or delay), (i) Buyer's obligations to Seller under this Agreement shall remain in full force and effect until fully paid, performed, and satisfied and (ii) Seller shall continue to deal solely and directly with Buyer in connection with Buyer's obligations under this Agreement.

**9. Payments**

9.1 All payments made by Buyer to Seller under this Agreement shall be made on the Effective Date in the lawful currency of the United States by wire transfer of immediately available funds in accordance with the following wire instructions:

Seller's Wire Instructions:

Bank Name: JPMorgan Chase
City & State: 1411 Broadway New York, NY 10018
Account No: 523887795
ABA Routing No.: 021000021
Account Name: GARANTIA LLC

**10. Exercise of Rights and Remedies**

10.1 No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Parties and no waiver of any provision of this Agreement, nor consent to any departure by either Party from it, shall be effective unless it is in writing and signed by the affected Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

10.2 No failure on the part of a Party to exercise, and no delay in exercising, any right or remedy under this Agreement shall operate as a waiver hereof by such Party, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right or remedy. The rights and remedies of each Party provided herein (a) are cumulative and are in addition to, and are not exclusive of, any rights or remedies provided by law (except as otherwise expressly set forth in this Agreement) and (b) are not conditional or contingent on any attempt by such Party to exercise any of its rights under any other related document against the other Party or any other Entity.

**11. Survival; Successors and Assign**

11.1 All representations, warranties, covenants, indemnities and other provisions made by the Parties shall be considered to have been relied upon by the Parties, shall be true and correct

as of the Effective Date, and shall survive the execution, delivery and performance of this Agreement.

11.2 This Agreement, including the representations, warranties, covenants and indemnities contained in this Agreement, shall inure to the benefit of, be binding upon and be enforceable by and against the Parties and their respective successors and permitted assigns.

**12. Confidentiality**

12.1 Each Party agrees that, without the prior consent of the other Party, it shall not disclose the contents of this Agreement (including the Purchase Price) to any Entity, except that any Party may make any such disclosure (a) as required to implement or enforce this Agreement, (b) if required to do so by any law, court, regulation, subpoena or other legal process, (c) to any Governmental Authority or self-regulatory Entity having or asserting jurisdiction over it, (d) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in it incurring a liability to any other Entity or sanctions that may be imposed by any Governmental Authority, (e) to its lenders, professional advisors and auditors, (f) to the Company, or (g) as set forth in Section 12.2.

12.2 Buyer may disclose the contents of this Agreement to any proposed transferee, assignee, participant, or other Entity proposing to enter into contractual relations with Buyer in respect of the Transferred Assets or any part of them, provided such other Entity executed a non-disclosure agreement containing commercially reasonable terms.

**13. Further Assurances**

13.1 Each Party agrees to (i) execute and deliver, or to cause to be executed and delivered, all such other and further agreements, documents and instruments, and (ii) take or cause to be taken all such actions as the other Party may reasonably request to effectuate the intent and purposes, and to carry out the terms, of this Agreement.

**14. Parties' Relationships**

14.1 Each Party and any of its Affiliates may engage in any kind of lawful business or other relationship with any Company or its Affiliates, without liability to the other Party or any obligation to disclose such business or relationship to the other Party.

**15. Entire Agreement; Conflict**

15.1 This Agreement constitutes the entire agreement of the Parties with respect to the Transaction and supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, representations and warranties in respect thereof, all of which have become merged and finally integrated into this Agreement.

**16. Counterparts; Telecopies**

16.1 This Agreement may be executed in multiple counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument. Transmission by telecopier, facsimile or other form of electronic transmission of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart. Each fully executed counterpart of this Agreement shall be deemed to be a duplicate original.

**17. Relationship Between Buyer and Seller**

17.1 The relationship between Seller and Buyer shall be that of seller and buyer. Neither is a trustee or agent for the other, nor does either have any fiduciary obligations to the other. This Agreement shall not be construed to create a partnership or joint venture between the Parties.

**18. Severability**

18.1 The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

**19. Governing Law**

19.1 THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED AND DETERMINED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION).

**20. Waiver of Trial by Jury**

20.1 THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Docusign Envelope ID: 7F8702A3-51C0-4D26-A3CD-45AC847A8B60

**21. Jurisdiction**

21.1 The Parties irrevocably and unconditionally submit to and accept the exclusive jurisdiction of the United States District Court for the Southern District of New York located in the Borough of Manhattan or the courts of the State of New York located in the County of New York for any action, suit or proceeding arising out of or based upon this Agreement or any matter relating to it and waive any objection that they may have to the laying of venue in any such court or that such court is an inconvenient forum or does not have personal jurisdiction over them.

21.2 The Parties irrevocably agree that, should either Party institute any legal action or proceeding in any jurisdiction (whether for an injunction, specific performance, damages or otherwise) in relation to this Agreement, no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such action or proceeding shall be claimed by it or on its behalf, any such immunity being hereby irrevocably waived, and each Party irrevocably agrees that it and its assets are, and shall be, subject to such legal action or proceeding in respect of its obligations under this Agreement.

**22. Interpretation**

22.1 This Agreement includes any annexes, schedules or other documents attached to or incorporated by reference into the Agreement.

22.2 Terms used in the singular or the plural include the plural and the singular, respectively; "includes" and "including" are not limiting; and "or" is not exclusive.

22.3 Any reference to a Party includes such Party's successors and permitted assigns.

22.4 Unless otherwise indicated, any reference to:

(a) this Agreement or any other agreement or document shall be construed as a reference to this Agreement or, as the case may be, such other agreement or document as the same may have been, or may at any time before the Effective Date be, in effect as modified, amended or supplemented as of the Effective Date; and

(b) a statute, law, order, rule or regulation shall be construed as a reference to such statute, law, order, rule or regulation as it may have been, or may at any time before the Effective Date be, in effect as modified, amended or supplemented as of the Effective Date.

22.5 Section and other headings and captions are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

22.6 This Agreement shall be deemed to have been jointly drafted by the Parties and no provision of it shall be interpreted or construed for or against either Party because such Party actually or purportedly prepared or requested such provision, any other provision or the Agreement as a whole.

Docusign Envelope ID: 7F8702A3-51C0-4D26-A3CD-45AC847A8B60

[Signature page follows]

13

Docusign Envelope ID: 7F8702A3-51C0-4D26-A3CD-45AC847A8B60

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Loan Purchase and Sale Agreement by their duly authorized officers as of the date first set forth above.

**BUYER**

OLDEN GROUP, LLC

Signed by:
By: Yechiel S. Sprei
B3BC93B5E991483...
Name: Yechiel S. Sprei
Title: A.S.

**SELLER**

GARANTIA, LLC

DocuSigned by:
By: PETER STERN
F226234D6E85407...
Name: PETER STERN
Title: President

ACKNOWLEDGED AND AGREED:

SURF 9, LLC

DocuSigned by:
By: John Chenciner
75248BF78D4B431...
Name: John Chenciner
Title: Managing Member

# **Exhibit B**

# ASSIGNMENT OF INTERCREDITOR AGREEMENT

This Assignment of Intercreditor Agreement (the "**Agreement**") is made and entered into as of December 30, 2024, by and between Garantia LLC, a New York limited liability company ("**Assignor**") and Olden Group LLC, a New York limited liability company ("**Assignee**").

WHEREAS, Assignor, by assignment from Express Trade Capital, Inc. ("**ETC**"), is party to that certain Master Purchase Order Financing Agreement, dated as of August 22, 2014 (the "**Credit Agreement**"), by and between Surf 9, LLC (the "**Company**") and Assignor; and

WEHREAS, Assignor, by assignment from ETC, is party to that certain Intercreditor, Subordination and Collateral Nondisturbance Agreement, dated as of November 30, 2023 (the "**Intercreditor Agreement**"), by and between Assignor and Body Glove IP Holdings, LP ("**Licensor**"), setting forth the relative rights and priorities of Assignor and Licensor in the assets of the Company pursuant to the Credit Agreement and that certain License Agreement, dated as of September 1, 2009, between Licensor and the Company (the "**License Agreement**");

WHEREAS, in connection with a sale of all of Assignor's rights, title and interest in and to the Credit Agreement and all liens and security interests in assets of the Company thereunder and all documents executed in connection therewith, the parties hereto desire to enter into this Agreement to confirm the transfer to Assignee of all rights, title and interest of Assignor in and to the Intercreditor Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **ASSIGNMENT OF TRANSFERRED ASSETS.** Assignor hereby sells, assigns, transfers, and conveys to Assignee all of Assignor's right, title, and interest in and to the Intercreditor Agreement and any documents executed or delivered in connection therewith (the "**Transferred Assets**").

2. **REPRESENTATIONS AND WARRANTIES**

   a. **Assignor's Representations**. Assignor represents and warrants that:

      i. It is the sole owner of the Transferred Assets, free and clear of all liens, security interests, setoffs, encumbrances, and claims.

      ii. It has full power and authority to enter into this Agreement and to assign the Transferred Assets.

      iii. The assignment of the Transferred Assets does not violate any agreement to which Assignor is a party.

   b. **Assignee's Representations**. Assignee represents and warrants that:

      i. It has full power and authority to enter into this Agreement and to accept the assignment of the Transferred Assets.

3. **MISCELLANEOUS**

   a. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law or conflict of law provisions.

Docusign Envelope ID: 7F8702A3-51C0-4D26-A3CD-45AC847A8B60

The parties consent to the exclusive jurisdiction of the courts of the State of New York for any action arising out of or relating to this Agreement.

b. This Agreement shall inure to the benefit of the parties and their successors and assigns.

[signature page follows]

Page 2 of 3

Docusign Envelope ID: 7F8702A3-51C0-4D26-A3CD-45AC847A8B60

IN WITNESS WHEREOF, the parties have executed this Assignment Agreement as of the date first above written.

**ASSIGNOR:**
Garantia LLC

DocuSigned by:
By: PETER STERN
F226234D6E85407...
Name: Peter Stern
Title: President

**ASSIGNEE:**
Olden Group, LLC

Signed by:
By: Yechiel S. Sprei
B3BC93B5E991483...
Name: Sam Sprei
Title: President

ACKNOWLEDGED AND AGREED:

SURF 9, LLC

DocuSigned by:
By: John Chenciner
75248BF78D4B431...
Name: John Chenciner
Title: President

# Exhibit C

# INTERCREDITOR, SUBORDINATION AND COLLATERAL NONDISTURBANCE AGREEMENT

This Intercreditor, Subordination and Collateral Nondisturbance Agreement (this "**Agreement**") is made and entered into as of November 30, 2023, by and among Surf 9 LLC ("**Borrower**"), Body Glove IP Holdings, LP ("**Licensor**"), and Express Trade Capital, Inc. (the "**Lender**").

## Recitals

A) Pursuant to the License Agreement, dated as of September 1, 2009, between Licensor and Borrower (as amended, supplemented or restated from time to time, the "**License Agreement**"), Licensor has granted to Borrower the right to use the trademarks, merchandising rights and/or rights of publicity covered by the License Agreement (collectively, the "**Licensed Property**") in connection with the manufacture, promotion, distribution and sale by Borrower of certain products which bear the Licensor's trademark(s) (all such products being herein collectively referred to as the "**Licensed Products**"). The obligations of Borrower under the License Agreement are secured by a security interest in substantially all of the assets of the Borrower pursuant to the terms of the License Agreement and subject to the terms herein.

B) Pursuant to (i) the Factoring Agreement dated August 22, 2014, and (ii) the Master Purchase Order Finance Agreement dated August 22, 2014, both between Borrower and Lender (as amended, supplemented or restated from time to time, collectively, along with any notes, guarantees, and other loan documents relating thereto, the "**Credit Agreement**"), the Lender has agreed to extend certain credit to Borrower, which credit shall at all times be secured by a security interest in all assets of the Borrower, including, without limitation all right, title and interest of the Borrower under the License Agreement and including further without limitation all right, title and interest of the Borrower in and to the Licensed Products.

C) It is a condition to the Lender's obligations under the Credit Agreement that the parties enter into this Agreement, and the parties are entering into this Agreement for such purpose and to: (i) confirm the relative priority of the liens of the Lender and the Licensor in the assets and properties of Borrower, (ii) provide for the orderly sharing among the Lender and the Licensor, in accordance with such lien priorities, of proceeds from such assets and properties upon any foreclosure thereon or other disposition thereof, (iii) agree upon the terms of the subordination of the obligations of the Borrower to Lender and (iv) address related matters.

NOW, THEREFORE, for and in consideration of the premises, in order to induce the Lender to extend credit to Borrower under the Credit Agreement, as well as for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties do hereby agree as follows.

DocuSign Envelope ID: CB853BA5-AB23-4B07-AAB4-6A065AF13429

**Agreement**

1. **DEFINITIONS.** Defined Terms. As used in this Agreement, the following terms shall have the following meanings:

a) "Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

b) "Bankruptcy Court" means a United States Bankruptcy Court of competent jurisdiction or any other competent court of any other jurisdiction in respect of any Bankruptcy Law.

c) "Bankruptcy Law" means the Bankruptcy Code and any similar federal, state, provincial or foreign law for the relief of Obligors.

d) "Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the laws of the State of New York and a day on which Lender is open for the transaction of business.

e) "Collateral" means all of the property and interests in property, real or personal, tangible or intangible, now owned or hereafter acquired by Borrower in or upon which either or both of Creditors at any time has a Lien, and including, without limitation, all proceeds of such property and interests in property.

f) "Credit Agreement" has the meaning set forth in the Recitals hereto.

g) "Creditors" means, collectively, the Lender and the Licensor and their respective successors and assigns.

h) "Discharge of Senior Debt" means:

(i) payment in full in cash of the principal of, interest and other obligations constituting Senior Debt (and including, without limitation, any principal, interest, fees, costs, expenses and other amounts, which would accrue and become due but for the commencement of any Insolvency or Liquidation Proceeding, whether or not such amounts are allowed or allowable in whole or in part in any such Insolvency or Liquidation Proceeding); and

(ii) termination or expiration of all commitments, if any, to extend credit that would constitute obligations owing under the Credit Agreement.

i) "Insolvency or Liquidation Proceeding" means, as to any Person, any of the following: (a) any case or proceeding with respect to such Person under the Bankruptcy Code, any Bankruptcy Law or any other federal or state bankruptcy, insolvency, reorganization or other law of any jurisdiction affecting creditors' rights or any other or similar proceedings or actions seeking any stay, reorganization, arrangement, composition or readjustment of the obligations and indebtedness of such Person or (b) any proceeding

seeking the appointment of any trustee, receiver, liquidator, custodian or other insolvency official with similar powers with respect to such Person or any of its assets or (c) any proceeding for liquidation, dissolution or other winding up of the business of such Person or (d) any assignment for the benefit of creditors or any marshaling of assets of such Person.

j) "Lien" means any lien, mortgage, pledge, assignment, security interest, hypothec, prior claim, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust, UCC financing statement or other preferential arrangement having the practical effect of any of the foregoing.

k) "Person" or "person" means any natural person, corporation, limited liability company, unlimited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

l) “Senior Debt" means any and all obligations, liabilities and indebtedness of every kind, nature and description owing by Borrower under the Credit Agreement or in connection therewith (including, without limitation, under any settlement agreement, forbearance agreement or judgment related to the foregoing), including principal, interest, charges, fees, premiums, indemnities and expenses, however evidenced, whether primary, secondary, direct, contingent, fixed or otherwise, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of the Credit Agreement or after the commencement of any Insolvency or Liquidation Proceeding (and including, without limitation, any principal, interest, fees, costs, expenses and other amounts, which would accrue and become due but for the commencement of such Insolvency or Liquidation Proceeding, whether or not such amounts are allowed or allowable in whole or in part in any such Insolvency or Liquidation Proceeding), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, and whether arising directly or howsoever acquired by Lender. Senior Debt shall be considered to be outstanding whenever any loan commitment under the Credit Agreement is outstanding.

m) "Senior Default" shall mean any “event of default” or "Event of Default" under the Credit Agreement, or any condition or event that, after notice or lapse of time or both, would constitute such an event of default if that condition or event were not cured or removed within any applicable grace or cure period set forth therein.

n) “Subordinated Debt" means all obligations, liabilities and indebtedness of every kind, nature and description owing by Borrower to Licensor, including principal, interest, charges, fees, premiums, indemnities and expenses, however evidenced, whether primary, secondary, direct, contingent, fixed or otherwise, arising under the License Agreement or independent thereof, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of the License Agreement or after the commencement of any Insolvency or Liquidation Proceeding

(and including, without limitation, any principal, interest, fees, costs, expenses and other amounts, whether or not such amounts are allowable in whole or in part, in any such Insolvency or Liquidation Proceeding), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, and whether arising directly or howsoever acquired by Licensor.

o) “UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

All references to any term in the plural shall include the singular and all references to any term in the singular shall include the plural.

The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. The term "security interest" shall be construed to include a hypothec.

2. The Licensor hereby consents to the grant by the Borrower to the Lender of a Lien in, to and upon the License Agreement, the Licensed Products and all proceeds thereof; *provided, however*, that the Lender may not, in its capacity as the holder of any such Lien, transfer any or all of the Borrower’s right, title and interest under the License Agreement to itself (except as provided herein) or any other person without obtaining the Licensor’s prior written consent. Lender hereby acknowledges the grant by the Borrower to the Licensor of a Lien in, the Collateral.

3. Borrower assigns to Lender all of Borrower’s right, title and interest in and to the License Agreement; *provided, however*, that the foregoing assignment is a collateral assignment and the Lender agrees not to take any action to assert its rights to make the assignment absolute unless and until there shall occur and continue to exist a Senior Default and enforcement of Lender’s security interest as set forth in Section 4 hereof.

4. Notwithstanding anything in the License Agreement to the contrary, upon the occurrence and during the continuance of a Senior Default, which shall include without limitation a termination of the License Agreement, in the event that Lender gives Licensor written notice of its intention to take possession of any Collateral constituting Licensed Products by any means (the “**Lender Action Notice**"), including without limitation through cooperation with Borrower, by foreclosure of Lender’s security interest under and pursuant to the UCC, or by exercising its rights in an Insolvency and Liquidation Proceeding, Licensor agrees that the Lender shall have the right, for a period of ninety (90) days from the date it obtains possession of Licensed Products (as may be extended per this Agreement, the “**Inventory Liquidation Period**”), to use the Licensed Property solely to sell any inventory on hand of the Licensed Products or ordered upon the date of such Lender Action Notice, provided that Lender shall comply with all the obligations of Licensee under the License Agreement with respect to the Territory and Distribution Channels and Approved Customers, Licensee shall not Dump such Licensed Products, as such terms are defined in the License Agreement, and

shall pay or cause to be paid to Licensor any Royalties as defined in the License Agreement in respect of actual sales by Lender of Licensed Products bearing or making use of the Licensed Property (other than to Licensor) at the rates set forth in the License Agreement. Notwithstanding the foregoing, the Inventory Liquidation Period may, at Lender's option, be extended for an additional 90 days, provided that in such case, the Royalties payable by Lender and Borrower, jointly and severally, pursuant to this Section 4 due to sales of Licensed Products sold after the first 90 days of the Inventory Liquidation Period shall be increased by 15% on each Licensed Product then sold; provided further that in no event shall the Inventory Liquidation Period continue for more than 270 days from the date of the Lender Action Notice, not counting any days in which a stay is in effect in an Insolvency or Liquidation Proceeding preventing Lender from taking such action. Lender shall keep accurate books and records covering all sales of Licensed Products pursuant to this Section 4 to verify the accuracy of the Royalties payable by Lender (and Borrower, jointly and severally) and in accordance with the reporting and accounting requirements of Borrower under the License Agreement and provide such records to Licensor upon its request, and in any event, bi-weekly during the Inventory Liquidation Period. Other than the obligations expressly assumed by Lender in this Agreement, the Lender shall have no obligation, undertaking or liability under the License Agreement.

5. **Subordination and Standstill**.

(a) Priority of Liens. For so long as Lender has a Lien on the Collateral securing the Senior Debt, any Lien Licensor may now have or hereafter acquire upon the Collateral securing the Subordinated Debt, shall be subject and subordinate in all respects to any Lien upon the Collateral securing the Senior Debt Lender may now have or hereafter acquire upon the Collateral, and except as expressly provided herein, Licensor shall take no steps to enforce any Lien it may now have or hereafter acquire in the Collateral without Lender's written consent.

(b) Rights of Third Parties; No Contest of Lien. Each Creditor shall be solely responsible for perfecting and maintaining the perfection of its Lien in and to each item constituting the Collateral in which such Creditor has been granted a Lien; except that, Lender agrees that, solely with respect to any Collateral now or hereafter held by Lender in which perfection of a Lien therein can be perfected, pursuant to applicable law, solely by possession or control thereof, Lender hereby agrees that it shall hold or control such Collateral for its own benefit and, to the extent permitted by law and not in derogation of its own rights in the Collateral, the benefit of Licensor solely for purposes of Licensor's perfection or, solely in relationship to Persons other than Lender or any holder of Senior Debt, priority of any Lien therein now or hereafter granted by Borrower to Licensor. The foregoing provisions of this Agreement are intended solely to govern the respective Lien priorities as among the Creditors and shall not impose on Lender any obligations, including without limitation, in respect of the disposition of proceeds of foreclosure on any Collateral which would conflict with the priorities established herein or with prior perfected claims therein in favor of any other Person or any order or decree of any court or other governmental authority or any applicable law, and Lender shall have no liability to Licensor for a breach of this subsection 5(b).

(c) Until the Discharge of the Senior Debt has occurred, the Lender shall have the exclusive right to manage, perform, and enforce (or not enforce) the terms of the Credit Agreement with respect to the Collateral, to exercise and enforce all privileges and rights thereunder in such order and manner as it may determine in its sole discretion, including, without limitation, the exclusive right to take or retake control or possession of any Collateral and to make determinations regarding the release, disposition, or restrictions with respect to the Collateral, without any consultation with or the consent of the Licensor; *provided*, that the disposition of Collateral is in accordance with this Agreement and provided further that the Lien securing the Subordinated Debt shall remain on the proceeds of such Collateral released or disposed, except to the extent such proceeds are retained by the Lender and applied to the Senior Debt. In that regard, the Licensor shall not, without the prior written consent of the Lender (i) exercise or seek to exercise any rights or remedies (including setoff) with respect to any Collateral in respect of Subordinated Debt or any other obligation of the Borrower to Licensor, or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), (ii) contest, protest, or object to any foreclosure proceeding or action brought with respect to the Collateral by Lender in respect of the Senior Debt, or any other exercise by Lender of any rights and remedies relating to the Collateral under the Credit Agreement or otherwise in respect of the Senior Debt, or (iii) object to the forbearance by Lender from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies. Notwithstanding the foregoing, the Licensor may file and defend proofs of claim against the Borrower in any Insolvency or Liquidation Proceeding involving the Borrower or its assets or property and shall have the right to vote such claim. Lender shall not have any liability to Licensor in respect of any failure by Licensor to obtain repayment in full of the Subordinated Debt, except to the extent due solely to the breach by Lender of the obligations of Lender to Licensor expressly provided for in this Agreement.

(d) Notwithstanding the foregoing, the Licensor may exercise or seek to exercise any rights or remedies with respect to any Collateral of the Borrower constituting Licensed Products (but not other assets) in respect of Subordinated Debt after the expiration of the Inventory Liquidation Period from the date of delivery of a written notice to Lender of Licensor's intention to exercise such rights, which notice may only be delivered following the occurrence of and during the continuation of an Event of Default under the License Agreement; provided that, notwithstanding the foregoing, until the Discharge of the Senior Debt, in no event shall Licensor exercise or continue to exercise any such rights or remedies if an Insolvency or Liquidation Proceeding shall have been commenced in respect of the Borrower other than rights as an unsecured creditor.

6. This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, and the priorities contained in Section 5shall apply at all times, whether before, during or after the pendency of any Insolvency or Liquidation Proceeding relating to the Borrower, and notwithstanding the priorities that may otherwise result under the UCC or other applicable law. Licensor agrees not to initiate, prosecute, or participate in any claim, action, or other proceeding, whether part of an Insolvency or Liquidation Proceeding or otherwise, challenging the enforceability, validity, perfection, or priority of any portion of the Senior Debt or any Liens securing any

DocuSign Envelope ID: CB853BA5-AB23-4B07-AAB4-6A065AF13429

portion of the Senior Debt. In the event of any Insolvency or Liquidation Proceeding involving the Borrower, the Licensor agrees that the Lender may consent to the use of cash collateral or provide debtor-in-possession financing to the Borrower on such terms and conditions and in such amounts as Lender, in its sole discretion, may decide and, in connection therewith, the Borrower may grant to the Lender Liens and security interests upon all of the property of the Borrower, which Liens and security interests (i) shall secure payment of all Senior Debt (whether arising prior to the commencement of any Insolvency or Liquidation Proceeding or at any time thereafter) and all other financing provided by Lender during such Insolvency or Liquidation Proceeding and (ii) to the extent that the claims comprising Senior Debt or Liens securing any Senior Debt are subordinated to or *parri passu* with such debtor-in-possession financing or the Liens granted to secure the same, shall be superior in priority to the Liens in favor of Licensor on the Collateral. The Licensor agrees that it will not object to or oppose any such cash collateral usage or debtor-in-possession financing or any sale or other disposition of any property securing all of any part of the Senior Debt free and clear of security interests, liens, or other claims of Licensor under Section 363 of the Bankruptcy Code or any other provision of the Bankruptcy Code, if the Lender has consented to such sale or disposition. The Licensor agrees not to assert any right it may have to "adequate protection" of its interest in any Collateral in any Insolvency or Liquidation Proceeding and agrees that it will not seek to have the automatic stay lifted with respect to any Collateral without the prior written consent of Lender; provided that, Lender will not object to any request by Licensor for adequate protection replacement liens on all prepetition and postpetition property of the Borrower upon which Lender is also granted adequate protection replacement liens, with such liens in favor of Licensor being subject in all respects to this Agreement; provided, further that, other than such replacement liens the Licensor will not seek any other form of adequate protection. The Licensor waives any claim it may now or hereafter have against Lender arising out of the election of Lender of the application of Section 1111(b)(2) of the Bankruptcy Code or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the Collateral in any Insolvency or Liquidation Proceeding. Licensor agrees that it will not provide, or offer to provide, any debtor-in-possession financing to the Borrower without the prior written consent of the Lender. Licensor agrees that, provided there is no Discharge of the Senior Debt and Lender has not terminated this Agreement pursuant to Section 8 of this Agreement, Licensor will take no action to file or assist in the filing of an involuntary petition against Borrower under the Bankruptcy Code.

7.     In the event that an Event of Default has occurred and is continuing under the License Agreement, and continues after any applicable cure period, then upon Licensor giving written notice thereof to Lender, the Borrower hereby directs Lender and Lender agrees, to remit to Licensor on a monthly basis solely from collections received by Lender of the Borrower's receivables relating to sales of Licensed Products equal to the Royalties payable by Borrower solely on account of such sales pursuant to the License Agreement. Licensor hereby agrees to indemnify and to hold Lender harmless from any and all loss, claim, liability, cost or expense, including attorneys' fees, which may be incurred by reason of Lender's recognition of the assignment herein contained in this Section 7 and its remittances to Licensor as herein provided. This indemnity shall survive the termination of this Agreement. Provided Lender has not given a Lender Action Notice pursuant to Section 4, the obligation of Lender under

DocuSign Envelope ID: CB853BA5-AB23-4B07-AAB4-6A065AF13429

this Section 7 shall terminate automatically upon the earlier to occur of the end of the Term (as defined in the License Agreement) and December 31, 2027.

8. This Agreement shall continue in effect until the Discharge of the Senior Debt and the termination of the Credit Agreement (the "Termination Date"), but such termination shall not affect (a) the indemnity pursuant to Section 7 hereof, (b) the subordination and standstill provisions of Section 5 hereof, and (c) Licensor's right hereunder to receive moneys under Sections 4 and 7 with respect to transactions having their inception prior to the Termination Date.

9. Licensor shall promptly give Lender a written copy of any notice of an Event of Default given to Borrower pursuant to the License Agreement. In the case of a default subject to a cure period, Lender shall have the right, but not the obligation, to cure any such default within the same cure period provided by the License Agreement, which cure period shall begin upon Lender's receipt of Licensor's notice of default provided in accordance with paragraph 17.

10. Lender shall give Licensor prompt written notice of (a) a Senior Default declared under the Credit Agreement and (b) the commencement by the Lender of a foreclosure or enforcement (solely as set forth above) of its security interests in the Licensed Products. The Lender also shall give Licensor prompt written notice of the termination of the Credit Agreement.

11. This Agreement is entered into solely for the purposes set forth herein, and except as expressly provided herein, neither Lender nor Licensor assumes any duties or responsibilities to the other regarding the financial condition of the Borrower, or regarding any collateral, or regarding any other circumstance bearing upon the risk of nonpayment of the obligations of the Borrower and neither Lender nor Licensor shall be deemed to be the agent of the other for any purpose.

12. **Modifications and Amendments**.

(a) Lender may at any time and from time to time without the consent of or notice to Licensor, without incurring liability to Licensor, and without impairing or releasing the obligations of Licensor under this Agreement, change the manner or place of payment, or extend the time of payment of, or renew or alter any of the terms of the Senior Debt (including any increase in the amount thereof), or amend in any manner the Credit Agreement. Borrower shall provide true and correct copies of the Credit Agreement to Licensor and any and all amendments, renewals, or modifications thereof.

(b) Until the Discharge of the Senior Debt, the Borrower and the Licensor shall not, without the prior written consent of the Lender, agree to any amendment, modification, or supplement to the License Agreement if such amendment, modification, or supplement would add or change any terms in a manner materially adverse to the Borrower or Lender (including, for the avoidance of doubt, any addition of any Event of Default not existing on the date hereof would be materially adverse to the Borrower and the Lender), or reduce the

DocuSign Envelope ID: CB853BA5-AB23-4B07-AAB4-6A065AF13429

term of the License Agreement, or require any payment to be made sooner than originally scheduled or increase the rate applicable thereto.

13. This Agreement (i) constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and (ii) may be amended, modified or terminated only by a written instrument signed by the parties hereto and (iii) no waiver of any term or provision of this Agreement shall be effective unless it is in writing and signed by the party against whom such waiver is sought to be enforced.

14. This Agreement shall be governed by the laws of the State of New York and shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.

15. This Agreement may be executed in any number of several counterparts, which may be sign and delivered electronically, all of which shall collectively constitute one and the same agreement.

16. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

17. All notices hereunder shall be in writing, sent by (a) express overnight delivery, (b) certified mail, return receipt requested, or (c) email with the noticed party's reply email confirming receipt, to the respective parties at the following addresses:

If to Lender:

Express Trade Capital, Inc.
1410 Broadway, Suite 2600
New York, NY 10018
Attn: Ben Ellis, EVP
Email: ben@expresstradecapital.com

If to Licensor:

Body Glove IP Holdings LP
c/o Marquee Brands, LLC
50 W. 57th St, 5th Fl
New York, NY 10019
Attn: Heather Greenberg, SVP General Counsel
Email: hgreenberg@marqueebrands.com

If to Borrower:

Surf 9 LLC
c/o Maughan, Himschoot & Associates Law Group
15750 New Hampshire Court, Suite A

DocuSign Envelope ID: CB853BA5-AB23-4B07-AAB4-6A065AF13429

Fort Myers, FL 33908
Attn: Jason R. Maughan, Esq.
Email: jm@mhalawgroup.com

[signature page follows]

10

DocuSign Envelope ID: CB853BA5-AB23-4B07-AAB4-6A065AF13429

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, all as of the day and year first written above.

EXPRESS TRADE CAPITAL, INC.:

Ben Ellis

Name: Ben Ellis
Title: EVP

BODY GLOVE IP HOLDINGS, LP:

Mark Flaherty

Name: Mark Flaherty
Title: CFO

SURF 9 LLC:

John Chenciner

Name: John Chenciner
Title: CEO