GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
Kevin J. Nash
125 Park Ave, 12th Floor
New York, NY 10017
Email: Knash@gwfglaw.com

*Proposed Counsel for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:                                                                                              Chapter 11

Surf 9 LLC,                                                                                    Case No. 25-40078-JMM

                                 Debtor.
-----------------------------------------------------------------x

**DEBTOR'S RESPONSE TO PRELIMINARY OBJECTIONS TO PROPOSED
DIP FINANCING FILED BY BODY GLOVE IP HOLDINGS LP**

     Surf 9 LLC (the "<u>Debtor</u>") the above-captioned debtor and debtor-in-possession, as and for its Response to the Preliminary Objections (the "<u>Objections</u>") filed by Body Glove IP Holdings LP ("<u>Body Glove</u>") represents and shows this Court as follows:

     1.     The Objections, which are long on speculation and omit critical facts, should be largely overruled. Whatever rights Body Glove actually retains in accordance with the operative Intercreditor Agreement (defined below) can be fully preserved under the DIP Financing Order while potentially making certain adjustments to the timing of royalty payments.

     2.     In many respects, however, the Objections are premised on a false narrative. Pursuant to express agreement, Body Glove's purported lien (completely undersecured) is deeply subordinated to the senior lien of Express Trade, Inc. ("<u>Express Trade</u>") as subsequently assigned to Olden Group LLC ("<u>Olden</u>"). In conjunction with the sixth amendment to the license agreement which granted Body Glove certain lien rights for the first time, Body Glove contemporaneously therewith entered into a document styled "*Intercreditor, Subordination and*

-1-

*Collateral Nondisturbance Agreement*" dated November 30, 2023 (the "Intercreditor Agreement"). The Intercreditor Agreement was signed by the Debtor as borrower, Body Glove as licensor and Express Trade as secured lender and is attached hereto as Exhibit "A". But for the Intercreditor Agreement, Body Glove would not have received any lien rights whatsoever. Yet, as the name of the document suggests, Body Glove has very limited and circumscribed rights as against the senior liens held by Olden.

3. Even under a preliminary read, the terms of the Intercreditor Agreement completely negate any contention that Body Glove retains either rights to adequate protection or a defense to the priming of its purported liens. In point of fact, under the express terms of the Intercreditor Agreement, the liens held by Express Trade and its assigns have already been recognized as being superior, including liens against the license, licensed products and all proceeds thereof. Without attaching the Intercreditor Agreement to its Objections, Body Glove makes a selective reference to paragraph 2, out of context, while ignoring the balance of the Intercreditor Agreement and failing to quote the operative provisions in the document in full.

4. Most importantly for purposes of this Motion, paragraph 6 of the Intercreditor Agreement recognizes that it is a valid subordination agreement under Section 510(a) of the Bankruptcy Code, and states that Body Glove cannot object to debtor-in-possession financing or seek adequate protection in the event of bankruptcy, providing in relevant part as follows:

> This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, and the priorities contained in Section 5 [of the Intercreditor Agreement] shall apply at all times, whether before, during or after the pendency of any Insolvency or Liquidation Proceeding relating to the Borrower, and notwithstanding the priorities that may otherwise result under the UCC or other applicable law . . . In the event of any Insolvency or Liquidation Proceeding involving the Borrower, the Licensor agrees that the Lender may consent to the use of cash collateral or provide debtor-in-possession financing to the Borrower on such terms and conditions and in such amounts as Lender, in its sole discretion, may decide and,

in connection therewith, the Borrower may grant to the Lender Liens and security interests upon all of the property of the Borrower, which Liens and security interests (i) shall secure payment of all Senior Debt (whether arising prior to the commencement of any Insolvency or Liquidation Proceeding or at any time thereafter) and all other financing provided by Lender during such Insolvency or Liquidation Proceeding and (ii) to the extent that the claims comprising Senior Debt or Liens securing any Senior Debt are subordinated to or *parri passu* with such debtor-in-possession financing or the Liens granted to secure the same, shall be superior in priority to the Liens in favor of Licensor on the Collateral. The Licensor agrees that it will not object to or oppose any such cash collateral usage or debtor-in-possession financing or any sale or other disposition of any property securing all of any part of the Senior Debt free and clear of security interests, liens, or other claims of Licensor under Section 363 of the Bankruptcy Code or any other provision of the Bankruptcy Code, if the Lender has consented to such sale or disposition. The Licensor agrees not to assert any right it may have to "adequate protection" of its interest in any Collateral in any Insolvency or Liquidation Proceeding and agrees that it will not seek to have the automatic stay lifted with respect to any Collateral without the prior written consent of Lender; provided that, Lender will not object to any request by Licensor for adequate protection replacement liens on all prepetition and postpetition property of the Borrower upon which Lender is also granted adequate protection replacement liens, with such liens in favor of Licensor being subject in all respects to this Agreement; provided, further that, other than such replacement liens the Licensor will not seek any other form of adequate protection . . . .

5. It is disappointing to say the least that Body Glove would file its Objections without due recognition of the Intercreditor Agreement in its entirety. Whatever the motive, Body Glove's Objections are contradicted by the Intercreditor Agreement.

6. As permitted, the Intercreditor Agreement was assigned to Olden in connection with Olden's acquisition of Express Trade's secured claim, including a specific Assignment of Intercreditor Agreement dated December 30, 2024, a copy of which is annexed hereto as <u>Exhibit "B"</u>.

7. The motion to authorize DIP financing took into consideration the Intercreditor Agreement, which undermines the major thrust of the Objections. By the same token, Body Glove's involvement in the bankruptcy proceeding is not unexpected and, hopefully, once the

business stabilizes, the Debtor will have the opportunity to repair its relationship with Body Glove so as to ultimately be in a position to cure and reinstate the license.

8. The DIP Financing Motion is not a back door attempt to circumvent Body Glove's statutory or contractual rights regarding final disposition of the license through assignment or otherwise. The question of a potential assignment of the license can and should be addressed in due course once the Debtor's business is stabilized and after the Debtor is ready to promulgate a plan of reorganization. The proposed DIP financing allows the Debtor to keep all of its plan options open. Indeed, if there is a silver lining in the Objections, it is that Body Glove does not contend that the license is terminated by operation of law and, thus, a cure and reinstatement remains a viable option for the Debtor going forward.

9. In the interim, the Debtor's ability to operate, purchase inventory overseas and deliver goods to Costco (which is the lifeblood of the company) is of paramount importance. The fact that Body Glove and the Lender have disputes as to the potential assignability of the license should not be used as a wedge to derail absolutely critical financing. One of the ways to address the Objections is to make the DIP Financing subject to the Intercreditor Agreement with a full reservation of rights and claims for all parties.

10. Body Glove is also incorrect that Olden is somehow an insider of the Debtor merely because it is the Debtor's largest creditor. Olden is not obligated to finance operations. That Olden is being supportive of the Debtor does not make it an insider, nor is Olden an insider by virtue of the fact that it may potentially be willing to convert debt to equity.

11. The Debtor listed Olden's offices as it mailing address in its petition to signify that the collection of receivables flow to Olden through its collection agent, Express Trade.

12. Neither Olden nor its principals have any equity stake in the Debtor. They do not have any management control over production or the sale of licensed products, nor does Olden dictate day-to-day operations. The Debtor is run by its 100% member and manager, John Chenciner, and his senior executive staff, including Marshall Crosby and Hang Matchett. A copy of the Debtor's operating agreement indicating that John Chenciner is the sole member is annexed hereto as Exhibit "C".

13. Both the Debtor and Olden recognize that it is in their mutual interest to attempt to maximize the value of the business by completing pending orders and generating receivables, for which financing is needed. The Debtor is borrowing on favorable terms which are not otherwise available in the market place, particularly since there is no equity in existing collateral.

14. Moreover, the Debtor developed the budgets and established the cash requirements of the company with due recognition that Olden, like any lender, is not issuing a blank check. In the main, the lending relationship is moving forward, but at arms-length as both parties are represented by separate counsel.

15. Insofar as the three (3%) percent royalties are concerned, royalties have historically been paid on a quarterly basis. The Debtor has budgeted the payment of $219,000 due for the first quarter of 2025 to be made in April consistent with historical procedures (See Exhibit "B" to the DIP Motion). To the extent that Body Glove wants royalty payments on a monthly basis, the Debtor is willing to discuss adjusting the payment schedules with Olden to ease any concerns. Appropriate changes to the payment schedule can be negotiated before the final DIP Financing Order is entered. But it is absolutely essential that the financing be approved on an interim basis to maintain operations. Given the clear import of the Intercreditor Agreement, the Objections filed by Body Glove are not well- founded and should be overruled or limited so that the Debtor is not deprived of badly needed financing.

**WHEREFORE**, the Debtor respectfully requests relief consistent with the foregoing, and that the DIP Financing Motion be approved through entry of the Interim Order and the scheduling of a final hearing.

Dated: New York, NY
February 6, 2025

GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
Goldberg Weprin Finkel Goldstein LLP
125 Park Ave
New York, NY 10017
Email: Knash@gwfglaw.com


By: */s/ Kevin J. Nash*