# INTERCREDITOR, SUBORDINATION AND COLLATERAL NONDISTURBANCE AGREEMENT

This Intercreditor, Subordination and Collateral Nondisturbance Agreement (this "**Agreement**") is made and entered into as of November 30, 2023, by and among Surf 9 LLC ("**Borrower**"), Body Glove IP Holdings, LP ("**Licensor**"), and Express Trade Capital, Inc. (the "**Lender**").

## Recitals

A) Pursuant to the License Agreement, dated as of September 1, 2009, between Licensor and Borrower (as amended, supplemented or restated from time to time, the "**License Agreement**"), Licensor has granted to Borrower the right to use the trademarks, merchandising rights and/or rights of publicity covered by the License Agreement (collectively, the "**Licensed Property**") in connection with the manufacture, promotion, distribution and sale by Borrower of certain products which bear the Licensor's trademark(s) (all such products being herein collectively referred to as the "**Licensed Products**"). The obligations of Borrower under the License Agreement are secured by a security interest in substantially all of the assets of the Borrower pursuant to the terms of the License Agreement and subject to the terms herein.

B) Pursuant to (i) the Factoring Agreement dated August 22, 2014, and (ii) the Master Purchase Order Finance Agreement dated August 22, 2014, both between Borrower and Lender (as amended, supplemented or restated from time to time, collectively, along with any notes, guarantees, and other loan documents relating thereto, the "**Credit Agreement**"), the Lender has agreed to extend certain credit to Borrower, which credit shall at all times be secured by a security interest in all assets of the Borrower, including, without limitation all right, title and interest of the Borrower under the License Agreement and including further without limitation all right, title and interest of the Borrower in and to the Licensed Products.

C) It is a condition to the Lender's obligations under the Credit Agreement that the parties enter into this Agreement, and the parties are entering into this Agreement for such purpose and to: (i) confirm the relative priority of the liens of the Lender and the Licensor in the assets and properties of Borrower, (ii) provide for the orderly sharing among the Lender and the Licensor, in accordance with such lien priorities, of proceeds from such assets and properties upon any foreclosure thereon or other disposition thereof, (iii) agree upon the terms of the subordination of the obligations of the Borrower to Lender and (iv) address related matters.

NOW, THEREFORE, for and in consideration of the premises, in order to induce the Lender to extend credit to Borrower under the Credit Agreement, as well as for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties do hereby agree as follows.

DocuSign Envelope ID: CB853BA5-AB23-4B07-AAB4-6A065AF13429

## Agreement

1. **DEFINITIONS.** <u>Defined Terms</u>. As used in this Agreement, the following terms shall have the following meanings:

a) "Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

b) "Bankruptcy Court" means a United States Bankruptcy Court of competent jurisdiction or any other competent court of any other jurisdiction in respect of any Bankruptcy Law.

c) "Bankruptcy Law" means the Bankruptcy Code and any similar federal, state, provincial or foreign law for the relief of Obligors.

d) "Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the laws of the State of New York and a day on which Lender is open for the transaction of business.

e) "Collateral" means all of the property and interests in property, real or personal, tangible or intangible, now owned or hereafter acquired by Borrower in or upon which either or both of Creditors at any time has a Lien, and including, without limitation, all proceeds of such property and interests in property.

f) "Credit Agreement" has the meaning set forth in the Recitals hereto.

g) "Creditors" means, collectively, the Lender and the Licensor and their respective successors and assigns.

h) "Discharge of Senior Debt" means:

(i) payment in full in cash of the principal of, interest and other obligations constituting Senior Debt (and including, without limitation, any principal, interest, fees, costs, expenses and other amounts, which would accrue and become due but for the commencement of any Insolvency or Liquidation Proceeding, whether or not such amounts are allowed or allowable in whole or in part in any such Insolvency or Liquidation Proceeding); and

(ii) termination or expiration of all commitments, if any, to extend credit that would constitute obligations owing under the Credit Agreement.

i) "Insolvency or Liquidation Proceeding" means, as to any Person, any of the following: (a) any case or proceeding with respect to such Person under the Bankruptcy Code, any Bankruptcy Law or any other federal or state bankruptcy, insolvency, reorganization or other law of any jurisdiction affecting creditors' rights or any other or similar proceedings or actions seeking any stay, reorganization, arrangement, composition or readjustment of the obligations and indebtedness of such Person or (b) any proceeding

seeking the appointment of any trustee, receiver, liquidator, custodian or other insolvency official with similar powers with respect to such Person or any of its assets or (c) any proceeding for liquidation, dissolution or other winding up of the business of such Person or (d) any assignment for the benefit of creditors or any marshaling of assets of such Person.

j)  "Lien" means any lien, mortgage, pledge, assignment, security interest, hypothec, prior claim, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust, UCC financing statement or other preferential arrangement having the practical effect of any of the foregoing.

k)  "Person" or "person" means any natural person, corporation, limited liability company, unlimited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

l)  "Senior Debt" means any and all obligations, liabilities and indebtedness of every kind, nature and description owing by Borrower under the Credit Agreement or in connection therewith (including, without limitation, under any settlement agreement, forbearance agreement or judgment related to the foregoing), including principal, interest, charges, fees, premiums, indemnities and expenses, however evidenced, whether primary, secondary, direct, contingent, fixed or otherwise, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of the Credit Agreement or after the commencement of any Insolvency or Liquidation Proceeding (and including, without limitation, any principal, interest, fees, costs, expenses and other amounts, which would accrue and become due but for the commencement of such Insolvency or Liquidation Proceeding, whether or not such amounts are allowed or allowable in whole or in part in any such Insolvency or Liquidation Proceeding), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, and whether arising directly or howsoever acquired by Lender. Senior Debt shall be considered to be outstanding whenever any loan commitment under the Credit Agreement is outstanding.

m)  "Senior Default" shall mean any "event of default" or "Event of Default" under the Credit Agreement, or any condition or event that, after notice or lapse of time or both, would constitute such an event of default if that condition or event were not cured or removed within any applicable grace or cure period set forth therein.

n)  "Subordinated Debt" means all obligations, liabilities and indebtedness of every kind, nature and description owing by Borrower to Licensor, including principal, interest, charges, fees, premiums, indemnities and expenses, however evidenced, whether primary, secondary, direct, contingent, fixed or otherwise, arising under the License Agreement or independent thereof, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of the License Agreement or after the commencement of any Insolvency or Liquidation Proceeding

(and including, without limitation, any principal, interest, fees, costs, expenses and other amounts, whether or not such amounts are allowable in whole or in part, in any such Insolvency or Liquidation Proceeding), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, and whether arising directly or howsoever acquired by Licensor.

o) "UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

All references to any term in the plural shall include the singular and all references to any term in the singular shall include the plural.

The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. The term "security interest" shall be construed to include a hypothec.

2. The Licensor hereby consents to the grant by the Borrower to the Lender of a Lien in, to and upon the License Agreement, the Licensed Products and all proceeds thereof; *provided, however*, that the Lender may not, in its capacity as the holder of any such Lien, transfer any or all of the Borrower's right, title and interest under the License Agreement to itself (except as provided herein) or any other person without obtaining the Licensor's prior written consent. Lender hereby acknowledges the grant by the Borrower to the Licensor of a Lien in, the Collateral.

3. Borrower assigns to Lender all of Borrower's right, title and interest in and to the License Agreement; *provided, however*, that the foregoing assignment is a collateral assignment and the Lender agrees not to take any action to assert its rights to make the assignment absolute unless and until there shall occur and continue to exist a Senior Default and enforcement of Lender's security interest as set forth in Section 4 hereof.

4. Notwithstanding anything in the License Agreement to the contrary, upon the occurrence and during the continuance of a Senior Default, which shall include without limitation a termination of the License Agreement, in the event that Lender gives Licensor written notice of its intention to take possession of any Collateral constituting Licensed Products by any means (the "**Lender Action Notice**"), including without limitation through cooperation with Borrower, by foreclosure of Lender's security interest under and pursuant to the UCC, or by exercising its rights in an Insolvency and Liquidation Proceeding, Licensor agrees that the Lender shall have the right, for a period of ninety (90) days from the date it obtains possession of Licensed Products (as may be extended per this Agreement, the "**Inventory Liquidation Period**"), to use the Licensed Property solely to sell any inventory on hand of the Licensed Products or ordered upon the date of such Lender Action Notice, provided that Lender shall comply with all the obligations of Licensee under the License Agreement with respect to the Territory and Distribution Channels and Approved Customers, Licensee shall not Dump such Licensed Products, as such terms are defined in the License Agreement, and

shall pay or cause to be paid to Licensor any Royalties as defined in the License Agreement in respect of actual sales by Lender of Licensed Products bearing or making use of the Licensed Property (other than to Licensor) at the rates set forth in the License Agreement. Notwithstanding the foregoing, the Inventory Liquidation Period may, at Lender's option, be extended for an additional 90 days, provided that in such case, the Royalties payable by Lender and Borrower, jointly and severally, pursuant to this Section 4 due to sales of Licensed Products sold after the first 90 days of the Inventory Liquidation Period shall be increased by 15% on each Licensed Product then sold; provided further that in no event shall the Inventory Liquidation Period continue for more than 270 days from the date of the Lender Action Notice, not counting any days in which a stay is in effect in an Insolvency or Liquidation Proceeding preventing Lender from taking such action. Lender shall keep accurate books and records covering all sales of Licensed Products pursuant to this Section 4 to verify the accuracy of the Royalties payable by Lender (and Borrower, jointly and severally) and in accordance with the reporting and accounting requirements of Borrower under the License Agreement and provide such records to Licensor upon its request, and in any event, bi-weekly during the Inventory Liquidation Period. Other than the obligations expressly assumed by Lender in this Agreement, the Lender shall have no obligation, undertaking or liability under the License Agreement.

5. **Subordination and Standstill**.

(a) <u>Priority of Liens</u>. For so long as Lender has a Lien on the Collateral securing the Senior Debt, any Lien Licensor may now have or hereafter acquire upon the Collateral securing the Subordinated Debt, shall be subject and subordinate in all respects to any Lien upon the Collateral securing the Senior Debt Lender may now have or hereafter acquire upon the Collateral, and except as expressly provided herein, Licensor shall take no steps to enforce any Lien it may now have or hereafter acquire in the Collateral without Lender's written consent.

(b) <u>Rights of Third Parties; No Contest of Lien</u>. Each Creditor shall be solely responsible for perfecting and maintaining the perfection of its Lien in and to each item constituting the Collateral in which such Creditor has been granted a Lien; <u>except that</u>, Lender agrees that, solely with respect to any Collateral now or hereafter held by Lender in which perfection of a Lien therein can be perfected, pursuant to applicable law, solely by possession or control thereof, Lender hereby agrees that it shall hold or control such Collateral for its own benefit and, to the extent permitted by law and not in derogation of its own rights in the Collateral, the benefit of Licensor solely for purposes of Licensor's perfection or, solely in relationship to Persons other than Lender or any holder of Senior Debt, priority of any Lien therein now or hereafter granted by Borrower to Licensor. The foregoing provisions of this Agreement are intended solely to govern the respective Lien priorities as among the Creditors and shall not impose on Lender any obligations, including without limitation, in respect of the disposition of proceeds of foreclosure on any Collateral which would conflict with the priorities established herein or with prior perfected claims therein in favor of any other Person or any order or decree of any court or other governmental authority or any applicable law, and Lender shall have no liability to Licensor for a breach of this subsection 5(b).

DocuSign Envelope ID: CB853BA5-AB23-4B07-AAB4-6A065AF13429

(c) Until the Discharge of the Senior Debt has occurred, the Lender shall have the exclusive right to manage, perform, and enforce (or not enforce) the terms of the Credit Agreement with respect to the Collateral, to exercise and enforce all privileges and rights thereunder in such order and manner as it may determine in its sole discretion, including, without limitation, the exclusive right to take or retake control or possession of any Collateral and to make determinations regarding the release, disposition, or restrictions with respect to the Collateral, without any consultation with or the consent of the Licensor; *provided*, that the disposition of Collateral is in accordance with this Agreement and provided further that the Lien securing the Subordinated Debt shall remain on the proceeds of such Collateral released or disposed, except to the extent such proceeds are retained by the Lender and applied to the Senior Debt. In that regard, the Licensor shall not, without the prior written consent of the Lender (i) exercise or seek to exercise any rights or remedies (including setoff) with respect to any Collateral in respect of Subordinated Debt or any other obligation of the Borrower to Licensor, or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), (ii) contest, protest, or object to any foreclosure proceeding or action brought with respect to the Collateral by Lender in respect of the Senior Debt, or any other exercise by Lender of any rights and remedies relating to the Collateral under the Credit Agreement or otherwise in respect of the Senior Debt, or (iii) object to the forbearance by Lender from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies. Notwithstanding the foregoing, the Licensor may file and defend proofs of claim against the Borrower in any Insolvency or Liquidation Proceeding involving the Borrower or its assets or property and shall have the right to vote such claim. Lender shall not have any liability to Licensor in respect of any failure by Licensor to obtain repayment in full of the Subordinated Debt, except to the extent due solely to the breach by Lender of the obligations of Lender to Licensor expressly provided for in this Agreement.

(d) Notwithstanding the foregoing, the Licensor may exercise or seek to exercise any rights or remedies with respect to any Collateral of the Borrower constituting Licensed Products (but not other assets) in respect of Subordinated Debt after the expiration of the Inventory Liquidation Period from the date of delivery of a written notice to Lender of Licensor's intention to exercise such rights, which notice may only be delivered following the occurrence of and during the continuation of an Event of Default under the License Agreement; provided that, notwithstanding the foregoing, until the Discharge of the Senior Debt, in no event shall Licensor exercise or continue to exercise any such rights or remedies if an Insolvency or Liquidation Proceeding shall have been commenced in respect of the Borrower other than rights as an unsecured creditor.

6. This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, and the priorities contained in Section 5 shall apply at all times, whether before, during or after the pendency of any Insolvency or Liquidation Proceeding relating to the Borrower, and notwithstanding the priorities that may otherwise result under the UCC or other applicable law. Licensor agrees not to initiate, prosecute, or participate in any claim, action, or other proceeding, whether part of an Insolvency or Liquidation Proceeding or otherwise, challenging the enforceability, validity, perfection, or priority of any portion of the Senior Debt or any Liens securing any

portion of the Senior Debt. In the event of any Insolvency or Liquidation Proceeding involving the Borrower, the Licensor agrees that the Lender may consent to the use of cash collateral or provide debtor-in-possession financing to the Borrower on such terms and conditions and in such amounts as Lender, in its sole discretion, may decide and, in connection therewith, the Borrower may grant to the Lender Liens and security interests upon all of the property of the Borrower, which Liens and security interests (i) shall secure payment of all Senior Debt (whether arising prior to the commencement of any Insolvency or Liquidation Proceeding or at any time thereafter) and all other financing provided by Lender during such Insolvency or Liquidation Proceeding and (ii) to the extent that the claims comprising Senior Debt or Liens securing any Senior Debt are subordinated to or *parri passu* with such debtor-in-possession financing or the Liens granted to secure the same, shall be superior in priority to the Liens in favor of Licensor on the Collateral. The Licensor agrees that it will not object to or oppose any such cash collateral usage or debtor-in-possession financing or any sale or other disposition of any property securing all of any part of the Senior Debt free and clear of security interests, liens, or other claims of Licensor under Section 363 of the Bankruptcy Code or any other provision of the Bankruptcy Code, if the Lender has consented to such sale or disposition. The Licensor agrees not to assert any right it may have to "adequate protection" of its interest in any Collateral in any Insolvency or Liquidation Proceeding and agrees that it will not seek to have the automatic stay lifted with respect to any Collateral without the prior written consent of Lender; provided that, Lender will not object to any request by Licensor for adequate protection replacement liens on all prepetition and postpetition property of the Borrower upon which Lender is also granted adequate protection replacement liens, with such liens in favor of Licensor being subject in all respects to this Agreement; provided, further that, other than such replacement liens the Licensor will not seek any other form of adequate protection. The Licensor waives any claim it may now or hereafter have against Lender arising out of the election of Lender of the application of Section 1111(b)(2) of the Bankruptcy Code or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the Collateral in any Insolvency or Liquidation Proceeding. Licensor agrees that it will not provide, or offer to provide, any debtor-in-possession financing to the Borrower without the prior written consent of the Lender. Licensor agrees that, provided there is no Discharge of the Senior Debt and Lender has not terminated this Agreement pursuant to Section 8 of this Agreement, Licensor will take no action to file or assist in the filing of an involuntary petition against Borrower under the Bankruptcy Code.

7. In the event that an Event of Default has occurred and is continuing under the License Agreement, and continues after any applicable cure period, then upon Licensor giving written notice thereof to Lender, the Borrower hereby directs Lender and Lender agrees, to remit to Licensor on a monthly basis solely from collections received by Lender of the Borrower's receivables relating to sales of Licensed Products equal to the Royalties payable by Borrower solely on account of such sales pursuant to the License Agreement. Licensor hereby agrees to indemnify and to hold Lender harmless from any and all loss, claim, liability, cost or expense, including attorneys' fees, which may be incurred by reason of Lender's recognition of the assignment herein contained in this Section 7 and its remittances to Licensor as herein provided. This indemnity shall survive the termination of this Agreement. Provided Lender has not given a Lender Action Notice pursuant to Section 4, the obligation of Lender under

this Section 7 shall terminate automatically upon the earlier to occur of the end of the Term (as defined in the License Agreement) and December 31, 2027.

8. This Agreement shall continue in effect until the Discharge of the Senior Debt and the termination of the Credit Agreement (the "Termination Date"), but such termination shall not affect (a) the indemnity pursuant to Section 7 hereof, (b) the subordination and standstill provisions of Section 5 hereof, and (c) Licensor's right hereunder to receive moneys under Sections 4 and 7 with respect to transactions having their inception prior to the Termination Date.

9. Licensor shall promptly give Lender a written copy of any notice of an Event of Default given to Borrower pursuant to the License Agreement. In the case of a default subject to a cure period, Lender shall have the right, but not the obligation, to cure any such default within the same cure period provided by the License Agreement, which cure period shall begin upon Lender's receipt of Licensor's notice of default provided in accordance with paragraph 17.

10. Lender shall give Licensor prompt written notice of (a) a Senior Default declared under the Credit Agreement and (b) the commencement by the Lender of a foreclosure or enforcement (solely as set forth above) of its security interests in the Licensed Products. The Lender also shall give Licensor prompt written notice of the termination of the Credit Agreement.

11. This Agreement is entered into solely for the purposes set forth herein, and except as expressly provided herein, neither Lender nor Licensor assumes any duties or responsibilities to the other regarding the financial condition of the Borrower, or regarding any collateral, or regarding any other circumstance bearing upon the risk of nonpayment of the obligations of the Borrower and neither Lender nor Licensor shall be deemed to be the agent of the other for any purpose.

12. **Modifications and Amendments**.

(a) Lender may at any time and from time to time without the consent of or notice to Licensor, without incurring liability to Licensor, and without impairing or releasing the obligations of Licensor under this Agreement, change the manner or place of payment, or extend the time of payment of, or renew or alter any of the terms of the Senior Debt (including any increase in the amount thereof), or amend in any manner the Credit Agreement. Borrower shall provide true and correct copies of the Credit Agreement to Licensor and any and all amendments, renewals, or modifications thereof.

(b) Until the Discharge of the Senior Debt, the Borrower and the Licensor shall not, without the prior written consent of the Lender, agree to any amendment, modification, or supplement to the License Agreement if such amendment, modification, or supplement would add or change any terms in a manner materially adverse to the Borrower or Lender (including, for the avoidance of doubt, any addition of any Event of Default not existing on the date hereof would be materially adverse to the Borrower and the Lender), or reduce the

term of the License Agreement, or require any payment to be made sooner than originally scheduled or increase the rate applicable thereto.

13. This Agreement (i) constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and (ii) may be amended, modified or terminated only by a written instrument signed by the parties hereto and (iii) no waiver of any term or provision of this Agreement shall be effective unless it is in writing and signed by the party against whom such waiver is sought to be enforced.

14. This Agreement shall be governed by the laws of the State of New York and shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.

15. This Agreement may be executed in any number of several counterparts, which may be sign and delivered electronically, all of which shall collectively constitute one and the same agreement.

16. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

17. All notices hereunder shall be in writing, sent by (a) express overnight delivery, (b) certified mail, return receipt requested, or (c) email with the noticed party's reply email confirming receipt, to the respective parties at the following addresses:

If to Lender:

Express Trade Capital, Inc.
1410 Broadway, Suite 2600
New York, NY 10018
Attn: Ben Ellis, EVP
Email: ben@expresstradecapital.com

If to Licensor:

Body Glove IP Holdings LP
c/o Marquee Brands, LLC
50 W. 57th St, 5th Fl
New York, NY 10019
Attn: Heather Greenberg, SVP General Counsel
Email: hgreenberg@marqueebrands.com

If to Borrower:

Surf 9 LLC
c/o Maughan, Himschoot & Associates Law Group
15750 New Hampshire Court, Suite A

        Fort Myers, FL 33908  
        Attn: Jason R. Maughan, Esq.  
        Email: jm@mhalawgroup.com

[signature page follows]

DocuSign Envelope ID: CB853BA5-AB23-4B07-AAB4-6A065AF13429

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, all as of the day and year first written above.

EXPRESS TRADE CAPITAL, INC.:

*Ben Ellis*

Name: Ben Ellis
Title:  EVP

BODY GLOVE IP HOLDINGS, LP:

*Mark Flaherty*

Name: Mark Flaherty
Title: CFO

SURF 9 LLC:

*John Chenciner*

Name: John Chenciner
Title: CEO