**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY**

**OPERATING AGREEMENT**

**OF**

**SURF 9, LLC**

**A FLORIDA LIMITED LIABILITY COMPANY**

THE LIMITED LIABILITY COMPANY UNITS ISSUED IN ACCORDANCE WITH AND REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, THE FLORIDA SECURITIES ACT OR UNDER SIMILAR LAWS OR ACTS OF OTHER STATES IN RELIANCE UPON THE INAPPLICABILITY OF SUCH LAWS UNDER THE CIRCUMSTANCES AND/OR EXEMPTIONS UNDER THOSE ACTS. THESE UNITS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER: (A) THIS LIMITED LIABILITY COMPANY AGREEMENT; AND (B) THE SECURITIES ACT OF 1933 AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.

**Dated as of December __, 2020**

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY**

**OPERATING AGREEMENT**

**OF**

**SURF 9, LLC**

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "**Agreement**") of SURF 9, LLC, a Florida limited liability company (the "**Company**") is entered into, and shall be effective, as of December __, 2020, by and among the Company, the members of the Company from time to time party hereto pursuant to the terms hereof (each a "**Member**" and, collectively, the "**Members**" and together with the Company, each a "**Party**" and, together, the "**Parties**") and in accordance with the Florida Limited Liability Company Act (Fla. Stat. Ch. 605.0101 *et. seq*.), as amended from time to time (the "**Act**").

RECITALS

A.      The Company was formed on February 1, 2006 by JOHN CHENCINER, the founding Member, who believes he entered into an Operating Agreement of even date therewith (the "**Original Agreement**").

B.      The Company and its founding Member now desire to create additional classes of Units in the Company, as well proportionally convert the founding Member's existing units into such additional classes, and further desire to amend and restate the Original Agreement, and any amendment or restatement thereto, to provide for such and to set forth the governance and regulation of the Company.

C.      The Members intend to conduct business, in the name of the Company and for its account, as a manager-managed limited liability company, and that the Manager shall maintain control over the management and policies of the Company.

**NOW, THEREFORE**, in consideration of the mutual promises made herein, the sufficiency of which is hereby acknowledged, the Parties agree that this Agreement is hereby amended and restated in its entirety as follows:

**ARTICLE I**

**DEFINITIONS**

Section 1.1.    <u>Certain Definitions</u>.  For purposes of this Agreement, the following terms shall have the following meanings:

"**Act**" shall have the meaning set forth in the preamble to this Agreement.

"**Adverse Person**" means any Person who, either directly or through an Affiliate, is a Competitive Business of, or is otherwise materially adverse to the Company or any of the Company Subsidiaries as reasonably determined by the Manager in good faith.

"**Affiliate**" means (a) with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such first Person or (c) any spouse, child, grandchild, parent, grandparent or sibling of a Holder or a trust or other entity for their benefit. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with") means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

"**Applicable Federal Rate**" means the interest rate specified for debt instruments of equivalent terms pursuant to Code Section 1274(d)(1).

"**Approved Change in Control**" shall have the meaning set forth in Section 5.4(a).

"**Business Day**" means any day other than (a) a Saturday, Sunday or federal holiday or (b) a day on which commercial banks in New York, New York are authorized or required to be closed.

"**Capital Contributions**" means with respect to any Member, the sum of the amount of cash and the fair market value (on the date contributed) of any property (other than money) contributed to the Company by such Member (or its predecessors in interest) with respect to the Units held by such Member.

"**Change in Control**" means (a) a sale, merger or similar transaction or series of related transactions involving the Company or any of the Company Subsidiaries, as a result of which those persons who held (directly or indirectly) 100% of the voting power of the Company immediately prior to such transaction do not hold (either directly or indirectly or together with all of their Affiliates) more than 50% of the voting power of the Company (or the surviving or resulting entity thereof) after giving effect to such transaction; or (b) the sale of all or substantially all of the assets of the Company and the Company Subsidiaries, taken as a whole, in a transaction or series of related transactions to one or more Persons who are not Affiliates of the Company or the Members.

"**Change in Control Notice**" shall have the meaning set forth in Section 5.4(a).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" shall have the meaning set forth in the recitals.

"**Company Subsidiaries**" means any business entity of which the Company and/or any of its subsidiaries directly or indirectly owns at such time more than 50% of the outstanding voting equity interests of such entity.

"**Competitive Business**" means any business, organization, enterprise, entity or Person that competes, in any manner, with the Company or its Affiliates.

"**Confidential Information**" means all information, in any form or medium, that relates to the business, operations, affairs, financial arrangements, products, services, research or development of the Company or any Company Subsidiary, and its and their suppliers, panelists, customers or advertisers, including: (a) compilations of data (whether in whole or in part) and all analyses, processes, methods, techniques, systems, formulae, research, records, reports, manuals, documentation and models relating thereto; (b) computer software, documentation and databases (whether existing or in various stages of research and development); (c) identities of and information about the Company's and Company Subsidiaries' suppliers, panelists, customers and advertisers and their confidential information; (d) inventions, designs, developments, devices, methods and processes (whether or not reduced to practice); (e) internal business information, including, without limitation, information relating to strategic and staffing plans and practices (including information with respect to potential acquisition targets), marketing, promotional and sales plans, practices or programs, training practices and programs, cost and pricing structure, and accounting and business methods; (f) all copyrightable works; and (g) all similar or related information. Notwithstanding the immediately foregoing sentence, the term "Confidential Information" shall not include information with respect to the Company or any Company Subsidiaries that (i) becomes generally available to the public, other than as a result of disclosure by a Member in violation of this Agreement or any other agreement between the Company or Company Subsidiaries and such Member, (ii) becomes available to such Member on a non-confidential basis from a source other than the Company or Company Subsidiaries, which is not known to be subject to or bound by a contractual, legal or fiduciary obligation of confidentiality to the Company, any Company Subsidiaries or another Person with respect to such information, (iii) the Company agrees in writing that such information may be disclosed, or (iv) is required to be disclosed (A) by law or (B) in response to (x) any subpoena, (y) other legal process or (z) any regulatory or other governmental authority's investigative demand; *provided*, *however*, that any such disclosures shall be made only to the Person to whom the disclosure is required as set forth above in this clause (iv) and (unless legally prohibited by any law, regulation or court order) after prompt written notice to the Company of the required disclosure. Information shall not be deemed to be excluded from the meaning of "Confidential Information" merely because individual portions or components of such information are publicly known or available. If Confidential Information is to be disclosed pursuant to clause (iv) above, the disclosing Member agrees to cooperate with the Company (at the Company's expense), if the Company should seek to prevent such disclosure or obtain an order or other reliable assurance that confidential treatment shall be accorded to designated portions of the Confidential Information.

"**Consideration Securities**" shall have the meaning set forth in Section 5.3(h).

 "**Co-Sale Members**" shall have the meaning set forth in Section 5.3.

"**Co-Sale Notice**" shall have the meaning set forth in Section 5.3(a).

"**Co-Sale Terms**" shall have the meaning set forth in Section 5.3(a).

"**Election Notice**" shall have the meaning set forth in Section 5.3(a).

"**Fair Value**" means, with respect to a Unit, the amount that the Holder of such Unit would receive in cash if all of the assets of the Company were sold for Fair Market Value, all the liabilities of the Company were satisfied (including loans owed to Members) and all remaining cash were distributed by the Company in accordance with Section 9.2 as of the close of the immediately preceding calendar year, subject to discounts for lack of control and lack of marketability, all of the foregoing determined by the Manager in his reasonable discretion.

"**Fair Market Value**" means the price at which a willing buyer will buy from a willing seller when (1) both are unrelated, (2) know the relevant facts, (3) neither is under any compulsion to buy or sell, and (4) all rights and benefit inherent in (or attributable to) the item must have been included in the transfer.

"**Holder**" means any Member that is a holder of Units and any successor Member that is a holder of Units as a result of a Transfer permitted hereunder.

"**Indemnified Person**" shall have the meaning set forth in Section 11.1.

"**Members**" means the members of the Company listed on Exhibit A attached hereto, and includes any Person admitted as an additional or substitute member of the Company pursuant to the provisions of this Agreement, each in its capacity as a member of the Company.

"**Officers**" shall have the meaning set forth in Section 6.2(a).

"**Manager**" shall mean JOHN CHENCINER or any natural person subsequently granted the authority to manage the Company pursuant to this Operating Agreement.

"**Party**" shall have the meaning set forth in the preamble to this Agreement.

"**Percentage Interest**" of a Member means, subject to adjustment as provided in this Agreement, the ratio that the aggregate number of Units held by such Member bears to the aggregate number of Units held by all Members of the Company holding Units, expressed as a percentage.

"**Permitted Transfer**" shall have the meaning set forth in Section 5.1(b).

"**Permitted Transferee**" shall mean any person who shall have acquired and who shall hold Units pursuant to a Permitted Transfer.

"**Person**" means a natural person, corporation, partnership, limited liability company, trust, joint venture, governmental entity or other entity, association or group.

"**Proceeding**" shall have the meaning set forth in Section 11.1.

"**Regulations**" means the Income Tax Regulations promulgated under the Code, as amended from time to time.

"**Sale Proposal**" shall have the meaning set forth in Section 5.4(a).

"**Selling Member**" shall have the meaning set forth in Section 5.3.

"**Series A Member**" means a Member holding Series A Units. If a Series A Member holds different classes of Units, then such Series A Member shall be treated as a Series A Member only with respect to its Series A Units.

"**Series A Units**" shall have the meaning set forth in Section 3.3(a).

"**Series B Member**" means a Member holding Series B Units. If a Series B Member holds different classes of Units, then such Series B Member shall be treated as a Series B Member only with respect to its Series B Units.

"**Series B Units**" shall have the meaning set forth in Section 3.3(a).

"**Third Party Purchaser**" shall have the meaning set forth in Section 5.2(a).

"**Transfer**" means, with respect to any Units, (a) when used as a verb, to sell, assign, dispose of, exchange, pledge, encumber, hypothecate or otherwise transfer such Units or any participation, rights or interest therein, whether directly or indirectly, or agree or commit to do any of the foregoing and (b) when used as a noun, a direct or indirect sale, assignment, disposition, exchange, pledge, encumbrance, hypothecation, or other transfer of such Units or any participation, rights or interest therein, in each case whether directly or indirectly, or any agreement or commitment to do any of the foregoing. For purposes of this Agreement, an indirect Transfer shall include the Transfer of any securities issued by any Member (or the direct and indirect equity holders of such Member) or any issuance of any securities by a Member (or the direct and indirect equity holders of such Member) after the date hereof.

"**Units**" means each Series A Unit, Series B Unit, and any other class of membership interests in the Company which may from time to time be outstanding.

"**Voting Majority**" shall have the meaning set forth in Section 4.2.

Section 1.2. _Other Definitional Provisions_. Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a) _Calculation of Time Period_. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(b) _Dollars_. Any reference in this Agreement to $ shall mean U.S. dollars.

(c) _Exhibits/Schedules_. The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(d) <u>Gender and Number</u>. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(e) <u>Headings</u>. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(f) <u>Herein</u>. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(g) <u>Including</u>. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(h) <u>Joint Drafting</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## ORGANIZATION, PURPOSE AND POWERS

Section 2.1. <u>Name</u>. The name of the Company shall be Surf 9, LLC.

Section 2.2. <u>Articles of Organization</u>. The Company was formed under the Act by the filing of the Articles of Organization of the Company with the Florida Department of State.

Section 2.3. <u>Purpose</u>. The Company was formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in all lawful activities for which limited liability companies may be formed under the Act.

Section 2.4. <u>Powers</u>. The Company shall have the power to do any and all acts reasonably necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose and business described herein and for the protection and benefit of the Company.

Section 2.5. <u>Principal Office</u>. The principal place of business and office of the Company shall be located at, and the Company's business shall be conducted from 24850 Old 41 Road, #10, Bonita Springs, Florida 34135, or at such other place or places as may hereafter be determined by the Manager.

Section 2.6.   Registered Agent.   The name and address of the registered agent of the Company for service of process on the Company in the State of Florida are John Chenciner, 24850 Old 41 Road, #10, Bonita Springs, Florida 34135.

Section 2.7.   Qualification in Other Jurisdictions.   The Manager shall authorize the Company to be registered or qualified under its own name or under an assumed or fictitious name pursuant to a foreign limited liability company statute or similar laws in any jurisdictions in which the Company owns property or transacts business if such registration or qualification is necessary to protect the limited liability of the Members or to permit the Company lawfully to own property or transact business in such jurisdiction. Any Officer authorized in accordance with the foregoing sentence shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to register or qualify as provided in the foregoing sentence.

Section 2.8.   Term.   The term of the Company commenced on the date of filing of the Articles of Organization of the Company on or about February 1, 2006, in accordance with the Act and shall continue until dissolution of the Company in accordance with Article X of this Agreement.

Section 2.9.   Limited Liability.   Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and none of the Members, Managers, Officers, employees or agents of the Company (including a Person having more than one such capacity) shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of acting in such capacity.

## ARTICLE III

## CAPITALIZATION AND CAPITAL CONTRIBUTIONS

Section 3.1.   Initial Capital Contributions.   The Members and their respective Units are as set forth on Exhibit A attached hereto.

Section 3.2.   Additional Contributions.   No Member is required, under any circumstances, to make any additional Capital Contributions to the Company. The provisions of this Agreement, including this Section 3.2, are intended to benefit the Members and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor of the Company shall be a third-party beneficiary of this Agreement) and the Members shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

Section 3.3.   Units.

(a)   Units Generally.

(i)   Each Member's limited liability company interests in the Company shall be represented by Units.  The Company shall have the authority to issue (1) a class of units designated as Series A units (the "**Series A Units**"), and (2) a class of units designated as Series B

units (the "**Series B Units**").  The Series A Units and Series B Units shall be identical in all respects except that the Series B Units shall have no right to vote on any matter whatsoever, except as expressly provided for herein.

(ii)     The number of Units issued to each Member is set forth opposite their respective names on Exhibit A attached hereto. The Units do not need to be certificated.

(b)     Additional Units.  The Manager may authorize, create and issue Units of different classes (which may be existing classes or new classes) and admit Persons as Members in exchange for such contributions to capital or such other consideration (including past or future services) and on such terms and conditions as the Manager deems appropriate, subject to the consent of a majority of the issued and outstanding Series A Units and a majority of the issued and outstanding Series B Units. Promptly following the issuance of Units, the Manager shall cause the books and records of the Company to be amended to reflect the number and classes of Units issued and, in the case of Units issued other than in connection with the performance of services for the Company, the capital contribution per Unit. Upon issuance of the Units as provided in this Agreement, the Units shall be deemed to be duly authorized, validly issued, fully paid and nonassessable.

Section 3.4.     Additional Investments.  Subject to the consent of a majority of the issued and outstanding Series A Units and a majority of the issued and outstanding Series B Units, the Manager may, at any time: (i) increase the total number of Units that the Company shall have authority to issue; (ii) subject to Article V, admit additional Members; and (iii) amend this Agreement to create new classes of Units or reflect any rights of such additional Members.  Any new Units shall be issued at a commercially reasonable fair market value of such Units determined by the Manager; provided, if the Manager cannot determine such fair market value, the Manager shall engage a nationally recognized valuation firm to assist in such determination.

Section 3.5.     Application of Article 8 of the Uniform Commercial Code.  Each Unit shall constitute a "security" within the meaning of and shall be governed by (a) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (b) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

Section 3.6.     Certain Payments.  Under the Act, a member of a limited liability company may, under certain circumstances, be required to return amounts previously distributed to such member.  It is the intent of the Members that no distribution to any Member pursuant to Article VII or Article VIIII shall be deemed to constitute money or other property paid or distributed in violation of the Act, and the Members agree that each such distribution shall constitute a compromise of the Members and, to the fullest extent permitted by law, the Member receiving such distribution shall not be required to return to any Person any such money or property, except as otherwise expressly set forth herein. If, however, any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Member is obligated to make any such payment, such obligation shall be the obligation of such Member and not of the other Members, and, when funded, shall constitute a Capital Contribution to the Company by such Member.

# ARTICLE IV

# MEMBERS; VOTING

Section 4.1.     Members.  The name and the mailing address of each Member is set forth below his, her or its name on <u>Exhibit A</u> attached hereto and shall be amended from time to time in accordance with this Agreement to reflect the addition, substitution, withdrawal or resignation of any Member as permitted under the terms of this Agreement.

Section 4.2.     Consent.  Unless otherwise expressly provided herein, the consent of the Members for purposes of this Agreement may be obtained: (a) at any meeting of the Series A Members (the "**Voting Members**"); *provided*, *that*, Holders of a majority in interest of the outstanding Series A Units (a "**Voting Majority**") is present at such meeting and that a Voting Majority votes in favor of the matter being voted upon, or (b) by the written consent of a Voting Majority. In addition to the consent of a Voting Majority, any merger or sale of all or substantially all of the assets of the Company shall require the written consent of Holders of a majority in interest of the outstanding Series B Units, separately as a class.

Section 4.3.     Meetings.   Any matter requiring the approval or consent of the Voting Members pursuant to this Agreement may be considered at a meeting of the Voting Members held not less than twenty-four (24) hours after notification thereof shall have been given by the Manager to the Voting Members. Such notification may be given by the Manager, in its discretion, at any time. Any such notification shall state briefly the purpose, time and place of the meeting.  All such meetings shall be held within or outside the State of the Company's principal place of business at such reasonable place as the Manager shall designate and during normal business hours. To the fullest extent permitted by applicable law, any meeting may be held by conference telephone or similar communication equipment so long as all Voting Members participating in the meeting can hear one another, and all Voting Members participating by telephone or similar communication equipment shall be deemed to be present in person at the meeting. Any Voting Member may waive such notice by executing a written waiver. Attendance at a meeting of Voting Members is deemed to be a waiver of notice. A Voting Member may act in person or by written proxy at any meeting of the Voting Members.

Section 4.4.     Admission of Additional Members.  Subject to the restrictions herein, one or more additional or substitute Members of the Company may be admitted to the Company with the approval of the Manager. Subject to the foregoing sentence, any additional or substitute Member shall be admitted to the Company as a member of the Company upon its execution of a counterpart signature page to this Agreement. If a Member Transfers all of his, her or its limited liability company interest in the Company pursuant to the terms of this Agreement, such admission shall be deemed effective immediately prior to such Transfer and, immediately following such admission, the transferor Member shall cease to be a member of the Company.

Section 4.5.     Voting Rights.  Only Voting Members shall be entitled to participate in the governance of the Company. Each Voting Member shall have the right to one vote per full Series A Unit held by him, her or it. Notwithstanding anything to the contrary contained in this Agreement, (i) Series B Members shall have no voting or consent or other rights, powers or duties

under this Agreement or the Act, other than the right to receive distributions with respect to their Series B Units or as otherwise expressly set forth in this Agreement.

Section 4.6.    No Management or Dissent Rights.  Except as set forth herein or otherwise required by law, no Member shall have any right to take part in the management or operation of the Company other than through the Manager appointed by the Members having the right to designate such Manager. No Member shall, without the prior written approval of the Manager, take any action on behalf of or in the name of the Company, or enter into any commitment or obligation binding upon the Company, except for actions expressly authorized by the terms of this Agreement. Except as required by law, Members shall not be entitled to any rights to have dissenter's rights to compensation or seek appraisal with respect to any transaction, including the merger or consolidation of the Company with any Person.

Section 4.7.    Bankruptcy of a Member.  The occurrence of any event set forth in the Act with respect to a Member shall not cause a dissolution of the Company, but the rights of such Member to receive distributions shall, on the happening of such an event, devolve on its successor, administrator or other legal representative for the purpose of settling its estate or administering its property, and the Company shall continue as a limited liability company. The successor or estate of any bankrupt Member described in the preceding sentence shall be liable for all the obligations of such Member.

# ARTICLE V

# TRANSFER OF COMPANY INTERESTS

Section 5.1.    Prohibited and Permitted Transfers.

(a)    Prohibited Transfers.  No Member shall Transfer all or any Units:

(i)    without the prior written consent of the Manager; and

(ii)    without first complying with the terms of this Agreement.

(b)    Permitted Transfers.    Subject to Section 5.1(a) (other than Section 5.1(a)(i)), any Series A Member or Series B Member may Transfer all or any of its Series A Units or Series B Units, as applicable, to a transferee in each of the following cases (each a "**Permitted Transfer**") without following the procedures of Section 5.2 or Section 5.3:

(i)    pursuant to such Member's obligations under Section 5.4 hereof or as a Co-Sale Member pursuant to Section 5.3;

(ii)    such Member shall be entitled to Transfer all or any portion of such Member's Units, (1) in the case of any other Member who is an individual, to a trust or single member limited liability company for the sole benefit of such Member or one or more such immediate family members or the sole member of such limited liability company (so long as the person controlling such trust or member of such limited liability company is reasonably satisfactory to the Manager) and (2) in the case of any Member who is a trust or a single member liability company, to the beneficiary of such trust or the sole member of such limited liability

company (so long as the beneficiary of such trust or member of such limited liability company is reasonably satisfactory to the Manager); *provided*, *however*, that (a) no such Transfer shall be effective until the holders of beneficial interests of such transferee shall have delivered to the Company a written acknowledgement and agreement in form and substance reasonably satisfactory to the Company that they will not Transfer any such beneficial interests or permit such transferee to issue any such beneficial interests except to the extent such Transfer or issuance (treating such issuance as a Transfer by such holders) would be permitted under this clause (iv) if the beneficial interests were Units; (b) such Member shall retain sole voting control of such transferred Units, whether by proxy or other arrangement, and in no event shall all or any part of a Unit be transferred to a minor or an incompetent except in trust or pursuant to the Uniform Gift to Minors Act; (c) in no event shall any such Transfer be permitted to an Adverse Person without the prior consent of the Manager; (d) on any subsequent Transfer, the determination of whether the transferee is a Permitted Transferee under this clause (iv) shall be determined by reference to the Member who was an original party to this Agreement (and not by reference to the transferring Permitted Transferee in such subsequent Transfer); and (e) if at any time after a Permitted Transfer pursuant to this clause (iv), a transferee ceases to be a Permitted Transferee of the Member who Transferred the Units to the transferee, then such transferee must Transfer the Units to such Member or a Permitted Transferee of such Member as promptly as practicable; and

(iii)     in the case of a Member that is an individual, upon the death of such Member, by the will or other instrument taking effect at the death of such Member or by applicable laws of descent and distribution to such Member's estate, executors, administrators, and personal representatives, and then to such Member's heirs, legatees or distributees.

(c)     Conditions to Permitted Transfers.  In the case of a Permitted Transfer, such transferee shall receive and hold such Units subject to the provisions of this Agreement in the same manner as the transferor; *provided*, *further*, that, notwithstanding anything to the contrary contained herein, a Transfer of Units shall, to the fullest extent permitted by law, be null and void unless the transferee executed and delivered to the Company the representations and warranties approved and required by the Manager in connection with such Transfer. In the event of a Permitted Transfer under this Section 5.1, if requested by the Manager, the requesting Member shall pay the Company's reasonable out of pocket expenses incurred in connection with such Transfer, including the fees and expenses of counsel.

Section 5.2.     Intentionally Omitted.

Section 5.3.     Right of Co-Sale.  Subject to the terms of Section 5.1, if any Series A Member (a "**Selling Member**") proposes to sell all or any Units to a Third Party Purchaser, the Series B Members (the "**Co-Sale Members**"), shall have the right to Transfer Series B Units of the Co-Sale Member to the Third Party Purchaser, as a condition to such Transfer by such Selling Member, in the amounts and on the terms and conditions as follows:

(a)     Option to Participate.  The Selling Member shall deliver to the Company and the Co-Sale Members a written notice of the proposed transaction (hereinafter referred to as a "**Co-Sale Notice**") to Transfer the Units which shall set forth the name and address of the Third-Party Purchaser and the material terms and conditions of the proposed transactions, including the purchase price (the "**Co-Sale Terms**"). Co-Sale Members may elect to participate in the

contemplated sale by delivering a written notice (an "**Election Notice**") to the Selling Member within twenty (20) Business Days after receipt of a Co-Sale Notice relating to such Transfer and the Co-Sale Members may elect to Transfer in the contemplated transaction up to that number of Units owned by the Co-Sale Members as is determined in accordance with Section 5.3(c). If any Co-Sale Member fails to deliver in a timely manner an Election Notice to the Selling Member, such Co-Sale Member shall be deemed to have waived any right to participate in the Transfer. Promptly following expiration of the offering period for the Inside Offer, the Selling Member will notify each Co-Sale Member whether the Units offered by the Selling Member in the First Refusal Notice will be purchased by, and shall confirm the final terms of the sale to, the Third-Party Purchaser.

(b)     Price per Unit.  Each Co-Sale Member shall have the right to Transfer Units to the Third Party Purchaser pursuant to the Co-Sale Notice for an amount per Unit that equals the amount per Unit that such Co-Sale Member would be entitled to receive, if, immediately prior to such sale, the Company sold all of its assets subject to all of its liabilities for an amount equal to the implied aggregate equity valuation of the Company as reasonably determined by the Manager based on the price per Unit that the Third Party Purchaser proposed to pay to the Selling Member, and distributed such amount to the Members pursuant to Section 7.1(b) hereof and otherwise on the same terms and conditions as involved in such proposed sale to the Third Party Purchaser by the Selling Member.

(c)     Number of Units.  Each Co-Sale Member shall have the right to Transfer pursuant to the Co-Sale Notice a number of Units equal to: (i) the number of Units to be sold by the Selling Member to the Third-Party Purchaser; multiplied by (ii) the result of: (A) the number of Units held by such Co-Sale Member; divided by (B) the total number of Units issued and outstanding. To the extent that any Co-Sale Member exercises such right of participation, in accordance with the terms and conditions hereof, the number of Units which the Selling Member may Transfer shall be correspondingly reduced.

(d)     Transfer Restrictions Binding on Third Party Purchaser.  If any Units are sold pursuant to this Section 5.3 to any Third-Party Purchaser who is not a party to this Agreement, such purchaser shall agree to be bound by the terms, conditions and obligations of this Agreement as a precondition to the purchase of such Units and such Units shall continue to be subject to the provisions set forth in this Agreement.

(e)     Representations and Warranties; Other Obligations.  In connection with a Transfer pursuant to this Section 5.3, each participating Co-Sale Member shall be required (i) to make representations and warranties in such form as the Selling Member or the Third Party Purchaser may reasonably request, regarding the Units that it proposes to Transfer, including, such Co-Sale Member's ownership of and authority to Transfer such Units, the absence of any liens or other encumbrances on such Units, and the compliance of such Transfer with the federal and state securities laws and all other applicable laws and regulations; and (ii) to bear his, her or its proportionate share of any escrows, holdbacks or adjustments in respect of the purchase price or indemnification obligations.

(f)     No Waiver of Subsequent Rights.  The exercise or non-exercise of the rights of any Co-Sale Member under this Section 5.3 shall not affect his, her or its rights to participate in subsequent Transfers by a Selling Member that meet the conditions specified in this Section 5.3.

(g)     Consummation of Sale; Withdrawal of Election.  At all times prior to consummation of a Transfer or entry by a Co-Sale Member into a binding agreement with a Third-Party Purchaser with respect to a Transfer, such Co-Sale Member shall be free to withdraw its Election Notice to participate in a sale of Units by a Selling Member. The Selling Member shall have no liability to any Co-Sale Member if any Transfer proposed to be made pursuant to this Section 5.3 is not consummated.

(h)     Consideration Securities.  Notwithstanding the foregoing provisions of this Section 5.3, in the event the consideration to be paid in connection with a Transfer subject to this Section 5.3 includes any securities ("**Consideration Securities**"), and the receipt thereof by a Member would require under applicable law (i) the registration or qualification of such Consideration Securities or of any person as a broker or dealer or agent with respect to such Consideration Securities or (ii) the provision of any information regarding the Company, such Consideration Securities or the issuer thereof, such Member shall not have the right to Transfer Units to the Third Party Purchaser in such Transfer.

Section 5.4.     Sale of Units Upon an Approved Change in Control.

(a)     Obligations of Certain Members.  If the Manager receives an indication of interest from a Person who is not an Affiliate of the Series A Members to consummate a Change in Control (a "**Sale Proposal**"), and the Sale Proposal is approved by the Series A Members (an "**Approved Change in Control**"), then the Manager or the Series A Members may send a written notice to all Members stating that such Approved Change in Control has been so approved ("**Change in Control Notice**"). Upon receipt of the Change in Control Notice, each Member shall be obligated to, and shall sell, Transfer and deliver, or cause to be sold, Transferred and delivered, all of the Units held by such Member and its Permitted Transferees (subject to Section 5.8) in the Approved Change in Control for an amount per Unit that equals the amount per Unit that such Member would be entitled to receive if, immediately prior to such sale, the Company sold all of its assets subject to all of its liabilities for an amount equal to the implied aggregate equity valuation of the Company as reasonably determined by the Manager based on the price per Unit applicable in the Sale Proposal, and distributed such amount to the Members pursuant to Section 8.1(b). Furthermore, each Member shall take all necessary action, including waiving any dissenters' rights, appraisal rights or other similar rights in connection with the Approved Change in Control, providing access to documents and records of the Company, entering into agreements reflecting the terms of the Sale Proposal, bearing their proportionate share of any escrows, holdbacks or adjustments in respect of the purchase price or indemnification obligations, providing appropriate documents evidencing ownership of the Units giving any customary and reasonable representations and warranties and executing and delivering any agreements, certificates or other documents, reasonably requested by the purchaser and their counsel, to cause the Company to consummate such Approved Change in Control. Each Member hereby grants a proxy in favor of the Company to take any action to consummate any of the actions contemplated by this Section 5.4 (including to vote such Member's Units in favor of any action contemplated hereby), which proxy

is irrevocable, coupled with an interest and shall survive until the expiration of the provisions of this Section 5.4.

(b)     Sharing of Costs.  The Members shall bear their pro rata share (based upon the amount of consideration received) of the costs incurred pursuant to an Approved Change in Control to the extent such costs are incurred for the benefit of all Members and are not otherwise paid by the Company or the purchaser in such Approved Change in Control. Costs incurred by any Member on its own behalf will not be considered costs of the Approved Change in Control hereunder. Any costs incurred pursuant to the obligations under Section 5.8 hereunder shall be borne by all Members on a pro-rata basis (based on the proceeds received by such Member).

(c)     No Liability.  Notwithstanding anything contained in this Section 5.4, there shall be no liability on the part of the Company to the other Members if the Transfer of Units pursuant to this Section 5.4 is not consummated for whatever reason, regardless of whether the Company has delivered a Change in Control Notice.

(d)     Each Member hereby grants a proxy in favor of the Company to take any action to consummate any of the actions contemplated by this Section 5.4 (including to vote such Member's Units in favor of any action contemplated hereby), which proxy is irrevocable, coupled with an interest and shall survive until the expiration of the provisions of this Section 5.4.

Section 5.5.     Indemnities.  In the event that the Members are required to provide, or are liable for, any representations, warranties or indemnities in connection with any sale or Transfer of such Units in a transaction described in this Article V, then each such Member shall not be liable for more than the amount of proceeds actually received by such Member for his, her or its Units (other than for any liability for fraud or intentional misrepresentation) and such liability shall be satisfied first out of any funds escrowed for such purpose (if any).

Section 5.6.     Intentionally Omitted.

Section 5.7.     Termination of Rights.  The terms, conditions and obligations set forth in this Article V shall terminate upon the closing of an Approved Change in Control.

Section 5.8.     Termination of Membership.  A Member shall be divested of his/her/its Membership Interest and all related rights under this Agreement, and shall be required to Transfer his/her/its Membership Interest to the Company, in the following circumstances:

(a)     After occurrence of any of the events or circumstances with respect to a Member as set forth in the Act, or a Member's Total and Permanent Disability whereupon the Company shall redeem such Member's Membership Interest, not later than 90 days thereafter.  As used herein, "Total and Permanent Disability" shall mean a mental or physical condition of a Limited Partner which, in the reasonable opinion of the Manager, with the input from two physicians selected by such Manager, renders the Member unable or incompetent, even with reasonable accommodation, to devote his/her best efforts to the Company, for more than 90 days, unless further time is required as a reasonable accommodation under the Americans With Disabilities Act.

(b)     Other Events of Termination.

(i)     After occurrence of any of the events or circumstances with respect to a Member as set forth in the Act;

(ii)    In the event of a marital settlement agreement or judicial decree (in either case) purporting to Transfer (or having the direct or indirect effect of a Transfer) of all or any part of a Member's Units in connection with a division of property in divorce proceedings

(iii)   the breach by a Member, other than a Series A Member, of this Agreement that is incapable of being cured or is not cured within ten (10) calendar days following the delivery of written notice thereof to such Member;

(iv)    the commission by a Member of a felony of moral turpitude;

(v)     a conviction of, or a finding against, a Member, whether judicial or administrative, that causes the Company or any of its Affiliates to incur material liability or to be the subject of a material action being brought against the Company or any of its Affiliates by a governmental entity, customer or third party;

(vi)    any willful or fraudulent misconduct by a Member that materially injures the Company or any of its Affiliates;

(vii)   any violent behavior, theft, willful destruction of property owned by the Company or any of its Affiliates, or such other conduct by a Member that materially injures the Company or any of its Affiliates; or

(viii)  the cessation by such Member of his, her or being regularly and substantially involved with the business and affairs of the Company (other than because of an occurrence specified in Section 5.8(a));

whereupon the Company shall redeem such Member's Membership Interest, not later than 90 days after the Manager being made aware of such event.

(c)     In all cases arising under Paragraph (a) above, redemption of the applicable Units shall be consummated by payment in cash of an amount equal to the Fair Value of the applicable Units. Neither the Company nor the remaining Members shall have any duty or obligation to assess or pay for goodwill or any other intangible or speculative element (including future Profits or cash flow) of fair value that may be associated with the Membership Interest being redeemed. If the fair market value as of the date of the event giving rise to the redemption, such Member's Units shall nevertheless be surrendered and cancelled, without any payment by the Company. At the option of the Manager, acting in his or her sole and absolute discretion, the Company may consummate the redemption contemplated by this Section 5.8(c) pay paying 20% of the redemption price for the affected Units in cash and the remainder of such redemption price pursuant to a promissory note payable within five years after the applicable date of consummation together with interest at the Applicable Federal Rate.

(d)     In all cases arising under Paragraph (b) above, redemption of the Units shall be consummated by payment in cash of an amount equal to the book value of the applicable Units subject to discount for lack of control and lack of marketability discounts. Neither the Company

nor the remaining Members shall have any duty or obligation to assess or pay for goodwill or any other intangible or speculative element (including future Profits or cash flow) of fair value that may be associated with the Membership Interest being redeemed. If the book value as of the date of the event giving rise to the redemption, such Member's Units shall nevertheless be surrendered and cancelled, without any payment by the Company. At the option of the Manager, acting in his or her sole and absolute discretion, the Company may consummate the redemption contemplated by this Section 5.8(d) pay paying 20% of the redemption price for the affected Units in cash and the remainder of such redemption price pursuant to a promissory note payable within five years after the applicable date of consummation together with interest at the Applicable Federal Rate.

(e)     The foregoing provisions of Section 5.8(a) shall not affect any rights of the subject Member: (i) to receive distributions from in accordance with the Member's Units prior to the completion of the redemption or surrender of his/her/its Units, or (ii) to indemnification under Article XII.

(f)     If any event described in Section 5.8(b) occurs, the affected Member's rights: (i) to receive distributions from in accordance with the Member's Units prior to the completion of the redemption or surrender of his/her/its Units, or (ii) to indemnification under Article XII shall cease as of the date that the Manager notifies the affected Member in writing of its determination.

## ARTICLE VI

## MANAGEMENT AND OPERATION OF THE COMPANY

Section 6.1.     Manager.

(a)     Management.  In accordance with the Act, management of the Company shall be vested in a Manager, a natural person, appointed by the vote of the Series A Members holding a majority of the issued and outstanding Series A Units. The Manager shall have the power to do any and all lawful acts necessary or convenient to or for the furtherance of the purposes of the Company set forth in this Agreement.

(b)     Resignation; Removal; Replacement.  The Manager may resign at any time or may be removed at any time for any reason or no reason upon the written direction of the Series A Members holding a majority of the issued and outstanding Series A Units, effective upon the delivery of such written direction to the Company.

(c)     Expenses of the Manager.  Direct out-of-pocket expenses in connection with the Manager serving in his or her capacity as such will be reimbursed by the Company.

Section 6.2.     Officers.

(a)     Appointment of Officers.  The Manager may appoint individuals as officers ("**Officers**") of the Company, which may include a Chief Executive Officer and/or President, and such other Officers (such as any number of Vice Presidents) as the Manager deems advisable. No Officer need be a Member or a Manager. An individual can be appointed to more than one office.

(b)     Duties of Officers Generally.   Under the direction of and, at all times, subject to the authority of the Manager, the Officers shall have full and complete discretion to manage and control the day-to-day business, operations and affairs of the Company in the ordinary course of its business, to make all decisions affecting the day-to-day business, operations and affairs of the Company in the ordinary course of its business and to take all such actions as he or she deems necessary or appropriate to accomplish the foregoing. Each Officer shall have such individual powers and duties as may be prescribed by the Manager or this Agreement.

(c)     Authority of Officers.   Subject to Section 6.2(b), any Officer of the Company shall have the right, power and authority to transact business in the name of the Company or to execute agreements on behalf of the Company, with respect to those agreements which are commonly signed by such equivalent officers of a corporation organized under the laws of the State of Florida. With respect to all matters within the ordinary course of business of the Company, third parties dealing with the Company may rely conclusively upon any certificate of any Officer to the effect that such Officer is acting on behalf of the Company.

(d)     Removal, Resignation and Filling of Vacancy of Officers.   The Manager may remove any Officer, for any reason or for no reason, at any time. Any Officer may resign at any time by giving written notice to the Manager, and such resignation shall take effect at the date of the receipt of that notice or any later time specified in that notice; *provided*, *however*, that unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any such resignation shall be without prejudice to the rights, if any, of the Company or such Officer under this Agreement. A vacancy in any office because of death, resignation, removal or otherwise shall be filled in the manner prescribed in this Agreement for regular appointments to that office.

(e)     Compensation of Officers.  The Officers shall be entitled to receive compensation from the Company as determined by the compensation committee in accordance with the terms hereof.

## ARTICLE VII

## TAX MATTERS

Section 7.1.     S Corporation Status.  The Company previously elected to be taxed as a S corporation within the meaning of Section 1361 of the Code.  The Members, the Managers and the Officers of the Company shall not take any action that shall jeopardize or otherwise cause the Company to not qualify as a S corporation, and any such action taken by a Member, the Managers or any Officer of the Company, including the transfer of any Units in the Company to a person who is not qualified to hold an interest in a S corporation, shall be null and without effect.

## ARTICLE VIII

### DISTRIBUTIONS

Section 8.1.    Order of Distributions.

(a)    Distributions.  If and to the extent that the Company makes distributions to its Members, the Company shall, in the manner prescribed by Section 8.1(b), to the fullest extent permitted by law, make distributions to the Holders of Units, pro rata, in proportion to their Percentage Interests.

(b)    Timing of Distributions.  The Members acknowledge that the Company shall make distributions at such times as designated by the Manager, in its sole discretion, and in accordance with the terms set forth herein.

## ARTICLE IX

### BOOKS AND RECORDS; REPORTS

Section 9.1.    Books and Records.  The Officers will keep appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists and copies of documents required to be provided pursuant to Section 8.2 or pursuant to applicable law. Each Member shall have reasonable access, during normal business hours and upon reasonable advance notice, to discuss the operations and business of the Company with the Officers of the Company, and to inspect, audit or make copies of all books, records and other information relative to the operations and business of the Company at its own expense, subject to reasonable confidentiality agreements that the Manager may require. The Company shall maintain a system of accounting that permits the Company to produce monthly and annual financial statements on the accrual method in accordance with United States generally accepted accounting principles, and all expenses required to be accrued on a monthly basis, including employee compensation and bonuses, shall be accrued and included in the documents required to be provided pursuant to Section 9.2.

Section 9.2.    Reports.

(a)    Financial Statements.  For so long as any Series A Member's or Series B Member's Percentage Interest continues to be 5% or greater, and such Member has not breached this Agreement or any other material agreement between such Member and the Company or any Company Subsidiaries in any material respect, such Member shall be entitled to receive from the Company the following information (i) unaudited consolidated quarterly financial reports of the Company and its consolidated subsidiaries for the first three (3) fiscal quarters of each year and (ii) to the extent prepared, audited consolidated annual financial reports of the Company and its consolidated subsidiaries; provided, however, that (a) the Company may require any such Member making a request under this Section 9.2(a) to enter into a customary confidentiality agreement and indemnity which may include a covenant not to use or disclose any information contained in the requested information and to create appropriate internal information walls and (b) no Series B Member shall be entitled to receive any information under this Section 9.2(a) (or any other

information regarding the Company and the Company Subsidiaries) if such Member or any of its Affiliates is engaged in a Competitive Business as reasonably determined by the Manager.

(b)     Tax Reports.  Within seventy-five (75) days after the end of each fiscal year, the Company shall deliver to each Member such Member's Schedule K-1 and such other information, if any, with respect to the Company as may be necessary for the preparation of such Member's federal income tax returns, including a statement showing such Member's share of the Company's income, gain or loss, expense and credit for such fiscal year for federal income tax purposes.

Section 9.3.   Fiscal Year.  The fiscal year of the Company shall be the twelve-month period ending on December 31 of each calendar year, or such other annual accounting period as may be established by the Manager; *provided, that*, if the Company is required under the Code to use a taxable year other than a calendar year, then the fiscal year of the Company shall be such taxable year.

Section 9.4.   Non-Disclosure.  Each Member agrees that it shall not, and shall cause its directors, officers, employees and Affiliates not to, directly or indirectly, disclose, reveal, divulge or communicate to any Person other than authorized officers, directors, managers, employees, members and partners of such Member or use or otherwise exploit for its own benefit or for the benefit of anyone other than such Persons, any Confidential Information.  No Member shall have any obligation to keep confidential (or cause its officers, directors or Affiliates to keep confidential) any Confidential Information if and to the extent disclosure thereof is specifically required by applicable law; *provided*, *however*, that in the event disclosure is required by applicable law, the applicable Member shall, to the extent reasonably possible, provide the Company with prompt notice of such requirement prior to making any disclosure so that the Company may seek an appropriate protective order.

## ARTICLE X

## DISSOLUTION AND LIQUIDATION

Section 10.1.   Dissolution.  The Company shall dissolve, and its affairs shall be wound up, upon the first to occur of the following: (a) the written consent of the Manager and the written consent of a Voting Majority, (b) the sale of all of the assets of the Company, and (c) the entry of a decree of judicial dissolution under the Act.

Section 10.2.   Liquidation.  Upon dissolution of the Company, the Manager or, if one is appointed, an authorized liquidating trustee, shall wind up the Company's affairs. Upon termination and dissolution of the Company and liquidation of its assets, the Manager or liquidating trustee, as the case may be, shall apply the Company's assets to the payment of all liabilities owing to creditors in accordance with the applicable law. The Manager or liquidating trustee, as the case may be, shall set up such reserves as it deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company. Said reserves may be paid by the Manager or liquidating trustee, as the case may be, upon dissolution to a bank or trust company to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations and, at the expiration of such period or occurrence of such events as the Manager or

liquidating trustee, as the case may be, may in establishing such reserves deem advisable, such reserves shall be distributed to the Members or their assigns in the manner set forth in Section 7.1(b).

**ARTICLE XI**

**DISPUTE RESOLUTION**

Section 11.1.  <u>Mandatory, Non-Binding Mediation</u>.  In the event of a dispute regarding the performance, interpretation, application or breach of this Agreement or Exhibit (a "**Dispute**"), the Parties to the Dispute agree, *first*, to negotiate a resolution in good faith of such Dispute for a period of thirty (30) calendar days following written Notice of Dispute from a Party, each Party to the dispute agreeing to have present at such negotiations a representative authorized to settle the Dispute; and *second*, if the Members in the Dispute are thereafter unable to resolve the Dispute fully, and if they agree, they will request non-binding mediation of unresolved portions of the Dispute administered by the American Arbitration Association under its Commercial Mediation Procedures, to be held before one mutually-agreed, qualified mediator in Lee County, Florida for a period of a further twenty-one (21) calendar days.

Section 11.2.  <u>Arbitration</u>.  If the Parties to the Dispute are not able to resolve their Dispute after application of <u>Section 11.1</u>, to the maximum extent allowed by applicable law, shall be submitted to and finally resolved by, binding arbitration.  Either party may file a written Demand for Arbitration with the American Arbitration Association's Regional Office closest to the Company's Registered Office, and shall send a copy of the Demand for Arbitration to the other party.  The arbitration shall be conducted pursuant to the terms of the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association, except that discovery may be had in accordance with the Federal Rules of Civil Procedure.  The venue for the arbitration shall be Lee County, Florida.  The arbitration shall be conducted before one arbitrator selected through the American Arbitration Association's arbitrator selection procedures.  The arbitrator shall promptly fix the time, date and place of the hearing and notify the parties.  The parties shall stipulate that the arbitration hearing shall last no longer than five business days.  The arbitrator shall render a decision within 10 days of the completion of the hearing, which decision may include an award of legal fees, costs of arbitration and interest.  The arbitrator shall promptly transmit an executed copy of its decision to the parties.  The decision of the arbitrator shall be final, binding and conclusive upon the parties.  Each party shall have the right to have the decision enforced by any court of competent jurisdiction.  Notwithstanding any other provision of this Section, any Dispute in which a party seeks equitable relief may be brought in any court in Lee County, Florida, having jurisdiction. Each party (a) acknowledges that the other parties would be irreparably damaged if any of the provisions of this Agreement are not performed by such party in accordance with their specific terms and (b) agrees that the other parties are entitled to injunctive relief to prevent breaches of this Agreement, and have the right to specifically enforce this Agreement and the terms and provisions hereof, in addition to any other remedies available at law or in equity.

## ARTICLE XII

## INDEMNIFICATION

Section 12.1.  Right to Indemnification of Directors and Officers.  The Company shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (an "**Indemnified Person**") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "**Proceeding**"), by reason of the fact that such person, or a person for whom such person is the legal representative, is or was the Manager or Officer or, while the Manager or Officer, is or was serving at the request of the Company as a director, officer, manager, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Indemnified Person in such Proceeding. Notwithstanding the preceding sentence, except as otherwise provided in Section 11.3, the Company shall be required to indemnify an Indemnified Person in connection with a Proceeding (or part thereof) commenced by such Indemnified Person only if the commencement of such Proceeding (or part thereof) by the Indemnified Person was authorized in advance by the Manager.

Section 12.2.  Prepayment of Expenses.  The Company shall pay the expenses (including attorneys' fees) incurred by an Indemnified Person in defending any Proceeding in advance of its final disposition, *provided*, *however*, that to the extent required by law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Indemnified Person to repay all amounts advanced if it should be ultimately determined that the Indemnified Person is not entitled to be indemnified under this Article XI or otherwise.

Section 12.3.  Claims by Manager and Officers.  If a claim for indemnification or advancement of expenses under this Article XI is not paid in full within thirty (30) days after a written claim therefor by the Indemnified Person has been received by the Company, the Indemnified Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim. In any such action the Company shall have the burden of proving that the Indemnified Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

Section 12.4.  Indemnification of Employees and Agents.  The Company may indemnify and advance expenses to any person who was or is made or is threatened to be made or is otherwise involved in any Proceeding by reason of the fact that such person, or a person for whom such person is the legal representative, is or was an employee or agent of the Company or, while an employee or agent of the Company, is or was serving at the request of the Company as a director, officer, manager, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such person in connection with such Proceeding. The ultimate determination of entitlement to indemnification of persons who are non-director or officer employees or agents shall be made in such manner as is determined by the Manager in its sole

discretion. Notwithstanding the foregoing sentence, the Company shall not be required to indemnify a person in connection with a Proceeding initiated by such person if the Proceeding was not authorized in advance by the Manager.

Section 12.5. <u>Advancement of Expenses of Employees and Agents</u>. The Company may pay the expenses (including attorneys' fees) incurred by an employee or agent in defending any Proceeding in advance of its final disposition on such terms and conditions as may be determined by the Manager.

Section 12.6. <u>Non-Exclusivity of Rights</u>. The rights conferred on any person by this <u>Article XI</u> shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of the certificate of formation, this Agreement, any other agreement, vote of the Members or disinterested Managers or otherwise. The Company hereby agrees (i) that it is the indemnitor of first resort (and that its obligations to an Indemnified Person are primary and any obligation of any other person to advance expenses or to provide indemnification for the same expenses or liabilities incurred by an Indemnified Person are secondary) and (ii) that it shall be required to advance the full amount of expenses incurred by an Indemnified Person and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement (or any other agreement between the Company and an Indemnified Person), without regard to any rights the Indemnified Person may have against any other person.

Section 12.7. <u>Other Indemnification</u>. The Company's obligation, if any, to indemnify any person who was or is serving at its request as a director, manager, officer or employee of another corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise shall be reduced by any amount such person actually collects as indemnification from such other corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise.

Section 12.8. <u>Insurance</u>. The Manager may, to the full extent permitted by applicable law as it presently exists, or may hereafter be amended from time to time, authorize an appropriate Officer or Officers to purchase and maintain at the Company's expense insurance in form, scope and substance satisfactory to the Voting Members (a) to indemnify the Company for any obligation which it incurs as a result of the indemnification of Managers, Officers and employees under the provisions of this <u>Article XI</u>, and (b) to indemnify or insure Managers, Officers and employees against liability in instances in which they may not otherwise be indemnified by the Company under the provisions of this <u>Article XI</u>.

Section 12.9. <u>Waiver of Business Opportunities Doctrine</u>. To the fullest extent permitted by law, the doctrine of corporate opportunity, or any analogous doctrine, shall not apply to the Series A Members, the Manager, and their respective Affiliates (collectively, the "**Business Opportunities Exempt Parties**"). The Company renounces any interest or expectancy of the Company in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to any Business Opportunity Exempt Party. No Business Opportunity Exempt Party who acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Company shall have any duty to communicate or offer such opportunity to the Company, and such Business Opportunity Exempt Party shall not be liable

to the Company or to its Members for breach of any fiduciary or other duty by reason of the fact that such Business Opportunity Exempt Party pursues or acquires, or directs such opportunity to another Person or does not communicate such opportunity or information to the Company. The parties hereto expressly acknowledge and agree that the Business Opportunity Exempt Parties and their respective Affiliates will not be prohibited by virtue of their investment in the Company or participation on the Manager from pursuing and engaging in any business ventures or arrangements, including any business ventures or arrangements that are or may be competitive with the Company and the Company Subsidiaries. In addition, the doctrine of corporate opportunity, or any analogous doctrine, shall not apply to a Member or the Manager unless the opportunity involves the business of distributing payment processing services.

Section 12.10. <u>Waiver of Fiduciary Duties</u>.

(a)     <u>Manager</u>.   Each of the Members acknowledges and agrees that (a) the Manager is the designee of the Member(s) that appointed such Manager, is acting as a proxy for such Member(s) with respect to the management of the Company and does not have any duties (including fiduciary duties) to the Company, any Company Subsidiary or any other Member, nor shall any Member have any such duty, and (ii) the Manager may act in and consider the best interest of the Member who designated the Manager and shall not be required to act in or consider the best interests of the Company or the other Members or parties hereto, except to the extent expressly set forth in this Agreement. Each of the Members agree that any duties, whether express or implied (including fiduciary duties), of the Manager to the Company or to any other Member that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law, and each Member hereby waives all rights to, and releases the Manager from, any such duties, except to the extent expressly set forth in this Agreement. Notwithstanding anything to the contrary contained in this Agreement, (i) the foregoing shall not eliminate or limit the obligation of the Members or the Manager to act in compliance with the express terms of this Agreement (other than the foregoing), and (ii) the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing of the Members. Except as otherwise expressly provided in this Agreement, nothing contained in this Agreement shall be deemed to constitute the Manager or Member an agent or legal representative of any other Member or to create any fiduciary relationship for any purpose whatsoever, apart from such obligations between the members of a limited liability company as may be created by the Act. A Member shall not have any authority to act for, or to assume any obligation or responsibility on behalf of, any other Member, the Company or any Company Subsidiary.

(b)     <u>Members</u>.   Each of the Members acknowledges and agrees that the sole duty and responsibility of any Member pursuant to this Agreement, applicable law or otherwise, shall be to act in the interest of such Member, as determined by the applicable Member in its sole discretion, and there shall be no limitations on such Member's right to act as determined by the Member in its sole discretion, except as otherwise specifically provided herein. In connection therewith, the Member may take into account only the Member's best interests and the Member shall not be required to take into account the interest of any other Member or any other Person other than its own. No Member shall have any fiduciary or other implied duties or responsibilities except those expressly set forth herein, nor shall any fiduciary functions, responsibilities, duties, obligations or any liabilities be read into this Agreement or otherwise exist against such Member.

To the maximum extent permitted by applicable law, no Member shall be a trustee or fiduciary for any other Member or the Company by reason of this Agreement. To the maximum extent permitted by law, each Member and the Company waive any fiduciary or other express or implied covenant, duty or other obligation of the Member to the other Members, the Company, any Company Subsidiaries or any third party, except for the specific obligations expressly set forth in this Agreement. To the maximum extent allowed by applicable law, each Member and the Company hereby waive all of the foregoing and all other duties, responsibilities or obligations (fiduciary or otherwise) that might otherwise apply to each.

Section 12.11. <u>Amendment or Repeal</u>.  Any repeal or modification of the foregoing provisions of this <u>Article XI</u> shall not adversely affect any right or protection hereunder of any Person in respect of any act or omission occurring prior to the time of such repeal or modification. The rights provided hereunder shall inure to the benefit of any Indemnified Person and such Person's heirs, executors and administrators.

**ARTICLE XIII**

**<u>GENERAL PROVISIONS</u>**

Section 13.1.  <u>Amendments</u>.  Except as otherwise expressly set forth in this Agreement, this Agreement may not be modified, altered, supplemented or amended (by merger, repeal, or otherwise) except pursuant to a written agreement executed and delivered by the Voting Majority; *provided*, *however*, that any such modification, alteration, supplement or amendment that (a) adversely affects the rights and privileges of the Series B Members in a manner that is disproportionate from the effects on the Series A Members (other than resulting from difference in Percentage Interests or holdings of Units), (b) requires the Series B Members to make Capital Contributions to the Company or (c) modifies the limited liability or financial obligations of the Series B Members, shall require the consent of the Holders of the majority of interests of the outstanding Series B Units held by such Series B Members, separately as a class.  Notwithstanding the foregoing, the Manager may update and amend <u>Exhibit A</u> to this Agreement as it deems reasonably necessary or appropriate without the consent of any Person.

Section 13.2.  <u>Specific Performance</u>.  The Parties acknowledge and agree that a breach of this Agreement would cause irreparable damage to the other Parties and that the other Parties will not have an adequate remedy at law. Therefore, the obligations of the Parties under this Agreement shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies which any Party may have under this Agreement or otherwise.

Section 13.3.  <u>Submission to Jurisdiction; Consent to Service of Process, Waiver of Jury Trial</u>.

(a)  Subject to the terms of <u>Section 11.1</u> and <u>Section 11.2</u>, the Parties hereby irrevocably submit to the non-exclusive jurisdiction of any federal or state court located within, or having jurisdiction over, Lee County, Florida over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each Party hereby irrevocably

agrees that all claims in respect of such dispute or any suit, action proceeding related thereto may be heard and determined in such courts. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)     Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.6.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION: (i) ARISING UNDER THIS AGREEMENT; OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE.  EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 13.4.  Entire Agreement; Waivers.  This Agreement (including the schedules and exhibits hereto) represents the entire understanding and agreement among the Parties with respect to the subject matter hereof and any provision hereof can be waived only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such waiver is sought. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

Section 13.5.  Governing Law.  This Agreement, and all claims or causes of action or other matters (whether in contract, tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement or the consummation of any of the transactions contemplated hereby, shall be governed by and construed in accordance with the laws of the State of Florida applicable to contracts made and performed in such state.

Section 13.6.  <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and shall be deemed given: (a) when delivered personally by hand (with written confirmation of receipt); (b) when sent by facsimile or electronic mail (with written confirmation of successful transmission); or (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the to the appropriate address(es) set forth in <u>Exhibit A</u> (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision).

Section 13.7.  <u>Representations of the Members</u>.  Each of the Members hereby, severally and not jointly, represents and warrants to the Company and the other Members, as of the date of this Agreement and any amendment, as follows:

(a)    <u>Authorization</u>.  The execution, delivery and performance of this Agreement by such Member has been duly authorized by all appropriate action on the part of such Member.

(b)    <u>Enforceability</u>.  The execution and delivery by such Member of this Agreement will result in legally binding obligations of such Member enforceable against such Member in accordance with the respective terms and provisions hereof and thereof, except as may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity).

(c)    <u>No Conflicts</u>.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby and thereby do not and will not, with notice or passage of time or both (i) conflict with or result in a material breach of the terms, conditions, or provisions of, (ii) constitute a material default under or result in a material violation of, (iii) result in the creation of any lien or encumbrance upon the Units or assets, properties or rights of such Member pursuant to, (iv) give any Person the right to modify, terminate or accelerate any liability of, or charge any fee, penalty or similar payment to such Member under, or (v) require any authorization, consent, approval, exemption or other action by or declaration or notice to any Person pursuant to any material contract, agreement or understanding (including, without limitation, any agreement restricting such Member from engaging in any line of business, competing with any Person or in any geographical area, or using or disclosing any information) to which such Member is a party, by which such Member is bound or to which any of such Member's assets are subject.

Section 13.8.  <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to affect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 13.9.  Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a Party to this Agreement. No assignment of this Agreement or of any rights or obligations hereunder may be made by any Party except subject to the terms hereof.

Section 13.10. Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement

[SIGNATURE PAGE FOLLOWS]

<u>SIGNATURE PAGE TO AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT</u>

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Amended and Restated Limited Liability Company Agreement of Surf 9, LLC as of the date first written above.

**COMPANY:**

SURF 9, LLC

By: _____
Name: _____
Title: _____

**SERIES A MEMBER:**

_____
JOHN CHENCINER

**SERIES B MEMBER:**

_____
JOHN CHENCINER

**Exhibit A**

**MEMBERS**

| Member Name, Address, Telephone Number, Facsimile Number (if applicable) and Email Address | Series A Units | Series B Units |
|---|---|---|
| JOHN CHENCINER<br>24850 Old 41 Road, #10<br>Bonita Springs, Florida 34135<br>[Email Address]<br>[telephone]<br>[facsimile] | 10,000 | 99,000 |
| **TOTAL** | **10,000** | **99,000** |