**EXHIBIT A**

# LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is entered into this *9* day of _JUNE_ 2017, between **BERNWOOD, LLC,** an Ohio limited liability company ("Landlord"), and **SURF9, LLC,** a Florida limited liability company ("Tenant").

## WITNESSETH THAT;

The following exhibits are attached and made a part of this Lease:

| Exhibits "A": | Location of the Leased Premises showing Tenant's space. |
| Exhibit "B": | Required Disclosures as per Chapter 475 and Florida Statute 404.056. |
| Exhibit "C": | Rent Schedule and Common Area Maintenance Adjustments. |
| Exhibit "D": | Personal Guaranty |

1.    LEASED PREMISES.  Landlord leases to Tenant and Tenant leases from Landlord, subject to the terms and provisions of this Lease, approximately five thousand forty six (5,046) square feet of space of the building located at 24850 Old 41 Road, Suite 10, Bonita Springs, FL 34135, known as Bernwood Centre, Suite 10 (the "Premises" or "Leased Premises") with the non-exclusive rights in common with all other tenants of the Building(s) to use the parking facilities and areas around the development.  The location of the building of which the Leased Premises are made a part (the "Building") is set forth in Exhibit "A," attached hereto and made a part hereof.  The term "Land" as it is used herein shall mean the real property upon which the Building sits, including, but not limited to, all common areas, parking facilities, sidewalks, and driveways.

2.    TERM.  The initial term of this Lease shall be for five (5) years, as defined below (the "Initial Term") (or until sooner terminated as herein provided), commencing on December 1, 2017 (the "Commencement Date").  In the event Landlord is unable to deliver possession of the Premises on the Commencement Date, Landlord shall not be liable for any damage thereby, nor shall this Lease be void or voidable, but Tenant shall not be liable for any rent until either (a) the day after Tenant's personnel first occupy a part of the Premises for carrying on the normal functions of Tenant's business in the Premises, or (b) the fifth day following the giving by the Landlord to Tenant of a written notice stating that the Premises are ready for occupancy by Tenant, whichever event occurs first.

So long as Tenant is not in default of this Lease Agreement, Landlord shall grant Tenant one (1) option to renew this Lease for an additional five (5) years; Rent (as defined herein) for the first year of the option term to be at then market rate; Rent for remaining years in option term to have annual escalations of fifty cents ($0.50) per square foot.  Tenant must notify Landlord in writing, on or before ninety (90) days from the expiration of the Initial Term, of Tenant's intent to exercise said option.

3.    RENTAL (NNN BASIS), SECURITY DEPOSIT, AND UTILITY PAYMENTS.

(a)    Rental.  Tenant covenants to pay to Landlord as Base Rent the amount of Twenty Seven Thousand Seven Hundred Fifty Three and no/100  Dollars ($27,753.00) ("Base Rent") payable in monthly installments of Two Thousand Three Hundred Twelve and 75/100 Dollars ($2,312.75) during the first Lease Year (for purposes hereof, a Lease Year is twelve (12) consecutive months, commencing on December 1, 2017)  Commencing with the second year of this Lease, Rent will be increased annually as set forth in Exhibit "C".

1

Tenant also covenants to pay to Landlord as additional rent, its Proportionate Share (as defined herein) of Common Area Maintenance (CAM) and Reimbursable Expenses (as defined herein), and sales tax for the Initial Term, and any option or renewal terms.

The term "Rent" shall mean Base Rent and any additional rent required pursuant to this Lease. Monthly installments of Rent shall be payable on the first day of each calendar month, together with any Florida sales tax.

Tenant shall pay Landlord upon the signing of this Lease Five Thousand Three Hundred Forty Eight and 76/100 Dollars ($5,348.76) as a non-refundable pre-payment of monthly Base Rent, Tenant's Proportionate Share of Common Area Maintenance and Reimbursable Expenses, and sales tax for the first of the Initial Term hereof.

Tenant's "Proportionate Share" shall mean the percentage computed from the fraction, the numerator of which is the number of rentable square feet of the Premises and the denominator of which is the total rentable square feet of all space available to commercial and retail tenants in the Building(s). Adjustments for additions or deletions of commercially rentable square feet shall be made annually as of the first of the following year for the ensuing (not retroactive). Landlord and Tenant acknowledge that Tenant's Proportionate Share as of the date hereof is 5.51% (5,046 s.f./91,540 s.f.).

The minimum rental for any fraction of a month at the beginning of this Lease shall be computed on a per diem basis payable at the beginning of such fractional period for the remainder of such month, in order that all rentals due hereunder will become payable on the first day of each month.

This is a triple net Lease and the Rent and all other sums payable hereunder by Tenant shall be paid without setoff, counterclaim, recoupment, abatement, suspension or deduction. This Lease shall not terminate, nor shall Tenant have any right to terminate this Lease during the term hereof, nor shall Tenant be entitled to any abatement, deduction, deferment or reduction of Rent hereunder, except as otherwise expressly provided herein, nor shall the obligations of Tenant under this Lease be affected by any interference with the Tenant's use of the Premises not directly caused by Landlord, except as otherwise expressly provided herein. It is the intention of the parties hereto that Tenant's obligations hereunder shall be separate and independent covenants and agreements, that the Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events, and that the obligations of Tenant hereunder shall continue unaffected, unless the requirement to pay or perform the same shall have been terminated pursuant to an express provision of this Lease.

In the event Tenant fails to pay any rent, tax or other sum when due, Tenant shall pay as additional rent under this Lease a Late Charge in accordance with the following schedule:

| LATE CHARGES | |
| --- | --- |
| Days in Arrears | Late Charge |
| * 5 - days or more | 5% of such installment |
| Any outstanding balance that is more than 30 days past due shall be assessed an interest fee of 18% per annum. | |

2

Acceptance by Landlord of any rental payment in an amount less than the amount due and owing shall not be deemed a waiver of Landlord's right to collect the full amount of rent or additional rent due hereunder.

(b)    Security Deposit.  Tenant shall deposit with the Landlord Five Thousand Three Hundred Forty Eight and 76/100 Dollars ($5,348.76)which shall be held by Landlord without liability for interest, covenants, and conditions of this Lease, and may be applied by Landlord in whole or in part, to any sum due Landlord because of any breach of this Lease by Tenant.

In the event of any such application by Landlord, Tenant shall, upon the written demand of Landlord, forthwith remit to Landlord a sufficient amount of cash to restore the Security Deposit to the original sum deposited.  The balance of Security Deposit shall be returned to Tenant upon termination of Tenant's occupancy, once Tenant has complied with all the terms, covenants, and conditions of this Lease, including those relating to the condition in which the Premises shall be left by Tenant. If Tenant is in default under this Lease more than two (2) times within any twelve month period, irrespective of whether or not such defaults are cured, then, without limiting Landlord's other rights and remedies provided for in this lease or at law or in equity, the Security Deposit shall automatically be increased by an amount equal to the greater of:

(i)     Two (2) times the original Security Deposit; or
(ii)    Two (2) months' Minimum Rent, which shall be paid by Tenant to Landlord forthwith on demand.

Landlord may deliver such deposit to any purchaser or other transferee of Landlord's interest in Land and Building, and thereupon Landlord shall be discharged from any further liability with respect to such deposit, provided that any such purchaser or transferee assumes Landlord's obligations under this paragraph

(c)    Summary of Non-Refundable and *Refundable Monies Received Upon Signing of Lease.  The total amount of non-refundable and *refundable monies received consists of the following:

|  | Rent | Sales Tax | Total |
|---|---|---|---|
| **First Month's Rent:** | $5,046.00 | $302.76 | $5,348.76 |
| **Last Month's Rent:** | N/A | N/A | N/A |
| **\*Security Deposit:** |  |  | $5,348.76 |
| **TOTAL DEPOSITS:** |  |  | $10,697.52 |

(d)    CAM and Reimbursable Expenses Paid to Landlord (Additional Rent).  Tenant shall pay its Proportionate Share of Common Area Maintenance (CAM) and Reimbursable Expenses as described in Paragraph 3(d)(1) through (d)(3),  Paragraph 10 (a), and Paragraph 10 (b) of this Lease.  The Common Area Maintenance and Reimbursable Expenses shall be calculated on a calendar-year basis.

3

1)      Any tax that may be imposed, levied, or assessed upon the Base Rent by any governmental authority acting under any present or future law, which payment shall be made by Tenant to Landlord forthwith upon notice therefore by Landlord to Tenant and in any event before any fine, penalty, interest, or costs are added to said tax.  If Tenant is prohibited by law from paying such tax, Landlord may, at its election, terminate this Lease.

2)      Any future assessment, tax, charge or surcharge of whatever kind or description, which may be imposed by any development or utility district, community or homeowners association, and any local, state and/or federal agency to comply with any environmental protection legislation or to comply with any other rules, laws, or regulations created or to be created by such agency or authority.

3)      Common Area Maintenance and Reimbursable Expense charges for all operating costs of the Land and Building(s) for each full or partial calendar year of the Initial Term hereof, and for each full or partial calendar year of the Renewal Term(s).  Operating costs shall mean all items of cost and expense of whatsoever kind incurred by Landlord for operation and maintenance of the Land and Building(s), including but not limited to items covered under number 1, 2, and 3 of this paragraph and:  property taxes and insurance; water, sewer, electricity, telephone, and other utility costs; the cleaning, maintenance, repair and replacement of all HVAC, plumbing, and electrical systems within the development and individual premises not paid directly by Tenant; janitorial service for common areas; extra window washing; parking lot maintenance; exterior pest control; seasonal decorations; management fees; trash removal; landscape costs; and all other repairs, maintenance, replacement, reserves for replacement, and contractual operational services within the development and/or covered under Paragraph 10 (a) and 10 (b) below.  This reimbursement also includes the property, liability, and other required insurances and property tax estimates for the base year and shall be paid in monthly installments together with the Base Rent on the first day of each month.

The amount of the monthly installment shall be determined by Landlord as set forth in Exhibit "C" and shall be based on Landlord's estimated cost of operating the Land and Building(s) for the remainder of the current calendar year and each year thereafter during the Initial Term in accordance with sound management and accounting principles and practices generally accepted with respect to the operation of a first-class facility

Tenant shall pay its Proportionate Share of any CAM, Reimbursable Expenses, insurance premiums and real estate taxes assessed against the Land and Building(s) for the current year and each succeeding year of the Lease.

Where occupancy of the Premises is for a partial calendar year, Tenant's Proportionate Share will be pro-rated.  Landlord has the option to determine Tenant's Proportionate Share based on a pro-ration of the assessed increase from the prior year.

(e)      Utility Payments.  Tenant agrees to arrange for and pay all charges for electric, telephone, water/sewer, and other utility services which are individually metered directly to Tenant from the respective utility provider.  If tenant-direct billing is not available by any of such service providers, Landlord shall bill Tenant for said services via the monthly Rent invoice.

4.　　QUIET POSSESSION.  Tenant, upon paying the Rent herein provided and performing all the covenants of this Lease, shall have quiet possession of the Premises during the term hereof.

5.　　RENT ADJUSTMENTS.  See Exhibit "C", attached hereto and made a part hereof.

6.　　USE AND OCCUPANCY.  The Premises shall be used and occupied by Tenant only as office/retail and for no other purpose.  Tenant shall not cause or permit anything to be done in or about the Premises, or bring or keep anything therein, which will in any way increase the rate of insurance upon the Premises or Building wherein the Premises are situated.  Tenant shall obtain and provide Landlord with a copy of any licenses and occupancy permits and comply with all laws, ordinances, orders and regulations affecting the Premises and the cleanliness, safety, occupation and use thereof.  Tenant shall not cause or permit injury or waste to the Premises or Building or common areas of which the Premises are a part, or cause or permit a nuisance to exist.

Upon Tenant's taking possession of the Premises, Tenant shall be provided with the rules and regulations in regard to occupancy of the Bernwood Properties. These and such reasonable alterations, additions and modifications thereof, that may from time to time be made by Landlord, shall be considered a part of this Lease Agreement, with the same effect as though written herein, and Tenant covenants and agrees that the said rules and regulations shall be faithfully observed by said Tenant, the employees of Tenant, and all persons invited by Tenant into or onto said Premises and/or common areas.  The Landlord hereby expressly reserves the right to add, alter, modify, or rescind from time to time such rules and regulations, however such other and further rules, not to be inconsistent with the proper rightful enjoyment by the Tenant of the Leased Premises.

Tenant covenants and agrees to deliver up and surrender to Landlord the possession of the Premises upon the expiration or termination of this Lease, or any renewal thereof, in as good a condition as at the commencement of said term, or as improved during the term, the effects of time excepted.  Tenant will not hold over beyond the end of any term for failure of Landlord to give notice to vacate, any such notice being waived by Tenant.  In the event Tenant, notwithstanding, shall hold over termination of this Lease, it shall constitute a tenancy from month to month only, and shall be governed by the terms hereof with the Rent being adjusted automatically and charged at two times the Rent contained in Paragraph 3(a).  Upon termination of this Lease, Landlord shall be entitled to evict Tenant and shall be entitled to recover from Tenant rents due for this period and reasonable expenses; including attorney's fees and damages resulting from Tenant's failure to vacate.

7.　　CONDITION OF PREMISES.  Tenant agrees to accept the Premises in its present condition, except to the extent that Landlord has agreed in writing to adjust the Premises.  In such event, Tenant agrees to execute and deliver to Landlord a written acceptance of the Premises following completion of such work by Landlord and prior to occupancy of the Premises by Tenant.  However, taking possession of the Premises shall be conclusive evidence that the Premises were then in satisfactory condition.

8.　　IMPROVEMENTS TO BUILDING INTERIOR.  Interior improvements shall be as specified in Section 37, Supplement. Any addition to the specified remodeling and construction of the Tenant's space, including all mechanicals, all construction upgrading and all floor, wall and window coverings, ceilings, lighting and signage and any and all extras, will be charged to the Tenant and shall be paid by the Tenant as additional Tenant improvements.  Payment of all additions shall be paid by the Tenant within thirty (30) days of receipt of an invoice.  Failure to pay within said thirty days shall be deemed a default under this lease, as more specifically described in Paragraph 15.

5

9.    RIGHTS OF LANDLORD TO MORTGAGE PREMISES.

(a)    Landlord reserves the right to subject this Lease to the lien of any mortgage(s) now or hereafter placed upon the Premises, the Land, and/or the Buildings. This Lease shall be subject and subordinate at all times to the lien of any mortgage(s) and/or other instrument of encumbrance now or hereafter placed by the Landlord upon any and all of the Premises, the Land, and/or of all renewals, modifications, consolidations, replacements and extensions therefore (each of which is herein referred to as a "Mortgage"), all automatically and without the necessity of any further action on the part of the Tenant to effectuate such subordination.

(b)    The Tenant shall, promptly at the request of the Landlord or the holder of any Mortgage(s) (herein referred to as "Mortgagee"):

1)    Execute, acknowledge and deliver such further instruments evidencing such subordination as the Landlord or such Mortgagee may deem necessary or desirable, and

2)    Attorn to such Mortgage(s), provided that such Mortgagee agrees with the Tenant that such Mortgagee will, in the event of a foreclosure of any such Mortgage(s) take no action to interfere with the Tenant's rights hereunder, except upon the occurrence of an Event of Default.

The terms and provisions of this Lease may require approval by Landlord's Mortgagee. If such Mortgagee should require, as a condition for financing, any reasonable modification of the terms and provisions of the Lease as approved by Landlord, and if Tenant should refuse to approve and execute the modifications so required, thus the Landlord shall have the right by thirty (30) days written notice to Tenant to cancel this Lease without liability on the part of the Landlord.

Within ten (10) days following Landlord's written request, Tenant shall provide an instrument in recordable form certifying:

(i)    That this Lease is unmodified and in full force and effect (or, if there has been any modification thereof, that it is in full force and effect as so modified, stating therein that nature of such modification);

(ii)    As to the dates to which the Rent and any Additional Rent and other charges arising hereunder have been paid in advance as of the dates on which payment thereof is due hereunder, if any;

(iii)    That the Tenant has accepted possession of the Premises, and the date on which the Term commenced;

(iv)    As to whether, to the best knowledge, information and belief of the signer of such certificate, the Landlord is then in Default in the performance of any of its obligations hereunder (and, if so, specifying the nature of each such default); and

(v)    As to any other fact or condition reasonably requested by the Landlord, any Mortgagee or prospective Mortgagee or purchaser of any or all of the Premises, the Building, or any interest therein, or any assignee or prospective assignee of any interest of the Landlord under this Lease; and acknowledging and agreeing that any

6

statement contained in any such certificate may be relied upon by the Landlord and any such other person.

10.    SERVICES, MAINTENANCE, REPAIRS AND ALTERATIONS.

(a)    Landlord's Responsibilities. Landlord shall keep in good order, condition and repair, the exterior foundations, exterior walls  (excluding glass, glazing, and interior window washing), and roof of the Building in which the Leased Premises form a part.  Landlord shall also keep in good order, condition, and repair the main sewage system, HVAC system (except HVAC system exclusively serving the Leased Premises, if any), underground  plumbing system, and primary electrical system to the Building(s).  Landlord shall also be responsible for maintaining the parking areas, sidewalks and driveways, and shall keep the exterior common areas reasonably clear of debris, and the parking area will be illuminated during normal working hours.  Failure by Landlord to furnish water, plumbing and janitorial  service for the common areas, except as the result of the gross and willful neglect of Landlord, shall not be construed as an eviction of Tenant, allow an abatement of the rent, or otherwise render Landlord liable for damages either to person(s) or to property suffered by Tenant, Tenant's employees, licensee's or invitees under this Lease.  Landlord shall have no liability for the non-performance of any undertakings of the public utilities or utility district.

(b)    Tenant's Responsibilities. Tenant shall keep clean and maintain in  good order, condition and repair, the Leased Premises. Tenant hereby agrees to repair and maintain in good condition the entire interior and exterior of the Leased  Premises, including but not limited to ceilings, walls, floor coverings, windows, storefronts and doors (including glass breakage and washing), HVAC (if exclusively serving the Leased Premises), plumbing and electrical systems of the Premises in good condition, including light bulb replacement, pest control and janitorial services.  Any special cleaning, maintenance, repair, or replacement of plumbing, and electrical system within the premises not completed by Tenant shall be performed by licensed service companies acceptable to the Landlord, and the costs for the above responsibilities shall be charged to Tenant.

(c)    Alterations. Tenant shall have the right, following receipt of written consent of Landlord, which consent shall not be unreasonably withheld, to make alterations to the interior of the Premises so long as the cost thereof is paid by Tenant, and all such work is done in a workmanlike manner by a licensed and insured building contractor and without damage to the structural elements of the Building and in conformance with local Building Codes and the regulations of fire insurance underwriters carrying insurance on the Premises.  Tenant agrees that upon termination of the Lease and written request by Landlord it will, at its own expense, if Landlord shall so request, restore the Premises to their former condition, except ordinary wear and tear.

(d)    Personal Property on Leased Premises - Risk of Damage. Tenant agrees that all personal property of every kind or description which may at any time be in the Premises shall be at Tenant's sole risk or at the risk of those claiming through or under Tenant, and in no event shall Landlord be liable for same.  Landlord shall be held harmless by Tenant against any and all claims for damage to said property of Tenant arising from any cause whatsoever.  Tenant shall carry its own required insurance coverages for any and all of its personal property.

(e)    Trade Fixtures. All improvements to the Premises and all fixtures attached thereto shall be and become the property of Landlord, except that all machinery, equipment and furnishings installed by Tenant, including all trade fixtures and signage installed or used by Tenant, shall

7

remain the personal property of Tenant, and upon condition that Tenant is not in default in any of the provisions hereof, Tenant shall, without cost or damage to Landlord or to the Building, remove the same at the termination of the term of this Lease provided that Tenant at his expense shall repair any and all damage caused to the Building by such removal.

(f)    Liens. Tenant shall not have the right to cause or permit the creation of any lien against the Premises for any cause or reason whatsoever including labor, or materials furnished, or services rendered at the request of Tenant. In the event any such lien shall be filed against the Premises, Tenant shall cause such lien to be released within ten (10) days after actual notice of the filing thereof or shall furnish to Landlord an Irrevocable Letter of Credit or deposit cash funds with the Clerk of the Court, conditioned to indemnify Landlord against the foreclosure of such lien. Failure of Tenant to comply shall be treated as a default and subject to the provisions of Paragraph 14. Tenant shall be liable for all costs and expenses including but not limited to attorney fees, required to remove any lien that is placed upon Property of Landlord as a result of any action of Tenant.

(g)    Inspection and Repair by Landlord. Upon twenty four (24) hour notice, with entrance during regular business hours (except in the event of an emergency, in which case notice shall not be required), Landlord shall have the right to enter upon the Premises at all reasonable hours for the purpose of inspection or to make such improvements, repairs or alterations as may be deemed necessary, except as otherwise expressly provided in this Lease.

(h)    Force Majeure. Anything in this Agreement to the contrary notwithstanding, providing such cause is not due to the gross and willful act or neglect of Landlord, it shall not be deemed that the Landlord is in default with respect to the performance of any of the terms, covenants and conditions of this Lease if same shall be due to any strike, lockout, civil commotion, war-like operation, invasion, rebellion, hostilities, military or usurped power, sabotage, governmental regulations or controls, inability to obtain any material, service, or financing, through act of God or other cause beyond the control of Landlord.

11.    INSURANCE AND INDEMNITY REQUIREMENTS. During the term of this Lease and any extension or renewal thereof, Tenant shall procure and keep in force, or shall where appropriate, require others to procure and keep in force, at least the following insurance coverages, when applicable, from insurers that are authorized to do business in the State of Florida and that are well rated by any recognized national rating organization and approved by Landlord. Tenant's insurance coverage shall be primary.

(a)    Comprehensive General Liability Insurance coverage, including but not limited to Contractual, Independent Contractors and Completed Operations Liability; and Products Liability; to cover all claims arising out of Tenant's operation or use of the Leased Premises, for personal injury, bodily injury or death and property damage occurring in, on or about the Leased Premises, including sidewalks, driveways and common areas. The minimum amount of such coverage shall be $2,000,000 Combined Single Limit each occurrence for Bodily Injury and Property Damage.

(b)    Comprehensive Automobile Liability Insurance coverage for all owned, leased, rented, or borrowed vehicles. Also, when applicable, Garage Liability and Garagekeepers Legal Liability Insurance coverage. The minimum amount of coverage shall be $1,000,000 Combined Single Limit each occurrence for Bodily Injury and Property Damage.

(c)    Workers Compensation Insurance, unless Tenant's business is exempt from carrying workers compensation insurance under the statutes of the State of Florida, including limits of Employer's Liability sufficient to meet the state statutory requirements protecting all employees of the Tenant and employees of its tenants, contractors, or subcontractors during the term of this Lease.

(d)    Tenant shall be responsible for Fire, Extended Coverage, Vandalism, and the Standard All Risk form of insurance to be carried on all of Tenant's improvements, personal property and contents located in, on or about the Tenant's Leased Premises.

Landlord shall not be responsible or liable for any accident, death, injury or damage to any person or persons or to any of Tenant's improvements, personal property and contents resulting from fire, explosion, lightning, wind, steam, gas, electricity, water, rain, snow, ice, theft or any other condition affecting or touching any part of the Tenant's Leased Premises and/or Tenant's improvements, personal property and contents.

(e)    Tenant shall be responsible for Comprehensive General Liability insurance and Workers Compensation Insurance in relation to the Leased Premises occupied by Tenant, as outlined above. Tenant also covenants and agrees that it will at all times keep and save harmless, protect and indemnify the Landlord, from and against any and all losses, damages, claims, demands, costs, expenses, suits, actions or causes of actions in any manner which may occur or be claimed pertaining to any accident, death, injury or damage whatsoever caused to any person or persons, corporations, property, or chattels of the land or building itself arising directly or indirectly out of the business conducted at or out of the Leased Premises, or incidents occurring at the Leased Premises, arising directly or indirectly from an act or omission of the Tenant or its concessionaires, sub-tenants, licensees, servants, agents, contractors, employees, customers, invitees and others from and against any and all costs, expenses, and liability incurred in connection with such claim including all attorney fees, for proceedings brought thereon. This indemnity shall survive the termination of this Lease Agreement.

(f)    All of the above insurance policies shall cover all operations of the Tenant and shall be made effective the date Landlord delivers possession of the Premises to Tenant and shall continue throughout the term of this Lease and any extension or renewal thereof.

(g)    Tenant shall provide Landlord with a Certificate of Insurance covering each of the required insurance policies with limits acceptable to the Landlord. **The Certificate shall name the Landlord and CRM Companies, Inc. as additional insureds** and state that at least thirty (30) days written notice shall be given Landlord in the event of non-renewal, suspension, cancellation, termination, or material change of any insurance policy required hereunder.

(h)    **Before Tenant takes possession of the Leased Premises, Tenant must have the required insurance policies paid for and in force, and provide copy of same to Landlord prior to receiving keys to Premises. Insurance requirements will be reviewed annually by the Tenant and the Landlord, and adjustments will be made if needed.**

12.    CASUALTY. In the event (a) the Premises shall be partially or totally destroyed by fire or other casualty so as to become partially or totally untenantable, or (b) the Building shall be destroyed or damaged by fire or other casualty as to render fifty percent (50%) or more therein untenantable although not damaging the Premises, then, and in either event, Landlord shall within thirty (30) days after such

9

damage, give written notice to Tenant of its election to either (a) restore or rebuild, or (b) terminate this Lease, without any further obligations on either party to be performed. If Landlord elects to restore or rebuild the Premises, Landlord shall proceed with reasonable speed, and an adjusted proportionate part of the rent shall be abated until the Premises are so repaired. The adjusted proportionate part of the rent shall correspond to the time during which and to the portions of the Premises of which the Tenant shall be deprived of possession. Said adjusted proportionate part of the rent shall be effective as of the date of damage. Landlord's obligation shall be to rebuild or restore the Premises, if practical, but shall not include replacement or restoration of additions or fixtures installed by Tenant.

13.     EMINENT DOMAIN. If the whole of the Premises or any part of the floor space of the Premises shall be taken by any public authority under the power of Eminent Domain, the Lease shall terminate as of the day possession shall be taken by such public authority. The Tenant shall pay rent up to that date with appropriate refund by Landlord of such rent as shall have been paid in advance for a period subsequent to the date of such taking. Either party shall have the right to terminate this Lease upon notice in writing, within thirty (30) days after such taking of possession by any public authority. In the event Tenant remains in possession, and Landlord does not so terminate, all of the terms provided shall continue in effect except that the rent shall be equitably abated, and Landlord shall make all necessary repairs or alterations to the Building and exterior work so as to constitute the remaining Premises a complete architectural unit. If more than fifty percent (50%) of the Building, but no other part of the Premises, shall be taken under the power of Eminent Domain, or if all, or substantially all, of the parking areas of the Building is taken under the power of Eminent Domain, either party may by notice in writing one to the other delivered on or before the day of surrendering possession to the public authority, terminate this Lease, and rent shall be paid or refunded as of the date of termination. All compensation awarded for rent shall be paid or refunded as of the date of termination. All compensation awarded for any taking under the power of Eminent Domain, whether for the whole or a part of the Premises, shall be the property of Landlord, whether such damages shall be awarded as compensation for diminution in the value of, or loss of, the leasehold or for diminution in the value of, or loss of, the fee of the Premises or otherwise, and Tenant hereby assigns to Landlord all of Tenant's rights, title and interest in and to any and all such compensation, provided, however, that Landlord shall not be entitled to any award made to Tenant for loss of business, or depreciation of and cost of removal of stock and fixtures.

14.     BROKERAGE COMMISSIONS. No agent(s) shall be entitled to a commission as a result of this transaction other than Michael C. Maurer of Engel & Völkers Olde Naples ("Landlord's Agent") and Michael Frye of RE/MAX Realty Group ("Tenant's Agent"). The amount of said commission shall be per the terms and conditions of the listing agreement between Landlord and Landlord's Agent, shall be split on a 50/50 basis between Landlord's Agent and Tenant's Agent, and shall be paid by Landlord upon this Lease being duly executed.

15.     DEFAULT PROVISIONS.

       (a)     Events of Default. Any of the following events, upon expiration of any stated time periods, shall constitute an Event of Default under this Lease, and shall entitle Landlord to exercise any remedy provided for in this Lease or by Law:

             1)     Payment of Rent. Failure of Tenant to pay any installment of Rent on or before the date due. Unless the failure constitutes a subsequent or continuing non-compliance within twelve (12) months of written warning by the Landlord of a similar violation, Tenant shall have five (5) days following written notice of such default within which to cure the default.

2)      Performance of Agreements. Failure of tenant to perform any other agreement or
        obligation provided for in this Lease within the time period required. Unless the
        failure constitutes a subsequent or continuing non-compliance within twelve (12)
        months of written warning by the Landlord of a similar violation, Tenant shall have
        twenty (20) days following written notice of such default within which to cure the
        default.

3)      Abandonment. If at any time Tenant shall abandon the Premises for a period
        longer than fifteen (15) days; remove therefrom a major portion of its trade fixtures,
        inventory or other property; or cease to conduct normal business activities.

4)      Levy or Attachment. Levy upon, attachment, execution, or seizure with respect to
        any of Tenant's assets located at the Premises, or of Tenant's interest in this Lease,
        by any legal action, whether by court order or judgment, or administrative action of
        any federal, state, or local government, which action is not satisfied or negated
        within thirty (30) days.

5)      Assignment or Transfer of Stock or Membership Interest. Any assignment or
        attempted assignment of this Lease by Tenant, in violation of the terms contained
        herein, or if Tenant is a corporation or limited liability company, the completion of
        any merger or consolidation or any other change of majority control, without the
        prior written consent of Landlord.

6)      Assignment for Benefit of Creditors. Tenant shall make an assignment for the
        benefit of creditors.

7)      Receiver. If a receiver of any property of Tenant in or upon the Premises be
        appointed in any action, suit or proceeding by or against Tenant and not removed
        within forty-five (45) days after appointment.

(b)     Remedies on Default. Upon the occurrence of an Event of Default, Landlord may take any
legal or equitable action available to it, and, in addition to such legal action, Landlord may take
any or all of the following actions:

1)      Possession. Take immediate possession of the Premises, with or without
        terminating the Lease, and exclude Tenant from possession, for any purpose, as
        permitted by law.

2)      Termination. Terminate this Lease, in which event it may hold Tenant liable for all
        unpaid installments of Rent together with liquidated damages in an amount equal to
        the present value of all Rent reserved hereunder for the balance of the Term.

3)      Continuation and Reletting. Landlord may continue this Lease in full force and
        effect, and attempt to relet the Premises for the benefit of Tenant. In such event,
        Tenant shall  remain liable for all obligations under this Lease together with all
        costs and expenses incurred by Landlord in attempting to relet the Premises, and
        making the Premises suitable for occupancy by a subsequent tenant. Any amounts

which Landlord is able to recover from reletting shall be credited against Tenant's liability.

4) <u>Acceleration of Balance Due</u>. Landlord may declare the entire unpaid balance of the Rent for the remainder of the Term, to be immediately due and payable, and may commence legal action for the collection thereof, including all legal fees, without having any obligation to take steps to mitigate damages resulting from Tenant's default.

5) <u>Attorney's Fees and Expenses</u>. Tenant shall be liable to Landlord for all attorney's fees and expenses incurred by Landlord in enforcing its rights under this Lease.

6) Landlord may, at its election, apply the Security Deposit to payment of any unpaid Rent or other sums due under this Lease.

7) In an action by the Landlord for possession of the Premises, if the Tenant interposes any defense other than payment, the Tenant shall pay into the registry of the court the accrued rent as alleged in the complaint or as determined by the court and the rent which accrues during the pendency of the proceeding, when due. Failure of the Tenant to pay all the rent into the registry of the court as provided herein constitutes an absolute waiver of the Tenant's defenses other than payment, and the Landlord is entitled to an immediate default without further notice or hearing thereon.

16.  <u>ASSIGNMENT AND SUBLETTING</u>.  Tenant shall not have the right to assign this Lease, nor to sublet all or any portion of the Premises without the prior written consent of Landlord, which shall not be unreasonably withheld, and then only in the manner and upon the conditions set forth in such consent, and engaged in the same business or other business reasonably acceptable to Landlord. Consent shall not be unreasonably withheld, but will be subject to Landlord's then current lease, rates, terms and conditions. Tenant shall be responsible for the payment of any attorney's or other fees required to prepare, review, and participate in such written consent.  Any assignment or subletting of the provisions under this Lease Agreement does not relieve the Tenant from any of its responsibilities, and the Tenant and Personal Guarantors shall continue to remain liable for all of the covenants, agreements, and obligations of this Lease Agreement.

Landlord shall have the right to sell, assign or transfer this lease.

17.  <u>NON-WAIVER PROVISIONS</u>.  No waiver of any condition or covenant of this Lease or failure to exercise remedy by either of the parties hereto shall be considered to imply or constitute a waiver of such condition or covenant in the future.

18.  <u>COST BORNE BY TENANT</u>.  In the event Landlord shall, without alleged fault on its part, be made a party to litigation commenced by or against Tenant, arising by reason of the occupancy of the Premises, the Tenant shall indemnify, defend, save harmless, and protect Landlord against any and all, judgments, costs and attorney's fees' incident to such litigation incurred by or against Landlord in enforcing the covenants, agreements, terms and provisions of this Lease.

19.  <u>PROHIBITION AGAINST TENANT CORPORATION OR LLC</u>.  If Tenant is a corporation or limited liability company, and if at any time during the term of this Lease a majority or all of the

corporate shares or membership interests are to be transferred by sale, assignment, operation of law, or other disposition (except transfers by gift in estate planning, bequest by Will, or inheritance) by the person or persons owning shares of said corporation or membership interest of said or limited liabilty company, as applicable, at the date of this Lease, Tenant shall notify Landlord in writing immediately of such change in control. The new entity shall be bound by all of the terms and conditions contained in this Lease Agreement.

20.    LANDLORD-TENANT RELATIONSHIP ONLY. Nothing contained herein shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent, or partnership, or of joint venture, between Landlord and Tenant, it being agreed that neither the method of computation of rents nor any other provisions named herein, nor any acts of the parties herein, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant.

21.    USE OF NUMBER AND GENDER. Whenever herein the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders.

22.    USE OF TITLES. This Lease shall be construed without reference to the titles of paragraphs, which are inserted for convenience or reference only.

23.    CONDUCT OF TENANT. Tenant or its assigns or subtenants shall not perform any acts or carry on any practices which may injure the Building and/or Land or be a nuisance or menace to other tenants in the Building, and shall at all times keep the Premises under his control. Tenant shall not in any way act, cause or become in conflict with any of the rules and regulations of this Lease Agreement or of any deed restrictions, governmental or utility agencies or any property owners association.

24.    RIGHT OF ENTRY. Landlord and his agents shall have the right at any time to enter upon the Premises, for the purpose of inspection, serving or posting notices, maintaining the Premises, making any necessary repairs, alterations or additions to any portion of the Premises (including the erection and maintenance of scaffolding, partitions and repair equipment as shall be required), complying with the laws, ordinances and regulations, protecting the Premises, or for any other lawful purpose, including showing the Premises to prospective purchasers or tenants.

25.    OPTION. The submission of this Lease for examination does not constitute a reservation of, or option for, the Premises, and this Lease becomes effective as a Lease only upon execution and delivery thereof by Landlord and Tenant.

26.    SIGNS AND OUTDOOR DISPLAY OF GOODS. Tenant shall not place or permit to be placed any signs on the interior of the glass storefront, upon, about, or outside the said Premises or any part of the Building in which the Premises are located without written permission from the Landlord, which shall not be unreasonably withheld. All signs placed on the Premises, the Building, and/or the Land shall conform to the sign ordianances and regulations of the county and city where the Building is located (if applicable). There shall be absolutely no outdoor display or storage of any materials or goods or vehicles of any kind.

27.    LIGHT AND AIR. It is agreed that this Lease does not grant a continuance of light and air over any property adjoining the Premises.

28.  PARTIAL INVALIDITY.  In the event that any provision of the Lease, or part thereof, shall be determined to be invalid, void or unenforceable by any court of competent jurisdiction, the remaining provisions, or parts thereof, shall remain in full force and effect and shall in no way be affected or impaired, invalidated or voided thereby, it being understood that such remaining provisions shall be construed in a manner so as to carry out the intent of the parties regarding the  provision(s) or parts thereof, determined to be invalid, void or unenforceable.

29.  COMPLETE AGREEMENT. All negotiations, considerations, representations and understandings between the parties are incorporated herein and may be modified or altered only by agreement in writing between the parties, and under no circumstances shall any oral or verbal representation of either party alter, amend, or modify the terms and/or provisions of this Lease.

30.  GOVERNING LAW. This Lease shall be governed according to the laws of the State of Florida.

31.  ATTORNEYS FEES. In the event that legal proceedings are necessary to enforce the terms of this Lease, the prevailing party shall be entitled to recover from the other party all costs and expenses of such proceedings, including attorneys fees, whether or not any proceedings are prosecuted to judgment.

32.  AGREEMENT BINDING ON SUCCESSORS. The covenants, agreements, and  obligations herein contained shall extend to, bind, and inure to the benefit not only of the parties hereto, but their respective personal representatives, heirs, successors and assigns.

33.  TRANSFER OR SALE OF REAL ESTATE. Landlord, or Landlord's Agent, shall have the sole and exclusive right to sell, transfer, or convey the Land and/or Building or portions of the Building upon which the Lease is a part, and Landlord shall have no further liability as to this Lease or any provisions hereof after the date of such sale, transfer or conveyance.

34.  NOTICES.  Whenever in this Lease there shall be required or permitted that notice or demand be given or served by either party one to the other, such notices or demand shall be given or served in writing, by certified or registered U.S. Mail, return receipt requested, addressed as follows:

    (a)    To the Landlord at:
           24860 S. Tamiami Trail, Suite 3
           Bonita Springs, FL 34134

    (b)    To the Tenant at:
           24850 Old 41 Road, Suite 10
           Bonita Springs, FL  34135

All rental payments shall be made to: "BERNWOOD, LLC".  Checks shall be mailed to 24860 S. Tamiami Trail, Suite 3, Bonita Springs, FL 34134.  These addresses may be changed from time to time by either party by serving notices as above provided.

35.  LEASE AGREEMENT NOT RECORDABLE.  Neither this Lease Agreement nor any counterpart shall be recorded in the Public Records of any County in the State of Florida.

36.  TIME IS OF THE ESSENCE. Time is of the essence as to all terms of this Lease Agreement.

37.    SUPPLEMENT. Notwithstanding the foregoing:

(i)    Tenant shall take possession of the Premises in its 'as is, where is' condition.

(ii)    There shall be no Tenant Improvement allowance.  Landlord shall allow Tenant, at Tenant's sole cost and expense, to improve the Premises as office/retail space.

All improvements made by Tenant shall be completed by licensed and insured contractors, and shall be finished to code. Plans and specs for any and all work that requires a permit from the city/county/state shall be submitted to Landlord for approval prior to any permit application being filed and/or any work commencing; said approval not to be unreasonably withheld, conditioned or delayed.  Permits, drawings, and applications required by the City of Bonita Springs and/or Lee County are the sole responsibility and cost of the Tenant.

(iii)    Tenant responsible for any improvements and/or modifications to the Premises which are required by municipality, building codes, and/or any other regulatory agencies, based on Tenant's intended use of the Premises.

(iv)    Tenant shall be responsible, at Tenant's sole cost and expense, for obtaining an occupancy permit and all necessary federal/state/city license(s) and permit(s) for Tenant's intended use of the property.

(v)    Landlord shall allow Tenant to install, at Tenant's sole cost and expense, signage.  Any and all signage must be approved by Landlord prior to installation; said approval not to be unreasonably withheld.  Landlord shall allow Tenant, at Tenant's sole cost and expense, to install (i) vinyl signage on one of the half lines (double sided) on the existing Pylon sign for the Property – exact location to be mutually determined and agreed upon by Landlord and Tenant, (ii) vinyl signage on the front door of the Premises, and (iii) marquee signage above the front glass storefront of the Premises.  Specs, color, and design for all the above-referenced signage to be submitted to Landlord for approval prior to installation; said approval not to be unreasonably withheld.  Installation to be by a licensed and insured sign contractor, and shall have City permits issued prior to installation, if necessary.

Tenant must install marquee signage above the front glass storefront or on the canopy above outside dining area of the Premises on or before sixty (60) days from receiving certficate of occupancy from City of Bonita Springs.  In the event Tenant fails to install said marquee signage within the sixty (60) day timeframe, Landlord shall have the option to install said marquee signage using standard specs and color for the Bernwood Centre, and bill Tenant for same.

(vi)    Landlord and Tenant acknowledge and agree that there are two (2) HVAC systems for the Premises: (1) installed on or about 2016, and (2) installed on or about 1996.

With respect to maintenance of the 2016 HVAC system: (i) Tenant shall carry (and pay for) a maintenance service contract with a reputable HVAC contractor, approved in writing by Landlord (which approval shall not be unreasonably withheld), (ii) Tenant shall provide a copy of such maintenance service contract to Landlord not less often than annually, and (iii) to the extent there is any need for maintenance or repair or replacement of the HVAC,

15

Tenant shall be responsible for having any such work completed, at Tenant's sole cost and expense, by a licensed and insured HVAC contractor.

With respect to maintenance of the 1996 HVAC system: (i) Tenant shall carry (and pay for) a maintenance service contract with a reputable HVAC contractor, approved in writing by Landlord (which approval shall not be unreasonably withheld), (ii) Tenant shall provide a copy of such maintenance service contract to Landlord not less often than annually, and (iii) to the extent there is any need for maintenance or repair or replacement of the HVAC, Landlord shall be responsible for having any such work completed, at Landlord's sole cost and expense, by a licensed and insured HVAC contractor. In the event Landlord elects to replace the 1996 HVAC System with a new system, Tenant shall then be responsible, at Tenant's sole cost and expense, for any maintenance or repairs or replacement of the new system, by a licensed and insured HVAC contractor.

Landlord to provide Tenant with a copy of affiliated warranty information for both HVAC systems.

(vii) Landlord shall allow Tenant to occupy the Premises commencing on September 1, 2017 and terminating on November 30, 2017 ("Grace Period"), with the Tenant not being responsible for the payment of any Rent during said time. Tenant shall be responsible for all utilities during the Grace Period. Tenant shall have in place all Tenant-required insurances during said Grace Period, and deliver a copy of proof of said coverages to Landlord prior to Landlord delivering possession of the Premises.

(viii) Landlord shall designate three (3) parking spaces for Tenant's use only; said spaces to be located adjacent to front entrance of the Premises. Tenant may place "Surf9 Parking Only" parking designation lettering on parking stops for said spaces; Tenant shall, at Tenant's sole cost and expense, remove said lettering and return parking stops to original condition upon Lease termination.

38.    WAIVER OF SUBROGATION.  Landlord and Tenant hereby waive all claims, rights or recovery and causes of action which either has or may have or which may arise hereafter against the other, for any damage to the Premises or property or business within or about the Premises or the Building caused by any of the perils covered by Landlord's or Tenant's insurance (required to be carried hereunder) or for which either party may be reimbursed as a result of insurance coverage affecting any loss suffered by it, provided, however, that the foregoing waivers shall apply only to the extent the foregoing waivers do not invalidate any policy of insurance of the parties hereto, now or hereafter issued, it being stipulated by the parties hereto that the waivers shall not apply in any case in which the application thereof would result in the invalidation of any such policy of insurance. Any additional premium caused by this waiver of subrogation shall be paid by the insured party.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Lease to be duly executed.

_Karen Krakora_
Witness (Sign & Print Name)
_Marey Krakora_

_____
Witness (Sign & Print Name)
ERIC CALABRESE

**LANDLORD:**
**BERNWOOD, LLC**

By:  CRM DEVELOPMENT II, LLC
Its:   **Managing Member**

   By: Steven A. Calabrese Trust u/t/a
       dated January 25, 1991, as modified
   Its: Manager

   _____
   Steven A. Calabrese, Trustee

   Date:  6/9/17

COLEEN FAYE

_____
Witness (Sign & Print Name)

_____
Witness (Sign & Print Name)
Michael J. Faye

**TENANT:**
**SURF9, LLC**

By: _____
    (Signature)

Print Name:  JOHN CHEVCINER

Print Title:  CEO

Date:  6/9/17

Telephone: _____

Address:  24850 OLD 41 ROAD

   BONITA SPRINGS  FL 34135

Email: _____

17

# EXHIBIT "A"
## LOCATION OF LEASED PREMISES



Lease Agreement Dated: _____ 6/9/17 _____

Property:      Bernwood Centre, Suite 10, 24850 Old 41 Road, Bonita Springs, FL 34135

Landlord:     BERNWOOD, LLC
             By:  CRM Development II, LLC
             Its:  Managing Member
                   By:  Steven A. Calabrese Trust u/t/a
                        dated January 25, 1991, as modified
                   Its:  Manager

             By: _____     Date: 6/9/17
                 Steven A. Calabrese, Trustee

Tenant:       SURF9, LLC

             By: _____     Date: 6/9/17

## EXHIBIT "B"

## REQUIRED DISCLOSURES

RADON GAS

Notice to Prospective Tenant:

Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health unit. Pursuant to 404.056(8), Florida Statutes.

**EXHIBIT "C"**
NNN RENT SCHEDULE AND
COMMON AREA MAINTENANCE ADJUSTMENTS

| YEAR | ANNUAL BASE RENT PSF | MONTHLY BASE RENT | ESTIMATED 1ST YEAR CAM (MONTHLY) | SALES TAX (6%)** | MONTHLY TOTAL |
|------|------|------|------|------|------|
| 1 | $5.50 | $2,312.75 | $2,733.25 | $302.76 | $5,348.76 |
| 2 | $6.00 | $2,523.00 | $2,733.25 | $315.38 | $5,571.63 |
| 3 | $6.50 | $2,733.25 | $2,733.25 | $327.99 | $5,794.49 |
| 4 | $7.00 | $2,943.50 | $2,733.25 | $340.61 | $6,017.36 |
| 5 | $7.50 | $3,153.75 | $2,733.25 | $353.22 | $6,240.22 |

(1)    Commencing on the first anniversary of the commencement date of the Lease Agreement and each subsequent anniversary date, the Base Rent for the current year shall be increased by fifty cents ($0.50) per square foot annually.

(2)    Common Area Maintenance, including taxes and insurance costs are based on current year estimates and will be adjusted to actual costs on an annual basis on January 1 of each year. Tenant shall be provided and billed said adjustments on or before 60 days subsequent to January 1.

* Amounts for Year 1 calculated on Annual Basis and do not reflect Tenant's free rent for first month of Initial Term.

** Florida Sales Tax subject to change according to Florida State Law.

Lease Agreement Dated:    6/2/17

Property:    24850 Old 41 Road, Suite 10, Bonita Springs, FL  34135

Landlord:    BERNWOOD, LLC
　　　　　　By:   CRM Development II, LLC
　　　　　　Its:   Managing Member
　　　　　　　　　By:  Steven A. Calabrese Trust u/t/a
　　　　　　　　　dated January 25, 1991, as modified
　　　　　　　　　Its:  Manager

　　　　　　　　　By:_____    Date:  6/9/17
　　　　　　　　　Steven A. Calabrese, President

Tenant:    SURF9, LLC

　　　　　　By:_____    6/9/17
　　　　　　　　　　　　　　　　　　　　　　　Date

EXHIBIT "C" (Continued)
COMMON AREA MAINTENANCE, INSURANCE AND TAXES
ESTIMATED BUDGET 2017

Common Area Maintenance:

Property Management
General & Administrative (including Accounting and Legal)
Maintenance and Repairs (including Landscape & Parking Lot Lights Maintenance)
Replacement Reserves
District & Association Charges
Electricity
Water and Sewer
Trash Removal
Irrigation
Property Taxes and Insurance*

Total 2017 Annual Estimate:      $6.50 PSF

*Insurance protection shall cover all of the development including land, building, other
 improvements and business operations; and shall include, but not be limited to:

- Fire, Extended Coverage, Vandalism, and the standard All-Risk form of insurance coverage with full
  replacement value.
- Landlord's Loss of Rents; Income; Common Area Maintenance and Reimbursable Expenses
- Comprehensive General Liability
- Other Insurance coverage that may be added from time to time.

The above insurance coverages do not include any of the Tenant's insurance requirements as outlined in
Paragraph 11 of this Lease Agreement.

Lease Agreement Dated: _____ 1 / 9 / 1 )

Property:      24850 Old 41 Road, Suite 10, Bonita Springs, FL 34135

Landlord:      BERNWOOD, LLC
               By:  CRM Development II, LLC
               Its:  Managing Member
                       By: Steven A. Calabrese Trust u/t/a
                       dated January 25, 1991, as modified
                       Its:  Manager
                               By: _____      Date: 6/9/17
                               Steven A. Calabrese, President

Tenant:       SURF 9, LLC

               By: _____      6/8/17
                                                  Date

## EXHIBIT "D"
## CONTINUING PERSONAL GUARANTY

The undersigned ("Guarantor") gives BERNWOOD, LLC, an Ohio limited liability company ("Landlord") its continuing and unconditional guarantee of the payment in full when due of any and all indebtedness (as hereafter defined) of SURF9, LLC, a Florida limited liability company ("Tenant") to Landlord, to the same extent as if Guarantor were the principal debtor of such Indebtedness. Guarantor agrees to pay and discharge each such Indebtedness of Tenant to Landlord when due, by acceleration or otherwise, in accordance with the terms of the Indebtedness thereunder, and hereby waives all notice of acceptance of this Guaranty, notice of maturity, payment or default of any Indebtedness, and any other requirement or notice necessary to bind it hereunder, including but not limited to presentment, notice of dishonor and protest. Guarantor also agrees to pay all costs (including attorney's fees incurred in collection, trial and appeal) of collection against Guarantor under this Guaranty.

The term "Indebtedness" as used herein shall mean all obligations of Tenant to Landlord, whether now or hereafter due or arising, including without limitation all rent, late fees, common area maintenance charges, all costs of collection, including reasonable attorney's fees, whether incurred in connection with collection, trial, appeal or otherwise, all other amounts which Tenant is obligated to pay Landlord under any instruments evidencing, relating to or securing the Indebtedness or any part thereof. In the event any part of the Indebtedness is paid by Tenant and because of any bankruptcy or other laws relating to creditor rights, Landlord repays any amounts to the Tenant or to any trustee, receiver or otherwise, then the amount so repaid shall again become part of the Indebtedness, the repayment of which is guaranteed hereby. The term "Indebtedness" means all monies owing by the tenant pursuant to the Lease Agreement between Landlord and Tenant, including renewals, extensions and amendments to said Lease Agreement. This Continuing Personal Guaranty shall terminate after the expiration of the twenty fourth (24th) month of the Initial Term only if (i) Tenant has made all required Rent payments on time during said twenty four (24) months, and (ii) Tenant is not and has not otherwise been in default of the Lease.

The term "Guarantor" as used herein shall mean any and all signators of this Agreement, jointly and severally.

Witness _____

Witness _____
Michael J. Fito

Signature _____

Printed Name  JOHN CHENCINER

Date  6/9/17

Residence Address  681 Fairway Terrace, NAPLES, FL 34103

Date of Birth _____

Social Security Number _____

Drivers License Number _____

Witness     GOLDEN SMITH

Witness     Michael J. Frye

Signature

JOHN CHENGWA
Printed Name

6/9/17
Date

681 Fairway Terrace, Naples, FL 34103
Residence Address

Date of Birth

Social Security Number

Drivers License Number

## ADDENDUM TO LEASE AGREEMENT

### BERNWOOD, LLC (Landlord)

### SURF 9, LLC (Tenant)

**BERNWOOD, LLC (Landlord) and SURF 9, LLC (Tenant) entered into a Lease Agreement on or about June 9, 2017 for a total leasing period for five (5) years, for 5,046 square feet of space designated as Suite 10, Bernwood Centre, 24850 Old 41 Road, Bonita Springs, FL 34135 (Premises), with a Lease Commencement date for the Original Term of December 1, 2017 and a Termination Date of November 20, 2022.  Tenant desires to lease additional space on a temporary basis at the Bernwood Centre, and Landlord is amenable to same.  Landlord and Tenant do hereby agree to the following modifications to the Lease Agreement:**

1.  Landlord and Tenant do hereby agree to Tenant leasing an additional 2,666 square feet of space designated as Suite 25, Bernwood Centre, 24850 Old 41 Road, Bonita Springs, FL 34135 ("Expansion Premises") for a one (1) year period commencing March 1, 2019 and terminating February 28, 2020 ("Expansion Lease Term"), under the same terms and conditions as stated in the Lease Agreement.

    So long as Tenant is not in default of the Lease and this Addendum, Landlord shall grant Tenant two (2) options to renew the Expansion Lease Term for an additional one (1) year; Rent (as defined herein) to be at then market rates. Tenant must notify Landlord in writing, on or before ninety (90) days from the expiration of the Expansion Lease Term, of Tenant's intent to exercise said option(s).

2.  Tenant's NNN Rent for the Expansion Premises to be as follows (said amounts to be paid in addition to Tenant's rent liabilities as stated in the Lease Agreement for Suite 10):

| YEAR | ANNUAL BASE RENT PSF | MONTHLY BASE RENT | ESTIMATED 1ST YEAR CAM (MONTHLY) | SALES TAX* | MONTHLY TOTAL |
|---|---|---|---|---|---|
| 1 | $6.00 | $1,333.00 | $1,444.08 | $172.18 | $2,949.26 |

\* Florida Sales Tax subject to change according to Florida State Law.

3.      Tenant shall pay Landlord, upon the signing of this Addendum, Five Thousand Eight Hundred Ninety Eight and 52/100 Dollars ($5,898.52) as non-refundable pre-payment of monthly Base Rent, Tenant's Proportionate Share of Common Area Maintenance and Reimbursable Expenses, and sales tax for the first and last month of the Expansion Term.

4.      Tenant shall deposit with Landlord, upon the signing of this Addendum, a Security Deposit equal to Two Thousand Nine Hundred Forty Nine and 26/100 Dollars ($2,949.26).

5.      Landlord shall allow Tenant to occupy the Expansion Premises commencing on the date this Addendum is fully executed and terminating on February 28, 2019 ("Free Rent Period"), with the Tenant not being responsible for the payment of any Rent during said time. Tenant shall be responsible for all utilities during the Free Rent Period. Tenant shall have in place all Tenant-required insurances during said Free Rent Period, and deliver a copy of proof of said coverages to Landlord prior to Landlord delivering possession of the Expansion Premises.

6.      With respect to maintenance of the HVAC system: (i) Tenant shall carry (and pay for) a maintenance service contract with a reputable HVAC contractor, approved in writing by Landlord (which approval shall not be unreasonably withheld), (ii) Tenant shall provide a copy of such maintenance service contract to Landlord not less often than annually, and (iii) to the extent there is any need for maintenance or repair or replacement of the HVAC, if the repair/maintenance is less than $500.00 per HVAC unit, Tenant shall have the repair made at Tenant's sole cost and expense; if the maintenance/repair/replacement is more than $500.00 per HVAC unit, Tenant shall notify Landlord of the need for such maintenance or repair, and Landlord must reasonably approve such required maintenance or repair before engaging in such services, and then Tenant shall be required to pay for the first $500.00 of such expense, and the Landlord shall pay the balance thereof.

        Landlord shall have the right to use Landlord's licensed and insured HVAC contractor to complete any HVAC repairs in which Landlord in participating in the payment of same.

7.      Tenant shall allow Landlord and/or Landlord's agents/contractors to enter the Expansion Premises to convert the existing shower back to an ADA compliant bathroom.  Tenant shall not be responsible for the costs associated with said work.

8.      Tenant to take possession of the Expansion Premises in its "as-is, where-is" condition.

9.    All other terms and conditions of the original Lease Agreement shall remain in full force and effect. In the event of any inconsistency or conflict between the Lease Agreement and this Addendum, the terms of this Addendum shall control.

10.    Tenant, by execution below, acknowledges that Tenant has fully read, understands, and does individually and personally guarantee all of the covenants, agreements, obligations, and payment of rents for the Lease Agreement and this Addendum.

11.    By execution below and attachment of this Addendum to the Lease Agreement, Landlord and Tenant do hereby agree to the above modifications.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

LANDLORD:

By: CRM DEVELOPMENT II, LLC
Its: Managing Member
By: Steven A. Calabrese Trust u/t/a
dated January 25, 1991, as modified
Its: Manager

Steven A. Calabrese, Trustee

Date: _1-10-19_

TENANT:

SURF 9, LLC

By: _____
(Signature)

Print Name: _JOHN CHENCINER_

Print Title: _CEO_

Date: _1-8-18_

Telephone: _____

Email: _____

# SECOND ADDENDUM TO LEASE AGREEMENT

## BERNWOOD, LLC (Landlord)

## SURF 9, LLC (Tenant)

BERNWOOD, LLC (Landlord) and SURF 9, LLC (Tenant) entered into a Lease Agreement on or about June 9, 2017 for a total leasing period for five (5) years, for 5,046 square feet of space designated as Suite 10, Bernwood Centre, 24850 Old 41 Road, Bonita Springs, FL 34135 (Premises), with a Lease Commencement date for the Original Term of December 1, 2017 and a Termination Date of November 20, 2022. On or about January 10, 2019, Landlord and Tenant entered into an Addendum to Lease Agreement, expanding the Premises by additional 2,666 square feet of space designated as Suite 25, Bernwood Centre, 24850 Old 41 Road, Bonita Springs, FL 34135 ("Expansion Premises") for a one (1) year period commencing March 1, 2019 and terminating February 28, 2020 ("Expansion Lease Term"), under the same terms and conditions as stated in the Lease Agreement. Landlord and Tenant do hereby agree to the following modifications to the Lease Agreement:

1.  Landlord and Tenant do hereby agree to an extension of the Expansion Lease Term for a one (1) year period commencing March 1, 2020 and terminating February 28, 2021 ("New Lease Term").

2.  Tenant's NNN Rent for the Expansion Premises to be as follows (said amounts to be paid in addition to Tenant's rent liabilities as stated in the Lease Agreement for Suite 10):

| YEAR | ANNUAL BASE RENT PSF | MONTHLY BASE RENT | ESTIMATED 1ST YEAR CAM (MONTHLY) | SALES TAX* | MONTHLY TOTAL |
|------|----------------------|-------------------|----------------------------------|------------|---------------|
| 1 | $7.00 | $1,555.17 | $1,444.08 | $179.96 | $3,179.21 |

   * Florida Sales Tax subject to change according to Florida State Law.

3.  Landlord shall retain Tenant's deposits: security deposit and last month's rental deposit totaling Sixteen Thousand Ninety Six and 55/100 Dollars ($16,096.55).

4.  Landlord and Tenant agree that if Tenant's leasing needs increase at any time during the term of the Lease, and Bernwood, LLC/CRM Companies, Inc. or its affiliates has a bigger space available that fits Tenant's leasing needs within one of the properties owned by Bernwood, LLC/CRM Companies, Inc. or its affiliates, and Landlord and Tenant reasonably and mutually come to an

agreement on terms for said bigger space, Landlord shall allow Tenant to move to the bigger space under a new lease agreement and this Lease shall terminate, upon Tenant taking occupancy of the new space, without penalty to Tenant.

5.    All other terms and conditions of the original Lease Agreement shall remain in full force and effect. In the event of any inconsistency or conflict between the Lease Agreement and this Addendum, the terms of this Addendum shall control.

6.    Tenant, by execution below, acknowledges that Tenant has fully read, understands, and does individually and personally guarantee all of the covenants, agreements, obligations, and payment of rents for the Lease Agreement and this Addendum.

7.    By execution below and attachment of this Addendum to the Lease Agreement, Landlord and Tenant do hereby agree to the above modifications.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

LANDLORD:

By:  CRM DEVELOPMENT II, LLC
    Its:   Managing Member
       By: Steven A. Calabrese Trust u/t/a
       dated January 25, 1991, as modified
    Its:  Manager

    Steven A. Calabrese, Trustee

    Date:  _____3/5/20_____

TENANT:

SURF 9, LLC

By: _____
    (Signature)

Print Name: _Dan Thompson_____

Print Title:  _CFO_____

Date:  __3-4-2020_____

Telephone: _

Email: _

## THIRD ADDENDUM TO LEASE AGREEMENT

### BERNWOOD, LLC (Landlord)

### SURF 9, LLC (Tenant)

**BERNWOOD, LLC (Landlord)** and **SURF 9, LLC (Tenant)** entered into a Lease Agreement on or about June 9, 2017 for a total leasing period for five (5) years, for 5,046 square feet of space designated as Suite 10, Bernwood Centre, 24850 Old 41 Road, Bonita Springs, FL 34135 (Premises), with a Lease Commencement date for the Original Term of December 1, 2017 and a Termination Date of November 20, 2022 ("Initial Lease Term"). On or about January 10, 2019, Landlord and Tenant entered into an Addendum to Lease Agreement, expanding the Premises by additional 2,666 square feet of space designated as Suite 25, Bernwood Centre, 24850 Old 41 Road, Bonita Springs, FL 34135 ("Expansion Premises") for a one (1) year period commencing March 1, 2019 and terminating February 28, 2020 ("Expansion Lease Term"), under the same terms and conditions as stated in the Lease Agreement. On Or about March 5, 2020, Landlord and Tenant entered into a Second Addendum to Lease Agreement, extending the term for the Expansion Premises for an additional one (1) year period commencing March 1, 2020 and terminating February 28, 2021.

Tenant and an affiliate of Landlord entered into a separate purchase and sale agreement on or February 15, 2021, whereby Tenant is purchasing 4.12 acres +/- of vacant land from said affiliate of Landlord ("Vacant Land PSA"). Per the terms and conditions of the vacant land PSA, Tenant and Landlord acknowledge and agree that the Expansion Lease Term was further extended to November 30, 2022.

Tenant and an affiliate of Landlord entered into a separate lease agreement on or about June _9_, 2021, for space located at Bernwood Trade Center, 9201 Cockleshell Court, Bonita Springs, FL 34135 ("Bernwood Trade Center Lease"). Per the terms and conditions of the Bernwood Trade Center Lease, Landlord and Tenant acknowledge and agree that Tenant, upon taking possession of the premises at Bernwood Trade Center, shall vacate Suite 25 at 24850 Old 41 Road, and said lease for Suite 25 shall terminate without penalty to Tenant subject to final walkthrough and Tenant payment of any and all outstanding rent/monies owed to said third party landlord entity.

Landlord and Tenant do hereby agree to the following modifications to the Lease Agreement

1.  Landlord and Tenant do hereby agree to Tenant leasing an additional 5,411 square feet of space designated as Suites 6 & 27, Bernwood Centre, 24850 Old 41 Road, Bonita Springs, FL 34135 ("New Expansion Premises") for an approximately eighteen (18) month term commencing on the date this Third Addendum is fully executed and terminating on November 30, 2022 ("New

Expansion Lease Term"), under the same terms and conditions as stated in the Lease Agreement.

2.    So long as Tenant successfully closes on the vacant land per the terms and conditions of the Vacant Land PSA (as defined above), the Initial Lease Term for Suite 10, and the New Expansion Lease Term for Suites 6, & 27, may automatically be extended (at Tenant's option) for an additional six (6) month period.

3.    Tenant must notify Landlord in writing, on or before ninety (90) days prior to the date Tenant wishes to terminate the Lease Term and the New Expansion Lease Term (or any extension thereof), of Tenant's intent to vacate.  Landlord and Tenant acknowledge and agree that the Lease Term and the New Expansion Lease Term shall not terminate before November 30, 2022.

4.    Rent Schedule for New Expansion Premises (said amounts to be paid in addition to Tenant's rent liabilities as stated in the Lease Agreement for Suite 10):

Tenant's Modified Gross Rent for the first year of the New Expansion Lease Term shall be Six Thousand Five Hundred and no/100 ($6,500.00) per month.

Common Area Maintenance (CAM) expenses for 2021 shall be based on the actual CAM expenses for calendar year 2020 ("Base Year").

Tenant's Rent shall be increased during the New Expansion Lease Term by five percent (5%) annually.

* FL sales tax subject to change - currently six percent (6%)

5.    Landlord shall retain Tenant's deposits currently in Landlord's possession: security deposit and last month's rental deposit totaling Sixteen Thousand Ninety Six and 55/100 Dollars ($16,096.55).

Said deposits shall be held by Landlord through the New Expansion Lease Term, and shall be handled as set forth in the Lease.

6.    Tenant shall, simultaneous to the execution of this Addendum, make the following deposits with Landlord for the New Expansion Premises:

| | |
|---|---|
| First Month's Rent plus sales tax: | $6,890.00 |
| Last Month's Rent plus sales tax: | $7,234.50 |
| Security Deposit: | $6,890.00 |
| Total: | $21,014.50 |

7.  HVAC for New Expansion Premises: (i) Tenant shall carry (and pay for) a maintenance service contract with a reputable HVAC contractor, approved in writing by Landlord (which approval shall not be unreasonably withheld), that services the HVAC system at least semiannually, (ii) Tenant shall provide a copy of such maintenance service contract to Landlord not less often than annually, and (iii) to the extent there is any need for maintenance or repair or replacement of the HVAC, Tenant shall be responsible for having any such work completed, at Tenant's sole cost and expense, by a licensed and insured HVAC contractor.

Landlord shall have the HVAC system serviced and in proper working condition upon Landlord delivering possession of the Premises to Tenant.

8.  All other terms and conditions of the original Lease Agreement shall remain in full force and effect. In the event of any inconsistency or conflict between the Lease Agreement and this Addendum, the terms of this Addendum shall control.

9.  Tenant, by execution below, acknowledges that Tenant has fully read, understands, and does individually and personally guarantee all of the covenants, agreements, obligations, and payment of rents for the Lease Agreement and this Addendum.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

10. By execution below and attachment of this Addendum to the Lease Agreement, Landlord and Tenant do hereby agree to the above modifications.

LANDLORD:

    BERNWOOD, LLC
      By:  CRM DEVELOPMENT II, LLC
      Its:  Managing Member
        By: Steven A. Calabrese Trust u/t/a
        dated January 25, 1991, as modified
        Its:  Manager

      Steven A. Calabrese, Trustee

      Date:  6·11-21

TENANT:

    SURF 9, LLC

    By: _____
      (Signature)

    Print Name:  JOHN CHENCINER

    Print Title:  CEO

    Date:  6/9/21

    Telephone:

    Email:

## FOURTH ADDENDUM TO LEASE AGREEMENT

### BERNWOOD, LLC (Landlord)

### SURF 9, LLC (Tenant)

BERNWOOD, LLC (Landlord) and SURF 9, LLC (Tenant) entered into a Lease Agreement on or about June 9, 2017 for a total leasing period for five (5) years, for 5,046 square feet of space designated as Suite 10, Bernwood Centre, 24850 Old 41 Road, Bonita Springs, FL 34135 (Premises), with a Lease Commencement date for the Original Term of December 1, 2017 and a Termination Date of November 20, 2022 ("Initial Lease Term").

On or about January 10, 2019, Landlord and Tenant entered into an Addendum to Lease Agreement, expanding the Premises by additional 2,666 square feet of space designated as Suite 25, Bernwood Centre, 24850 Old 41 Road, Bonita Springs, FL 34135 ("Expansion Premises") for a one (1) year period commencing March 1, 2019 and terminating February 28, 2020 ("Expansion Lease Term"), under the same terms and conditions as stated in the Lease Agreement.

On Or about March 5, 2020, Landlord and Tenant entered into a Second Addendum to Lease Agreement, extending the term for the Expansion Premises for an additional one (1) year period commencing March 1, 2020 and terminating February 28, 2021.

Tenant and an affiliate of Landlord entered into a separate purchase and sale agreement on or February 15, 2021, whereby Tenant is purchasing 4.12 acres +/- of vacant land from said affiliate of Landlord ("Vacant Land PSA"). Per the terms and conditions of the vacant land PSA, Tenant and Landlord acknowledge and agree that the Expansion Lease Term was further extended to November 30, 2022.

Tenant and an affiliate of Landlord entered into a separate lease agreement on or about June 9, 2021, for space located at Bernwood Trade Center, 9201 Cockleshell Court, Bonita Springs, FL 34135 ("Bernwood Trade Center Lease"). Per the terms and conditions of the Bernwood Trade Center Lease, Landlord and Tenant acknowledge and agree that Tenant, upon taking possession of the premises at Bernwood Trade Center, shall vacate Suite 25 at 24850 Old 41 Road, and said lease for Suite 25 shall terminate without penalty to Tenant subject to final walkthrough and Tenant payment of any and all outstanding rent/monies owed to said third party landlord entity.

Landlord and Tenant, simultaneous the signing of this Addendum, will be entering into a Termination and Release of Lease Agreement for the Bernwood Trade Center Lease.

On or about June 9, 2021, Landlord and Tenant entered into a Third Addendum to Lease Agreement further expanding the Premises by an additional 5,411 square feet of space designated as Suites 6 & 27, Bernwood Centre, 24850 Old 41 Road, Bonita Springs, FL

34135 ("New Expansion Premises") for an approximately eighteen (18) month term commencing on June 9, 2021 and terminating on November 30, 2022 ("New Expansion Lease Term"), under the same terms and conditions as stated in the Lease Agreement.

**Landlord and Tenant do hereby agree to the following modifications to the Lease Agreement**

1.  <u>Suite 10</u>: Landlord and Tenant do hereby agree to extending the Lease Term for Suite 10 for an additional three (3) year period commencing March 15, 2022 and terminating March 14, 2025 ("Suite 10 New Lease Term").

    For the Suite 10 New Lease Term (and any future extensions thereof), Tenant's Lease shall be converted from a NNN Lease to a Modified Gross Lease.  Tenant's Modified Gross Rent schedule for the Suite 10 New Lease Term shall be per the schedule below:

    | PERIOD | MODIFIED GROSS PSF ANNUAL RENT |
    |---|---|
    | 3/15/22 – 11/30/22 | $14.00 psf |
    | 12/1/22 – 3/14/23 | $14.56 psf |
    | 3/15/23 – 3/14/24 | $15.14 psf |
    | 3/15/24 – 3/14 25 | $15.75 psf |

    Rent shall be increased as outlined above.

    \* FL sales tax subject to change. Currently six percent (6%)

    Paragraph 3(d) of the Lease shall be changed as follows (Modified Gross Lease):

    *(d)      CAM Paid to Landlord (Additional Rent).  Common Area Maintenance (CAM) expenses, with the exception of any overage incurred over Landlord's estimated CAM costs (as more fully described in Paragraph 3(d)(4) below), shall be paid by Landlord as this is a modified gross Lease. CAM expenses shall include all of the expenses as more fully described in Paragraphs 3(d)(1) through (d)(3) below.  CAM expenses shall include all sums in connection with the operation, management, and control of the Building and the Land and shall be calculated on a calendar-year basis.  CAM expenses shall include, but not be limited to, the following:*

    *1)      Any additional tax that may be imposed, levied, or assessed upon the Base Rent by any governmental authority acting under any present or future law, which payment shall be made by Tenant to Landlord forthwith upon notice therefore by Landlord to Tenant and in any event before any fine, penalty,*

*interest, or costs are added to said tax. If Tenant is prohibited by law from paying such tax, Landlord may, at its election, terminate this Lease.*

*2)    Any future assessment, tax, charge or surcharge of whatever kind or description, which may be imposed by any development or utility district, community or homeowners association, and any local, state and/or federal agency to comply with any environmental protection legislation or to comply with any other rules, laws, or regulations created or to be created by such agency or authority.*

*3)    All operating costs of the Land and Building(s) for each full or partial calendar year of the Original Term hereof, and for each full or partial calendar year of the Renewal Term(s). Operating costs shall mean all items of cost and expense of whatsoever kind incurred by Landlord for operation and maintenance of the Land and Building(s), including but not limited to items covered Section 3(d) plus the following: property taxes and insurance; water and sewer of common areas; electricity; telephone; and other utility costs; the cleaning, maintenance, repair and replacement of all HVAC, plumbing, and electrical systems within the development and individual premises not paid directly by Tenant; janitorial service for Common Areas; exterior window washing; parking lot maintenance; exterior pest control; seasonal decorations; management fees; trash removal; landscape costs; and all other repairs, maintenance, replacement, reserves for replacement, and contractual operational services within the development and/or covered under Paragraph 10 (a) and 10 (b) below. This also includes the property, liability, and other required insurances and property tax estimates for the base year.*

*(4)    Tenant shall be responsible for any overage in CAM costs, if any, on a pro rata square foot basis for the Years 2022 and beyond. For estimation of CAM expenses on a go-forward basis for 2022 and beyond for purposes of reconciling any overage, the actual CAM expenses for calendar year 2021 ("Base Year") will be utilized as the basis for calculating any additional rent to be incurred by Tenant.*

*This estimate and reconciliation of CAM expenses is in accordance with sound management and accounting principles and practices generally accepted with respect to the operation of a first-class facility.*

*Tenant shall pay, as additional rent, its proportionate share (calculated pro rata based on Tenant's occupied square footage), if any, of any amount over and above the Landlord's estimated cost described above for the current year and each succeeding year of the Lease. The increase is the difference in these costs for the current year (or succeeding year) over the Base Year. Tenant's proportionate share of any increase will be reconciled and billed annually and due within thirty (30) days after the date of such billing.*

*Where occupancy of the Premises is for a partial calendar year, Tenant's proportionate share will be pro rated accordingly.*

Option to Renew: So long as Tenant is not in default of the Lease, Landlord shall grant Tenant one (1) option to extend the Suite 10 New Lease Term for an additional one (1) year ("Renewal Term"); Rent (as defined herein) to be at then market rates for similar properties in the geographical location of the Premises, but in no event shall the annual Base Rent for the first year or any year thereafter of the Renewal Term be less than the annual Base Rent for the final year of the previous Lease Term. Tenant must notify Landlord in writing, on or before one hundred twenty (120) days from the expiration of the Initial Term, of Tenant's intent to exercise said option.

2.    <u>Suites 6 & 7</u>: Landlord and Tenant do hereby agree to extending the Lease Term for Suites 6 & 7 for an additional three (3) year period commencing March 15, 2022 and terminating March 14, 2025 ("Suites 6 & 7 New Lease Term").

Tenant's Modified Gross Rent schedule for the Suites 6 & 7 New Lease Term shall be per the schedule below:

| PERIOD | MODIFIED GROSS PSF ANNUAL RENT |
|---|---|
| 3/15/22 – 11/30/22 | $14.42 psf |
| 12/1/22 – 3/14/23 | $15.00 psf |
| 3/15/23 – 3/14/24 | $15.60 psf |
| 3/15/24 – 3/14 25 | $16.22 psf |

Rent shall be increased as outlined above.

\* FL sales tax subject to change. Currently six percent (6%)

Option to Renew: So long as Tenant is not in default of the Lease, Landlord shall grant Tenant one (1) option to extend the Suites 6 & 7 New Lease Term for an additional one (1) year ("Renewal Term"); Rent (as defined herein) to be at then market rates for similar properties in the geographical location of the Premises, but in no event shall the annual Base Rent for the first year or any year thereafter of the Renewal Term be less than the annual Base Rent for the final year of the previous Lease Term. Tenant must notify Landlord in writing, on or before one hundred twenty (120) days from the expiration of the Initial Term, of Tenant's intent to exercise said option.

3.    <u>Suite 25</u>: Landlord and Tenant do hereby agree to extending the Lease Term for Suite 25 for an additional three (3) year plus fifteen (15) day period retroactively

commencing March 1, 2022 and terminating March 14, 2025 ("Suite 25 New Lease Term").

For the Suite 25 New Lease Term (and any future extensions thereof), Tenant's Lease shall be converted from a NNN Lease to a Modified Gross Lease. Tenant's Modified Gross Rent schedule for the Suite 25 New Lease Term shall be per the schedule below:

| PERIOD | MODIFIED GROSS PSF ANNUAL RENT |
|---|---|
| 3/1/22 – 3/14/23 | $14.04 psf |
| 3/15/23 – 3/14/24 | $14.60 psf |
| 3/15/24 – 3/14 25 | $15.19 psf |

Rent shall be increased as outlined above.

\* FL sales tax subject to change. Currently six percent (6%)

Paragraph 3(d) of the Lease shall be changed as follows (Modified Gross Lease):

*(d)     CAM Paid to Landlord (Additional Rent).  Common Area Maintenance (CAM) expenses, with the exception of any overage incurred over Landlord's estimated CAM costs (as more fully described in Paragraph 3(d)(4) below), shall be paid by Landlord as this is a modified gross Lease. CAM expenses shall include all of the expenses as more fully described in Paragraphs 3(d)(1) through (d)(3) below.  CAM expenses shall include all sums in connection with the operation, management, and control of the Building and the Land and shall be calculated on a calendar-year basis.  CAM expenses shall include, but not be limited to, the following:*

*1)     Any additional tax that may be imposed, levied, or assessed upon the Base Rent by any governmental authority acting under any present or future law, which payment shall be made by Tenant to Landlord forthwith upon notice therefore by Landlord to Tenant and in any event before any fine, penalty, interest, or costs are added to said tax.  If Tenant is prohibited by law from paying such tax, Landlord may, at its election, terminate this Lease.*

*2)     Any future assessment, tax, charge or surcharge of whatever kind or description, which may be imposed by any development or utility district, community or homeowners association, and any local, state and/or federal agency to comply with any environmental protection legislation or to comply with any other rules, laws, or regulations created or to be created by such agency or authority.*

3)      *All operating costs of the Land and Building(s) for each full or partial calendar year of the Original Term hereof, and for each full or partial calendar year of the Renewal Term(s).  Operating costs shall mean all items of cost and expense of whatsoever kind incurred by Landlord for operation and maintenance of the Land and Building(s), including but not limited to items covered Section 3(d) plus the following: property taxes and insurance; water and sewer of common areas; electricity; telephone; and other utility costs; the cleaning, maintenance, repair and replacement of all HVAC, plumbing, and electrical systems within the development and individual premises not paid directly by Tenant; janitorial service for Common Areas; exterior window washing; parking lot maintenance; exterior pest control; seasonal decorations; management fees; trash removal; landscape costs; and all other repairs, maintenance, replacement, reserves for replacement, and contractual operational services within the development and/or covered under Paragraph 10 (a) and 10 (b) below.  This also includes the property, liability, and other required insurances and property tax estimates for the base year.*

(4)      *Tenant shall be responsible for any overage in CAM costs, if any, on a pro rata square foot basis for the Years 2022 and beyond.  For estimation of CAM expenses on a go-forward basis for 2022 and beyond for purposes of reconciling any overage, the actual CAM expenses for calendar year 2021 ("Base Year") will be utilized as the basis for calculating any additional rent to be incurred by Tenant.*

*This estimate and reconciliation of CAM expenses is in accordance with sound management and accounting principles and practices generally accepted with respect to the operation of a first-class facility.*

*Tenant shall pay, as additional rent, its proportionate share (calculated pro rata based on Tenant's occupied square footage), if any, of any amount over and above the Landlord's estimated cost described above for the current year and each succeeding year of the Lease.  The increase is the difference in these costs for the current year (or succeeding year) over the Base Year.  Tenant's proportionate share of any increase will be reconciled and billed annually and due within thirty (30) days after the date of such billing.*

*Where occupancy of the Premises is for a partial calendar year, Tenant's proportionate share will be pro rated accordingly.*

Option to Renew: So long as Tenant is not in default of the Lease, Landlord shall grant Tenant one (1) option to extend the Suite 25 New Lease Term for an additional one (1) year ("Renewal Term"); Rent (as defined herein) to be at then market rates for similar properties in the geographical location of the Premises, but in no event shall the annual Base Rent for the first year or any year thereafter of the Renewal Term be less than the annual Base Rent for the final year of the

previous Lease Term.  Tenant must notify Landlord in writing, on or before one hundred twenty (120) days from the expiration of the Initial Term, of Tenant's intent to exercise said option.

Option to Terminate Suite 25 New Lease Term: at anytime after the expiration of the twenty fourth (24th) month of the Suite 25 New Lease Term, Tenant may terminate the Suite 25 New Lease Term without penalty by giving Landlord at least one hundred twenty (120) day written notice of Tenant's intent to terminate. In the event Tenant elects to terminate, Tenant shall be responsible for all rent payments (and other Lease liabilities) during the said one hundred twenty (120) day notice period.

Use: Tenant's use of Suite 25 during the Suite 25 New Lease term shall be limited to storage of Tenant displays and samples – no distribution of product/supplies permitted. Tenant shall not be permitted to have semi-truck deliveries after 6/1/22 without the prior written consent of Landlord, and at no time during the Suite 25 New Lease Term shall Tenant deliveries block (i) neighboring tenant spaces in the Building. (ii) Building rights-of-way, entryways and/or exits, and (iii) ingress/egress at the Bernwood Centre.

4.      Landlord shall retain (and hold per the terms of the Lease) Tenant's deposits currently in Landlord's possession: security deposit and last month's rental deposit totaling Thirty Thousand Two Hundred Twenty One and 05/100 Dollars ($30,221.05).

5.      All other terms and conditions of the original Lease Agreement shall remain in full force and effect. In the event of any inconsistency or conflict between the Lease Agreement and this Addendum, the terms of this Addendum shall control.

6.      Tenant, by execution below, acknowledges that Tenant has fully read, understands, and does individually and personally guarantee all of the covenants, agreements, obligations, and payment of rents for the Lease Agreement and this Addendum.


[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

7.   By execution below and attachment of this Addendum to the Lease Agreement, Landlord and Tenant do hereby agree to the above modifications.

LANDLORD:                    BERNWOOD, LLC
                             By:  CRM DEVELOPMENT II, LLC
                             Its:  Managing Member
                                   By: Steven A. Calabrese Trust u/t/a
                                   dated January 25, 1991, as modified
                                   Its:  Manager

                             _____
                             Steven A. Calabrese, Trustee

                             Date: ___4/4/22_____

TENANT:                      SURF 9, LLC

                             By: _____
                                 (Signature)

                             Print Name: _JOHN CHENCINER_____

                             Print Title: ___CEO_____

                             Date: _4-4-22_____

                             Telephone: _                    _

                             Email: _____