UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

FLYBAR INC.,

                 *Plaintiff*,

        -against-

EXPRESS TRADE CAPITAL INC.,
GARANTIA LLC, PETER STERN,
and DREW COHEN,

               *Defendants*.

------------------------------------------------------------------------X

Index No.: _____/2025

**<u>COMPLAINT</u>**

**JURY TRIAL DEMANDED**

       Plaintiff Flybar Inc. ("Plaintiff" or "Flybar"), by and through its attorneys, Oved & Oved

LLP, brings this action against Defendants Express Trade Capital Inc. ("Express Capital"),

Garantia LLC ("Garantia"), Peter Stern ("Stern"), and Drew Cohen ("Cohen" and collectively with

Express Capital, Garantia, and Stern, "Defendants"), and alleges as follows:

## <u>NATURE OF ACTION</u>

       1.     This action arises from Defendants' fraudulent scheme to induce Flybar to deploy

its financial and operational resources to rescue Surf 9 LLC ("Surf 9") from the brink of collapse

by promising to sell Flybar a controlling senior secured interest in Surf 9's assets only to then

turn around and arrogate the value to themselves by selling the position to another buyer.

       2.     Express Capital is a trade finance company that provides purchase order financing

and factoring services to small-to-mid-size businesses like Surf 9, which manufactures and

distributes water sports equipment and footwear pursuant to license agreements with various

brands.

3.      By Spring of 2024, Express Capital had amassed an unexpected additional $37 million of Surf 9's debt following a product recall two years earlier and was looking for ways to offload that debt to other potential lenders or equity investors.

4.      After those efforts failed, Defendants were prepared to cut their losses by ceasing funding of Surf 9's rapidly accruing liabilities to licensors and vendors and tens of millions of dollars of purchase orders from Costco when, in early September 2024, they made a desperate, last-ditch attempt to secure a potential transaction with Flybar.

5.      Defendants knew that Costco was on the verge of cancelling the purchase orders and terminating the relationship because Surf 9 had failed to timely deliver products, so they moved quickly to strike a deal with Flybar whereby they agreed to sell Express Capital's controlling senior secured interest in Surf 9's assets.

6.      In reliance on Defendants' fraudulent representations and assurances, Flybar (a) used its stellar reputation as an established consumer goods company to persuade Costco not to cancel the purchase orders, which it was hours away from doing, and (b) began funding and operating Surf 9's business, including paying liabilities to vendors and payroll obligations and deploying resources to repair damaged relationships and rebuild confidence and goodwill.

7.      Defendants also induced Flybar to fund Surf 9's Costco purchase orders prior to conducting due diligence by agreeing that Flybar would have the right to receive 100% of the proceeds from the purchase orders that it funded without any deductions.

8.      Defendants repeatedly assured Flybar that the parties had all "the material commercial points hammered out," that they intended to execute a formal written agreement with Flybar as soon as they received clearance from their accountants and auditors, and that they were not negotiating with any other potential buyers.

9.      However, after fraudulently inducing Flybar to dedicate its time, financial and operational resources, know-how and business connections to pull Surf 9 from the brink of collapse and stabilize its operations, Defendants sought to arrogate the incredible value that Flybar provided in order to secure what they viewed as a more favorable transaction from another buyer, Olden Group LLC ("Olden Group").

10.     On December 10, 2024, after dragging their feet for weeks, Defendants suddenly communicated to Flybar that they had purportedly received a last-minute offer from another buyer and would neither proceed with selling Flybar their senior secured interest in Surf 9's assets nor even honor their agreement to transfer to Flybar 100% of the proceeds from the purchase orders and related invoices that were funded by Flybar.

11.     Flybar has since learned that Defendants had been engaged in discussions with Olden Group since as early as October 2024 and intended all along to fraudulently induce Flybar to deploy its resources to fund and operate Surf 9's business in order to secure a better deal for themselves.

12.     Flybar now brings this action to recover the damages that it has suffered from Defendants' fraudulent scheme and overt breaches of the parties' agreements.

## PARTIES

13.     Plaintiff Flybar is a New Jersey corporation with its principal place of business at 220 Centennial Avenue, Piscataway, New Jersey 08854.  Flybar has been in business since 1918 and is best known as the original pogo stick company.  Since coming under new ownership in 2015, Flybar has expanded its operations globally and grown its product line from 25 pogo sticks to over 500 products in 14 different categories, including ride-on vehicles, sleds, scooters, skateboards, swings, trampolines, and more.

14.     Defendant Express Capital is a New York corporation with its principal place of business at 1410 Broadway, Suite 2600, New York, New York 10018.  Express Capital is a trade finance company that purports to specialize in purchase order financing and factoring.

15.     Defendant Garantia is a New York limited liability company with its principal place of business at 1410 Broadway, Suite 2600, New York, New York 10018.  Upon information and belief, Garantia is an investment vehicle that Stern uses to purchase distressed loans.

16.     Defendant Peter Stern is a natural person who, upon information and belief, is a citizen of Florida.  Stern is the President and CEO of Express Capital and, upon information and belief, the sole member and President of Garantia.

17.     Defendant Drew Cohen is a natural person who, upon information and belief, is a citizen of New York.  Cohen is a Senior Vice President of Express Capital, and, upon information and belief, a member or officer of several other entities controlled by Stern.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because this is a civil action where Plaintiff is a citizen of New Jersey, Defendants are citizens of New York or Florida, and the amount in controversy exceeds the sum or value of $75,000.

19.     This Court has personal jurisdiction over Express Capital and Garantia because they are entities formed under the laws of New York with their principal place of business in New York, and over Cohen because he is a natural person and a citizen of New York.

20.     This Court also has personal jurisdiction over all of the Defendants, including Stern, because the claims in this action arise from their transaction of business in New York and their commission of tortious acts within New York.

21.    Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims in this action occurred in this district.

## **FACTUAL ALLEGATIONS**

**A.    Express Capital Agrees to Provide Purchase Order Financing and Factoring to Surf 9 Before Cutting Off Its Funding and Desperately Seeking to Offload the Massive Debt**

22.    On or around August 22, 2014, Express Capital and Surf 9 entered into a Master Purchase Order Finance Agreement and a Factoring Agreement pursuant to which Express Capital agreed to provide financing and receivables collection services and Surf 9 agreed to pay interest and fees and also to be responsible for chargebacks and returns.

23.    At the time, Surf 9 had been in business for approximately nine years and had secured an exclusive license from Body Glove IP Holdings LP ("Body Glove IP") to use the *Body Glove* trademark in connection with footwear and inflatable stand-up paddleboards (the "Body Glove License Agreement").[1]

24.    Despite the high interest and fees, Surf 9 was able to grow rapidly and expand its business by (i) securing amendments to the Body Glove License Amendment to expand the scope of the license to both hard and inflatable stand-up paddleboards, surfboards, and kayaks, (ii) securing additional licenses from other brands, including Nautica and Spyder, and (iii) entering into agreements to acquire the brands Denali Outdoors and Havasu Watersports.

25.    In or around December 2022, however, Surf 9's initial success came to a screeching halt when it was forced to issue a recall for over 20,000 inflatable paddleboards that it had sold through Costco because there was a problem related to the glue

---

[1] The initial party to the License Agreement dated September 1, 2009 was Body Glove International LLC, but that entity assigned its rights to Body Glove IP in connection with the Third Amendment following a sale of the intellectual property to Marquee Brands LLC ("Marquee Brands").

separating at the seams that caused the paddleboards to deflate unexpectedly and posed a drowning hazard.

26.     As a result of the recall, Surf 9 was required, but lacked the funds, to repay tens of millions of dollars of advances from Express Capital, which caused its debt to balloon and jeopardized its ability to fund future purchase orders, working capital, royalties to licensors, and the amounts it still owed to acquire the brands Denali Outdoors and Havasu Watersports.

27.     Express Capital and Marquee Brands (which had since acquired Body Glove IP's rights under the Body Glove License Agreement) initially worked with Surf 9 to find solutions to the issues created by the recall.

28.     To that end, on or around December 22, 2023, Surf 9, Body Glove IP, and Express Capital entered into an amendment to the Body Glove License Agreement pursuant to which Surf 9 acknowledged that it was in default based on, among other things, its failure to pay certain royalties that were due and payable and Body Glove IP agreed to a reduction in the amount that was due and a payment schedule.

29.     Express Capital initially continued to provide some funding to buy time and avoid a total collapse while it explored strategies to reduce its exposure.  For example, in the Spring of 2024, Express Capital and/or Surf 9 engaged the investment bank Houlihan Lokey to attempt to raise up to $50 million of debt or equity capital.

30.     However, Surf 9 continued to default under the Body Glove License Agreement by failing to pay the agreed-upon amounts by the agreed-upon revised deadlines, and Express Capital's efforts to offload Surf 9's debt to other potential lenders or equity investors had failed.

31.     Accordingly, on September 26, 2024, Marquee Brands sent an email to Surf 9 and Express Capital with a Notice of Reservation of Rights as to the ongoing default and explained

that, in order to move forward, they would require Surf 9 to provide a detailed schedule of "the amounts due to and from Costco including what is owed due to chargebacks, etc. in Costco Canada and what the credit is for Costco USA."

32.     Faced with the tens of millions of dollars of debt already owed by Surf 9 and the potential termination of the Body Glove License Agreement, Express Capital's bank ultimately decided to mitigate its risk by instructing Express Capital to cut its losses rather than continue to provide the funding necessary to keep Surf 9 afloat.

**B.     Express Capital Induced Flybar to Save Surf 9's Business**

33.     In early September 2024, a mutual business acquaintance connected Flybar and Express Capital and suggested that there might be a mutually beneficial business opportunity.

34.     Indeed, since acquiring Flybar in 2015, Flybar's new owners had been actively seeking to expand its product line by engaging in a series of acquisitions, including for Swurfer, Kid Trax, and NSG Sporting Goods, and had established a stellar reputation as honest, skilled, and savvy operators.

35.     For its part, Express Capital was seeking to buy more time to reduce its exposure by securing funding for Surf 9 and/or using the possibility of a transaction with an established and reputable company to assuage Body Glove IP's and Costco's concerns.

36.     During an initial phone call, Express Capital's EVP David Estrakh represented to Flybar's CEO Saul Wolhendler ("Wolhendler") that Express Capital was the first-position lender and owned the majority of debt for a sporting goods company that held a number of valuable brand licenses, but faced significant challenges due to a product recall two years earlier that had resulted in $37 million of losses.  Estrakh suggested that there could be a significant opportunity for Flybar to step in with adequate funding to support the company.

37.     Following the initial call, on September 8, 2024, Estrakh sent a text message to Wolhendler with additional details and attached a "teaser" which was a four-page summary of the opportunity that had previously been prepared by the investment bank Houlihan Lokey.

38.     After Wolhendler expressed interest in the opportunity, Estrakh provided Flybar with a Non-Disclosure Agreement, identified the company as Surf 9, and arranged for Wolhendler to speak with Surf 9's founder and CEO John Chenciner ("Chenciner").

39.     On September 15, 2024, Wolhendler spoke with Chenciner who provided an overview of Surf 9's challenges and opportunities, including emphasizing that the challenges arose from a one-time recall in July 2022 that resulted in $37 million in returns and chargebacks, but Surf 9 had valuable licenses with brands such as Body Glove, Nautica, and Spyder and owned the brands Denali and Havasu.  Chenciner also represented to Flybar that Surf 9 had sold over $100 million worth of products to Costco in 2021 and already had received $50 million of purchase orders from Costco in 2024, and that Surf 9 had $6 million in sellable inventory.

40.     During the call, Wolhendler expressed concern about Surf 9's significant debt, including substantial accounts payable, and suggested that bankruptcy might be the only realistic option, but Chenciner pushed back, stating that there was an urgent need to fund the Costo purchase orders and suggested that Flybar speak with Stern about acquiring Express Capital's senior secured position in Surf 9's assets.

41.     Chenciner's eagerness to convince Flybar to move forward and pursue a transaction was hardly surprising given that Surf 9's default meant that Express Capital could exercise its rights against not only Surf 9's assets but also the personal assets of Chenciner and Surf 9's Chief Operating Officer Marshall Crosby ("Crosby").

42.     Following the conversation with Chenciner, Wolhendler and Flybar's other principal Abe Goldberger ("Goldberger") arranged a call with Stern to negotiate the terms of a potential purchase of Express Capital's position and, ultimately, agreed on a framework for a deal. Specifically, the parties agreed that Express Capital would agree to sell to Flybar $27 million of Surf 9's indebtedness to Express Capital and the rights to the collateral, so that Flybar could acquire Surf 9's assets, including the valuable brand licenses, through a UCC secured party sale. In exchange, Flybar would agree to pay a total of $5 million, with $2 million paid upfront in cash and $3 million paid over time and secured by a promissory note, plus a percentage share of profits up to a maximum of $5 million.

43.     Although Express Capital and Flybar had agreed on the essential terms of the deal, Wolhendler informed Stern that Flybar would need assurances from Marquee Brands that they supported the deal and would assign the Body Glove License Agreement.

44.     Thereafter, on September 30, 2024, Marquee Brands' EVP Peter Maule ("Maule") sent an email to Wolhendler and Chenciner stating that, based on his conversations with Express Capital, it was his understanding that Flybar and Express Capital had "come to a deal regarding the Surf 9 business" and that Marquee Brands supported the deal and suggested that they have a call in the morning given the upcoming Rosh Hashanah holiday and the fact that "critical orders for[] Costco need to be fulfilled."

45.     The next day, on October 1, 2024, Express Capital's CEO (Stern), Surf 9's CEO (Chenciner), Marquee Brands' EVP (Maule), and Flybar's CEO (Wolhendler) participated in a call with Costco buyers Ryan Jordan ("Jordan") and Jeff Taylor ("Taylor").

46.     During that call, Jordan expressed Costco's immense frustration with Surf 9's delays in fulfilling its purchase orders, stating that Costco was "done" with listening to excuses and was "hours away" from cancelling all of the purchase orders unless it saw immediate action.

47.     Chenciner responded by informing Costco that Flybar had made a deal such that it would be providing funding for the purchase orders and Costco would begin seeing products delivered immediately.

48.     Based on the representations from Express Capital and Stern that the parties had reached a deal, Wolhendler confirmed to Costco that Flybar had just stepped in and was looking for a long-term relationship and would do whatever was in Flybar's power to ensure Costco's products are shipped on time.

49.     Based on Flybar's assurances, Costco agreed not to cancel the purchase orders, but advised that if the products were not delivered on time, then it would immediately cease doing business with Surf 9, and further insisted that Surf 9 provide letters from the factories confirming that the purchase orders would be filled and photographs showing that production had started.

**C.     Express Capital Induces Flybar to Fund and Operate
Surf 9's Business and Confirms its Agreement to Transfer
to Flybar 100% of the Revenue from Any Purchase Orders Funded by Flybar**

50.     Following the call with Costco, Express Capital's CEO (Stern) and Surf 9's CEO (Chenciner) called Flybar's CEO (Wolhendler) and pleaded with him to provide immediate funding for the purchase orders in order to preserve the relationship with Costco.

51.     To induce Flybar to agree to immediately provide the funding, Stern circulated a proposed letter of intent memorializing the key terms of the deal for Flybar to acquire Express Capital's senior secured interest in Surf 9's assets (the "Debt Sale Agreement").

52.     The next day, on October 2, 2024, Stern agreed that, in the interim, if Flybar funded the purchase orders then Express Capital would transfer to Flybar 100% of the proceeds from the purchase orders and related invoices with no deductions (the "Purchase Order Agreement").

53.     Wolhendler sent an email to Stern memorializing the parties' agreement regarding funding for purchase orders:

> In an interest to give us us [sic] time to do our Due Diligence and make sure that we are all properly protected all while Costco keeps getting their product.  You are allowing Flybar to fund PO's that need to ship ASAP to Costco.  Once Flybar Funds and Costco receives the product and payment is made to ETC, ETC will transfer the payment in full to Flybar with no deductions.  There will be no deductions from previous Costco transactions.

54.     Stern immediately responded by confirming the agreement: "Yes, we'll forward collections related to the goods you financed."

55.     In reliance on the Purchase Order Agreement, Flybar agreed to fund the Costco purchase orders and communicated directly with factories, warehouses, and third-party logistics providers to confirm that it would provide funding and to arrange the wire transfers.

56.     As a result of Flybar's assurances that it would provide funding, the factories, warehouses, and third-party logistics providers agreed to release products that were being held at ports, and other factories provided letters confirming that they had agreed on payment terms, received the purchase orders, and expected to meet the schedules set forth in the purchase orders.

57.     Chenciner informed Costco that they would immediately receive the products that had been held at the ports and also forwarded to Costco the letters from the factories regarding future purchase orders, which assured Costco that immediate action was being taken, averted the cancellation of the purchase orders, and preserved Surf 9's vital relationship with Costco.

**D.    Flybar Exercises Its Option to Proceed with the Deal
and Deploys Massive Resources to Fund and Operate Surf 9's Business**

58.    After funding the purchase orders and beginning to conduct due diligence, Flybar discovered significant additional issues that had not previously been disclosed, including significant accounts payable to vendors, an over $2 million debit balance with Costco Canada, over $1 million of royalties owed to Marquee Brands, over $2 million in unpaid warehouse fees, and significant returns and unsellable goods included in the purported $6 million of inventory.

59.    Despite these issues, Flybar elected to proceed with the transaction given the amount of time and capital that it had already invested.

60.    Accordingly, on or around October 15, 2024, Wolhendler had a call with Stern during which he stated that Flybar would proceed with the transaction, and Stern confirmed that Express Capital was ready, willing, and able to proceed and that Flybar could begin integrating Surf 9 into Flybar and doing "what the [Surf 9] business needs to make it profitable."

61.    In light of these assurances and the urgent issues that needed to be addressed, Flybar began to take over all aspects of funding and operating Surf 9's business.

62.    In the process of taking over Surf 9's operations, Flybar discovered more issues, including that Surf 9's insurance policies were lapsing, it owed another $2 million to finance and factor company Milberg Factor Inc., it failed to make a final payment for the acquisition of the brands Denali Outdoors and Havasu Watersports, and it was even behind on its payroll and payroll taxes and, thus, facing an imminent loss of essential employees and liability to tax authorities.

63.    Flybar devoted considerable resources to addressing these urgent issues, including providing funding for various obligations and liabilities and allocating substantial time and personnel to rebuilding confidence and goodwill with vendors and other stakeholders.

64.     In particular, Flybar provided funding to enable Surf 9 to pay factories, warehouses, and third-party logistics providers, payroll obligations and payroll taxes, insurance premiums, and the remaining amounts that it owed for the acquisition of the brands Denali Outdoors and Havasu Watersports, all of which were payments that were essential to ensuring that Surf 9 would be able to deliver products to Costco and preserve its vital relationship with Costco.

65.     Flybar also visited factories in China that were unwilling to do business with Surf 9 due to outstanding debts and used Flybar's own goodwill and reputation to revive these relationships and negotiate better terms, including forgiveness of over $2 million of Surf 9's debt.

66.     In total, Flybar's investment of capital alone in Surf 9 amounted to more than $5 million, which included funding in connection with (i) the Costco purchase orders, (ii) deposits for future purchase orders, (iii) logistics and transportation and shipping costs, (iv) inventory storage and warehouse charges, (v) payroll expenses for the Surf 9 team and the Flybar team that was performing work for Surf 9, (vi) other necessary operating expenses, (vii) Surf 9's liabilities, including credit card payments, and (viii) legal fees associated with the acquisition of Express Capital's senior secured interest in Surf 9's assets.

67.     At all relevant times, Defendants induced Flybar to fund and operate Surf 9's business by repeatedly assuring Flybar the deal was done and fraudulently misrepresenting that they were not negotiating with other potential buyers.

68.     For instance, in mid-October 2024, Goldberger received a phone call from a business contact, stating that he had heard that another buyer was trying to raise capital to buy Express Capital's position in Surf 9.

69.     Goldberger immediately confronted Stern to ask whether Express Capital was secretly engaging in talks with other potential buyers while inducing Flybar to fund and operate

Surf 9's business, and Stern responded by reassuring Golberger that Express Capital was not considering any other buyer and fully intended to close a transaction with Flybar.

70.    In addition,  on October 30, 2024, Marquee's EVP (Maule) sent an email to Flybar's CEO (Wolhendler), Express Capital's CEO (Stern), and Surf 9's CEO (Chenciner) requesting "an update on the deal status between Flybar/ETC/Surf 9" because "[w]e are at a critical juncture and need to ensure we have a path forward with appropriate legal paperwork prepared."

71.    Stern apparently forwarded the email internally to his team to strategize regarding how to respond and, ultimately, sought to distance himself from the fraud by responding through an intermediary who was not included on the initial email.

72.    Later that day, Cohen responded by reassuring Marquee that the "Flybar deal is moving along nicely" and that Wolhendler recently had "dinner with Peter (Stern) and then … was in Surf 9's offices all day yesterday [October 29]."

73.    As Flybar later discovered, these representations were entirely false and designed to induce Flybar to continue funding and operating Surf 9's business, so that it would be a healthier business and Defendants could negotiate a better deal with another buyer.

74.    In fact, Flybar discovered later that Defendants had entered into an initial letter of intent with either Yechiel Shimon Sprei a/k/a Sam Sprei ("Sprei") or his entity, Olden Group, on October 10, 2024, but continued to induce Flybar to fund and operate Surf 9's business by lying to Flybar about the existence of these negotiations.

**E.    Express Capital Confirms Multiple Times that the Parties
        Have an Agreement on All the Material Commercial Points for the Transaction**

75.    In early November 2024, Wolhendler reiterated his concern about Flybar continuing to deploy considerable resources to fund and operate Surf 9's business without

having a formal and fully executed written agreement in place codifying the agreed-upon terms of the Debt Sale Agreement.

76.     To induce Flybar to continue deploying its resources, Stern immediately reached out to Wolhendler to continue to string him along by purporting to finalize the remaining and outstanding terms of the agreement relating to the structure of the payments of the purchase price, including the guarantee of the deferred portion of the purchase price that would be secured by a promissory note.

77.     On November 7, 2024, Wolhendler sent an email to Stern memorializing their agreement that Flybar would pay $2 million at closing and $3 million over four years secured by a promissory note from Flybar, a personal guarantee from Wolhendler that would be released upon Express Capital's receipt of $3 million in the aggregate from either payments on the note or the profit sharing arrangement, and a "bad boy" guarantee from Goldberger.

78.     The next day, on November 8, 2024, Cohen responded by stating that "per my conversation with Peter [Stern], we agree to the below as this seems to be a very reasonable middle ground" and further stating that the parties "now have the material commercial points hammered out" and, thus, Flybar's attorneys should reach out to Express Capital's General Counsel Ben Ellis ("Ellis") "to finalize a definitive agreement."

79.     Later that day, Cohen sent a follow-up email memorializing a phone conversation with Wolhendler during which they agreed that Ellis "will be responsible for the first draft definitive agreement" and there was no need for an interim "LOI or intercreditor [agreement]" given that the parties had already agreed on the material terms in their emails.

80.     On November 10, 2024, Wolhendler sent an email to Cohen confirming that "all below [in his November 8 email] is agreed."

81.     Based on these assurances that the parties had reached an agreement regarding "the material commercial points" and would proceed to drafting a definitive agreement, Flybar continued to deploy its resources to fund and operate Surf 9's business.

82.     To that end, Wolhendler asked Marquee's EVP (Maule) to provide a letter authorizing Flybar to act as a non-exclusive sourcing agent of Surf 9 in connection with the Body Glove licensed products, and Maule promptly provided the letter on November 15, 2024.

83.     However, Defendants continued to conjure stall tactics.  This time, on November 13, 2024, Cohen sent an email to Wolhendler in which he suddenly reversed course, purportedly based on a "call with Peter [Stern] and Ben [Ellis] this afternoon," and stated that Ellis would "send [Flybar's] lawyers a term sheet this week so its easier to work towards a definitive agreement."

84.     On November 16, 2024, Express Capital's General Counsel (Ellis) sent an email to Wolhendler and Flybar's attorney attaching "the LOI for this deal" and stating that "[o]nce we are on the same page here we can start working on the definitive agreements."

85.     The next day, on November 17, 2024, Wolhendler responded by requesting a call to discuss a few minor differences between what was in the LOI and what was already agreed upon and also to get clarity on a few items.

86.     On November 18, 2024, the parties participated in a call to address these issues.

87.     That same day, Ellis sent an email to Wolhendler setting out Express Capital's understanding of the parties' agreement on the issues they discussed, which were limited to (i) the terms of the profit sharing arrangement; (ii) the distribution of the factoring proceeds and the timing for termination of the factoring agreement; and (iii) the timing for Express Capital to assign the UCC-1 given its desire to continue providing factoring services after closing.

88.    Ellis acknowledged that the parties had reached an agreement on these issues, including that the factoring agreement would be terminated after Express Capital collected the existing accounts receivable relating to amounts that were financed by Express Capital and other lenders (as set forth in an attached spreadsheet) and that Express Capital would add Flybar to the UCC-1 as an additional secured party and enter into an intercreditor agreement memorializing their respective rights as senior secured creditors.

89.    On November 22, 2024, Wolhendler and Stern participated in another call to address (i) Flybar's frustration with continuing to deploy resources to fund and operate Surf 9's business without a finalized agreement and (ii) Express Capital's insistence on charging fees for factoring services on purchase orders that were funded by Flybar despite the Purchase Order Agreement expressly providing that Express Capital agreed to "transfer the payment [from Costco] in full to Flybar with no deductions."

90.    To induce Flybar to continue deploying its resources, Stern responded by reassuring Wolhendler that Express Capital was ready, willing, and able to move forward with the transaction and that it would be retroactive to October 2, 2024 when Flybar began to fund and operate Surf 9's business.

91.    Despite Stern's assurances that the parties had reached a deal to proceed and Cohen's assurances two weeks earlier that the parties had agreed on "the material commercial points" and there was no need for a LOI, Defendants continued to engage in bad faith stall tactics.

92.    On November 27, 2024, Ellis circulated an updated LOI reflecting the parties' agreement on the issues memorialized in the email that he had sent over a week earlier on November 18, but he failed to update the terms of the profit-sharing arrangement.

93.    After Wolhendler pointed out that Ellis had neglected to update those terms and requested that he do so, Ellis recirculated an updated draft and Flybar's attorney responded within hours by providing a redline and clean document with minor revisions.  On November 29, 2024, Wolhendler followed up with Ellis to request that he "review the few minor changes so we can move to signing and next steps," but Stern responded that "[o]ur office is closed today" and "[w]e'll be back on Monday."

94.    On December 2, 2024, Flybar's attorney followed up yet again, but Cohen responded that Ellis still was not back in the office and would respond the next day – i.e., Tuesday.

95.    The next day, on December 3, 2024, Wolhendler followed up yet again and Ellis finally responded that "[w]e are generally fine with your latest edits to the LOI," but suddenly insisted that "the indebtedness belongs to [Express Capital] and must be transferred to Garantia (Peter's private investment vehicle) before we can do  the deal" and that they were still "waiting for [their] accountants/auditors to get back to [them] on booking and tax issues that need to be resolved" so they would "be in touch as soon as [they] get that taken care of."

96.    Wolhendler continued to follow up, but Defendants either ignored his calls and emails or reassured him that they expected to imminently receive the purportedly necessary tax clearance, including on December 5, 2024 when Cohen sent an email to Wolhendler stating "saw missed calls today; I am at a conference but I followed and was promised a final opinion by EOD tomorrow."

97.    Upon information and belief, all these statements were either false and/or made in bad faith in furtherance of Defendants' efforts to induce Flybar to continue to fund and operate Surf 9's business while knowing full well that Express Capital had no intention of honoring its end of the Purchase Order Agreement or the Debt Sale Agreement.

**F.    Express Capital Welches on the Deal and Flybar Discovers the Fraud**

98.    Wolhendler continued to follow up with Defendants, but they ignored his calls until Wolhendler finally reached out to Surf 9 directly to inform Chenciner that, in light of the lack of communication from Defendants and growing discomfort with their conduct, he intended to cease providing funding and to seek to preserve Flybar's reputation by reaching out to Costco to inform them of these issues.

99.    Faced with the prospect of Flybar contacting Costco, on December 10, 2024, Cohen finally sent an email to Wolhendler purporting to notify him that Express Capital purportedly had "received a compelling counteroffer to purchase S9's $27M debt" and that "[a]ccepting this offer is in the best interest of [Express Capital]."

100.    While Cohen stated that Express Capital "wanted to provide [Flybar] with an opportunity to beat this offer," he did not provide the terms of the offer.

101.    Immediately after receiving this email on December 10, 2024, Flybar was locked out of the Costco portal where it had previously been able to track the purchase orders that it funded and also shortly thereafter received emails and letters from the factories—including the very same factories that Flybar secured for Surf 9—stating that they were instructed to no longer communicate with Flybar.

102.    Flybar has since learned that on December 10, 2024, Defendants also sent an email to Marquee Brands purportedly following up on a conversation that had taken place the prior week on December 3 by stating that Express Capital had "accepted a compelling last-minute alternative offer and has now sold S9's debt" because it believed that doing so was "in the best interest of [Express Capital]."

103.    Express Capital purported to introduce Marquee Brands to the new debtholder's attorney who followed up by informing Marquee Brands that his client, Olden Group, had already commenced an action in New York Supreme Court for Kings County and obtained an *ex parte* temporary restraining order enjoining Marquee Brands from terminating the Body Glove license.

104.    Based on documents filed in that litigation, Flybar learned that Defendants had been making false representations for months, including that they intended to close a transaction with Flybar, that they were not engaged in discussions with any other potential buyer, and that they received a sudden and compelling last-minute offer but were willing to give Flybar an opportunity to beat it.

105.    For example, the letter of intent is purportedly an amended and restated version of a letter of intent that was signed back on October 10, 2024.  This demonstrates that Defendants' assurances that they intended to close a transaction with Flybar and were not engaged in discussions with any other potential buyer were false.

106.    In addition, Olden Group's binding letter of intent with Express Capital and Garantia was dated December 9, 2024.  Thus, at the time that Defendants were purporting to offer Flybar the opportunity to make a competing bid, they had already entered into a binding agreement to sell Express Capital's position to Olden Group.  Accordingly, Express Capital's offer to allow Flybar to make a competing offer was just a disingenuous attempt to lend credibility to Defendants' fraudulent scheme.

107.    Moreover, despite acknowledging in the letter of intent that Express Capital assigned to Flybar the proceeds of the purchase orders that were funded by Flybar and has collected substantial proceeds, Express Capital has materially breached and repudiated the Purchase Order Agreement by failing to transfer those proceeds to Flybar.

**AS AND FOR THE FIRST CAUSE OF ACTION**
**(Breach of Contract – Debt Sale Agreement –**
**Against Express Capital and Garantia)**

108.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein at length.

109.    The Debt Sale Agreement is a valid and binding agreement.

110.    As set forth above, Flybar either performed or was ready, willing, and able to perform all of its obligations as set forth in the Debt Sale Agreement.

111.    As set forth above, Express Capital and Garantia materially breached and repudiated the Debt Sale Agreement.

112.    As a result of the foregoing, Flybar has been damaged in an amount to be determined at trial but no less than $20 million.

**AS AND FOR THE SECOND CAUSE OF ACTION**
**(Breach of Contract – Purchase Order Agreement –**
**Against Express Capital)**

113.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein at length.

114.    The Purchase Order Agreement is a valid and binding agreement.

115.    As set forth above, Flybar performed all of its obligations under the Purchase Order Agreement.

116.    As set forth above, Express Capital materially breached and repudiated the Purchase Order Agreement.

117.    As a result of the foregoing, Flybar has been damaged in an amount to be determined at trial but no less than $5 million.

## AS AND FOR THE THIRD CAUSE OF ACTION
### (Fraud Against Express Capital, Garantia, and Stern)

118.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein at length.

119.    As set forth above, Defendants made numerous false statements and materially misleading omissions in their communications with Plaintiff in order to induce Plaintiff to invest massive funds, labor, and time in managing and operating Surf 9's business.

120.    As set forth above, Defendants knew that these statements were false and that their omissions were materially misleading at the time that they made them.

121.    As set forth above, Plaintiff reasonably relied on Defendants' false statements and materially misleading omissions.

122.    As a direct and proximate result of Defendants' false statements and materially misleading omissions, Plaintiff has suffered damages in an amount to be determined at trial but no less than $20 million.

## AS AND FOR THE FOURTH CAUSE OF ACTION
### (Aiding and Abetting Fraud Against Express Capital, Garantia, and Stern)

123.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein at length.

124.    As set forth above, Defendants engaged in a fraudulent scheme to induce Plaintiff to invest massive funds, labor, and time in managing and operating Surf 9's business.

125.    As set forth above, each of the Defendants was aware of the fraudulent scheme.

126.    As set forth above, each of the Defendants provided substantial assistance to advance the fraudulent scheme.

127.    As a direct and proximate result of Defendants' aiding and abetting the fraudulent scheme, Plaintiff has suffered damages in an amount to be determined at trial but no less than $20 million.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Unjust Enrichment Against Express Capital and Garantia)**

128.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein at length.

129.    As set forth above, Express Capital and Garantia have been unjustly enriched by reaping the benefits of Plaintiff's significant expenditures of money, time, and resources.

130.    As set forth above, Express Capital and Garantia obtained these benefits at Plaintiff's expense.

131.    Principles of equity and good conscience do not permit Express Capital and Garantia to retain the value of Plaintiff's money, time, and resources.

**JURY DEMAND**

Plaintiff demands a jury trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff hereby requests that the Court grant the following relief:

a.    On the first cause of action, a money judgment in Plaintiff's favor and against Express Capital and Garantia, jointly and severally, in an amount to be determined at trial, but in no event less than $20 million;

b.    On the second cause of action, a money judgment in Plaintiff's favor and against Express Capital in an amount to be determined at trial, but in no event less than $5 million;

c.    On the third cause of action, a money judgment in Plaintiff's favor and against Express Capital, Garantia, Stern, and Cohen, jointly and severally, in an amount to be determined at trial, but in no event less than $20 million, plus punitive damages;

d.  On the fourth cause of action, a money judgment in Plaintiff's favor and against Express Capital, Garantia, Stern, and Cohen jointly and severally, in an amount to be determined at trial, but in no event less than $20 million, plus punitive damages;

e.  On the fifth cause of action, a money judgment in Plaintiff's favor and against Express Capital and Garantia, jointly and severally, in an amount to be determined at trial, but in no event less than $10 million;

f.  Pre- and post-judgment interest;

g.  Plaintiff's costs and disbursements incurred in this suit;

h.  Plaintiff's attorneys' fees to the full extent permitted by law; and

i.  Any such other and further relief as the Court may deem just and proper.


Dated:  New York, New York
        January 21, 2025


By: */s/ Andrew J. Urgenson*
Terrence A. Oved, Esq.
Andrew J. Urgenson, Esq.
Jonathan P. Gordon, Esq.
OVED & OVED LLP
*Attorneys for Plaintiff*
401 Greenwich Street
New York, New York 10013
Tel.: 212.226.2700