Ira L. Herman
Evan J. Zucker
**BLANK ROME LLP**
1271 Avenue of the Americas
New York, New York 10020

Ira.Herman@BlankRome.com
Evan.Zucker@BlankRome.com
(212) 885-5000

*Attorneys for Body Glove IP Holdings, LP*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | |
| Surf 9 LLC, | Chapter 11<br>Case No. 25-40078-JMM |
| Debtor. | |

## MOTION OF BODY GLOVE IP HOLDINGS, LP FOR ENTRY OF AN ORDER (I) DEEMING THE LICENSE AGREEMENT REJECTED AND TERMINATED, AND (II) FOR RELIEF FROM THE AUTOMATIC STAY, AND RELATED RELIEF

Body Glove IP Holdings, LP ("**Licensor**"), by and through its undersigned counsel, files this motion (the "**Motion**") seeking entry an order, substantially in the form attached hereto as Exhibit A, deeming the License Agreement (as defined below) rejected pursuant to 11 U.S.C. § 365 and terminated, for relief from the automatic stay pursuant to 11 U.S.C. § 362 and related relief, and respectfully states as follows:

### JURISDICTION AND VENUE

1.      On January 8, 2025 (the "**Petition Date**"), the above-captioned debtor and debtor-in-possession (the "**Debtor**") commenced a bankruptcy case by filing a petition for relief under title 11 of the United States Code.

2.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* dated December 5, 2012.

3.     Venue over this Motion in this Court is proper under and pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

4.     Licensor is the owner of the intellectual property connected to the well-known Body Glove outdoor active brand, including the "BODY GLOVE" and "HAND DESIGN" trademarks, used in connection with a variety of products and services including wetsuits, swimwear, and other surfing equipment.

I.     **THE LICENSE AND DEBTOR'S MULTIPLE MONETARY AND NON-MONETARY DEFAULTS**

5.     In 2009, Body Glove International Inc., Licensor's predecessor in interest, entered into a License Agreement with Debtor, Surf 9, a Florida-based sporting goods manufacturer, for the use of the "BODY GLOVE" and "HAND DESIGN" trademarks (as amended and modified, the "**License Agreement**") in certain territories and in connection with certain specified goods.[1]

6.     The Debtor has an exclusive right to sell only certain Licensed Products solely within the agreed upon territories. The Debtor does not have the exclusive right to use Licensor's trademark on all products and product categories within the specified territory. For example, the Debtor has a specifically granted license to sell stand-up paddle boards, but not baseball caps with the Body Glove trademarked logo, in the agreed territory. Additionally, the License Agreement provides that the Licensor retained the right to license its mark to a third-party and Licensor shall coordinate and control the designs on all licensed products including Licensee's Licensed Products *See* License Agreement § 2(a). The License Agreement further provides that the Debtor did not

---

[1] All capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the License Agreement.

4

acquire any rights or interest in the trademark(s) or goodwill and that the Licensed Rights are owned solely and exclusively by the Licensor. *Id.* at § 12.

7.      The License Agreement, among other things, further provides, as follows:

     a.      The Debtor acknowledges and agrees that any and all goodwill arising from the Debtor's use of the Licensed Rights shall inure solely to the benefit of Licensor, and neither during nor after the termination of the License Agreement may Debtor assert any claim to such goodwill. License Agreement, § 3(b).

     b.      Debtor shall pay Licensor a Royalty plus a Marketing Contribution. License Agreement, § 5.

     c.      Payments made shall be based upon the greater of (i) the Net Sales of Licensed Products of each month of each Contract Year or Option Year; or (ii) the applicable Guaranteed Minimum Monthly Royalty. License Agreement, § 6.

     d.      In the event any errors or discrepancies are discovered during any audit or if payments due exceed ten percent (10%) of payments actually made, Debtor shall immediately pay the cost of the audit, any unpaid royalties plus interest calculated from the date such payments were due, and applicable late fee penalties. License Agreement, § 7(b).

     e.      Debtor agrees that it shall not grant, assign, sub-license or otherwise convey or transfer any rights inuring to the Debtor or any obligation or duties owed by Debtor to Licensor without the prior written consent of Licensor and any attempted transfer or assignment shall be null and void. License Agreement, § 13.

     f.      Debtor shall at all times during the term of the License Agreement and thereafter defend, indemnify, and hold Licensor and its officers, directors, agents, and employees, harmless from any and all claims, suits, damages, liabilities, costs and expenses, which arise or occur with respect to Debtor's operation of its business as it relates to the License Agreement. This indemnification includes, but is not limited to, court costs and reasonable attorneys' fees, and Licensor shall have the right to defend any action or proceeding with the attorney of its own selection. License Agreement, § 15(c).

8.      The License Agreement, as amended from time to time, terminates on December 31, 2027, unless the Debtor is eligible to exercise an option to extend the expiration date. Here, the Debtor is not eligible to exercise the option to extend the License Agreement, absent the

5

consent of the Licensor, in as much as the Debtor has failed to meet the requirements for a subsequent extension, which breaches, including those set forth below, cannot be cured. Specifically, the License Agreement provides that:

> If Licensee is not in default or breach under the License Agreement, and has achieved an aggregate of at least $20,000,000 in Net Sales of Licensed Products during Contract Year 2026, and at least 30% of Licensee's Net Sales of footwear are casual footwear products, and "isups" and "inflatable kayaks" are at least 25% of Licensee's total Net Sales for Calendar Year 2026 (or 15% if Costco is no longer a customer of "isups" and "inflatable kayaks"), Licensee shall be granted an option to renew the License Agreement for a period of five (5) years beginning on January 1, 2028 and ending on December 31, 2032 ("Option Period 2"), at the minimum guaranteed payment amounts listed below in Section 8 upon notice to Licensor to be received no later than January 1, 2027.

Third Amendment to License Agreement, ¶ 3.

9.    On December 22, 2023, the Debtor and Licensor entered into that certain *Sixth Amendment to License Agreement and Forbearance Agreement* (the "**Sixth Amendment**"). In the Sixth Amendment, the Debtor acknowledged certain existing defaults under the License Agreement including: (a) failure to provide timely and accurate Royalty reporting in accordance with the License Agreement; (b) failure to timely and accurately remit quarterly Royalties as of September 23, 2023; and (c) failure to timely pay amounts related to the Audit Shortfall, including the Audit Shortfall Amount (collectively, the "**Existing Events of Default**").

10.    The Sixth Amendment additionally provides that as a result of an audit for the period beginning January 1, 2019 and ending December 31, 2021, it was discovered that Debtor failed to pay to Licensor earned Royalties and Marketing Contribution with respect to the Audit Period equaling Two Million Two Hundred Thirteen Thousand Two Hundred Eighty-Four United States Dollars ($2,213,284), a portion of which was attributable to unpaid Marketing Contribution ("**Unpaid Marketing Contribution**").  The Unpaid Marketing Contribution is equal to Seven

Hundred Twenty-Nine Thousand Six United States Dollars ($729,006). Debtor claimed that the Parties had agreed that, instead of Debtor paying the Unpaid Marketing Contribution to Licensor in accordance with the terms and conditions of the License Agreement, Debtor was supposed to retain the Marketing Contribution and spend it on marketing and promotion of the Marks and Licensed Products in the Territory; however, the Parties never executed any written amendment to the License Agreement to support Debtor's claim. Notwithstanding the fact that no written agreement between the Parties exists to support Debtor's claim, Licensor agreed, during the Forbearance Period (as defined in the Sixth Amendment), to forbear from exercising Licensor's rights and remedies to collect on Licensee's obligation to pay the Unpaid Marketing Contribution to Licensor and agreed to reduce the Audit Shortfall by an amount equal to the Unpaid Marketing Contribution (*i.e.*, a remaining balance of the Audit Shortfall Amount equaling $1,484,278).

11.    Additionally, Licensor  agreed in the Sixth Amendment to reduce the Audit Shortfall amount by an additional Eighty Four Thousand Two Hundred Seventy-Eight United States Dollars ($84,278) and accept the sum of One Million Four Hundred Thousand United States Dollars ($1,400,000) (the "**Net Audit Shortfall Amount**"), to be paid by Debtor in accordance with the terms set forth in Paragraph 3(b) of the Sixth Amendment, in full settlement and satisfaction of the Audit Shortfall Amount (including the Unpaid Marketing Contribution).

12.    Paragraph 3(b) of the Sixth Amendment provides that:

> Licensee shall pay the Net Audit Shortfall Amount (i.e., the sum of $1,400,000 USD) to Licensor in installments of:  (i) One Hundred Fifty Thousand United States Dollars ($150,000.00 USD) on or before the date that is three business days  after the date this Sixth Amendment is fully executed ($40,000.00 of which Licensor acknowledges having previously received from Licensee), (ii) Seventy Thousand United States Dollars ($70,000.00 USD) on or before the last  day  of  December 2023 and January 2024 respectively; and (iii) One Hundred Twenty Thousand United States  Dollars ($120,000.00 )  on  or before the last day of February, March, April, May, June, July, respectively, and a final balloon payment to Licensor of

7

Three Hundred and Ninety Thousand United States Dollars ($390,000.00 USD) before the last date of August, 2024 (the "Net Audit Shortfall Due Dates").

13.     The Debtor defaulted under the Sixth Amendment by, among other things, failing to timely pay the full amount of the Net Audit Shortfall Amount, specifically it failed to make payments totaling $475,000, as it had agreed (although it did make partial payments in the aggregate amount of $925,000).

14.     On September 26, 2024, Licensor delivered a default notice to the Debtor and Express Trade,[2] including a statement that Body Glove IP "expressly reserve[s] all of its rights, powers, privileges and remedies under the License Agreement, any related documents, applicable law or otherwise with respect to any Event of Default now existing or hereafter arising under the License Agreement, including without limitation (i) the right to declare the License Agreement to be terminated."

15.     The applicable period to cure a monetary default under the Sixth Amendment is three (3) business days. Sixth Amendment, § 11. The Debtor did not timely cure its default nor did the Debtor attempt to do so. As a result, the Forbearance Period (as defined in the Sixth Amendment) with respect to the Existing Events of Default has expired and the Licensor is entitled to terminate the License Agreement. License Agreement, § 16(b).

---

[2] On August 22, 2014, pursuant to that certain Factoring Agreement and equally dated Master Purchase Order Finance Agreement (collectively, the "**Credit Agreement**") between the Debtor and Express Trade Capital, Inc. ("**Express Trade**"), Express Trade extended secured credit to the Debtor, including in the Debtor's inventory subject to the License Agreement. On November 30, 2023, Licensor, Debtor, and Express Trade entered into an Intercreditor, Subordination and Collateral Nondisturbance Agreement (the "**Licensor Intercreditor Agreement**") to, among other things, confirm the relative priority of Express Trade and the Licensor's liens on the Debtor's assets and properties. Section 2 of Licensor Intercreditor Agreement provides that "the Lender may not, in its capacity as the holder of any such Lien, transfer any or all of the Borrower's right, title and interest under the License Agreement to itself (except as provided herein) or any other person without obtaining the Licensor's prior written consent. Lender hereby acknowledges the grant by the Borrower to the Licensor of a Lien in, the Collateral." Additionally, Section 9 grants Express Trade the right (but not the obligation) to cure a Surf 9 License Agreement default, within the cure period running from Express Trade's receipt of a notice of default.

16.     In addition to the Existing Events of Default that occurred prior to the Forbearance Period, additional events of default have occurred pre-petition and post-petition, some of which constitute continuing defaults. For example, the following additional Events of Default have occurred:

**Monetary Defaults**

a.     failure to timely make payments under the Sixth Amendment, including the remaining Net Shortfall Amount totaling $475,000,

b.     failure to make payments resulting from the failure to pay the Net Shortfall Amounts totaling $84,278,

c.     failure to pay Unpaid Royalties for the period from April 2024 – through December 2024, totaling $716,325.49,

d.     failure to pay contractual interest pursuant to paragraph 3(g) of the Sixth Amendment in the amount of $84,630.55 as of January 8, 2025,

**Non-Monetary Defaults**

e.     failure to timely provide Licensor with "thirty (30) days' notice of Licensee's intent to voluntarily commence" bankruptcy under section 16(b)(i) of the Sixth Amendment,

f.     failure to "move within 10 days of the commencement [of a bankruptcy case] to have Licensor treated as a critical vendor and to have any prepetition amounts owing to Licensor timely paid" under section 16(b)(iii) of the Sixth Amendment,

g.     the failure to "as soon as possible in the design process" submit drawings and renderings for approval by Licensor for 2026 orders under section 4(b) of the License Agreement,

h.     the failure to allow Licensor to inspect the Debtor's premises and audit its records for compliance with the License Agreement as required under sections 4(e) and 7 of the License Agreement,

i.     failure to comply with the time of the essence provisions under section 6(e) of the License Agreement for all payments due, and

j.     failure to consult with Licensor "on a regular basis regarding . . . all new styles and designs, manufacturing schedules, distribution schedules, and new developments, or other matters which would materially affect" Licensor's rights under section 9 of the License Agreement.

154020604

II.    **PRIOR TO THE CHAPTER 11 FILING BY THE DEBTOR, OLDEN GROUP, WITH THE SUPPORT OF THE DEBTOR AND EXPRESS TRADE, WITHOUT ANY LEGAL BASIS WHATSOEVER, INTERFERED WITH LICENSOR'S RIGHT TO TERMINATE THE LICENSE DESPITE THE EXISTENCE OF MULTIPLE EVENTS OF DEFAULT**

17.    Olden Group, Express Trade, the Debtor, and Garantia, LLC, an affiliate of Express Trade, allegedly executed that certain First Amended and Restated Letter of Intent as of December 9, 2024 (the "**LOI**"). In the LOI, (a) Olden Group states its intention to buy certain indebtedness due to Express Trade, and (b) the parties agreed to draft definitive documents by an unidentified date. Additionally, the LOI indicates that as of November 30, 2024, the Debtor's debt under the Credit Agreement totaled $27,447,033.35. Importantly, nowhere in the LOI is there a reference to the License Agreement, including as part of any condition to closing.

18.    On December 10, 2024, the day after the purported effective date of the LOI,  Olden Group, not the Debtor as licensee, filed, without notice to Licensor, a Summons with Notice, captioned *Olden Group LLC v. Body Glove International Inc. and Body Glove IP Holdings*, *LP*, Index No. 533445/2024 (the "**Summons**") in the New York Supreme Court, County of Kings ("**Kings County Court**"). According to the Summons, Olden Group sought a declaratory judgment that Licensor may not terminate the License Agreement and must accept a payoff from Olden Group.  The Summons also sought a permanent injunction barring termination of the License Agreement without allowing Olden Group to exercise "its right to cure." Concurrently with its filing of the Summons, Olden Group moved for an *ex parte* order enjoining Defendants from terminating the License Agreement and requiring the Defendants to allow Olden Group to cure any default.

19.    That same day, the Kings County Court granted the no-notice, *ex parte* TRO requested by Olden Group, enjoining Licensor from terminating the License Agreement pending

a hearing to be held by the Kings County Court on December 18, 2024. Only after it received the *ex parte* TRO did Olden Group notify Licensor of the Summons and TRO.

20.     Licensor removed the action initiated by the Summons to the United States District Court for the Eastern District of New York on December 17, 2024, and on December 27, 2024, moved to dissolve the *ex parte* TRO imposed by the Kings County Court and to oppose Olden Group's request for a preliminary injunction, on among other grounds, that Olden Group, as alleged lender, did not have standing to seek the requested relief.

21.     On December 29, 2024, Olden Group opposed Licensor's motion and separately moved to extend the TRO.

22.     On January 7, 2025, the District Court conducted a hearing on the parties' requested relief and found, among other things, that Olden Group's counsel conceded that Olden Group

> might not be bound by the LOI to enter into the contemplated agreement ("LOI Agreement") if Defendant terminated the License Agreement with Surf 9, ***and then informed the Court mid-argument that Plaintiff had just finalized the LOI Agreement today***. ***Plaintiff has not yet produced the LOI Agreement nor provided a reason for the Court to conclude that it will impact this Court's decision***. ***The fact that Plaintiff reportedly executed this agreement, knowing that the parties were in the midst of a dispute over a TRO that Plaintiff claims would significantly affect its rights under the LOI Agreement, underscores that any alleged harm to Plaintiff could have been avoided.*** *See Convergen Energy WI, LLC v. L'Anse Warden Elec. Co., LLC*, No. 20-CV-5240 (LJL), 2020 WL 5894079, at *5 (S.D.N.Y. Oct. 5, 2020) (noting that "a movant cannot manufacture its own exigency" and then claim that a self-inflicted harm is irreparable, and that "irreparable harm does not exist where alternatives are available to the movant" (citations omitted)).

District Court Order dated January 7, 2025. As a result, the District Court entered an order at around 11:35 p.m. on January 7, 2025 finding that Olden Group "failed to demonstrate that it is

entitled to a TRO or preliminary injunction that would prevent Defendant from terminating the License Agreement," and vacating the TRO entered by the Kings County Court.

23.     Hours later, as threatened by Olden Group at the January 7, 2025, hearing, on January 8, 2025, at 9:01 a.m., the Debtor commenced the above-captioned Chapter 11 case by filing a skeletal petition. *See* Jan 7, 2025 Hr'g Tr. at *61 ("MR. MONTCLARE: By the way Surf9 and ETC fully endorse getting this restrained on termination of the license. What they're doing, your Honor, is they're going to force us into bankruptcy. THE COURT: Force who into bankruptcy?").*

## III.     THE DEBTOR'S FAILED CHAPTER 11 CASE, MULTIPLE POST-PETITION DATE DEFAULTS, AND FAILURE TO COMPLY WITH ORDERS ENTERED BY THE COURT AFTER BEING INSTRUCTED BY THE COURT TO COMPLY

24.     On January 31, 2025, more than twenty days after the Petition Date, the Debtor filed a motion (the "**DIP Motion**") seeking authority to enter into a senior secured superpriority debtor-in-possession revolving credit facility and borrow up to $3,180,000, on an interim basis through February 22, 2025, from Olden Group without a single payment, according to the budget, being made to the Licensor.

25.     On February 5, 2025, the Licensor filed an objection to the DIP Motion.

26.     On February 12, 2025, after the parties resolved the Licensor's objection, the Court entered an interim order approving the DIP Motion (the "**First Interim Order**"). The First Interim Order provided, among other things, that:

a.      The Debtor shall provide to the Prepetition Lender, counsel to any Committee, Counsel to Body Glove and the United States Trustee, so as to actually be received within three (3) business days following the end of every other week, bi-weekly line-by-line variance reports, for the preceding bi-weekly period and on a cumulative basis for the period from the Petition Date to the report date, comparing actual specified cash receipts and specified disbursements to lumped amounts projected in the Budget. (§ 10(a)) (the "**Court Reporting Obligations**"); and

12

  b.  The Guaranteed Minimum Royalty Payments for January through April of 2025, in the amount of $436,666.67 shall be paid in three installments with the first payment of $145,555.56 due on or before February 21, 2025, the second installment of $145,555.56 due on or before March 21, 2025, and the third installment of $145,555.55 plus any additional true-ups (upwards or downwards) required under the License Agreement due on or before April 21, 2025 (the "**Court Ordered Payments**," and collectively with the Court Reporting Obligations, the "**Court Ordered Obligations**").[3]

27.  The Debtor failed to timely comply with its Court Ordered Obligations.

28.  On February 26, 2025, Licensor sent the Debtor a notice of default for, among other things, its failure to make a payment on February 21, 2025, as required in the Interim Orders. On February 27, 2025, the Debtor wired the Licensor $145,555.56.

29.  On April 16, 2025, when Licensor raised the continuing failure of the Debtor to meet its Court Ordered Obligations, the Court admonished the Debtor and stated that the Debtor is required to comply with the Court's orders. To date, the Debtor has continued to willfully defy the Court and has continued to fail to meet its Court Reporting Obligations.

30.  The Debtor again failed to timely make a Court Ordered Payment on April 21, 2025. Seven (7) days after the deadline, on April 28, 2025, the Debtor made a partial payment of $83,197.75.

31.  On May 2, 2025, the Licensor sent the Debtor an additional letter addressing the Debtor's defaults of its Court Ordered Obligations, specifically, their failure to timely make the full amount of the payment due to Licensor. Debtor, when challenged, advised Licensor that the Debtor had deducted amounts from the late payment, as a "true-up," supposedly as provided in the License. However, the License does not authorize such a "true-up" mid-year. Any such true-up is to be done at the end of each calendar year. Therefore, the Debtor had no authority to reduce the

---

[3] On March 12, 2025, the Court entered a second interim order with respect to the DIP Motion (Dkt. No. 69) (the "**Second Interim Order**" and together with the First Interim Order, the "**Interim Orders**"). The Second Interim Order also contained the Court Ordered Obligations.

required payment amount. Moreover, the payments due under the Interim DIP Order were specifically negotiated postpetition payments that cover more than just Quarter 1 guaranteed minimum royalties. Thus, the "true-up" provision in the License is not at all relevant to amounts due under the Interim DIP Order. In an apparent acknowledgment of their improper deduction and in response to the Licensor's letter, the Debtor, through ETC, sent the balance due to the Licensor on May 15, 2025.

32.     Additionally, in its letter, Licensor notified the Debtor that it continues to be in default of certain nonmonetary obligations, including Court Reporting Obligations, as the Licensor has yet to receive a single report due under the Interim DIP Order.

## IV.     THE ONGOING HARM TO THE LICENSOR'S MARKS

33.     Prior to the Debtor's commencement of this case and continuing thereafter, Licensor continues to suffer harm to the Licensed Rights and the accompanying goodwill. The Debtor's failure on a prepetition and postpetition basis to pay its manufacturers, including Leewards Health and Sports Co., Ltd. and WaveDream Outdoor, continues to be a problem for the Licensor.

34.     Additionally, Licensor continues to receive reports from buyers at Costco, the Debtor's customer which, according to the Debtor, provides 80% of the Debtor's annual sales, that due to the instability of the Debtor, Costco will not purchase any additional goods from the Debtor and has cancelled existing orders.

35.     Time is of the essence with regard to the relief sought herein, as Licensor is informed by Costco that it intends to make a decision on or around June 15, 2025, as to whether it will place any purchase orders for the 2026 seasons for goods with Licensor's trademark. Since Costco will not do business with the Debtor, Licensor needs to quickly pivot to an alternative that

154020604

is acceptable to Costco. Absent an order terminating the Debtor's interest in the License, Licensor with be unduly prejudiced and irreparably harmed by its loss of the ability to have its trademarked goods sold at Costco.

## **RELIEF REQUESTED**

36.     Based on the facts and circumstances here, including, without limitation, the Debtor's inability to cure the outstanding defaults, the continuing harm to the Licensor's intellectual property, and Costco's refusal to do further business with the Debtor, Licensor by this Motion requests that the Court:

      a.    deem the License Agreement rejected and Debtor's interest terminated;

      b.    vacate the automatic stay so that Licensor may take any actions necessary to allow Licensor to exploit its intellectual property; and

      c.    determine that as of termination of the Licensed Agreement, the Debtor is required to immediately "cease all use of the Licensed Rights, including but not limited to manufacture, sale, and distribution of the Licensed Products except in accordance with" the License Agreement.

## **ARGUMENT**

37.     The License Agreement is an executory contract that is not capable of being assumed and/or assumed and assigned by the Debtor without the consent of the Licensor. Because Licensor does not consent to the assumption and/or assumption and assignment of the License Agreement, this Court should enter an order: (1) providing that the License Agreement is deemed rejected, since (a) it cannot be assumed, or assumed and assigned, by the Debtor without Licensor's consent, and Licensor will not consent to the assumption of the License, and (b) there are continuing uncured defaults under the License Agreement and under the applicable court orders; (2) terminating the Debtor's interest in the License Agreement and modifying the automatic stay to the extent necessary to allow Licensor to effect the termination of the License, and (3) determining that, pursuant to section 17(c) of the License Agreement, that immediately upon the

15

termination the Debtor shall "cease all use of the Licensed Rights, including but not limited to manufacture, sale, and distribution of the Licensed Products except in accordance with" the License Agreement, to prevent continuing economic harm to the Licensor by depriving it of the ability to exploit its intellectual property.

I. **THE LICENSE AGREEMENT CANNOT BE ASSUMED OR ASSIGNED BY THE DEBTOR ABSENT LICENSOR'S CONSENT UNDER SECTION 365(C) AND LICENSOR WILL NOT CONSENT**

38. Section 365 of the Bankruptcy Code provides a trustee or debtor in possession with the authority to assume, assign, or reject executory contracts of the debtor, notwithstanding any contrary provision appearing in such contracts or leases. *See* 11 U.S.C. § 365(a) and (f). However, such authority is not absolute. Section 365(c)(1) of the Bankruptcy Code provides, in pertinent part, that:

> (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

> (B) such party does not consent to such assumption or assignment;….

11 U.S.C. § 365(c)(1).

39. Under applicable non-bankruptcy law,[4] a trademark license may not be assigned without the consent of the licensor. *See, e.g., N.C.P. Mktg. Group, Inc. v. Blanks (In re N.C.P. Mktg. Group, Inc.)*, 337 B.R. 230, 237 (D. Nev. 2005) (holding that "[b]ecause we find that under applicable trademark law, trademarks are personal and non-assignable without the consent of the

---

[4] Under section 365(c), "applicable non-bankruptcy law" is any non-bankruptcy law applicable to the License Agreement, including federal law. *See, e.g., In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011) (explaining that "[t]he term 'applicable law' means any law applicable to a contract, other than bankruptcy law."); *In re Kazi Foods of Michigan Inc.*, 473 B.R. 887, 889-90 (Bankr. E.D. Mich. 2011) (finding federal trademark law is "applicable law" under section 365(c)).

licensor, the [] trademark would be unassumable as part of the bankruptcy estate of the [Debtor] without the [licensor's] consent"); *see also Wellington Vision, Inc. v. Pearle Vision, Inc. (In re Wellington Vision, Inc.)*, 364 B.R. 129 (D. Fla. 2007) (holding that a debtor-licensee could not assume and assign its trademark licensing agreement, since in the context of trademark license agreements "the Lanham Act is the 'applicable law' by which the exception to assumption and assignment is triggered via section 365(c)"); *In re Travelot Co.*, 286 B.R. 447, 453-55 (Bankr. S.D. Ga. 2002) (holding that the term "applicable law", as used in section 365(c)(1) of the Bankruptcy Code, is broad enough to include intellectual property law governing assignment of trademark licenses); *Miller v. Glenn Miller Productions*, 318 F.Supp. 2d 923, 928 (C.D. Cal. 2004) (holding that "copyright and trademark licensors share a common retained interest in the ownership of their intellectual property - an interest that would be severely diminished if a licensee were allowed to sub-license without the licensor's permission"); *Tap Publ'ns, Inc. v. Chinese Yellow Pages (New York) Inc.*, 925 F.Supp. 212, 218 (S.D.N.Y. 1996) (holding that "[t]he general rule is that unless the license states otherwise, the licensee's right to use the licensed mark is personal and cannot be assigned to another").

40.      Furthermore, while some courts have found that whether non-bankruptcy law precludes the assignment of an intellectual property license agreement turns on whether the license is exclusive or nonexclusive, such distinction is inapplicable to trademark licenses.  Specifically,

> The distinction between exclusive and non-exclusive licenses is simply not relevant in the trademark context. The general prohibition against the assignment of trademark licenses absent the licensor's consent is equally applicable to both exclusive and non-exclusive trademark licenses. A trademark licensor would have the same concerns with respect to the identity of the licensee and the quality of products bearing its trademark whether the trademark license is exclusive or non-exclusive. Thus, a rule distinguishing between exclusive and non-exclusive licenses for purposes of assignability makes little sense in the trademark context. Further,

17

> trademarks, copyrights, and patents are governed by different sets
> of laws and influenced by different policy concerns. "[W]hile the
> basic policies underlying copyright and patent protection are to
> encourage creative authorship and invention, the purposes of
> trademark protection are to protect the public's expectation
> regarding the source and quality of goods." *Miller*, 454 F.3d at 938.
> The *Catapult* and *Golden Books* decisions, while persuasive so far
> as they apply, simply address different circumstances than are
> before the Court here.

*In re Trump Ent. Resorts, Inc.*, 526 B.R. 116, 127 (Bankr. D. Del. 2015). Thus, the general

prohibition against assignment of trademark licenses absent the licensor's consent is equally

applicable to both exclusive and non-exclusive trademark licenses. *Id.*[5]

     41.     Here, the Debtor has no ownership interest in the Licensed Property.  Indeed, to the

contrary, the License Agreement specifically provides that not only does the Licensor own the

Licensed Property, but the Licensor owns "any and all goodwill arising from LICENSEE'S use of

the Licensed Rights." License Agreement, §§ 3(b) and 12(a). Additionally, the License Agreement

provides that the Debtor does not have any right to assign, sub-license or otherwise convey or

transfer any rights under the License Agreement. *Id.*, §§ 2(a), 13. Accordingly, since the Debtor

cannot assign, as a matter of law, its interests in the License Agreement it must be rejected.

     42.     As this Court is undoubtedly well aware, there is a split among the circuit courts of

appeal as to whether a debtor can assume agreements that it cannot assign. The majority rule is the

"hypothetical test," finding that section 365(c) prevents a debtor in possession from assuming a

contract if applicable non-bankruptcy law would bar the assignment of the contract to a

hypothetical third party. *See In re Catapult Entertainment, Inc.*, 165 F.3d 747 (9th Cir. 1999)

(holding that "where applicable nonbankruptcy law makes an executory contract nonassignable

---

[5] While some courts have found that exclusive trademark licenses are assignable, such cases are premised upon the
textual language of the specific license agreement which did not restrict the assignability of the trademark in question.
*Id.* These cases are clearly distinguishable from the case at hand, as the License Agreement expressly prohibits the
transfer or assignment of the license.

because the identity of the nondebtor party is material, a debtor in possession may not assume the contract absent consent of the nondebtor party"); *see also In re Sunterra Corp.*, 361 F.3d 257 (4th Cir. 2004); *City of Jamestown v. James Cable Partners (In re James Cable Partners)*, 27 F.3d 534, 537 (11th Cir. 1994); *In re West Electronics, Inc.*, 852 F.2d 79 (3d Cir. 1988).

43. Pursuant to the "hypothetical test", since applicable non-bankruptcy law precludes the assignment of the License Agreement to a third party, the Debtors may not assume the License Agreement notwithstanding that the Debtor may have no intention whatsoever of assigning the License Agreement to a third party. *See In re Catapult*, 165 F.3d at 755; *In re Access Beyond Technologies, Inc.*, 237 B.R. 32, 48-49 (Bankr. D. Del. 1999) ("a debtor in possession may not assume an executory contract over the nondebtor's objection if applicable law would bar assignment to a hypothetical third party"). To read section 365(c)(1) of the Bankruptcy Code otherwise and allow the Debtor to assume the License Agreement as long as no assignment is contemplated, improperly rewrites the statute to prohibit "assumption and assignment, rather than assumption or assignment." *In re Catapult*, 165 at 751.

44. By contrast, the minority rule, the so-called "actual test" serves to preclude only the assignment, but not necessarily the assumption of an executory contract, if applicable non-bankruptcy law would excuse a counterparty from accepting performance from (or rendering performance to) any party other than the debtor. *In re Catapult Ent., Inc.*, 165 F.3d 747, 751 (9th Cir. 1999). Similarly, other courts have applied what they claim to be a "literal reading approach." Under this approach, when trustee assumes an executory contract, there is essentially a de facto statutory assignment of the contract to the trustee because the trustee is, obviously, a different entity than the debtor and thus Congress was wary of forcing a contract counterparty from accepting performance from a trustee where applicable law would excuse the party from accepting

19

such performance. On the other hand, when a debtor-in-possession assumes an agreement, there is no "de facto" assignment because the same entity that was party to the agreement prepetition is party to the agreement postpetition. *In re Footstar, Inc.*, 323 B.R. 566, 569-70 (Bankr. S.D.N.Y. 2005). This approach, however, has not been applied to trademarks.

45.     The hypothetical test is the better reasoned standard, as the statute unambiguously reads that a trustee (or debtor in possession) cannot assume or assign the kind of contracts referenced in section 365(c). *Sunterra Corp.*, 361 F.3d at 266-67. It is axiomatic that where a statute is unambiguous, courts must interpret the language in accordance with its plain meaning. *Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then... 'judicial inquiry is complete.'"); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("where, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms.") (citations and internal quotation marks omitted); *see also Patterson v. Shumate*, 504 U.S. 753, 760 (1992) (party seeking to defeat plain meaning of Bankruptcy Code bears "an exceptionally heavy burden"). The controlling principle here is "the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992).

46.     Indeed, the Seventh Circuit has put the issue succinctly: "If the statute has an ascertainable meaning... then it must be applied as written even if the judge is confident that Congress would enact something different if it reconsidered the issue today." *Collins v. Gorman*, 96 F.3d 1057, 1059 (7th Cir. 1996) (Easterbrook, J.). If Congress had meant "assume and assign," it would have said so; it did not.

47.     Moreover, as applied here, the application of the actual or "literal reading approach" would lead to a result inconsistent with its stated objective. Here, any assumption of the

License Agreement would be in connection with a chapter 11 plan which would turn control of the Debtor to a third-party – Olden Group. In essence, the relief Debtor seeks undermines the basic principles of trademark law that a licensor should not be compelled to accept performance by anyone other than someone of its choosing.

48.     Accordingly, the Court should find that the Debtor cannot assume or assume and assign the License Agreement, without Licensor's consent, and Licensor will not consent.

II.     **THE DEBTOR CANNOT CURE ALL OUTSTANDING DEFAULTS AS REQUIRED BY SECTION 365(B)(1) OF THE BANKRUPTCY CODE**

49.     Pursuant to section 365(b)(1) of the Bankruptcy Code:

> [i[f there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee - (A) cures … such default ...; (B) compensates … a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

50.     Thus, if the Debtor cannot cure a breach under the License Agreement, it cannot assume the License Agreement. *Id.*; *see also Worthington v. GMC (In re Claremont Acquisition Corp.)*, 113 F.3d 1029, 1034 (9th Cir 1997) (non-monetary default could not be cured thus contract could not be assigned); *In re Eagle Creek Subdivision LLC*, 397 B.R. 758, 764-65 (Bankr. E.D.N.C. 2008); *In re New Breed Realty Enters.*, 278 B.R. 314 (Bankr. E.D.N.Y. 2002) (holding that non-monetary default which was a historical fact was unable to be cured and so contract could not be assumed); *Good Hope Refineries, Inc. v. Benavides*, 602 F.2d 998, 1003 (1st Cir. 1979) ("If the debtor has committed, or the trustee commits, an incurable breach, the trustee has no continuing rights under the contract"). The requirement that all existing breaches must be cured and all

21

provisions of the contract assumed applies both to monetary and non-monetary obligations. *In re Carterhouse, Inc.*, 94 B.R. 271, 273 (Bankr. D. Conn. 1988).

51. Here, there are multiple defaults the Debtor cannot cure.

52. *First*, with respect to the Debtor's pre-petition monetary defaults, the Debtor failed to timely make payments under the Sixth Amendment and failed to pay Unpaid Royalties for the period from April 2024 – through December 2024.

53. *Second,* post-petition, the Debtor has willfully failed to comply with the Interim Orders that required certain payments to timely be made by the Debtor. For example, the first payment under the Interim Order was due February 21, 2025; it was not until seven (7) days later (five (5) business days later) that the payment was made. Additionally, the Debtor has failed to comply with the Court Reporting Obligations under the Interim Order including providing bi-weekly variance reports.

54. *Third,* Licensor has filed a proof of claim in amount not less than $1,757,235.97. The Debtor's business performance in chapter 11, based on the limited financial information shared by the Debtor, has been abysmal. Thus, it cannot be argued that the Debtor has the ability to pay the cure amount due Licensor from its operations. *See, e.g.*, March 2025 Monthly Operating Report [Dkt. No. 93]. Additionally, as the Debtor has conceded, current geopolitical factors, including the imposition of substantial tariffs have drastically affected its business. In fact, Costco has cancelled all current orders within the United States due to the increased tariffs. To make matters worse, the bulk of the Debtor's sales historically have occurred in the first two quarters of the year. Thus, the Debtor's liquidity issues that have caused it to repeatedly fail to pay its administrative expenses as they became due and payable to Licensor, and at least two of its key factory suppliers, will only worsen later this year, impairing its ability to meet its obligations to

the Licensor and others. As for the availability of outside funding for the Debtor to pay the required "cure'" amount, such funding has proven to be illusory. Olden Group, as DIP lender, has shown no inclination or ability to provide the funds the Debtor needs to pay its ongoing obligation. Thus, any promises going back to December 2024, it has made to "cure," cannot be taken seriously. Certainly, there has been no evidence of funds being committed by Olden Group to effect "cure."

55. *Fourth*, there exist multiple non-monetary defaults that the Debtor cannot cure. For example:

a. *Reputation and Goodwill*. The Debtor has failed to "uphold and protect the image and reputation of the Licensed Rights," as required under Section 10 of the License Agreement. Over the course of the past several months, the Debtor has harmed the Licensor's relationships with many of the manufacturers and buyers of the Licensed Products, which has harmed goodwill associated with the Licensed Rights. Indeed, Costco one of the largest buyers of the goods with the Licensor's trademarks, not just through the Debtor but globally, has indicated its inclination to not purchase goods with the Licensor's marks in 2026.

b. *Failure to Provide Timely Notice*. A material term in the Sixth Amendment was the Licensor's right to receive thirty-day advance notice of any bankruptcy proceeding. Sixth Amendment, § 16(b)(i). The Debtor failed to comply and it's impossible to cure such default.

c. *Critical Vendor*. A material term in the Sixth Amendment was the Debtor's obligation to "move within 10 days of the commencement [of a bankruptcy case] to have Licensor treated as a critical vendor and to have any prepetition amounts owing to Licensor timely paid." Sixth Amendment, § 16(b)(iii). The Debtor failed to comply and it's impossible to cure such default, as more than 10 days have elapsed since the filing of this case. Indeed, while the Interim Orders provided the Licensor with certain monthly payments, such payments were on account of post-petition obligations. To date, since the commencement of this case, the Licensor has not received any payments on account of its prepetition claim.

d. *Submission of Designs*. The Debtor has failed to "as soon as possible in the design process" submit drawings and renderings for approval by Licensor for 2026 orders under section 4(b) of the License Agreement. In fact, to the contrary, at the April 16, 2026, hearing, the Debtor stated it was intentionally withholding the designs. Thus, conceding it has not "as soon as possible" submitted its designs. Any subsequent submission of the designs would not cure the non-monetary bargained for early submission of

23

designs so that the Licensor has adequate time to review and approve.

e. *Inspection and Audit*. The Debtor has failed to allow the Licensor "at any time" to the Debtor's premises and audit its records for compliance with the License Agreement as required under sections 4(e) and 7 of the License Agreement.

f. *Time of the Essence*. Debtor has failed to comply with the time of the essence provisions under section 6(e) of the License Agreement, and

g. *Consulting Rights*. The Debtor has failed to consult with Licensor "on a regular basis regarding . . . all new styles and designs, manufacturing schedules, distribution schedules, and new developments, or other matters which would materially affect" Licensor's rights under section 9 of the License Agreement.

56.    The Debtor cannot cure these existing material nonmonetary defaults, and, accordingly, Debtor can never, absent Licensor's consent or waiver of such defaults, assume the License Agreement.

## III.    THE DEBTOR CANNOT PROVIDE THE LICENSOR WITH ADEQUATE ASSURANCE OF FUTURE PERFORMANCE

57.    Under Section 365(f)(2) of the Bankruptcy Code, aside from the requirement that defaults be cured prior to assuming an executory contract, there is an additional hurdle for the assignee: It must provide "adequate assurance of future performance." 11 U.S.C. § 365(f)(2)(B). The term "adequate assurance of future performance" is not statutorily defined. Courts have looked to the legislative history to determine its meaning. *In re Rachels Indus., Inc.*, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *Westview*, 59 B.R. at 754; *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985); *In re Sapolin Paints, Inc.*, 5 B.R. 412, 420 (Bankr. E.D.N.Y. 1980).

58.    In determining whether "adequate assurance of future performance" has been shown, courts have considered some of the following factors:

(i) the debtor's payment history;

(ii) presence of a guarantee;

(iii) presence of a security deposit;

(iv) evidence of profitability;

(v) the general outlook in the debtor's industry; and

(vi) whether the unexpired lease is at, or below, the prevailing rate.

*See In re Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1310 (5th Cir. 1985); *Embers*, 184 B.R. at 902; *Westview*, 59 B.R. at 755; *Natco*, 54 B.R. at 440; *Sapolin Paints*, 5 B.R. at 421.

59.     Here, the Debtor cannot provide adequate assurance of future performance.  As part of the Debtor's bankruptcy case, the Debtor indicates that it intends to seek confirmation of a chapter 11 plan that will convert debt to equity. However, even with Olden Group's financial backing during the pendency of this case, the Debtor has not been able to timely meet its obligations to the Licensor and the Debtor's manufacturers. Further, the Debtor's ability to operate profitably is impaired by the general outlook for the Debtor's industry given the current tariff regime. Indeed, the Debtor's largest customer – Costco – has cancelled all U.S. purchase orders from 2025 and may not provide any purchase orders for 2026. Perhaps, most troubling, is that the Debtor's business is a seasonal business, with its principal sales occurring historically in the first and second quarters of the year. If the Debtor, during the height of its yearly cash flow cycle, cannot meet its obligations, it is almost a certainty it will not be able to meet its obligations in the second half of the year.

## IV.     CAUSE EXISTS TO DEEM THE LICENSE TERMINATED AND GRANT THE LICENSOR RELIEF FROM THE AUTOMATIC STAY

60.     Section 362(d)(1) of the Bankruptcy Code provides, in pertinent part, that:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –

> (1) for cause, including the lack of adequate protection of an
> interest in property of such party in interest

11 U.S.C. § 362(d)(1).

61. The term "cause" as referenced in section 362(d)(1) of the Bankruptcy Code is not defined in the Bankruptcy Code, and the determination of whether cause exists in order to lift the stay should be made on a case-by-case basis. *See Sonnax Inds.,* 907 F.2d 1280, 1286 (2d Cir. 1990); *Izzarelli v. Rexene Prod. Co. (In re Rexene Prod. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del. 1992). "Cause" for modification of the automatic stay is "an intentionally broad and flexible concept that permits ... [a] [b]ankruptcy [c]ourt, as a court of equity, to respond to inherently fact-sensitive situations." *In re Texas State Optical, Inc.*, 188 B.R. 552, 556 (Bankr. E.D. Tex. 1995). Accordingly, courts determine what constitutes "cause" based on the totality of the circumstances in each particular case. *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997); *In re Peregrine Systems, Inc.*, No. 04-1325, 2005 WL 2401955, at *3 (D. Del. Sept. 29, 2005); *In re Northwestern Corp.*, No. 03-12872, 2004 WL 1345100, *1 (Bankr. D. Del. June 16, 2004).

62. Here, there is ample cause to grant relief from the automatic stay.

63. *First*, the Debtor's continuing material breach of its post-petition obligations under the License Agreement and Interim Orders constitutes cause as it demonstrates the Debtor's inability to adequately protect the Licensor's rights in its trademarks. *See In re B-K of Kansas, Inc.*, 69 B.R. 812 (Bankr. D. Kan. 1987). Similarly, the Debtor's either inability or refusal to comply with basic, bargained for, provisions in the License Agreement continues cause for relief from the automatic stay. For example, "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured under the holder's trademark." *El Greco Leather Prods., Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2nd Cir. 1986). Here, the Debtor refuses to allow the Licensor to protect its trademark by withholding

drawings to the Licensor while simultaneously working with manufacturers on potential products bearing the Licensor's trademarks.

64. *Second*, since the Debtor has no right to assume and/or assume and assign the License Agreement, the Debtor retains no legally cognizable right in the License Agreement. As the U.S. Court of Appeals for the Third Circuit held in *In re West Electronics, Inc.*, "[t]he bankruptcy court was, therefore, confronted with a situation in which the debtor in possession was not entitled to assume the contract without the government's consent and the government was unwilling to give that consent. In that situation, the debtor in possession did not have a legally cognizable interest in the contract and it was an abuse of discretion for the court to decline to lift the stay." 852 F.2d at 83-84; *see In re Commonwealth Mortgage Co.*, 149 B.R. 4, 7 (Bankr. D. Mass. 1992) (relief from the automatic stay under section 362(d)(1) appropriate where contract not assumable or assignable by the debtor). Similarly, here, the Debtor has no legally cognizable interest in the License and stay relief is appropriate.

65. Finally, without this Court terminating the automatic stay, Licensor cannot properly protect its good name, goodwill and the trademark, which in and of itself should constitute sufficient "cause" for this Court to lift the automatic stay. *See, e.g., In re B-K of Kansas, Inc.*, 69 B.R. 812, 815 (D. Kans. 1989) (granting licensor relief from the automatic stay and holding that "the property in this case, the use of trademarks and service marks, is of such a type that money may never adequately protect the movant. The movant's reputation to the general public is at stake.").

66. Accordingly, Licensor is entitled to relief from the automatic stay for cause

27

67.     Pursuant to Fed. R. Bankr. P. 4001(a)(3), an order granting a motion for relief from the automatic stay made in accordance with Rule 4001(a)(3) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the Court orders otherwise.

68.     Here, there is ample cause for the court to exercise its discretion to waive the fourteen (14) day stay of relief. For example, the Licensor's inability to immediately exploit its property can result in long-term continuing harm. Decisions by customers on whether to order products with the Licensor's intellectual property for the next year are being made in or around the middle of June. Absent a waiver of the 14-day stay, the Licensor risks losing the ability to exploit its intellectual property for an entire year.

## CONCLUSION

For the foregoing reasons, the Licensor respectfully requests that the Court enter an order (i) deeming the License Agreement rejected and terminated, (ii) granting the Licensor relief from the automatic stay, and (iii) grant the Licensor such other relief as the Court deems just, proper and equitable.

Dated: June 1, 2025
        New York, New York

Respectfully submitted,

**BLANK ROME LLP**

*/s/ Ira L. Herman*
Ira L. Herman
Evan J. Zucker
1271 Avenue of the Americas
New York, New York 10020
Ira.Herman@BlankRome.com
Evan.Zucker@BlankRome.com
(212) 885-5000

*Attorneys for Body Glove IP Holdings, LP*

154020604