| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>EASTERN DISTRICT OF NEW YORK<br>-----------------------------------------------------------x<br>In re:<br><br>Surf 9 LLC,<br><br>                           Debtor.<br>-----------------------------------------------------------x | Hearing Date and Time:<br>July 1, 2025 at 2:30 p.m.<br><br>Chapter 11<br><br>Case No.: 25-40078-JMM |

**DEBTOR'S OBJECTION TO THE MOTION OF BODY GLOVE IP HOLDINGS SEEKING TO TERMINATE THE EXISTING BODY GLOVE LICENSE WITH THE DEBTOR AND/OR RELIEF FROM THE AUTOMATIC STAY**

The debtor herein, Surf 9 LLC (the "Debtor"), respectfully submits this Objection to the motion filed by Body Glove IP Holdings, LP ("Body Glove") seeking to terminate the existing Body Glove license with the Debtor, as amended on multiple occasions (the "License"), and/or relief from the automatic stay. While the Motion is contested and requires an evidentiary hearing, the key point to emphasize from the outset is that there is no absolute prohibition to preclude the Debtor from assuming the license agreement under Section 365 of the Bankruptcy Code without Body Glove's consent and any argument to the contrary must be rejected.

**(A)  Overview**

1. Despite the travails over tariffs and notwithstanding the recent reduction of about $7 million in sales of the "Performer" product line with Costco for 2026[1], the Debtor remains positive and confident about its future business prospects.

---

[1] Historically, the Debtor's "Performer" paddleboard sales constituted a large chunk of the overall business. In 2025, Costco bought Performer paddleboards totaling approximately $15 million, net of all returns, allowances and cancellations. In 2026, the total Performer business will be about $8 million, likewise net of allowances and returns. This represents a reduction of about $7 million form 2025. The Debtor hopes to procure replacement business to offset the $7.0 million lost sales volume, but the Company can survive regardless.

1

2. Understandably, the Debtor's original budgeting and projections for the post-petition period were impacted by the unprecedented changes in tariff policies targeting Chinese factories and imports. Substantially all of the Debtor's product lines come from China and like so many companies, the Debtor was caught flat-footed when tariffs increased ten-fold. The Debtor responded by scouting out alternate factories in Southeast Asia and elsewhere, and believes that it will obtain necessary levels of goods at competitive prices going forward.

3. The Debtor projects that its total sales volume in 2026 will be approximately $27 million covering all product lines as summarized in the following chart:

| Item | Brand | Customer | Category | Total |
|---|---|---|---|---|
| Performer 26 | Body Glove | Costco US | Watersports | |
| Performer 26 | Body Glove | Costco US | Watersports | $2,841,696 |
| Performer 26 | Body Glove | Costco CAN | Watersports | $6,186,444 |
| Performer 26 | Body Glove | Costco Int'l | Watersports | $248,700 |
| X2 | Body Glove | Costco US | Watersports | $792,000 |
| Oasis 26 | Body Glove | Costco US | Watersports | $899,712 |
| Oasis 26 | Body Glove | Costco CAN | Watersports | $231,528 |
| Footwear - varies | Body Glove | Multiple | Footwear | $5,500,000 |
| Footwear - Rapid | Body Glove | Costco US | Footwear | $480,384 |
| Hydroblast | Havasu | Costco CAN | Outdoor | $1,600,000 |
| Stole PFD | Havasu | | Outdoor | $1,500,000 |
| **Total PO's** | | | | **$20,280,464** |
| | | | | |
| **Balance of Non-PO's** | | | | |
| Multiple Costco Dropship | Body Glove | Costco US | Watersports | $1,000,000 |
| Multiple Costco Dropship | Body Glove | Costco CAN | Watersports | $1,000,000 |
| Sleeping Bag | Denali | | Outdoor | $100,000 |
| Camp Cot | Denali | | Outdoor | $100,000 |
| Camp Tent | Denali | | Outdoor | $100,000 |
| Camp Chairs | Denali | | Outdoor | $50,000 |
| Camp Stove | Denali | | Outdoor | $50,000 |
| Coolers | Denali | | Outdoor | $100,000 |

| Duffle Bag | Denali |  | Outdoor | $50,000 |
|---|---|---|---|---|
| Rush Snow Tube | Denali | Amazon Dropship | Winter | $1,000,000 |
| Denali Snow Shoes | Denali | Costco CAN dropship | Winter | $300,000 |
| Amazon Footwear | Surf 9 |  | Multi | $2,000,000 |
| Amazon Paddlesports | Surf 9 |  | Multi | $1,000,000 |
| **Total Non-PO's** |  |  |  | **$6,850,000** |
|  |  |  |  |  |
| Footwear |  |  |  | $7,980,384 |
| Watersports |  |  |  | $13,408,080 |
| outdoors |  |  |  | $3,650,000 |
| winter |  |  |  | $1,300,000 |
|  |  |  |  |  |
| **Grand Total** |  |  |  | **$27,130,464** |

4. To be sure, the Debtor was disappointed by the loss of certain "Performer" business in 2026, but views it as a "bump in the road". Indeed, the Debtor understands from recent in-person meetings with Costco that Costco will consider purchasing additional other products in 2026 and will provide the Debtor with the opportunity to recapture lost Performer business in 2027 and beyond.

5. Contrary to any naysayers, the Debtor still retains a relatively strong relationship with Costco which will only improve if the situation with Body Glove is stabilized. For this reason, efforts will be made to reach agreement with Body Glove concerning assumption of the License based upon upcoming meetings with Body Glove and its counsel.

6. From a bankruptcy perspective, however, the legal underpinnings that the Debtor cannot assume the existing Body Glove License without its consent has been uniformly rejected by the Bankruptcy Courts in the Second Circuit, although the Second Circuit itself has not yet jumped into the debate as to literal interpretation of the word "or" in Section 365(c)(i)[2] relating to

---

[2] Section 365(c) begins "The trustee may not assume or assign any executory contract ... if ...." leading to a debate among the Courts over whether "assume or assign" means "assume and assign".

the assumption and assignment of an intellectual property license. Two different tests have emerged based upon a split in other Circuits. In one camp, many courts apply what is generally referred to as the "actual test", holding that assumption is permitted even without Body Glove's consent so long as the debtor retains the license without assignment. In the other camp, courts employ the "hypothetical test", which denies assumption without the consent of the counterparty if applicable law would bar assignment to a hypothetical third party, even where the Chapter 11 debtor has no intention of assigning the license.

7. The so-called "actual test" is considered to be the majority view among the courts nationwide and has been followed by the New York bankruptcy courts consistent with the sound reasoning of Judge Hardin in *In re Footstar*, 323 B.R. 566, 570 (Bankr. S.D.N.Y. 2005):

> I agree with the outcome reached by the majority of the courts, which have adopted the "actual test," but I suggest a somewhat different focus for analysis of Section 365. The statute can and should be construed in accordance with its "plain meaning" to reach a conclusion which is entirely harmonious with both the objective sought to be obtained in Section 365(c)(1) and the overall objectives of the Bankruptcy Code, without construing "or" to mean "and."

8. The Hardin decision in *In re Footstar, supra*, however, clearly supports the Debtor's position that there is no absolute bar to an assumption of the Body Glove License. This in turn relegates the balance of Body Glove's Motion to a multi-faceted set of factual disputes concerning the validity, nature and scope of alleged defaults. All such factual disputes will require a further hearing under Local Rule 9014-2, which provides that, except for certain limited exceptions which do not apply here, "[t]he first scheduled hearing in a contested matter will not be an evidentiary hearing, at which witnesses may testify".

9. Moreover, the notion that the Debtor is guilty of so-called incurable defaults is also flawed and ignores the parties' historical course of dealing which deferred audits for years at a time and never required micro level reporting or advance authorization of designs and drawings.

At any rate, however, the actual defined Events of Default under Section 12 of the Sixth Amendment to the License Agreement are subject to an express "materiality" standard. The Debtor submits that Body Glove's historical failure to insist on strict compliance with the non-monetary covenants cited in the Motion negate their overall materiality.

### (B) The Alleged Defaults are Overstated and Remain Curable

10. The majority of the alleged defaults listed in the Motion involve unpaid pre-petition monetary obligations which remain curable once the proper amounts are reconciled, fixed and quantified. The Debtor has consistently recognized certain pre-petition arrears owed to Body Glove totaling $1,078,862, comprised of audit arrears of $480,000 and unpaid 2024 royalties of $598,862. By contrast, Body Glove alleges total arrears of $1,360,234.04 plus attorneys' fees, which includes higher audit amounts, interest and other shortfalls.

11. The Debtor's computation of the pre-petition royalties is as follows:

   a. Royalty Zone submission Jan thru Dec 2024 ($1,165,628.46)
   b. Payments _ $566,766.34
       i. Royalty shortfall $598,862.12
   c. Royalty Minimum  $1,001,500

12. A major difference between the parties relates to the fact that the Debtor paid royalties on "net" sales and payments received from Costco <u>after</u> deductions for allowances. The payment of net royalties is and was consistent with long-standing practices between the parties. Based upon the audit covering the years 2019 – 2022 (which was only performed in 2023), Body Glove asserts additional amounts based on gross sales. The difference between the Debtor and Body Glove concerning total royalties is about $281,372.04 for the audited period through 2022.[3] The Debtor is seeking liquidity to cure the alleged arrears from the DIP Lender in whatever amount

---

[3] The post-2022 audit has not yet occurred.

is ultimately allowed by the Court. Moreover, to provide adequate assurance of future performance, the Debtor is also seeking to establish a letter of credit in favor of Body Glove to secure one year's worth of royalties, which in 2025 requires a minimum annual payment of $1,110,500.[4]

13. Although Body Glove quibbles that the post-petition payments have been late, the fact remains that the Debtor is current with its post-petition royalty obligations. To date, the Debtor has paid total post-petition royalties of $582,222 itemized as follows:

1. Wire 2.27 _ $145,555.56
2. Wire 3.20 _ $145,555.56
3. Wire 4.28 _ $83,197.75 (this was the amount due via Royalty Zone for Q1 true up)
4. Wire 5.15 _ $ 62,357.81 (this was the balance paid following Q1 true up to reach $145,555.56 for the month)
5. Wire 6.05 _ $145,555.56
Total:             $582,222,24

14. Insofar as non-monetary defaults are concerned, Body Glove historically refrained from rigid enforcement of various covenants. Among other things, Body Glove never sought to review drawing and renderings, and never requested consultation regarding styles, designs or the Debtor's shipping and supply schedule. The evidence will establish that the Debtor dealt almost exclusively with Costco without material input from Body Glove. The situation changed in 2024 as the Debtor's business experienced the cumulative effects of the Costco recall and diminished liquidity. However, up to that point, Body Glove did not insist on strict compliance with the non-monetary covenants cited in the Motion because they were not material to the parties' overall relationship.

---

[4] Historically, since 2009 the Debtor has maintained the License with Body Glove subject to increasing minimum annual royalty payments and minimum total annual sales of branded merchandise. The Debtor has always reached these minimum and is projected to continue to do so next year and beyond.

15. The alleged defaults concerning the provisions of Section 16(b) of the Sixth Amendment relating to bankruptcy rights are in the nature of *ipso facto* clauses which are not enforceable under Section 365(b)(2) of the Bankruptcy Code. Nevertheless Body Glove was given special recognition under the prior financing orders on par with a critical vendor by virtue of the inclusion of post-petition royalties as a condition to the Debtors' borrowings. Body Glove never once sought to assert let alone enforce any rights as a critical vendor and is equitably estopped from raising the issue five months into the case as a basis to deny assumption of the License or vacate the stay.

**Legal Argument**

**The Motion Should be Denied or Deferred**

**(1) Body Glove Has Failed to Establish "Cause" to Lift the Automatic Stay or to Deem the License Terminated**

16. Sufficient "cause" has not been established by Body Glove to warrant either stay relief or termination of the License, both of which would severely undermine the Debtor's reorganization efforts. Since the Petition Date, the Debtor has overcome a number of challenges, many of which were unforeseen when the case was filed. To its credit, the Debtor re-negotiated payment terms with some of its major suppliers in order to fulfill pending orders, negotiated with Costco for release of receivables withheld as security, and resolved disputes with its factor in order to ensure release of payments to the Debtor to pay post-petition expenses. This accounts for the fact that the Debtor has been able to pay Body Glove post-petition royalties totaling $582,222. The payment of post-petition royalties constitutes adequate protection within the meaning of the Bankruptcy Code and militates against stay relief in and of itself.

17. Moreover, even though the Bankruptcy Code imposes no specific deadline by which the Debtor must seek to assume or reject the License Agreement, the Debtor is prepared to

7

make a final decision by July 1, 2025 (as extended by agreement to July 3, 2025) consistent with the first interim borrowing Order dated February 12, 2025 [ECF No. 42], which provides as follows:

> On or before July 1, 2025, the Debtor shall file any motion seeking to assume or reject the License Agreement, without prejudice to all of Body Glove's rights, claims, and defenses with respect to such motion, all of which rights, claims and defenses are expressly preserved. Notwithstanding anything else set forth herein, Body Glove may move to compel assumption or rejection of the License Agreement at anytime on such notice as may be appropriate under the circumstances.

18. With the deadline for disposition of the License quickly approaching, Body Glove will know the Debtor's final intentions in about one week from this filing.

### (2) Body Glove's Lack of Consent Does Not Prevent Assumption of the License

19. As noted, the law followed in the Second Circuit allows for the same even without the consent of Body Glove. Under the "actual test" cited above, Body Glove does not enjoy a veto right where, as here, the Debtor's request is to assume the License for its own account.

20. Section 365(a) of the Bankruptcy Code provides that the trustee, "subject to the Court's approval, may assume or reject any executory contract or unexpired lease of the debtor," subject to curing defaults and providing adequate assurance of future performance. *See* 11 U.S.C. § 365(a), (b)(1); *see also In re Footstar, Inc., supra*. The standard applicable to the debtor's decision to assume or reject a contract is the deferential "business judgment rule." *In re Times Square JV LLC*, 648 B.R. 277, 284 (Bankr. S.D.N.Y. 2023) ("Courts use a 'business judgment' standard when evaluating whether to permit a debtor to assumer or reject a contract."). If the Debtor believes in good faith that assumption would benefit its estate, the Court will generally not disturb such business judgment. *See In re Footstar, Inc., supra*, 323 B.R. at 568; *In re Times Square JV LLC, supra*, 648 B.R. at 284; ("Generally, absent a showing of bad faith, or

an abuse of business discretion, the debtor's business judgment will not be altered.") (*citing In re Old Carco LLC*, 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009)).

21. One exception to this rule, set forth in Section 365(c)(1), limits the trustee's ability to "assume or assign" an executory contract over the non-debtor counterparty's objection where applicable law excuses the party from "accepting performance from or rendering performance to an entity other than the debtor or the debtor-in-possession." It has been held that, under the Lanham Act, 15 U.S.C. § 1051, *et seq* (the "Lanham Act"), a trademark licensor is entitled to control and protect the goodwill associated with its trademark by refusing to accept performance from a party other than its intended licensee. 15 U.S.C. § 1060(a)(1). *In re N.C.P. Marketing Group, Inc.*, 337 B.R. 230 (D. Nev. 2005), *aff'd*, 279 F. App'x 561 (9th Cir. 2008); *In re Travelot Co.*, 286 B.R. 447, 454–55 (Bankr. S.D. Ga. 2002) (holding that federal trademark law, as set forth in the Lanham Act, qualifies as applicable law under section 365(c)(1)). The intent behind Section 365(c)(1) is to give effect to applicable law, such as the Lanham Act, in order to "protect the contract counterparty from unlawful assignment of the contract." *In re Footstar, Inc.*, 323 B.R. at 573-74.

22. By comparison, where, as here, the Debtor seeks only to assume the License for itself and not to assign it to a third party, courts differ as to whether Section 365(c)(1) applies. The First and Fifth Circuits have adopted the "actual" test, holding that if the debtor does not *actually* seek to assign the contract to a third party, it may assume the contract, as doing so merely maintains the *status quo* with respect to the identities of the contracting parties. *See Summit Inv. & Dev. Corp. v. Leroux*, 69 F.3d 608, 614 (1st Cir. 1995); *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 248 (5th Cir. 2006) (noting the hypothetical test, distinguishing

between the pre-petition and post-petition entities, would undermine the unenforceability of *ipso facto* clauses by allowing a licensor to force termination as a result of the bankruptcy).

23. The Third, Fourth, Ninth and Eleventh Circuits have adopted the "hypothetical" test, holding that a debtor may not assume a contract over the objection of its counterparty if it hypothetically would be unable to assign it. *See, e.g., In re Catapult Entertainment, Inc.*, 165 F.3d 747, 750 (9th Cir. 1999). These courts generally rely on a strict interpretation of the disjunctive language of section 365(c)(1), which states that the trustee may not "assume *or* assign" the contract. *See* 11 U.S.C. § 365(c)(1)

24. Although the Second Circuit has not directly ruled on this issue, bankruptcy courts in New York have held that the "actual test" is "by far the better view" and consistent with the "great majority of the lower courts," holding that 365(c)(1) does not allow a licensor to veto assumption by its original licensee. *See In re Adelphia Comm'ns Corp.*, 359 B.R. 65, 72 (Bankr. S.D.N.Y. 2007). These courts recognize that "[t]he basic objective of Section 365(c)(1) -- to protect the contract counterparty from unlawful assignment of the contract -- simply is not implicated when a debtor in possession itself seeks to assume, but not assign, the contract." *In re Footstar, Inc., supra*, 323 B.R. at 573-74. As Judge Gerber explained, courts favoring the "hypothetical test" are "incorrectly decided," "give insufficient attention to other provisions of section 365, link concepts that have no relation to each other, and yield results demonstrably at odds with the purposes of the statute." *See id*.

25. Here, Body Glove has failed to cite any case in the Second Circuit that has applied the "hypothetical test" under 11 U.S.C. §365(c). Instead, Body Glove creates a false premise by arguing that the Debtor intends to assign the License to the DIP Lender, Olden Group, conflating a collateral security interest with a direct assignment. At any rate, there is no actual motion for an

assignment to Olden Group and until such a request is made, these arguments are entirely premature and based upon pure conjecture.

### (3) Section 365(b)(1)(A) Requirement to Cure Defaults Would Not Prevent Debtor's Assumption of the License

26. Upon assuming an executory contract, the Debtor must, among other things, cure, or provide adequate assurance that it will promptly cure, defaults. Section 365(b)(1)(A) of the Bankruptcy Code provides, in relevant part, that "[i]f there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee (A) cures, or provides adequate assurance that the trustee will promptly cure, such default….". The fact that a default is "non-monetary" does not necessarily make it incurable; only a default that is *incapable of cure* will prevent assumption, and even then, only if such incurable default is *material* "in the sense that it goes to the very essence of the contract, i.e., the bargained for exchange" or causes "substantial economic detriment." *See In re Empire Equities Cap. Corp.*, 405 B.R. 687, 691 (Bankr. S.D.N.Y. 2009) ("A default precludes assumption of an executory contract under § 365 if it is both incurable and material in the sense that it goes to the very essence of the contract, i.e., the bargained for exchange.") (internal quotations omitted); *In re Clearwater Nat. Res., LP*, No. 09-70011, 2009 WL 2208463, at *4 (Bankr. E.D. Ky. July 23, 2009) ("[I]t is the materiality and economic significance of the default which is the measure of whether a debtor may assume a contact in which a non-curable, non-monetary default has occurred."); *In re Cumberland Corral, LLC*, No. 313-06325, 2014 WL 948473, at *10 (Bankr. M.D. Tenn. Mar. 11, 2014) ("Where the default is non-monetary and is not curable, the debtor is precluded from assuming an executory contract only if the default was material or if the default caused substantial economic detriment.") (internal quotations omitted); *In re Chapin Revenue Cycle Mgmt., LLC*, 343 B.R. 728, 731 (Bankr. M.D.

Fla. 2006) (same); *In re New Breed Realty Enterprises, Inc.*, 278 B.R. 314, 321 (Bankr. E.D.N.Y. 2002) (same). "Courts examine the provisions of the underlying contract and non-bankruptcy law to determine the nature of a default and the cure it requires for purposes of [section] 365." *In re Empire Equities, supra*, 405 B.R. at 691.

27. As noted, the Debtor is prepared to both promptly cure monetary and non-monetary defaults and provide a letter of credit for security concerning future payments. Conversely, Body Glove has not properly established that the alleged non-monetary defaults are (i) incapable of cure and (ii) go to the "very essence" of the License or result in "substantial economic detriment". The parties' fifteen (15) year relationship – in juxtaposition with Body Glove's laxity in seeking to enforce alleged non-monetary defaults historically – raises factual disputes over materiality which cannot be decided without a full evidentiary hearing.

WHEREFORE, for all of the reasons set forth herein, the Debtor respectfully requests relief consistent with the foregoing.

Dated: New York, NY
       June 25, 2025

                                      Goldberg Weprin Finkel Goldstein LLP
                                      *Counsel for the Debtor, Surf 9 LLC*
                                      125 Park Avenue, 12th Floor
                                      New York, New York 10017
                                      (212) 221-5700

                              By:    <u>/s/ Kevin J. Nash, Esq.</u>