Ira L. Herman
Samuel D. Levy
Martin S. Krezalek
Evan J. Zucker
**BLANK ROME LLP**
1271 Avenue of the Americas
New York, New York 10020

Samuel.Levy@BlankRome.com
Martin.Krezalek@BlankRome.com
Ira.Herman@BlankRome.com
Evan.Zucker@BlankRome.com
(212) 885-5000
*Attorneys for Body Glove IP Holdings, LP*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| In re: | |
|---|---|
| Surf 9 LLC, | Hearing Date: November 19, 2025<br>Hearing Time: 11:00 A.M. (EST)<br><br>Chapter 11<br><br>Case No. 25-40078-JMM |
| Debtor. | |

**OPPOSITION TO CREDITOR TOPOCEAN CONSOLIDATION SERVICE, INC.'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362**

Body Glove IP Holdings, LP ("**Body Glove**"), a creditor of the debtor and debtor in possession in the above-captioned case, Surf 9 LLC ("**Debtor**"), by and through its undersigned counsel Blank Rome, LLP, opposes Topocean Consolidation Service, Inc.'s, ("**Topocean**") October 23, 2025, motion seeking entry of an order granting relief from the automatic stay pursuant to § 362(d) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. ("**Bankruptcy Code**"), Rules 4001(a) and 9014 of the Local Bankruptcy Rules for the Eastern District of New York, and waiving the 14-day stay imposed by Bankruptcy Rule 4001(a)(3), allowing Topocean to liquidate inventory held by Topocean under non-bankruptcy law.

1

## ARGUMENT

1. Creditor Topocean alleges it holds $1,226,420.44 in claims against Debtor for charges related to unpaid invoices for shipping and warehouse services. ECF No. 147 at ¶ 7. To partially satisfy this claim, Topocean requests automatic stay relief to liquidate 421 pallets of inventory worth approximately $401,847.96. *Id.* at ¶ 8. Topocean, a shipping and logistics company, alleges that it has not been paid by the Debtor for shipping this inventory to the United States, and Topocean is currently storing the inventory for Debtor in its California warehouse. *Id.*

2. For the reasons explained below, Topocean does not have sufficient cause for relief from the automatic stay.

## I. AS AN UNSECURED CREDITOR TOPOCEAN IS NOT ENTITLED TO RELIEF FROM THE AUTOMATIC STAY

3. As a general unsecured creditor of the Debtor, Topocean is not entitled to relief from the stay in the Debtor's case. Although Topocean may be a creditor of the Debtor and may have possession of property of the estate - cargo belonging to the Debtor - Topocean's exclusive remedy for an unpaid balance for a prior shipment, under its November 17, 2014, Credit Agreement (Chuan Hsi Liu Declaration Ex. A, hereinafter the "**Liu Declaration**") with the Debtor is for Topocean to withhold Debtor's "cargo." Conversely, the Credit Agreement does not provide Topocean with the remedy of selling or foreclosing on such cargo and Topocean has not identified any authority to do so. The Credit Agreement does authorize Topocean to act as a seller or distributor of the cargo. (*Id.*, *passim*)

4. Topocean is a self-described logistics and shipping company, and nothing more. ECF No. 147 at ¶ 2. To that point, Topocean "entered into that certain Credit Agreement, whereby Topocean agreed to extend credit to the Debtor . . . in connection with providing shipping services to the Debtor." (*Id.* at ¶¶ 2-3; Ex. A; Liu Decl. ¶¶ 5-6). The Credit Agreement does not address

warehousing. Topocean's work as a shipping and logistics company is further confirmed by its Chief Financial Officer on the accompanying Declaration. *Id. See also* https://topocean.com/why-topocean ("The Topocean Group is one of the world's leading freight forwarding logistics and supply chain solutions provider.")

5. Since Topocean, as movant, simply is a general unsecured creditor of the Debtor, "the policies of the automatic stay weigh against" granting relief from the stay. *See In re Residential Cap., LLC*, 501 B.R. 624, 643 (Bankr. S.D.N.Y. 2013).

II. **BODY GLOVE WILL SUFFER IRREPARABLE BUSINESS AND REPUTATIONAL HARM IF TOPOCEAN IS PERMITTED TO SELL THE CARGO BEARING THE BODY GLOVE MARK**

6. If the automatic stay is lifted, Topocean proposes to sell in bulk and at a substantial discount 421 pallets of cargo bearing the Body Glove name and logo, all into territories that are not defined, in quantities that are not defined, and likely at discounted prices. The unauthorized dumping of discounted goods, especially in key markets important to the brand or company, typically leads to critical harm to the goodwill associated with a brand, including its name, reputation, and standing not only among sellers of full-priced goods, but among consumers who will view the discounted goods as cheapening the brand's name and reputation, expecting additional discounts when current inventory enters the market through the company's preferred channels and preferred timing.

7. The unauthorized sale of such a large volume of branded goods outside of their intended channels will expose both the Debtor and Topocean to Lanham Act and state law intellectual property claims and violations, including trademark infringement, dilution, and unfair competition. The Lanham Act authorizes legal remedies such as injunctive relief and damages when goods are sold without authorization, which can lead to consumer confusion and damage to a brand's reputation. This is particularly relevant for "gray-market goods," which are genuine

3

products introduced into markets outside of their intended channels. The sale of 421 pallets of Body Glove inventory will constitute transshipping, essentially the sale of gray-market goods. Further such sales into other territories could violate other exclusive licenses that Body Glove, as the intellectual property owner, has granted, further causing harm to Body Glove.

8. Such unauthorized sales activity will also result in the loss of significant revenue to Body Glove because such goods will not be sold by the Debtor pursuant to the parties' September 2, 2009, License Agreement (as amended) and, therefore, not be subject to account for the royalties for sales as contemplated in the License Agreement. Topocean moves simply to lift the automatic stay; there are no prohibitions contemplated about when and where the bulk inventory will be sold; at what discount; to whom; and the territories that will absorb the inventory, let alone representations about the condition of the inventory.

9. Further, such sale(s) will impact existing channels because aged inventory sold at a possibly substantial discount will be introduced into defined markets already serviced by authorized dealers (or as noted above violate exclusive agreements granted by Body Glove) which will now have to compete against a flood of discounted inventory for which no warranty, service, or other forms of accompanying service may be offered, further reducing the price of the discounted competing goods and harming the reputation of the brand and its distributors.

10. Such bulk sales into unintended markets present critical problems for manufacturers, which can lose significant revenue and margin from price erosion, as well as improper sales and marketing discounts and potential brand reputation risk. Further costs include

handling end-customer issues caused by inadequate customer service, product handling, and a lack of warranty coverage.

11. The unauthorized resale of genuine goods may constitute trademark infringement when the unauthorized sale leads to consumer confusion. *Italverde Trading, Inc. v. Four Bills of Lading Numbered LRNN 120950, LRNNN 122950, LRNN 123580, MSLNV 254064*, 485 F. Supp. 2d 187, 207–08 (E.D.N.Y. 2007). The dumping of gray-market goods into unintended markets at unintended volumes and at unintended times causes consumer confusion on the source or sponsorship of the goods at issue. Such actions deflate prices for an extended period of time, leading consumers to associate the brand with lesser quality.

12. The Lanham Act also precludes trademark dilution. "To prevail on a federal trademark dilution claim, a plaintiff must prove that (1) its mark is famous and distinctive, (2) its mark is used in commerce by the defendants, and (3) the [unauthorized party's] use is likely to cause dilution through either blurring or tarnishment." *Van Praagh v. Gratton*, 993 F. Supp. 2d. 293, 304 (E.D.N.Y. 2014) (quotation omitted). Blurring "refers to the whittling away of the established trademark's selling power and value thorough its unauthorized use by others." *Id.* (quotation omitted).

13. "[T]arnishment arises when the [trademark holder's] trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." *Id.* (quotation omitted). The dumping of discounted goods leads to the perception that the brand is low-quality, blurring the trademark's selling power and tarnishing the brand's reputation.

14. The Lanham Act further prohibits false or misleading advertisement or description of goods. "Section 43(a) of the Lanham Act prohibits any person from 'in commercial advertising

or promotion, misrepresenting the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.'" *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 112 (2d Cir. 2010). This applies in situations where discounted goods are sold in a manner that misleads consumers about the product's origins or quality, such as high-quality, reputable products sold by unauthorized retailers that call into question the quality of the brand.

15. Topocean seeks leave to liquidate Body Glove's products with no consideration given to the integrity of Body Glove's brand or whether goods will be sold to reputable retailers. This will lead to a myriad of possibly irreparable harm and consequences for Body Glove:

    a. **Damaged Brand Reputation**: Consumers may associate the lower quality of retailers with Body Glove itself, leading to Body Glove's loss of trust and goodwill with consumers. *See Hormel Foods Corp. v. Jim Henson Prods., Inc.* 73 F.3d 497, 507 (2d Cir. 1996) ("A trademark may be tarnished where it is 'linked to products of shoddy quality' . . . with the result that 'the public will associate the lack of quality or lack of prestige in the defendant's goods with'" unrelated goods).

    b. **Disruption of Authorized Channels**: The presence of cheaper, unauthorized goods entering unintended markets can undermine authorized distributors and retailers who sell at higher prices. The introduction of gray-market discounted goods into markets not intended to receive such goods may create seller and distributor backlash, causing sellers to substitute products and brands. *See Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 78 ("Goods [] that do not meet the trademark owner's quality control standards will not be considered genuine goods, and their sale will constitute trademark infringement."); *Bayer Corp. v. Custom Sch. Frames, LLC*, 259 F. Supp. 2d 503, 508 (E.D. La. 2003) ("The sale of gray market goods . . . violates the Lanham Act . . because it is likely to cause consumer confusion as to the source[,] nature, or approval of these products."). Additionally, sellers often demand reduced margins from the manufacturer to recover lost sales, and distributors typically consider their own transshipping of goods to compensate for lost sales, actions that completely fracture markets and make it more difficult for later, full-priced sales market penetration.

    c. **Loss of Control**: The sale of gray-market goods in unintended markets causes brands to lose control over the pricing, marketing, and presentation of their products in chosen markets. *Bulova Corp. v. Bulova Do Brasil Com. Rep. Imp. & Exp. Ltda.*, 144 F. Supp. 2d 1329, 1332 (S.D. Fla. 2001) (finding irreparable harm where "Defendant [] threatened to destroy the

      market for [Plaintiff's] products in Brazil by dumping its supply of" products into the chosen market).

  d. **Consumer Disappointment**: Customers who purchase goods expecting a certain quality may be disappointed to see their goods at unexpected discount retailers, leading to negative perceptions of the brand. *See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 641 (1st Cir. 1992) ("[T]he existence of any difference between the [] product and allegedly infringing gray good that consumers would likely consider to be relevant when purchasing a product creates a presumption of consumer confusion sufficient to support a" Lanham Act claim).

  e. **Price Erosion**: Brands carefully set their Manufacturer's Suggested Retail Price ("**MSRP**") and Minimum Advertised Pricing ("**MAP**") in order to maintain product value and brand perception. When unauthorized goods enter the market at prices lower than MSRP or MAP, this undercuts the brand's pricing strategy.

  f. **Dilution**: If a brand loses control over how products are marketed, priced, and positioned, the result is a fragmented brand image. When consumers observe inconsistent pricing, it can erode the perceived value of a brand and make the brand appear less premium. Gray-market goods may also be expired, refurbished, or lack warranties; customers may blame the brand, rather than the unauthorized seller, for these deficiencies.

  g. **Profit Erosion**: When consumers recognize and become accustomed to lower prices, it becomes difficult for brands to sell at the previously standard MSRP or MAP. This erodes profit margins and devalues the brand's positioning and value.

  h. **Market Confusion**: Authorized retailers invest in marketing, customer service, and brand trust. Unauthorized retailers free-ride on these efforts while offering no support of their own. Different price points for the same product can create confusion among consumers, leading to hesitancy to pay higher prices at authorized sellers.

  16. Further, the interests of judicial economy and efficient resolution of the litigation counsel against lifting the automatic stay. If the automatic stay is lifted, property of the Debtor's estate would now be subject to litigation in California. This would fragment the jurisdictions in which the Debtor's estate is being adjudicated and risk an outcome where disposition of the inventory at issue would solely benefit Topocean at the expense of the Debtor and all creditors.

Because of the myriad of Lanham Act harms described above, Surf 9 would have to pursue litigation against both Topocean and Debtor to prevent the dumping of the goods.

17. Finally, the balance of the harms favors keeping the automatic stay in place. As explained above, Body Glove will be harmed by Topocean selling Body Glove branded merchandise and, as a consequence, the Debtor will be liable for Body Glove's damages arising from such sale. Moreover, should Topocean sell the Body Glove branded merchandise, such sale would result in the Debtor's incurable breach of the License Agreement between Body Glove and the Debtor.

## CONCLUSION

18. For all of the foregoing reasons, the Topocean motion for stay relief must be denied.

**WHEREFORE**, based on the foregoing, Body Glove respectfully requests that the Court deny Topocean's motion for relief from the automatic stay under § 362(d)(1) of the Bankruptcy Code and waiver of the 14-day stay provided by Bankruptcy Rule 4001(a)(3).

Dated: November 12, 2025  
      New York, New York

Respectfully submitted,  
**BLANK ROME LLP**

*/s/ Evan J. Zucker*  
Ira L. Herman  
Samuel D. Levy  
Martin S. Krezalek  
Evan J. Zucker  
1271 Avenue of the Americas  
New York, New York 10020  
Samuel.Levy@BlankRome.com  
Martin.Krezalek@BlankRome.com  
Ira.Herman@BlankRome.com  
Evan.Zucker@BlankRome.com  
(212) 885-5000

*Attorneys for Body Glove IP Holdings, LP*